## Page 1

```
 1                UNITED STATES BANKRUPTCY COURT
 2                    DISTRICT OF MINNESOTA
 3  ----------------------------------------------------
 4  In re:                        Chapter 13
 5                                Case No. 15-42460 (KHS)
 6  Paul Robert Hansmeier,
 7
 8          Debtor.
 9  ----------------------------------------------------
10
11
12
13            DEPOSITION OF PADRAIGIN BROWNE
14                 Taken October 28, 2015
15                Commencing at 9:35 a.m.
16
17
18
19
20
21
22
23
24        REPORTED BY:  KELLEY E. ZILLES, RPR
25             www.paradigmreporting.com
```

## Page 2

```
 1      Deposition of PADRAIGIN BROWNE, taken on the 28th
 2  day of October 2015, commencing at 9:35 a.m., at the law
 3  firm of Best & Flanagan, LLP, 60 South Sixth Street,
 4  Suite 2700, Minneapolis, Minnesota, before Kelley E.
 5  Zilles, Registered Professional Reporter and a Notary
 6  Public of and for the State of Minnesota.
 7                        **********
 8
 9                       APPEARANCES
10
11  On Behalf of the Judgment Creditors:
12
13      EDWARD P. SHEU, ESQ.
14      Best & Flanagan, LLP
15      60 South Sixth Street, Suite 2700
16      Minneapolis, Minnesota  55402
17      612.339.7121
18      esheu@bestlaw.com
19
20  On Behalf of the Creditor Alan Cooper:
21
22      PAUL GODFREAD, ESQ.
23      Godfread Law Firm
24      612.284.7325
25      paul@godfreadlaw.com
```

## Page 3

```
 1  On Behalf of the Debtor:
 2
 3      BARBARA J. MAY, ESQ.
 4      Attorney at Law
 5      2780 Snelling Avenue North
 6      Suite 102
 7      Roseville, Minnesota  55113
 8      651.486.8887
 9      barbarajmay@hotmail.com
10
11
12
13  ALSO PRESENT:  Paul Robert Hansmeier
14
15
16
17
18
19
20
21
22      NOTE:  The original transcript will be delivered to
23  Edward P. Sheu, Esq., as the taking party of the
24  deposition.
25
```

## Page 4

```
 1                         INDEX
 2
 3
 4  WITNESS:  PADRAIGIN BROWNE                       PAGE
 5
 6
 7
 8  EXAMINATION BY MR. SHEU............................  6
 9
10
11
12
13  BROWNE EXHIBITS MARKED AND REFERRED TO:
14
15  Exhibit 1   Notice of Issuance of Subpoenas For
16              Rule 2004 Examinations................  7
17
18  Exhibit 2   Form 8879 IRS e-file Signature
19              Authorization......................... 19
20
21  Exhibit 3   1040 U.S. Individual Income Tax
22              Return 2013........................... 19
23
24  Exhibit 4   1040 U.S. Individual Income Tax
25              Return 2014........................... 19
```

800-545-9668
612-339-0545
Paradigm Reporting & Captioning
www.paradigmreporting.com
#90984
Exhibit 2 Page 1

Page 5

| | |
|---|---|
| Exhibit 5 | Supplemental Documentation in Support of Smith's Motion for Reconsideration (ECF No. 189).......................... 29 |
| Exhibit 6 | Copies of Checks Front and Back and Chase Bank Statements.................. 44 |
| Exhibit 7 | Box of Documents Produced............. 53 |
| Exhibit 8 | The Mill Trust........................ 67 |

(Original exhibits attached to original transcript. Copies attached to transcript copies.)

Page 6

PADRAIGIN BROWNE,
duly sworn, was examined and testified as follows:
EXAMINATION
BY MR. SHEU:
Q. Could you please state and spell your full name for the record.
A. Padraigin Browne, P-A-D-R-A-I-G-I-N, Browne, B-R-O-W-N-E.
Q. Ms. Browne, have you ever had your deposition taken before?
A. I have not.
Q. Have you ever given sworn testimony of any other kind?
A. I have not.
Q. Okay. I'm just going to give you a few ground rules for this. I'd ask that you let me finish asking a question before beginning to answer so that we don't create a fuzzy record. And I'll try to do the same when you're answering, not interrupt you. I'll ask that if you don't understand a question that you let me know otherwise I'm going to assume that you understood the question. Are you under any physical or mental impairments that could affect your ability to give truthful testimony today?
A. No.

Page 7

Q. Okay. Any medications that might affect your ability to give truthful testimony today?
A. No.
Q. Do you agree to give truthful testimony today?
A. Yes.
Q. Okay. First I'm going to have the court reporter mark this as Exhibit 1.
    (Browne Deposition Exhibit Number 1
    marked for identification.)
Q. Now I'm handing you what's been marked Exhibit 1. You're here today because of a subpoena, is that correct?
A. Yes.
Q. Okay. Could I have you take a look at Exhibit 1. Is this the subpoena that you've been served with and the reason you're here?
A. I believe so, yes.
Q. Okay. Now if you turn to the page in Exhibit 1 that refers to your reason for being here.
A. Do you know what page it is?
Q. If you flip to the subpoena that begins with your name, do you see it?
A. Yes.
Q. Okay. Now at the end of the subpoena there's a series of requests for documents, it says, "Documents

Page 8

requested," and there's several categories, there's 25 numbered paragraphs, do you see that?
A. Yes.
Q. Did you provide those documents to me today?
A. I believe so.
Q. Okay. Is that the box that is sitting on the table here?
A. Yes.
Q. Okay. So going through them you first provided your tax returns for the past six years?
A. I did not have 2009, but the rest of them, yes.
Q. Okay. Regarding No. 2, transfers to you, did you provide all documents showing any distributions, payments, et cetera, of any kind to you from the debtor?
A. Yes.
Q. And No. 3, did you provide any documents showing your receipt of any money by any company by which the debtor has had an interest in the past six years?
A. Yes.
Q. No. 4, I won't read them, can you just let me know if you provided all documents requested in No. 4?
A. What I had, yes.
Q. Okay. What did you do, by the way, to retrieve the documents requested in the subpoena?
A. I went to the banks, my banks, either accessed

800-545-9668
612-339-0545
Paradigm Reporting & Captioning
www.paradigmreporting.com
#90984
Exhibit 2 Page 2

### Page 9

```
online or if there was no longer online access I went to
the actual bank and requested the information.
   Q.  And which banks did you either go online for or
go physically and request?
   A.  Sallie Mae, Capital One 360, Associated Bank
online, and TCF in person.
   Q.  Okay.  Going back through No. 5, did you provide
the documents requested in No. 5 of the subpoena?
   A.  Yes.
   Q.  How about No. 6?
   A.  Yes.
   Q.  And No. 7?
   A.  Yes.
   Q.  No. 8?
   A.  Yes.
   Q.  No. 9?
   A.  Yes.
   Q.  No. 10?
   A.  Yes.
   Q.  11?
   A.  Yes.
   Q.  12?
   A.  Yes.
   Q.  13?
   A.  Yes.
```

### Page 10

```
   Q.  14?
   A.  Yes.
   Q.  15?
   A.  Yes.
   Q.  16?
   A.  Yes.
   Q.  17?
   A.  Yes.
   Q.  18?
   A.  Yes.
   Q.  19?
   A.  Yes.
   Q.  What software do you use?
   A.  None.
   Q.  Okay.  So some of your answers, when you say
yes, do you mean --
   A.  As in if I have it, I provided it; and if I
don't, I didn't.
   Q.  Okay.  No. 20?
   A.  Yes.
   Q.  As in provided or don't have?
   A.  I don't, I don't believe that we have, we don't
have an accountant.
   Q.  No accountant?
   A.  Right.
```

### Page 11

```
   Q.  Is that a yes?
   A.  Right, I have no accountant.
   Q.  Does the family have an accountant that it's
ever used in the past six years?
   A.  We did use in the past.
   Q.  Who was that?
   A.  Jackie Borster did our taxes.
   Q.  Do you remember for what years?
   A.  2011 and 2012 I believe.
   Q.  Could you spell Borster?
   A.  B, it's either Boyster or Borster, it's
B-O-R-S-T-E-R I believe.
   Q.  And is that person local?
   A.  She is.
   Q.  Do you happen to have her contact information?
       MS. MAY:  I presume it shows on the taxes,
doesn't it?
   A.  Yes, she signed for us those years and her
information is on the tax returns for those years.
       MS. MAY:  It's required by federal law.
   Q.  No. 21, insurance?
   A.  I don't think I gave you my health insurance
number, but I can give you the health insurance card.
Everything else, yes.
   Q.  That's fine.  Life and disability?
```

### Page 12

```
   A.  Yes, that's in there.
   Q.  No. 22?
   A.  Yes.
   Q.  Were there any loans between you and the debtor?
   A.  No.
   Q.  How about any gifts?
   A.  I'm not sure how, I mean, he's obviously given
me birthday presents, Christmas gifts, et cetera, over
the last six years.
   Q.  How about money gifts?
   A.  He helped me pay off my student loans in 2011.
   Q.  Any other gifts of money?
   A.  No.
   Q.  How about No. 23?
   A.  Yes.
   Q.  So were there any transfers of any documents
that you provided today showing transfers of money from
the debtor to you in the past six years?
   A.  Well, the bank account statements show all of
the money that is coming in and out, so.
   Q.  Were there any transfers of money from the
debtor to you in the past six years?
   A.  Yes, before we got married he would write me a
check and then I would write the check for our rent.
   Q.  When did you get married?
```

### Page 13

```
 1  A.  2011.
 2  Q.  So since 2011 there's been no transfers of money
 3  from the debtor to you?
 4  A.  Not of any significant amount that I remember.
 5  Q.  How about No. 24?
 6  A.  Yes, again, bank accounts.
 7  Q.  And then 25 is real estate, did you provide any
 8  documents relating to your real estate?
 9  A.  No, we just moved and I can't find everything,
10  but it's on public record.
11  Q.  All documents relating to your --
12  A.  It should be, I believe it should be on Hennepin
13  County property Web site.
14  Q.  Well, your mortgage wouldn't be.  Your deed
15  would be.
16  A.  Right.  Well, with respect to the mortgage, I
17  had to pay it and I don't keep the stubs after I pay it,
18  so I don't have a current copy of how much we owe.
19  Q.  Do you --
20  A.  And online they don't have, they do not have a
21  printable thing for our mortgage.
22  Q.  Who's the mortgage company?
23  A.  TCF Bank.
24  Q.  What is the monthly mortgage payment?
25  A.  Including taxes it's $4,600, give or take.
```

### Page 14

```
 1  There's some cents involved in that, but approximately.
 2  Q.  And does insurance, do you have to pay real
 3  estate insurance or property insurance?
 4  A.  Do you mean like --
 5  Q.  Like hazard insurance for the property?
 6  A.  Yes, we have insurance through State Farm.
 7  Q.  Is that a separate bill?
 8  A.  Yes.
 9  Q.  And then you have --
10  A.  I think.
11  Q.  And then you have CIC fees?
12  A.  I have no idea what that means.
13  Q.  Condo fees, common interest community fees?
14  A.  Yes, and that is in there, in the box.
15  Q.  In the box you provided today?
16  A.  Yes.
17  Q.  Who's the management company?
18  A.  It used to be, it used to be Gittleman and they
19  changed their name.  I think it's First Service
20  Residential now, I'm not positive.
21  Q.  And do you know what the monthly fees are?
22  A.  Approximately $860 a month.
23  Q.  And other than your mortgage payment which
24  includes real estate taxes, other than State Farm
25  Insurance payments, other than the management fees, are
```

### Page 15

```
 1  there any other expenses that are associated with your
 2  property?
 3  A.  Electric bill.
 4  Q.  Utility bills?
 5  A.  Yes.
 6  Q.  Anything else?
 7  A.  Not that I can think of, no.
 8  Q.  Do you know what the current mortgage loan
 9  balance is right now?
10  A.  I think it just went under 600.  Obviously not
11  $600, $600,000.
12  Q.  When did you purchase the property?
13  A.  I think we signed in March 15, 2013, I'm not
14  positive on the date.
15  Q.  So about two, two and a half years ago?
16  A.  Yeah.
17  Q.  How much did you buy it for?
18  A.  775, so $775,000.
19  Q.  Let me have you turn a few pages in Exhibit 1 to
20  the subpoena directed to Monyet or Monyet, M-O-N-Y-E-T,
21  LLC, do you see this?
22  A.  I do.
23  Q.  Are you appearing on behalf of Monyet?
24  A.  I am not.
25  Q.  Okay.  How do you pronounce it, is it Monyet or
```

### Page 16

```
 1  Monyet?
 2  A.  I don't know.
 3  Q.  Okay.  Have you ever heard of Monyet or Monyet?
 4  A.  Yes, I have.
 5  Q.  Okay.  What is it?
 6  A.  It's an LLC.
 7  Q.  Okay.  Other than being an LLC, do you know
 8  anything about Monyet or Monyet, LLC?
 9  A.  It was a company that's part of our trust and
10  estate planning.
11  Q.  By our, you mean you and the debtor?
12  A.  Yes, our family.
13  Q.  Okay.  So what was the origin of it, who set it
14  up?
15  A.  A trust and estate attorney.
16  Q.  At your direction?
17  A.  It was probably at our, both of ours, it's our
18  trust and estate planning.
19  Q.  Okay.  Is it associated with the Mill Trust,
20  M-I-L-L, trust?
21  A.  It is.
22  Q.  Okay.  Is the Mill Trust actually your family
23  trust?
24  A.  Yes.
25  Q.  Okay.  And your family is you and the debtor and
```

Page 17

1  your two children, is that correct?
2  A. That's correct.
3  Q. Okay. And when was that trust set up?
4  A. I think 2011, I think, I'm not sure.
5  Q. And are there any documents associated with the
6  creation of that trust such as a trust instrument?
7  A. Yes.
8  Q. Did you provide them today with the box of
9  documents?
10 A. I believe so.
11 Q. So the trust document itself is in there?
12 A. I think so, yes.
13 Q. Okay. I just looked through it, I didn't find
14 it.
15         THE WITNESS: Paul?
16 Q. You don't know if it was provided or not?
17 A. No. I thought it was in there, but if it's not,
18 then it's not.
19 Q. Okay. Is the Mill Trust still in existence
20 today?
21 A. I don't know how to answer that. I guess so,
22 yes.
23 Q. And what is the purpose of the trust?
24 A. To provide for our family expenses.
25 Q. How is it funded?

Page 18

1  A. Through transfers from Paul and from his
2  companies.
3  Q. How much is in it now?
4  A. Approximately $8,000.
5  Q. What was the high water mark?
6  A. I don't know.
7  Q. Did you ever have access to the account
8  statements for that trust?
9  A. Yes.
10 Q. Was Monyet the, the funding LLC for the trust?
11 A. I don't know what that means.
12 Q. Well, a trust itself I presume doesn't have its
13 own bank account, is that your understanding?
14 A. I just did what the attorney said to do and I
15 didn't, I don't know how any of it works.
16 Q. What attorney are you talking about?
17 A. The attorney that set up the trust.
18 Q. Who's that?
19 A. I don't remember his name. He's out of Utah.
20 Q. Was it Lee McCullough?
21 A. That sounds familiar.
22 Q. Did you ever have access to the account
23 statements for Monyet or Monyet, LLC?
24 A. Yes.
25 Q. Were you a signatory on that account?

Page 19

1  A. I don't believe so.
2  Q. Where was the account?
3  A. Scottrade I think.
4  Q. Scottrade?
5  A. I think.
6  Q. Is that an online broker?
7  A. Yes.
8  Q. So was the money in stocks as opposed to cash?
9  A. I don't know.
10 Q. I'm sorry?
11 A. I don't know.
12 Q. Who would know most about Monyet and the Mill
13 Trust?
14 A. Paul was the manager of the, of Monyet.
15 Q. You were the trustee, weren't you?
16 A. I was the trustee of the Mill Trust.
17 Q. And as trustee of the Mill Trust, what were your
18 obligations or duties?
19 A. I was in charge of using the money as I saw fit
20 for our family.
21         MR. SHEU: I'm going to have a few more
22 exhibits marked.
23         (Browne Deposition Exhibit Numbers 2 - 4
24         marked for identification.)
25 Q. Ms. Browne, I'm handing you what's been marked

Page 20

1  Exhibits 2, 3 and 4. I'll indicate to you that these
2  were provided by your attorney a few weeks ago.
3         MS. MAY: I'm uncomfortable not seeing the
4  documents my client is seeing.
5         MR. SHEU: I will share them with you.
6  Q. Do you see Exhibits 2, 3 and 4?
7  A. Yes.
8  Q. Are these, and you can take a look through them,
9  are these your 2012, 2013 and 2014 income tax returns?
10 A. That's what they appear to be.
11 Q. Okay. I'll have you first look at 2012 which is
12 Exhibit 2. The second page of it appears to be a W-2
13 from your employer Shumaker & Sieffert, is that correct?
14 A. Yes, that's what it looks like.
15 Q. What is your income at Shumaker & Sieffert?
16 A. I get paid a percentage of the amount I bill.
17 Q. Are you a partner or an associate?
18 A. I'm not, I'm an associate.
19 Q. Okay. What was your income in 2012?
20 A. It appears that it was 55,000 for state and 62
21 for federal, with respect to Social Security it was
22 62,000.
23 Q. When did you begin working at Shumaker &
24 Sieffert?
25 A. 2011.

Page 21

1  Q. Do you remember what your income was in 2011
2  roughly?
3  A. No.
4  Q. Do you believe it was comparable to 2012?
5  A. No, I believe it was more.
6  Q. Was there some reason in 2012 it was lower than
7  2011?
8  A. Yeah, I took five months of maternity leave.
9  Q. Understandable. Do you know what your income is
10 going to be for 2015?
11 A. No.
12 Q. Do you know how much you've been paid to date?
13 A. No.
14 Q. You have no idea how much you've been paid?
15 A. No, I don't look at my W-2.
16 Q. You don't look at your paychecks?
17 A. No.
18 Q. You have no idea how much money you make, is
19 that what you're telling me?
20 A. No, that's correct, I don't know how much I
21 make.
22 Q. I'm going to have you flip ahead in Exhibit 2 to
23 schedule E. Under part 2 of Exhibit --
24 A. I'm not there yet.
25 Q. Excuse me.

Page 22

1  A. Did I miss it? I'm sorry, I don't, I don't know
2  where it is.
3  Q. If you hand it back to me I'll find it. I've
4  turned the page in Exhibit 2 to what's the beginning of
5  schedule E of your 2012 tax return. I see three
6  entities there, do you see that, Steele Hansmeier, PLLC,
7  Under the Bridge, and Big Sky Films, LLC?
8  A. Yes.
9  Q. Are you familiar with any of those entities?
10 A. No.
11 Q. You know nothing about them?
12 A. All I know is that they are somehow related to
13 Paul.
14 Q. You don't know anything beyond that?
15 A. I know Steele Hansmeier was a law firm.
16 Q. What do you know about Under the Bridge?
17 A. Nothing.
18 Q. Nothing at all?
19 A. That's correct.
20 Q. It appears on your tax return and you have no
21 idea what it is?
22 A. That's correct.
23 Q. Same with Big Sky Films, LLC --
24 A. That's correct.
25 Q. Excuse me, we have to make sure not to talk over

Page 23

1  each other.
2  A. Sorry.
3  Q. You have no idea what Big Sky Films, LLC is?
4  A. That's correct.
5  Q. Who would know?
6  A. Paul.
7  Q. The debtor?
8  A. Yes.
9  Q. Would the debtor also know more about Monyet,
10 LLC and the Mill Trust than yourself?
11 A. I don't know.
12 Q. Now you realize that the debtor testified in his
13 debtor's exam a year ago that you would know more than
14 him about Monyet, LLC?
15 A. No.
16 Q. You didn't know that?
17 A. I did not.
18 Q. Was that not an accurate statement?
19 A. I have no idea.
20 Q. So who knows more about Monyet and the Mill
21 Trust, you or the debtor?
22 A. I don't know.
23 Q. I'll have you turn to Exhibit 3 which is the
24 next document. Is this your 2013 tax return?
25 A. It appears to be.

Page 24

1  Q. And what was your income in 2013?
2  A. I don't know.
3  Q. Do you have any idea from looking at your 2013
4  tax return?
5  A. It looks like it was 85 something.
6  Q. 85,000 something?
7  A. Yeah.
8  Q. What's the most you've ever made as an attorney
9  in a year?
10 A. I don't know.
11 Q. Is it more than $100,000?
12 A. Yes.
13 Q. Is it more than $150,000?
14 A. I don't think so, I don't know.
15 Q. What was the starting salary at Shumaker &
16 Sieffert when you began working there?
17 A. As I said, I get paid a percentage of what I
18 bill.
19 Q. I'll have you turn to schedule B of Exhibit 3
20 which is the beginning of the interest and ordinary
21 dividends. It's on Page 4 of the Exhibit 3.
22 A. Okay. Here, okay.
23 Q. Now do you see under part 2 of schedule B
24 Scottrade, Inc.?
25 A. Yes.

800-545-9668
612-339-0545
Paradigm Reporting & Captioning
www.paradigmreporting.com
#90984
Exhibit 2 Page 6

Page 25

1  Q. Is that the Scottrade we were talking about
2  earlier associated with Monyet, LLC?
3  A. I don't know.
4  Q. You don't know anything about this Scottrade?
5  A. There's two Scottrades listed.
6  Q. Okay. Do you know anything about either of
7  them?
8  A. I know Scottrade is a company and I know that
9  they paid us dividends.
10 Q. What did they pay you dividends for?
11 A. I don't know.
12 Q. You don't know why you were being paid money
13 from Scottrade?
14 A. No.
15 Q. Did you set up any Scottrade accounts?
16 A. I have a personal Scottrade account.
17 Q. Is that one of these listed?
18 A. I assume so, yes.
19 Q. Do you know which one it is, the smaller number
20 or the bigger number?
21 A. I believe it's the smaller number.
22 Q. How do you fund your Scottrade account?
23 A. With money I make.
24 Q. From working?
25 A. Yes.

Page 26

1  Q. Do you have a direct deposit from your job at
2  Shumaker & Sieffert?
3  A. I do.
4  Q. Where does it go?
5  A. Associated Bank.
6  Q. And so from Associated Bank you can write checks
7  or make transfers to, for example, Scottrade?
8  A. That's correct.
9  Q. If I have you flip forward a couple of pages to
10 form 8946 you'll see a reference to long-term stocks, do
11 you see that?
12 A. I do.
13 Q. Do you know what that's about?
14 A. No.
15 Q. Have you ever had any long-term stocks?
16 A. I have.
17 Q. What kind of stocks?
18 A. Ones in the stock market, I don't remember the
19 names.
20 Q. Are they chosen individually by you as opposed
21 to a fund?
22 A. That's correct.
23 Q. And are they with Scottrade?
24 A. Yes.
25 Q. Any other companies that you use to invest?

Page 27

1  A. I have a 401(k).
2  Q. Other than the 401(k)?
3  A. I have a Roth IRA.
4  Q. Other than the Roth?
5  A. No.
6  Q. So this long-term stocks, I see sale proceeds
7  95,544. Did you guys sell stocks in 2013?
8  A. That is my guess, yes.
9  Q. Did you play a role in deciding to sell any
10 stocks?
11 A. I don't remember.
12 Q. What would you have done with the 95,000 in
13 proceeds that you received?
14 A. I don't know.
15 Q. It looks like it was sold on July 1, 2013 and
16 you received $95,544?
17 A. Okay.
18 Q. No recollection of what that could be for?
19 A. That's correct.
20 Q. I'll have you turn to what's been marked
21 Exhibit 4. Let me know when you're there.
22 A. Okay.
23 Q. Does this appear to be your 2014 income tax
24 return?
25 A. It does.

Page 28

1  Q. And what was your income in 2014?
2  A. It looks like it was $81,618.
3  Q. How much of that was earned by you as opposed to
4  the debtor?
5  A. I don't know.
6  Q. Can you ascertain that by looking at the tax
7  return?
8  A. I don't know.
9  Q. Do you know what your income was in 2014?
10 A. No.
11 Q. You don't know what you made in 2014?
12 A. No.
13 Q. Was it more than $100,000?
14 A. I don't know.
15 Q. I'll have you flip ahead to form 8949 just like
16 the one we were looking at on Exhibit 3. Again, there's
17 a reference to stock being sold on April 11, 2014 for
18 $19,010, do you see that?
19 A. Yes.
20 Q. And do you know what stocks were sold?
21 A. Nope.
22 Q. Did you give the direction to sell the stocks?
23 A. I don't remember.
24 Q. Okay.
25    MR. SHEU: I'll have another exhibit marked

800-545-9668
612-339-0545

Paradigm Reporting & Captioning
www.paradigmreporting.com

#90984

Exhibit 2 Page 7

(B) Padraigin Browne
10/28/2015
Page: 8

Page 29

1 at this time.
2 (Browne Deposition Exhibit Number 5
3 marked for identification.)
4 Q. I'm going to hand you what's been marked as
5 Exhibit 5. I don't expect you to have read this before,
6 per se, but I'll have you flip ahead. Within Exhibit 5
7 you'll see several exhibits, one is Exhibit H. I think
8 you're a little past it, go back one more. Yep, right
9 there, Exhibit H. So if you flip to the next page
10 you'll see what looks like an opening application for a
11 TCF Bank account, do you see that?
12 A. Yep.
13 Q. And it looks like it's from Monyet, LLC, do you
14 see that?
15 A. Yes.
16 Q. Now did you have any signatory authority for
17 this Monyet, LLC account at TCF Bank?
18 A. No, I don't think so.
19 Q. Did you know about it?
20 A. Yes.
21 Q. You knew it was being opened?
22 A. That's correct.
23 Q. It was being opened as part of the Mill Trust
24 estate plan?
25 A. Presumably, yes.

Page 30

1 Q. I'll have you flip ahead a few pages. And
2 you'll see a Scottrade broker's account application, do
3 you see that?
4 A. I do.
5 Q. And I see two signatures at the bottom for
6 applicant authorized person's signature, they're both
7 dated December 27, 2010. Is one of those your
8 signatures?
9 A. I don't think so.
10 Q. Do you recognize those signatures?
11 A. I'm not sure whose they are, whose.
12 Q. Would you recognize your husband's signature if
13 you saw it?
14 A. Probably not. I don't see him sign things.
15 Q. Have you seen his handwriting before?
16 A. Yes.
17 Q. You guys were married in 2011?
18 A. That's correct.
19 Q. And how long had you been together before that?
20 A. We started, I think we started dating in 2006.
21 Q. Was that in law school?
22 A. Yes.
23 Q. Were you guys in the same class?
24 A. No.
25 Q. Was he ahead of you or were you ahead of him?

Page 31

1 A. He was a 3L and I was 1L.
2 Q. What year did you graduate?
3 A. 2009.
4 Q. What did you do after you graduated?
5 A. I took the bar.
6 Q. What did you do for employment after you took
7 the bar? I presume you passed.
8 A. I did pass the bar, yes. I started working at a
9 law firm called Crawford Manno in about October of 2009,
10 I think October, I'm not positive.
11 Q. How long did you work there?
12 A. I'm really, I'm sorry, I'm really bad at dates.
13 I think until January 2011, but I'm not positive.
14 Q. What did you do after working at that law firm?
15 A. I started working at Shumaker & Sieffert.
16 Q. And you've been there ever since?
17 A. No.
18 Q. Were you with Shumaker & Sieffert for a short
19 period and then left to go somewhere else?
20 A. I quit in 2013, I think it was 2013, and then
21 went back shortly. So I quit in August of 2013 and went
22 back either at the end of December or beginning of
23 January 2014.
24 Q. Quit as in took a leave or quit, quit?
25 A. Quit.

Page 32

1 Q. What for?
2 A. I thought I had another job offer.
3 Q. I'll have you flip ahead a page in Exhibit 5.
4 The next document appears to be the operating agreement
5 of Monyet, LLC, do you see that?
6 A. Yes.
7 Q. Do you know if this was one of the documents
8 that you produced today in the box that's sitting on the
9 table here?
10 A. I don't know.
11 Q. You don't know?
12 A. No.
13 Q. Have you seen this document before?
14 A. I assume, yes, I don't remember.
15 Q. If you turn to Page 18 you'll see the signature
16 pages?
17 A. So yes, I have seen it before, I signed it.
18 Q. Is that your signature?
19 A. It is.
20 Q. Padraigin Lane Browne, trustee of the Mill
21 Trust, is that correct?
22 A. Yes.
23 Q. And you're signing on behalf of the Mill Trust
24 as trustee and the Mill Trust is the member of Monyet,
25 LLC?

Page 33

1  A. That's correct.
2  Q. Is it the sole member?
3  A. Yes.
4  Q. Okay. And Mr. Hansmeier is listed as the
5  manager of Monyet, LLC, is that correct?
6  A. That is correct.
7  Q. Is that your recollection of how it was all set
8  up?
9  A. Yes.
10  Q. This document doesn't seem to be dated. Do you
11  know when this would have been signed?
12  A. No.
13  Q. Was it, do you have a date range? Obviously
14  after law school and before today.
15  A. I would even go after law school and before
16  whatever day that Scottrade was opened.
17  Q. Before the Scottrade was opened in 2010?
18  A. Yep, I'd feel comfortable saying that.
19  Q. Okay. Were you married at this time?
20  A. No.
21  Q. So why, why were you guys setting up a trust
22  when you weren't married?
23  A. We knew we were going to get married.
24  Q. So it was in anticipation of getting married?
25  A. I think so.

Page 34

1  Q. How old were you guys when you, in 2010 let's
2  say?
3  A. Depending on the time of year, I would be 28 or
4  27 I think, yeah.
5  Q. And how old is Mr. Hansmeier?
6  A. He's a year older than me.
7  Q. Do you guys, do you know why you set up a
8  Delaware LLC?
9  A. Because that's where people set up LLC's,
10  Delaware.
11  Q. They set them up here too.
12  A. I'm guessing that Lee McCullough, assuming that
13  is actually the attorney, told us to do it there.
14  Q. How did you find out about Mr. McCullough?
15  A. I don't remember.
16  Q. Did you actually meet with Mr. McCullough?
17  A. In person, no.
18  Q. Do you know if the debtor did?
19  A. No, I don't.
20  Q. I'll have you flip ahead past the operating
21  agreement in Exhibit 5. You'll see a series of
22  Scottrade authorizations to wire brokerage fund
23  documents, do you see those?
24  A. Yes.
25  Q. Now the first one is for an appellate bond, I'll

Page 35

1  just skip past that. And the next one is an
2  investment/loan to Livewire from Monyet, LLC for $10,000
3  transferred in June of 2013, do you see that?
4  A. I do.
5  Q. Are you familiar with Livewire?
6  A. No.
7  Q. Have you ever heard of Livewire?
8  A. Yes.
9  Q. What do you know about it?
10  A. That it's a company.
11  Q. What else other than the fact it's a company?
12  A. That's it.
13  Q. Is it a, is it a company that your husband is
14  associated with in any fashion whatsoever?
15  A. Not that I'm aware of.
16  Q. You have no idea if he's an investor or a
17  creditor of Livewire?
18  A. I don't know.
19  Q. Who handles the finances in your family?
20  A. I need you to be more specific.
21  Q. Well, usually someone pays attention in a family
22  to how much money people have, paying bills and so
23  forth. Is it both of you guys, do you guys do it each
24  yourselves when you set up a trust together before you
25  got married?

Page 36

1  A. I think we both pay some attention to our
2  finances.
3  Q. So you, I'm trying to figure out if you would
4  know what the debtor is up to with his finances, such as
5  investment companies?
6  A. I do not have access to his private bank
7  accounts, just as he does not have access to my personal
8  private bank accounts.
9  Q. What private bank accounts does he have?
10  A. I don't know.
11  Q. So he may have none, is that what you're saying?
12  A. That's correct, or he, yeah.
13  Q. I'll have you flip ahead to the next one which
14  is also Livewire Holdings, a transfer to Livewire
15  Holdings from Monyet in June of 2013 for $10,000.
16  Again, your testimony now under oath is that you have no
17  idea what this could be for?
18  A. That's correct.
19  Q. I'll have you flip ahead to the next one which
20  you can skip, and the next one after that. And then the
21  next one that says recipient is Class Justice, PLLC,
22  $25,000 transfer from Monyet on July 26, 2013, do you
23  see that?
24  A. Yes.
25  Q. Are you familiar with Class Justice, PLLC?

Page 37

1  A. I've heard of it before.
2  Q. You've heard of it?
3  A. Yes.
4  Q. Is that your husband's law firm?
5  A. I think so.
6  Q. You think so, you don't know that for a fact?
7  A. That's correct.
8  Q. I'll have you flip ahead to the next one which hopefully you'll know something about, the recipient is yourself, it's $5,000 on July 30, 2013, the reason for the request is personal transfer. Do you know what that was for?
13       MS. MAY: What was the date on that?
14       MR. SHEU: July 30, 2013.
15  A. I don't remember what the money was for.
16  Q. Do you know where you put the money?
17  A. It went to my Associated Bank account.
18  Q. Do you remember where it went?
19  A. Yes.
20  Q. Do you know what you did with it?
21  A. I can't be positive, it was in 2013.
22  Q. Did you provide in the documents today any statements for Associated Bank?
24  A. I did.
25  Q. For 2013?

Page 38

1  A. Yes, I provided six years of Associated Bank account statements.
3  Q. Did you include copies of checks?
4  A. I did not have those.
5  Q. I'll have you turn to the next page. This is a $30,000 transfer from Monyet, Scottrade account, to yourself on August 27, 2013. Do you know what this was for?
9  A. I don't know the exact specifics of why the money was transferred, no, I don't remember.
11  Q. Under reason for request it says, "Trust agreement," does that ring any bells for you?
13  A. No.
14  Q. You have no idea why your husband was transferring $30,000 to you?
16  A. Probably because we talked about it.
17  Q. Do you know what you would have done with it?
18  A. I can't say for sure, but I'm assuming it went to pay everyday living expenses.
20  Q. It looks like the receiving institution was TCF Financial. Did you have an account at TCF Financial?
22  A. I did.
23  Q. Did you provide bank statements with your, that box?
25  A. Yes.

Page 39

1  Q. Did you provide statements for 2013?
2  A. I provided statements for the entire time that that account was open.
4  Q. Did you also have an Associated Bank account at the same time during 2013?
6  A. Yes.
7  Q. So what was the purpose of having another bank account, that TCF Financial Bank account?
9  A. TCF Bank asked me to open up a personal bank account when we had the, got the mortgage, so I did.
11  Q. And you don't know where this $30,000 went?
12  A. Not specifically, no.
13  Q. Is there any way we'll be able to find that out?
14  A. I would look at the statements that I provided.
15  Q. I'll have you turn to the next page. Actually, you can skip that. And the next page after that is a $25,000 loan from Monyet to Class Justice, PLLC. Are you familiar with your husband having loaned any money to anybody including any entities?
20  A. We would have talked about this, but I don't remember because it was in 2013.
22  Q. Are there any loan agreements that you know of?
23  A. I don't know.
24  Q. Do you know if there's any money that's owed to you or your husband by anybody or any entity?

Page 40

1  A. I personally am not owed any money that I know of.
3  Q. What about your husband?
4  A. I don't know.
5  Q. I'll have you turn to the next page which you can skip and the next page which you can also skip. And then stop where it says the November 22, 2013 transfer of $175,000 to you from Monyet, Scottrade account. What was this for?
10  A. For personal and everyday living expenses.
11  Q. $175,000?
12  A. That's correct.
13  Q. This is transferred to your TCF Bank account?
14  A. Yes.
15  Q. And so the, this $175,000, your sworn testimony is it's all been spent, is that correct?
17  A. Well, the trust currently has approximately $8,000 in it.
19  Q. What was the most the trust ever had?
20  A. I don't know.
21  Q. Who would know?
22  A. I don't know.
23  Q. You don't know who would know about --
24  A. I don't know if anyone would know how much it had, what the maximum amount that was ever in it.

### Page 41

1  Q. Well, there would be some bank record of some
2  sort, wouldn't there?
3  A. I don't know.
4  Q. You don't know?
5  A. That's correct.
6  Q. You're the trustee of this trust, right?
7  A. That is correct.
8  Q. It's kind of your job to know what's in it,
9  isn't that part of the job of a trustee?
10 A. If that's how you want to define it, sure.
11 Q. I'll have you turn to the next page. You'll see
12 a $21,250 transfer to Robert P. Balzebre,
13 B-A-L-Z-E-B-R-E. Do you know who that is?
14 A. I've heard the name before.
15 Q. Where have you heard the name?
16 A. In discussing this.
17 Q. Discussing what?
18 A. Making a loan or whatever this was, this
19 transfer.
20 Q. What was this loan or transfer for?
21 A. I believe, I'm going to say I don't know because
22 I don't remember. It was a while ago.
23 Q. It was December of 2013?
24 A. That's correct.
25 Q. You don't remember two years ago --

### Page 42

1  A. That's correct.
2  Q. -- a $21,000 loan? I'll have you turn, skip the
3  next page and then stop at the next one where there's
4  the $70,000 transfer to you from Monyet, Scottrade
5  account, on February 7, 2014. Do you know what that was
6  for?
7  A. That money was used for everyday living
8  expenses.
9  Q. What expenses are those?
10 A. Our mortgage, daycare, my personal car payment,
11 food, utilities. I don't know, what everybody spends
12 money on.
13 Q. Is that money all gone?
14 A. There's approximately $8,000 left in the trust
15 account.
16 Q. At some point did you ever hear how your husband
17 had a judgment against him?
18 A. Yes, I am aware that there is a judgment against
19 my husband.
20 Q. There's a few judgments, is that correct, is
21 that your understanding?
22 A. I don't know the specifics. I know we're here
23 today.
24 Q. When did you first learn about any judgments or
25 liabilities that your husband had?

### Page 43

1  A. I don't know.
2  Q. I'll have you flip ahead a couple of pages to
3  the authorization to wire money to Chisholm Properties
4  South Beach, Inc., do you see that?
5  A. I do.
6  Q. What is Chisholm Properties South Beach?
7  A. I don't know.
8  Q. You've never heard of it?
9  A. I don't remember hearing about it, I don't
10 remember that specific name.
11 Q. Do you guys have any property in Florida?
12 A. No.
13 Q. Do you know anybody with property in Florida?
14 A. I don't, yes, I do know some people that have
15 property in Florida.
16 Q. Who's that?
17 A. Paul's aunt, for one.
18 Q. Anybody else?
19 A. I know, that's the only person I feel
20 comfortable for sure saying has property in Florida.
21 Q. Have you ever invested any money --
22 A. No.
23 Q. -- in Florida property?
24 A. No.
25 Q. Have you ever invested any money in Florida

### Page 44

1  property?
2  A. No.
3  Q. Do you know if Paul has?
4  A. I do not.
5  Q. So he could have since you don't know?
6  A. I don't know.
7  Q. Okay. We can set aside Exhibit 5. And by the
8  way, let me know if you ever need to take a break to go
9  to the bathroom, get a drink of water.
10         MS. MAY: Can you make sure that I get
11 copies of the exhibits?
12         MR. SHEU: Yes.
13         MS. MAY: Ms. Court Reporter, make sure
14 that you catch that I asked for copies of the exhibits.
15         MR. SHEU: My intention is to leave the
16 exhibits that have been marked with the court reporter
17 and have the transcript include all of the exhibits.
18         MS. MAY: But I won't necessarily be asking
19 for a copy of the transcript, which is why I'm asking
20 for a copy of the exhibits.
21         MR. SHEU: Okay. Can we mark another one.
22         (Browne Deposition Exhibit Number 6
23         marked for identification.)
24         (Attorney Paul Godfread entered the
25         deposition room.)

Page 45

BY MR. SHEU:
Q. I'm handing you what's been marked Exhibit 6. I'm going to ask you to take a look at it, please.
A. **Before we go any farther, I wasn't expecting anyone that was not you here and it was my understanding that this was just for this bankruptcy.**
Q. We should make a record. Mr. Godfread has entered the room. Mr. Godfread is an attorney of record in the bankruptcy, he's noticed his appearance.
    MR. GODFREAD: Do you want me to state anything further on the record? Paul Godfread appearing both as a creditor and a representative of another creditor in the bankruptcy proceeding.
BY MR. SHEU:
Q. Okay. And the first page of what's been marked Exhibit 6, you'll see at the very top an Alpha Law Firm, LLC check made payable to the U.S. Treasury, do you see that?
A. **I do.**
Q. And it's for $196,865 on April 16, 2012, do you see that?
A. **Yes.**
Q. Do you know what that was for?
A. **I'm not positive.**
Q. Could it have been to pay estimated taxes?

Page 46

A. **That is possible.**
Q. Who handled the taxes in 2012?
A. **It looks like we had someone prepare our taxes, Jackie Borstner prepared our taxes in 2012.**
Q. And you're looking at Exhibit 2?
A. **Yes.**
Q. Do you know if that payment would have been for estimated taxes or for --
A. **I do not know.**
Q. Do you remember actually making any checks out for taxes yourself or did your husband handle it?
A. **I don't remember.**
Q. I'll have you flip ahead a couple of pages in Exhibit 6 to a check, that's the one dated February 6, 2013?
    MS. MAY: What is Exhibit 6?
    MR. SHEU: This was an exhibit in the application.
Q. You'll see a February 5th, 2013 check from Alpha Law Firm to Class Action Justice Institute for $65,970, do you see that?
A. **I do.**
Q. Are you familiar with Class Action Justice Institute?
A. **No.**

Page 47

Q. You've never heard of it?
A. **I don't remember.**
Q. How about Alpha Law Firm, have you ever heard of Alpha Law Firm?
A. **I have.**
Q. What do you know about it?
A. **It's a law firm.**
Q. What else do you know about it?
A. **It was run by Paul I believe.**
Q. Do you know what kind of law he practiced?
A. **No, I don't know what he practiced with Alpha Law Firm.**
Q. Do you know what the $65,970 payment would be for?
A. **No.**
Q. I'll have you turn one more page. Do you see a check written out on July 26, 2010 from Alpha Law Firm to Media Copyright Group, LLC for $2,000, do you see that?
A. **I do.**
Q. Are you familiar with Media Copyright Group, LLC?
A. **I am not.**
Q. Never heard of it?
A. **I don't know if I've heard of it, but I don't**

Page 48

remember it if I have.
Q. I'll have you turn ahead a page. There's a series of checks starting in the middle and going to the bottom, two are from Mr. Hansmeier to Monyet, LLC, do you see that?
A. **I do.**
Q. Was this basically the funding of the trust we were talking about earlier?
A. **I think so.**
Q. The bottom check is for $2,250 to the law offices of Lee McCullough, M-C-C-U-L-L-O-U-G-H, III, PA, do you see that?
A. **I do.**
Q. Is that the attorney you believe set up the Mill Trust and Monyet, LLC --
A. **Yes.**
Q. -- estate plan?
A. **Yes.**
Q. Does it make sense that maybe in December of 2010 is the time period of when the trust was set up?
A. **That is possible.**
Q. Other than the Mill Trust, are you a trustee or beneficiary of any other trust?
A. **I don't know.**
Q. You don't know?

800-545-9668
612-339-0545
Paradigm Reporting & Captioning
www.paradigmreporting.com
#90984
Exhibit 2 Page 12

Page 49

1   A. No, I don't know.
2   Q. You don't know if you are the trustee of any
3 other trust?
4   A. You asked a compound question.
5   Q. Okay. Do you know if you're the trustee of any
6 other trust?
7   A. No, I don't believe that I am.
8   Q. Do you know if you're the beneficiary of any --
9   A. I do not know.
10  Q. Do you guys have a home office?
11  A. Yes.
12  Q. At the Carlisle?
13  A. Yes.
14  Q. Is it like a room, like a segregated room or is
15 it a place you rent out?
16  A. It's a portion of our bedroom.
17  Q. Do you pay, you don't pay separate rent on it
18 though, it's part of the --
19  A. It's a home office, as in it's part of our home.
20  Q. Okay. Now you guys are living somewhere else,
21 is that correct?
22  A. That is correct.
23  Q. Where are you living?
24  A. 3749 Sunbury Alcove, Woodbury, 55125.
25  Q. Are you renting?

Page 50

1   A. We are.
2   Q. Who are you renting from?
3   A. An individual person.
4   Q. Who is the individual person?
5   A. I don't remember how to spell her name.
6   Q. Do you know how to say her name?
7   A. Xu Dai maybe.
8   Q. Xu Dai?
9   A. Yes. It's, I think her first name is X-U, but I
10 don't remember if there's other letters. And I believe
11 the last name is D-A-I.
12  Q. What are you paying for rent?
13  A. 1,950 a month.
14  Q. Who's paying the rent, you or the debtor or both
15 of you?
16  A. We are paying it jointly as joint tenants to the
17 property.
18  Q. When did you move into that place?
19  A. October 5th.
20  Q. Is it a month-to-month lease or a yearly lease?
21  A. It is a six-month lease.
22  Q. And what's, what kind of work are you doing now
23 on the unit 3201 of the Carlisle?
24  A. We are redoing the floors, replacing the carpet,
25 painting, having some plumbing work done, having light

Page 51

1 fixtures changed. And I, I think that's it, I'm not
2 positive.
3   Q. Did you get a quote for the construction work?
4   A. We got individual quotes. Oh, and eventually it
5 will be staged for sale.
6   Q. Yeah. Did you, what's the cost of all the
7 repair work and fixing up?
8   A. I don't remember off the top of my head.
9   Q. I understand you're going to list it for
10 $950,000, did I hear that correctly?
11  A. We will have a final decision on that after the
12 repair work is done.
13  Q. Who are you using as a realtor?
14  A. Ben Ganje.
15  Q. Can you spell that?
16  A. G-A-N-J-E.
17  Q. First name is Ben?
18  A. Mm-hmm.
19  Q. Is this an individual or company?
20  A. He's with Lakes Sotheby's.
21  Q. Lake Sotheby's?
22  A. Lakes Sotheby's.
23  Q. Lake Sotheby's?
24  A. Lakes, L-A-K-E-S, and then --
25  Q. Sotheby's?

Page 52

1   A. Yes.
2   Q. Do you know when you're going to make a decision
3 on the listing price?
4   A. We have not scheduled a final appointment with
5 him yet.
6   Q. Has he told you the range of what you may want
7 to list it for?
8   A. We've heard from 900,000 to 1.3.
9   Q. Are you familiar with any other recent sales of
10 comparable apartments, excuse me, condos in your
11 building?
12  A. There aren't very many comparable units in our
13 building.
14  Q. So you haven't heard of any sales?
15  A. No.
16  Q. Now in the petition papers in this case there
17 was an estimated value of $885,000. Do you believe it's
18 worth more than that?
19  A. I'm hoping after the renovations it is, but I
20 believe that $885,000 is the number that the county
21 assessor provided us for our taxes.
22  Q. Are you familiar with the Barry Berg Group?
23  A. No.
24  Q. What's your timeline to sell the place after
25 it's fixed up and listed?

Page 53

```
 1   A.  As soon as possible.
 2   Q.  Why so quickly?
 3   A.  So that we can lower our overhead and hopefully
 4  pay off the, this stuff.
 5   Q.  What's this stuff?
 6   A.  The bankruptcy.
 7   Q.  I want to turn your attention back to the Mill
 8  Trust and Monyet.  Do you know if the Mill Trust is a
 9  revocable trust?
10   A.  I have no idea.
11   Q.  It would say so on the trust documents probably?
12   A.  Yes.  I don't remember.
13   Q.  Do you know if there's a spendthrift clause?
14   A.  I don't know what that means.
15   Q.  And you're representing that there's in the box
16  of documents you brought today a copy of the Mill Trust?
17   A.  I think there is.
18   Q.  Okay.
19       MR. SHEU:  Why don't we mark that stack as
20  Exhibit 7.
21       (Browne Deposition Exhibit Number 7
22        marked for identification.)
23   Q.  I'll have you flip through Exhibit 7 and find
24  the Mill Trust for me.
25   A.  There is over 2,000 pages of documents here.
```

Page 54

```
 1   Q.  Okay.  Well, you're telling me it's in there
 2  somewhere, I didn't see it.
 3   A.  Paul and I put it together together, it was my
 4  understanding this could be in there and I don't know if
 5  it is or not, other than that was my understanding.
 6   Q.  Okay.  I went through the documents and they're
 7  in --
 8   A.  I can spend an hour going through that if you
 9  want, but I --
10   Q.  Well, I spent 15 minutes going through it.  They
11  are in no order whatsoever, in fact, they appear to be
12  deliberately out of order.  So if there's the Mill Trust
13  in there, I'd love to find it.
14       MR. HANSMEIER:  Mr. Sheu, rather than have
15  my wife page through 2,000 pages of documents, I'd be
16  glad when I go back to my office to send you a copy to
17  your personal email, a copy of that.  So regardless of
18  whether you can find it or not right now, you'll have it
19  this afternoon.
20       MR. SHEU:  Well, I'm taking her deposition,
21  I don't want to ask, be asking you questions at the same
22  time.
23   A.  Do you mind if I take out portions after I look
24  through them?
25   Q.  Please do.  In fact, if you want to take a look
```

Page 55

```
 1  at Exhibit 1 and --
 2   A.  I can't look at two things at once.
 3       MS. MAY:  Mr. Sheu, she's not even a fifth
 4  of the way through it.  We've all sat here in dead
 5  silence for 20 minutes while she digs through 2,100
 6  pages of documents.  Is there a better plan than this?
 7       MR. SHEU:  Why don't we do this.  We can
 8  take a short break while Ms. Browne takes a look at
 9  Exhibit 1 and puts into piles categories of documents.
10   A.  I'm not organizing this for you.
11   Q.  Well, the alternative would be for me to then
12  ask you where in the stuff you sent me are the various
13  categories of documents which I've listed by category,
14  tax returns, transfers to you.  Monyet, LLC is its own
15  category, we went through it earlier, and you said you
16  either produced it or didn't have it.
17       MS. MAY:  I can tell you that my client is
18  not going to be your administrative assistant today.
19  And I'm going to object to having her sort through your
20  documents.
21       MR. SHEU:  I'm trying to see if the
22  documents are actually produced.  This was a subpoena
23  for documents.
24       MS. MAY:  And we have produced them.
25       MR. SHEU:  And we have yet to see if they
```

Page 56

```
 1  were produced.
 2       MS. MAY:  Well, maybe that's because you
 3  didn't ask for them in advance.  You had them delivered
 4  at the moment the deposition was to start and you left
 5  them out in the hallway for 45 minutes.  So it isn't our
 6  fault that you never read or reviewed the documents.
 7  And I don't think we should all sit here while you use
 8  the deponent as a slave to dig through your documents.
 9       MR. SHEU:  I went through the documents in
10  15 minutes and I didn't find any Mill Trust documents
11       MS. MAY:  And we've offered an alternative
12  to that.  We can provide a copy of the Mill Trust
13  document.  I think I have it in my office, he has it in
14  his office.  If it isn't in there, we can certainly
15  provide it.  But this appears just to be petty and
16  punishment and I want that on the record.
17       MR. SHEU:  I want it on the record that
18  this is the most bad faith production of documents I
19  have ever seen.  They are not in any order, and in fact,
20  they are deliberately out of order, they're upside down.
21   A.  I didn't see a single page upside down as of
22  yet.
23   Q.  That's because I put them in the right order
24  when I reviewed them before the deposition started, at
25  least most of them.
```

Page 57

1  MR. HANSMEIER: Mr. Sheu, I'll reiterate my
2  request for my offer to go to my office and grab you a
3  copy of it. I believe you just missed it when you went
4  through the documents. I don't think you can
5  realistically go through 2,000 pages of documents in
6  15 minutes. But we can isolate the document for you,
7  you can have it very shortly and we can stop this
8  charade of forcing my wife to page by page through 2,100
9  documents when you have a good faith legitimate
10 alternative before you.
11     MR. SHEU: We can adjourn the deposition
12 and reconvene it after I have it.
13     MR. HANSMEIER: Sure, that's not a problem.
14     MS. MAY: I know we have also produced it
15 to the Chapter 13 trustee.
16  A. And it's actually not on the subpoena. It says
17 Monyet, but not Mill Trust on your subpoena, so.
18     MR. HANSMEIER: Why don't we adjourn.
19     MR. SHEU: We're not adjourning, this is my
20 deposition.
21     MR. HANSMEIER: You just said.
22     MR. SHEU: I'd like to see if it's in there
23 before we adjourn.
24     MS. MAY: Okay. Well, pass it back over to
25 him and let him go through it, you're done.

Page 58

1  A. Here you go. And this is what I've looked
2  through so far.
3     MR. SHEU: Okay. I'm just going to make a
4  record that the box of documents that was produced today
5  is in no discernible order and there apparently is no
6  Mill Trust record in it.
7  A. You can't actually say that since you haven't
8  actually looked through all 2,000 pages.
9  Q. Okay. Well, I have looked through all 2,000
10 pages. There's duplicates in there, there's two sets of
11 Alpha Law Firm bank records at TCF, two duplicate sets.
12 There's no Mill Trust anywhere in there.
13     MR. SHEU: So if you have it and you're
14 going to produce it, great, we can adjourn the
15 deposition and reconvene after you've produced it. If
16 you want to do that this afternoon, that's fine.
17     MS. MAY: Or if you want to dig through
18 there and find it, that's fine.
19     MR. HANSMEIER: Mr. Sheu, my office is ten
20 minutes away, I can walk over there, print off the
21 document and bring it back.
22     MR. SHEU: It's quarter to 11 now. Why
23 don't you do that, we'll reconvene at 11:30.
24     MS. MAY: It's ten to 11:00.
25     MR. HANSMEIER: No problem.

Page 59

1     MR. SHEU: Okay. We'll go off the record
2  and we'll come back at 11:30.
3     (Short break taken at 10:52 a.m.)
4  BY MR. SHEU:
5  Q. Ms. Browne, the debtor on his schedules in this
6  case listed some business rent of $2,173 a month. Do
7  you know if your husband rents out space for his, for
8  his business?
9  A. I think so.
10 Q. Do you know where it is located at?
11 A. I'm not sure.
12 Q. You don't know where your husband works?
13 A. I know he has an office downtown.
14 Q. You don't know where?
15 A. That's correct.
16 Q. Have you ever been to his place of work?
17 A. Yes.
18 Q. Where is it?
19 A. It's downtown.
20 Q. Where downtown?
21 A. In one of the buildings down here.
22 Q. Which building?
23 A. I don't know the name.
24 Q. What's the address?
25 A. I don't know the address.

Page 60

1  Q. Is it the Fifth Street Towers?
2  A. I have been to the Fifth Street Towers, I do not
3  believe that is where his physical office is.
4  Q. Do you know what the building looks like?
5  A. It's tall and white or silver or something.
6  Q. Now you have a car payment?
7  A. I do.
8  Q. What is your monthly car payment?
9  A. Approximately 830 something I think.
10 Q. How much do you have left on it to pay off?
11 A. I'm not sure.
12 Q. When did you buy it?
13 A. July 2012.
14 Q. Was it bought new?
15 A. Yes.
16 Q. Do you know what the total purchase price was?
17 A. I do not remember.
18 Q. What kind of car is it?
19 A. An Audi Q7.
20 Q. Is it the family car?
21 A. Yes.
22 Q. Do you guys have any other vehicles?
23 A. We just started leasing another car.
24 Q. What car is that?
25 A. It is a Toyota Prius.

Page 61

1  Q. When did you start leasing it?
2  A. October 5th or 4th.
3  Q. Of this year?
4  A. Or 3rd, whatever, that weekend. Right before we
5  moved because we need two cars now.
6  Q. And who drives the Prius?
7  A. It depends on the day.
8  Q. So you guys both drive both cars?
9  A. Yes.
10 Q. How much is the lease on the Prius?
11 A. I, I don't remember.
12 Q. You don't remember 20 days ago?
13 A. No. I can give you a ballpark, but that's it.
14 Q. Yeah, what's your ballpark?
15 A. Under 300.
16 Q. Under 300, is that correct?
17 A. Yes.
18 Q. Where are you leasing it from?
19 A. A Toyota dealership.
20 Q. Are you signatory on the lease?
21 A. I am.
22 Q. Is your husband as well?
23 A. No.
24 Q. Do you pay the lease payments?
25 A. I will be.

Page 62

1  Q. Are you the one responsible for the mortgage
2  payments at the condo, at the Carlisle?
3  A. I don't understand what you mean by responsible.
4  Q. Do you pay, are you the one that --
5  A. It comes out of my personal checking account.
6  Q. Is that true for the rent you're paying at the
7  house in Woodbury as well?
8  A. So far it has, but we paid once, so.
9  Q. So you're paying the Carlisle mortgage payments
10 and the rent payments in Woodbury, is that correct?
11 A. That's what's coming out of my personal bank
12 account, yes.
13 Q. At Associated Bank?
14 A. Yes.
15 Q. How about the other household expenses like
16 daycare and so forth, does that come out of your
17 personal bank account?
18 A. It does.
19 Q. Do all the household expenses come out of your
20 personal bank account?
21 A. Currently, yes.
22 Q. Do any come out of your husband's bank accounts?
23 A. I don't know. I don't know that he has any.
24 Q. Any bank accounts?
25 A. I know he has a joint bank account with me.

Page 63

1  Q. Is that at Stonebridge?
2  A. There's one at Associated and one at
3  Stonebridge.
4  Q. And those are sort of nominal amounts of money
5  in them?
6  A. The Stonebridge account has a nominal amount in
7  it.
8  Q. And the Associated one does as well?
9  A. I'm not sure what it has in it currently.
10 Q. Less than a thousand dollars?
11 A. I'm not sure.
12 Q. And what credit cards do you have, either you
13 personally or you with your husband?
14 A. I have a Citi card, a Chase, Capital One,
15 Target, Bank of America, Banana Republic, maybe some, I
16 don't know, Loft, did I say that.
17 Q. Have you engaged the real estate broker you
18 talked about earlier, Ben Ganje of Lakes Sotheby's, do
19 you have a listing agreement or a broker agreement with
20 him?
21 A. We do.
22 Q. When did you enter into that agreement?
23 A. Either in September or October of this year.
24 Q. When did you decide to sell the condo?
25 A. At around the time we entered the agreement.

Page 64

1  Q. September or October of this year?
2  A. Mm-hmm.
3  Q. Do you have any expenses that are not household
4  expenses, like just your own personal ones that you have
5  to pay out of your separate accounts?
6  A. I don't understand.
7  Q. Do you have any expenses you have to pay, bills
8  and so forth that are not joint household bills?
9  A. Well, the car is mine.
10 Q. Okay, so car.
11 A. If I buy clothes I pay for them myself.
12 Q. Do you still have student loans?
13 A. No.
14 Q. When were they paid off?
15 A. I don't remember exactly.
16 Q. Other than the Mill Trust which as soon as the
17 copy comes back we'll take a look at, are there any
18 other entities, corporate entities that you have an
19 interest in or an involvement in?
20 A. I don't think so.
21 Q. You've never signed an LLC agreement other than
22 as trustee of the Monyet?
23 A. Not that I remember.
24 Q. So you were never a member of Guava, LLC?
25 A. That's correct.

Page 65

1  Q. How about AF Holdings, LLC?
2  A. I was not a member of AF Holdings.
3  Q. Do you know who was?
4  A. No.
5  Q. How about Guava?
6  A. No.
7  Q. How about Ingenuity 13?
8  A. I do not know and I was not a member.
9  Q. How about Livewire Holdings?
10 A. I do not know and I was not a member.
11 Q. How about Media Copyright Group?
12 A. I do not know and I was not a member.
13 Q. How about Prenda Law, Inc.?
14 A. I do not know and I was not a member.
15 Q. Do you know if your husband was a member of any
16 of those entities I just mentioned?
17 A. It is my understanding that he is not, or was
18 not.
19 Q. Is not or was not?
20 A. Correct.
21 Q. Was not as well as is not?
22 A. Well, I don't know if they currently exist, but
23 it's my understanding that he is not now and has never
24 been a member of the ones that you listed, but I could
25 be wrong.

Page 66

1  Q. So it sounds like you've heard of those entities
2  that I just mentioned?
3  A. I've heard of Prenda because it's in the news.
4  Q. What about Livewire Holdings?
5  A. I have heard of it once or twice before, don't
6  know what it does.
7  Q. Where did you hear about it?
8  A. I don't remember.
9  Q. You've never seen any documents?
10 A. I don't remember.
11 Q. If you add up all your monthly expenses, the
12 condo that you pay, the house that you're now renting,
13 your car payment, it sounds like that's more than what
14 you've earned, is that accurate?
15 A. Yes.
16 Q. So how are you paying --
17 A. That's why there's only $8,000 left in the
18 trust.
19 Q. How are you paying your expenses now?
20 A. There's $8,000 left in the trust.
21 Q. But it sounds like after a month of mortgage and
22 a house, that's going to last a couple of months?
23 A. Well, hopefully we'll have sold the house in a
24 couple of months.
25 Q. So you have no other assets of any kind directly

Page 67

1  or indirectly other than the $8,000 that's in the Monyet
2  trust?
3  A. There's money in various accounts as reflected
4  in the papers that I provided you.
5  Q. So all the papers that you provided, which we'll
6  get back in a second, reflect the world of your net
7  worth?
8  A. Yeah, that and the condo, yep.
9  Q. Okay.
10    MR. SHEU: Why don't we take a break while
11 we wait for the documents, I'll go check on them.
12    (Short break taken at 11:39 a.m.)
13    (Browne Deposition Exhibit Number 8
14    marked for identification.)
15 BY MR. SHEU:
16 Q. Ms. Browne, I'm going to hand you back
17 Exhibit 7. And I'm not going to ask you to do much with
18 it other than just let me know if Exhibit 7 accurately
19 is what you guys produced to me today?
20 A. I can't do that because I didn't see it being
21 copied, so I don't know. I mean, you're the only person
22 that can tell me if it's an accurate copy of what we
23 provided for you.
24 Q. Okay. Well, assuming I accurately copied it, is
25 what you've provided today the world of documents that

Page 68

1  you could find responsive to the subpoena?
2  A. Yes.
3  Q. Okay. Now I'm going to hand you what's been
4  marked Exhibit 8 and ask you if you can identify it for
5  me?
6  A. It is a copy of the Mill Trust.
7  Q. And is this the Mill Trust that you provided to
8  me during the break?
9  A. Yes.
10 Q. So going back a bit. Lee McCullough who is
11 listed at the end of the document as the trust
12 protector, can you see that at the end of the document?
13 A. Yes.
14 Q. Okay. Do you know why you have a trust
15 protector set up with this trust?
16 A. Nope.
17 Q. What was your plan in setting up this trust?
18 A. I don't know.
19 Q. You don't know why you set this trust up?
20 A. It's for estate planning.
21 Q. What about, can you expand on that?
22 A. No.
23 Q. You can't expand on that?
24 A. That's correct.
25 Q. Where did you get the name the Mill Trust?

Page 69

1  A.  I don't remember.
2  Q.  Is it fair that your husband knows more about
3  this trust than you?
4  A.  I don't know.
5  Q.  Okay.  He testified previously that you would
6  know more about this than he would?
7  A.  I don't know what he testified to previously.
8  Q.  Okay.  He also testified that after one day of a
9  debtor's exam he came back for another day and said that
10 he had spoken to you and that you had reminded him about
11 wills and trusts.  Do you remember speaking to him about
12 wills and trusts?
13 A.  I don't, no.  I don't even know when the debtor
14 exam happened, so I have no idea what happened around
15 that time.
16 Q.  Okay.  It was in June and July of 2014?
17 A.  I don't remember what we talked about in June or
18 July of 2014.
19 Q.  Of all the people in the world who would know
20 the most about the Mill Trust, this Exhibit 8, who would
21 that be?
22 A.  I don't know.
23 Q.  You don't know?
24 A.  That's correct.
25 Q.  Do you know today why it's set up?

Page 70

1  A.  It was set up for trust and estate planning.
2  Q.  What do you mean by trust and estate planning?
3  A.  I mean trust and estate planning.
4  Q.  What does that mean?
5  A.  I don't know.
6  Q.  You don't know?
7  A.  I don't know other than what it says in here.
8  Q.  Did you draft this document?
9  A.  I did not.
10 Q.  You did sign the document?
11 A.  That's correct.
12 Q.  You must have read it before you signed it?
13 A.  I did, back in 2010.
14 Q.  Has there been any amendments to this trust?
15 A.  Not that I'm aware of.
16 Q.  Have you signed any other documents relating to
17 this Mill Trust?
18 A.  I have not signed any amendments to the Mill
19 Trust.
20 Q.  Has the Mill Trust filed its own tax returns?
21 A.  No, it's a trust.
22 Q.  So it must be a revocable trust?
23 A.  I don't know, you'd have to read the document.
24 Q.  In other words, could you guys revoke that right
25 now if you want to?

Page 71

1  A.  I don't remember.  I'd have to read through it
2  again.
3  Q.  Okay.
4      MR. SHEU:  Well, at this point I'm going to
5  adjourn my questioning with the reservation that I get
6  to fully review Exhibit 7, what was produced today, and
7  reserve the right to reconvene.  I'll ask if Mr.
8  Godfread has any questions that he would want to ask?
9      MR. GODFREAD:  No, not at this time.
10     MS. MAY:  I have nothing.
11 BY MR. SHEU:
12 Q.  Okay.  Thank you for your time.
13 A.  Thanks.
14     (Proceedings adjourned at 11:50 a.m.)

Page 72

1           REPORTER'S CERTIFICATE

3  STATE OF MINNESOTA   )
4                       ) ss.
   COUNTY OF WASHINGTON )

6      I hereby certify that I reported the deposition of
7  Padraigin Browne on the 28th day of October 2015, in
   Minneapolis, Minnesota, and that the witness was by me
8  first duly sworn to tell the whole truth;
       That the testimony was transcribed by me and is a
9  true record of the testimony of the witness;
10     That the cost of the original has been charged to
   the party who noticed the deposition, and that all
11 parties who ordered copies have been charged at the same
   rate for such copies;
12     That I am not a relative or employee or attorney or
   counsel of any of the parties, or a relative or employee
13 of such attorney or counsel;
14     That I am not financially interested in the action
15 and have no contract with the parties, attorneys, or
   persons with an interest in the action that affects or
16 has a substantial tendency to affect my impartiality;
17     That the right to read and sign the deposition by
   the witness was waived.
18     WITNESS MY HAND AND SEAL THIS 28th day of October
19 2015.

24 Kelley E. Zilles, RPR
   Notary Public, Washington County, Minnesota
25 My commission expires 1-31-2020

800-545-9668
612-339-0545

Paradigm Reporting & Captioning
www.paradigmreporting.com

#90984

Exhibit 2 Page 18