## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:                                                    BKY No. 15-42460
                                                          Chapter 7 Case

Paul Hansmeier,

      Debtor.

---

### NOTICE OF HEARING AND MOTION FOR ORDER
### COMPELLING BARBARA MAY
### TO TURN OVER ESTATE PROPERTY

---

1.    Randall L. Seaver, the Chapter 7 trustee herein, moves the court for the relief request below and gives notice of hearing herewith.

2.    The Court will hold a hearing on this motion at 9:30 a.m. on March 23, 2016. The hearing will be held in Courtroom 8W, U.S. Bankruptcy Court, 300 South Fourth Street, Minneapolis, MN 55415.

3.    Any response to this motion must be filed and served by delivery not later than March 18, 2016 which is five days before the time set for the hearing (including Saturdays, Sundays and holidays).   UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.

4.    This Court has jurisdiction over this motion under 28 U.S.C. § 157 and § 1334 and Bankruptcy Rule 5005.  This motion is filed under Local Rule 9013-2, this proceeding arises under 11 U.S.C. §§ 541 and 542(a) and Local Rule 6072-1.

5.    The petition commencing the Chapter 13 case was filed on July 13, 2015.  The case was converted to one under Chapter 7 on December 3, 2015.  The case is now pending in this court.

6.    At the time this case was converted to a Chapter 7, the Chapter 13 trustee was holding $10,169.81 in funds paid to fund a plan which was never confirmed.  The debtor, through his attorney, Barbara May, asserted that the funds were derived from post-petition

earnings and so had to be returned to the debtor.  The Chapter 7 trustee did not have information sufficient to determine the source of the funds.  An order was entered by this court, pursuant to a stipulation, whereby the funds were paid over to Barbara May to hold pending further court order.  A copy of that order is attached as Exhibit 1.

7.      The debtor's schedules, signed under penalty of perjury, stated that he had $72,000 in accounts receivable at the time the Chapter 13 case was commenced.  A copy of the debtor's Schedule B is attached hereto as Exhibit 2.

8.      The trustee has discovered that during the course of the Chapter 13, the debtor spent in excess of $72,000 in accounts receivables.  A copy of a page of his §341 testimony confirming that is attached as Exhibit 3.

9.      On February 16, 2016, the debtor signed an affidavit representing to the Eighth Circuit BAP stating that "the accounts receivables were used to run my law practice and to fund my Chapter 13 plan."  A copy of that affidavit is attached hereto as Exhibit 4.

10.     The Debtor confirmed that the pre-petition accounts receivables were used to fund his Chapter 13 payments at his continued 341 meeting of creditors:

> Q(Kreuziger): So you also testified that some of the funds that were collected that are attributed to these accounts receivable were used to make Chapter 13 plan payments, correct?
>
> A(Debtor): The were – They were paid as post-petition wages to me and then I used my post-petition wages to make Chapter 13 payments.

See Exhibit 5 at 38-39.

11.     A true and correct copy the transcript of the debtor's February 25, 2016 continued meeting of creditors is attached as Exhibit 5.

12.     The Trustee believes that the Debtor's assertion that the accounts receivable are no longer property of the estate when converted post-petition is incorrect.  Although distributed post-petition, payments on these account receivables were pre-petition assets.

13.     The monies held by Barbara May, are directly traceable to assets of the Debtor's Chapter 13 bankruptcy estate, and upon conversion remain property of the Chapter 7 bankruptcy estate and must be turned over to the trustee.

14.     After receipt of the February 16, 2016 affidavit signed by the debtor, the trustee demanded that the funds be paid over to him.  However, Barbara May and the debtor have refused to turn over the estate property, prompting the Trustee's motion.

WHEREFORE, the trustee requests an order from the court requiring Barbara May to turn over to the trustee, immediately upon entry of the order on this motion, the sum of $10,169.81, currently in the possession of Barbara May pursuant to this court's order of December 29, 2015.

FULLER, SEAVER, SWANSON & KELSCH, P.A.


Dated: March 4, 2016                    By: /e/ Matthew D. Swanson
                                        Matthew D. Swanson              390271
                                        Randall L. Seaver               152882
                                        12400 Portland Avenue South, Suite 132
                                        Burnsville, MN 55337
                                        (952) 890-0888
                                        Attorneys for Randall L. Seaver, Trustee

## VERIFICATION

I, Randall L. Seaver, trustee for the Bankruptcy Estate of Paul Hansmeier named in the foregoing notice of hearing and motion for turnover of property declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information and belief.

Executed on March 4, 2016                /e/ Randall L. Seaver
                                        Randall L. Seaver, Trustee

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | BKY No. 15-42460 |
| Paul Hansmeier, | ORDER |
| Debtor. | |

The Chapter 7 Trustee, Randall Seaver and counsel for the Debtor filed a stipulation concerning the disposition of funds the debtor paid into the Chapter 13 office during the pendency of his case.  Pursuant to the stipulation of the parties,

It is Ordered:

1.     The Chapter 13 Trustee shall disburse the funds paid into his office by the debtor, during the pendency of the Chapter 13 case, to the Debtor's counsel Barbara May.

2.     Barbara May shall hold the funds until the parties have resolved their dispute via settlement or stipulated agreement, or by entry of an Order by this Court concerning the appropriate disposition of the assets.

Dated:   *December 29, 2015*

/e/ Kathleen H. Sanberg

Kathleen H. Sanberg
United States Bankruptcy Judge

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on *12/29/2015*
Lori Vosejpka, Clerk, by LH

EXHIBIT 

B6B (Official Form 6B) (12/07)

In re **PAUL HANSMEIER**

Case No. _____

                                                   (if known)

## SCHEDULE B - PERSONAL PROPERTY

| Type of Property | None | Description and Location of Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, Without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 1. Cash on hand. | X | | | |
| 2. Checking, savings or other financial accounts, certificates of deposit or shares in banks, savings and loan, thrift, building and loan, and homestead associations, or credit unions, brokerage houses, or cooperatives. | | CHECKING ACCOUNT AT STONEBRIDGE | - | $100.00 |
| | | CHECKING ACCOUNT AT ASSOCIATED BANK | J | $20.00 |
| | | CAPITAL ONE | - | $2,400.00 |
| | | BUSINESS ACCOUNT AT ASSOCIATES BANK, HELD IN NAME OF CLASS JUSTICE LLC, 6773 | - | $19,400.00 |
| | | IOLTA ACCOUNT, NOT PART OF ESTATE, DOES NOT CONTAIN DEBTOR'S FUNDS, FOR DISCLOSURE PURPOSES ONLY HAS $1400.00 BALANCE | - | $0.00 |
| | | ONE HALF INTEREST IN SUPERCEDEAS BOND POSTED WITH APPELLATE COURT IN INGENUITY 13, LLC V. JOHN DOE, CASE #2:12-CV-08333-ODW-JC MATTER.  DEBTOR  CONTRIBUTED $118791 AND HIS CODEBTOR CONTRIBUTED THE REST OF A $237583.66 SUPERCEDEAS BOND.  UNDERLYING AMOUNT ON APPEAL IS $81319.79 | - | $118,791.00 |
| | | SELF SETTLED TRUST MONYET | J | $8,554.00 |
| 3. Security deposits with public utilities, telephone companies, landlords, and others. | X | | | |
| 4. Household goods and furnishings, including audio, video and computer equipment. | | NORMAL HOUSEHOLD GOODS, DEBTOR OWNS ONE HALF | - | $4,000.00 |

# EXHIBIT 2

B6B (Official Form 6B) (12/07) -- Cont.

In re **PAUL HANSMEIER**                                        Case No. _____

                                                                    (if known)

## SCHEDULE B - PERSONAL PROPERTY

*Continuation Sheet No. 1*

| Type of Property | None | Description and Location of Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, Without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 5. Books; pictures and other art objects; antiques; stamp, coin, record, tape, compact disc, and other collections or collectibles. | X | | | |
| 6. Wearing apparel. | | NORMAL WEARING APPAREL | - | $1,500.00 |
| 7. Furs and jewelry. | | WATCH | - | $0.00 |
| | | WEDDING BAND | - | $200.00 |
| 8. Firearms and sports, photo-graphic, and other hobby equipment. | X | | | |
| 9. Interests in insurance policies. Name insurance company of each policy and itemize surrender or refund value of each. | | TERM LIFE INSURANCE THROUGH STATE FARM | J | $0.00 |
| 10. Annuities. Itemize and name each issuer. | X | | | |
| 11. Interests in an education IRA as defined in 26 U.S.C. § 530(b)(1) or under a qualified State tuition plan as defined in 26 U.S.C. § 529(b)(1). Give particulars. (File separately the record(s) of any such interest(s). 11 U.S.C. § 521(c).) | X | | | |
| 12. Interests in IRA, ERISA, Keogh, or other pension or profit sharing plans. Give particulars. | X | | | |

B6B (Official Form 6B) (12/07) -- Cont.

In re  **PAUL HANSMEIER**                                         Case No. _____

                                                                              (if known)

## SCHEDULE B - PERSONAL PROPERTY

*Continuation Sheet No. 2*

| Type of Property | None | Description and Location of Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, Without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 13. Stock and interests in incorpo-rated and unincorporated businesses. Itemize. | | 100% OWNERSHIP CLASS JUSTICE, PLLC,  ALL ASSETS OF BUSINESS HAVE BEEN LISTED SEPARATELY | - | $0.00 |
| | | ACCOUNTS RECEIVABLE  (AMOUNT IS ESTIMATED, AND VARIES WITH WHETHER IS EACH A/R IS ACTUALLY COLLECTIBLE) | - | $72,000.00 |
| 14. Interests in partnerships or joint ventures. Itemize. | X | | | |
| 15. Government and corporate bonds and other negotiable and non-negotiable instruments. | X | | | |
| 16. Accounts receivable. | X | | | |
| 17. Alimony, maintenance, support, and property settlements to which the debtor is or may be entitled.  Give particulars. | X | | | |
| 18. Other liquidated debts owed to debtor including tax refunds. Give particulars. | X | | | |
| 19. Equitable or future interests, life estates, and rights or powers exercis-able for the benefit of the debtor other than those listed in Schedule A - Real Property. | X | | | |
| 20. Contingent and noncontingent interests in estate of a decedent, death benefit plan, life insurance policy, or trust. | X | | | |

B6B (Official Form 6B) (12/07) -- Cont.

In re  **PAUL HANSMEIER**                                          Case No. _____
                                                                              (if known)

## SCHEDULE B - PERSONAL PROPERTY

*Continuation Sheet No. 3*

| Type of Property | None | Description and Location of Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, Without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 21. Other contingent and unliqui-dated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims.  Give estimated value of each. | X | | | |
| 22. Patents, copyrights, and other intellectual property. Give particulars. | X | | | |
| 23. Licenses, franchises, and other general intangibles. Give particulars. | X | | | |
| 24. Customer lists or other compilations containing personally identifiable information (as defined in 11 U.S.C. § 101(41A)) provided to the debtor by individuals in connection with obtaining a product or service from the debtor primarily for personal, family, or household purposes. | X | | | |
| 25. Automobiles, trucks, trailers, and other vehicles and accessories. | X | | | |
| 26. Boats, motors, and accessories. | X | | | |
| 27. Aircraft and accessories. | X | | | |
| 28. Office equipment, furnishings, and supplies. | | DEBTOR'S OFFICE EQUIPMENT IS ALL LEASED WITH THE EXCEPTION OF 4 COMPUTERS, EACH 3 YEARS OLD ALSO, MISCELLANEOUS PAPER, SUPPLIES, STAPLER, ENVELOPES | - | $2,000.00 |

B6B (Official Form 6B) (12/07) -- Cont.

In re  **PAUL HANSMEIER**                                    Case No. _____
                                                                            (if known)

## SCHEDULE B - PERSONAL PROPERTY

*Continuation Sheet No. 4*

| Type of Property | None | Description and Location of Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, Without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 29. Machinery, fixtures, equipment, and supplies used in business. | X | | | |
| 30. Inventory. | X | | | |
| 31. Animals. | X | | | |
| 32. Crops - growing or harvested. Give particulars. | X | | | |
| 33. Farming equipment and implements. | X | | | |
| 34. Farm supplies, chemicals, and feed. | X | | | |
| 35. Other personal property of any kind not already listed.  Itemize. | X | | | |

_____4_____ continuation sheets attached

(Include amounts from any continuation sheets attached.  Report total also on Summary of Schedules.)

Total >     $228,965.00

In Re: Paul Hansmeier, Debtor

341 Meeting of Creditors - Paul Hansmeier
January 21, 2016

**Page 17**

1 Q. The accounts receivable, who are the people or
2 entities that are included in this accounts
3 receivable?
4 A. It's a Minnesota nonprofit corporation called
5 Disability Support Alliance.
6 Q. It's that one?
7 A. Yes.
8 Q. That is the only account receivable there is?
9 A. That's correct.
10 Q. Okay. And why does that exist? I mean, why did
11 they owe you money?
12 A. They owed me money because I performed legal
13 services on their behalf.
14 Q. So why is it so hard to get me the information on
15 one account receivable?
16 A. Because at first I understood the account receivable
17 term to mean something different than I think what
18 it actually means. When I had talked about it and
19 went through it and thought through it, what we
20 realized is that an account receivable is simply
21 someone who owes you money and it was really quite
22 simple. I had a single client that I was
23 representing in the course of this business and we
24 now have determined that.
25 Q. Is that who you meant when you originally said it

**Page 18**

1 was 72,000, that one client?
2 A. Yes.
3 Q. And what's the approximate balance now?
4 A. This $72,000 has been paid, and I don't know what my
5 current account receivable is to them at this point.
6 Q. So this $72,000 account receivable was collected
7 during the course of the Chapter 13?
8 A. Yes.
9 Q. Was it all gone by the time you converted to a 7 --
10 Or the time the case was converted to a 7?
11 A. To the best of my knowledge, yes.
12 Q. All right. In the schedules -- I'm going now to
13 Schedule F, which is the unsecured creditors
14 schedules.
15 A. Okay. I have it.
16 Q. Does Schedule F accurately list all of your
17 creditors?
18 A. Yes, although the only point I might clarify is I
19 believe Chowdhury has now been resolved.
20 Q. Chowdhury was the one that was paid in conjunction
21 with the closing on the sale of the condominium?
22 A. That is correct, so I suppose he is not a creditor
23 any longer.
24 Q. Okay, all right. Now, let's go to the Statement of
25 Financial Affairs. Go to Item 4 at the Statement of

**Page 19**

1 Financial Affairs.
2 A. I'm turning to it right now.
3 Q. Do you have that front of you?
4 A. I have it in front of me now, yes.
5 Q. All right. I just want to run briefly through
6 these. The first one, Cooper versus Steele, et al.,
7 is that a lawsuit against you and Mr. Steele?
8 A. Are you referring to Item 4 at this point?
9 Q. Yes, I am, the first case that's listed there.
10 A. The first case that's listed in that schedule was
11 brought against Allen Cooper, and the defendants in
12 this case were John Steele, Paul Duffy, Prenda Law,
13 Inc., AF Holdings, LLC, and a company called
14 Ingenuity 13, LLC. I am not a party to that case.
15 Q. Okay.
16 A. So I'm neither a plaintiff nor a defendant nor a
17 counter-plaintiff nor counter-defendant.
18 Q. Okay. So why do you have it listed here?
19    MS. MAY: I did it, Mr. Trustee, out of
20 an abundance of caution because this case had come
21 up again and again and again --
22    MR. SEAVER: Okay.
23    MS. MAY: -- In my talks with him.
24    BY MR. SEAVER:
25 Q. Okay. And then the next one, AF Holdings, LLC

**Page 20**

1 versus Patel, are you a defendant in that?
2 A. I am not a party to that case. That case the
3 plaintiff is just AF Holdings and the defendant is a
4 gentleman by the name of Frahesh (phonetic) Patel.
5 Q. In either of these first two, is there any motion
6 against you for sanctions?
7 A. In the first case, at one point I believe they tried
8 to have me added to it. They were unsuccessful in
9 doing so. In the second case I don't believe
10 there's anything pending against me personally, but,
11 again, the attorney in that case I know would like
12 to have me added to it even if he hasn't formally
13 filed anything.
14 Q. Okay. And then Guava, LLC, I'm on the next one on
15 this list, it says judgment entered.
16 A. That one, although I was never a party to the case,
17 judgment was, nevertheless, entered against me in
18 the case in the amounts that are described.
19 Q. Okay. And how much? Just tell me roughly with that
20 one.
21 A. Ballpark about 64,000.
22 Q. Okay.
23 A. And one of those judgments has been fully satisfied
24 and the rest remain.
25 Q. Okay. How did that get satisfied? When was payment

EXHIBIT 3

## U.S. BANKRUPTCY APPELLATE PANEL
## FOR THE EIGHTH CIRCUIT

| | |
|---|---|
| In re:<br>Paul Robert Hansmeier, | BKY 15-42460 |
| Debtor. | Chapter 13 |

| | |
|---|---|
| Paul Robert Hansmeier, | Appeal No. 15-6035 |
| Appellant, | |
| v. | |
| Daniel McDermott, United States Trustee, | |
| Appellee. | |

### AFFIDAVIT IN SUPPORT OF MOTION FOR STAY PENDING APPEAL

STATE OF MINNESOTA    )
                            )SS.
COUNTY OF WASHINGTON  )

    Paul R. Hansmeier, being duly sworn upon oath, states and alleges as follows:

1.    I am the debtor in the above-captioned proceeding, and I make this affidavit in support of my motion for a stay pending the decision on this appeal.

2.    I was not a party or served with process in the litigation giving rise to the damage awards asserted by the claimants as the basis for claims 9, 10 and 11 in this proceeding.  The damages in those cases consist of attorney fees and punitive damages against the parties to those cases. No judgment was entered against me in any of those cases.

3.    I am not a principal of Prenda Law, Inc.

# EXHIBIT 4

4.    From the beginning of this case, it has been my goal to put an end to the claims
      against me by paying my creditors 100% of their legitimate claims.

5.    The Bankruptcy Court suggested that I tried to conceal the sale of my homestead.
      As I looked at the prospect of meeting the 100% plan from my income, it became
      apparent that sale of the homestead would ensure my ability to fund my plan and
      reduce my monthly expenses.   My wife and I contacted a realtor about the
      possibility of selling it, and we signed a listing agreement.   I did not know I was
      required to get court approval prior to signing the listing agreement.   We received
      an offer nearly immediately.   As soon as the offer was received, I informed my
      attorney and she amended the schedules, filed an amended plan, and moved for
      court approval of the proposed sale, which I received.   My plan proposed using the
      homestead proceeds to pay my plan in full 6 months from the time I filed my case.

6.    I disclosed the claims against me and their amounts to the best of my knowledge
      and belief.   All claims that have been made except the objected-to claims were set
      out in my schedules.   I was not a party to those lawsuits, and those claims were not
      against me.

7.    The Bankruptcy Court has criticized me for errors in my schedules involving the
      Mill Trust, an irrevocable trust that I settled in 2010, and for confusion regarding
      my household expenses.   I did not intend any deception by these errors and I am
      trying to pay my creditors 100% of their claims.

8.    The Bankruptcy Court has asserted that I liquidated an estate asset when I used the

accounts receivables associated with my law practice. The accounts receivables were used to run my law practice and to fund my Chapter 13 plan. My accounts receivables were are earned and spent and earned again on a monthly basis, like any business.

Dated: February 16, 2016

Paul Hansmeier

Subscribed and sworn to before me

This _16_ day of February, 2016.



NOTARY PUBLIC

DENA R ACOSTA
NOTARY PUBLIC - MINNESOTA
My Commission Expires Jan. 31, 2019

**1**

```
1
2              UNITED STATES BANKRUPTCY COURT
3                  DISTRICT OF MINNESOTA
4      ---------------------------------------------
5  In re:
6        Paul Hansmeier,      Bky. File No: 15-42460
7              Debtors.
8      ---------------------------------------------
9              The above-entitled matter came duly on for a
10  341 Meeting of Creditors hearing before the Honorable
11  Randall L. Seaver, pursuant to Notice, on February 25,
12  2016.  The hearing was electronically recorded and
13  transcribed by Julie A. Rixe, Court Reporter.
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
1                      I N D E X
2  WITNESS                                        PAGE
3    Paul Hansmeier                                4
4    Examination by Mr. Seaver                     4
5    Examination by Mr. Kreuziger                 37
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**2**

```
1  APPEARANCES:
2        BARBARA MAY, Attorney at Law, appeared
3  for and with the Debtor.
4        COLIN KREUZIGER, Attorney at Law, U.S.
5  Trustee's Office.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22        WHEREUPON, the following proceedings were
23  duly had and entered of record, to wit:
24
25
```

**EXHIBIT 5**

**4**

```
1            MR. SEAVER:  All right.  We're on the
2   record now.  This is the Paul Hansmeier case.  It's
3   case number 15-42460.  This is the continued 341
4   meeting.  And present here are Barbara May, Mr.
5   Hansmeier, Colin Kreuziger from the U.S. Trustee's
6   office and other representatives of the U.S.
7   Trustee's office.
8            Would you raise your right hand, sir?
9            PAUL HANSMEIER,
10   after having been first duly sworn, was
11   examined and testified on his oath as follows:
12                  EXAMINATION
13  BY MR. SEAVER:
14  Q   Would you state your name, please?
15  A   Paul Hansmeier.
16  Q   And, Mr. Hansmeier, I had made a request through
17      Ms. May for you to bring your financial condition
18      report that you submitted in the Lightspeed case and
19      I didn't see it on the drop box.  Did you bring that
20      with you?
21  A   I received the request for the statement of
22      financial condition I believe yesterday afternoon.
23      I looked through it, through my boxes in my house
24      from my move.  I was not able to locate it; but when
25      I do locate it, I'll drop it on the drop box.
```

5

| 1 | Q | Okay. |
| 2 | | MS. MAY: But isn't that available on |
| 3 | | Pacer? |
| 4 | | THE WITNESS: No, it's not. |
| 5 | | MS. MAY: Okay. |
| 6 | BY MR. SEAVER: |
| 7 | Q | It was a confidential thing, wasn't it? |
| 8 | A | I believe it was filed under seal. |
| 9 | Q | Yeah. |
| 10 | A | So I can't access it now. |
| 11 | Q | So you have it, you just haven't been able to locate |
| 12 | | it? |
| 13 | A | I believe I have it, but I have not been able to |
| 14 | | locate it -- |
| 15 | Q | Okay. |
| 16 | A | -- the past 24 hours. |
| 17 | Q | All right. The first thing I want to talk about |
| 18 | | here is the Groupon case that has come to my |
| 19 | | attention and the Padraigin Brown objection in the |
| 20 | | Groupon case. I have seen the motion of Ms. Brown |
| 21 | | for attorney's fees and a service award. And you're |
| 22 | | representing her in that, correct? |
| 23 | A | Various attorneys have represented her through the |
| 24 | | pendency of the litigation. I am representing her |
| 25 | | in connection with the motion to support the request |

6

| 1 | | for a service award and attorney's fees. |
| 2 | Q | And when the objection to the Groupon class -- |
| 3 | | Proposed class settlement was filed, what law firm |
| 4 | | was representing her? |
| 5 | A | I believe the attorney who filed the objection on |
| 6 | | her behalf was an attorney named Brett Gibbs. |
| 7 | Q | Okay. What law firm, though? |
| 8 | A | I'm sure it shows on the pleading. I don't recall |
| 9 | | what law firm he was. |
| 10 | Q | Well, it was one of your law firms, right? |
| 11 | A | Again, I don't specifically recall which law firm |
| 12 | | Brett Gibbs appeared through in connection with that |
| 13 | | objection. It would be on the caption of the |
| 14 | | filing. |
| 15 | Q | Who was Brett Gibbs employed by? |
| 16 | A | Brett Gibbs is a California attorney, and I'm not |
| 17 | | clear on who he's employed by at that time. |
| 18 | Q | Okay. Who was Mr. Worzel employed by? |
| 19 | A | Mr. Worzel was employed by my law firm at the time. |
| 20 | Q | What's the name of that law firm? |
| 21 | A | It would either be -- It would be class action -- |
| 22 | | Well, actually, at the time that Mr. Worzel defended |
| 23 | | Ms. Brown, I'm not sure if he was employed by any |
| 24 | | law firm at that point in time. There was a period |
| 25 | | of time where he was representing her where he was |

7

| 1 | | employed by a law firm and then there was a period |
| 2 | | of time where he was not employed by a law firm. |
| 3 | Q | So the law firm that he was employed by at whatever |
| 4 | | time, what's the name of that law firm? |
| 5 | A | I believe it would have been the Class Action |
| 6 | | Justice Institute. |
| 7 | Q | All right. And who was the shareholder of that law |
| 8 | | firm? |
| 9 | A | I was the shareholder of that law firm. |
| 10 | Q | The sole one, right? |
| 11 | A | The sole shareholder. |
| 12 | Q | Okay. And does Ms. Brown have a contingency fee |
| 13 | | agreement with someone? |
| 14 | A | You would have to ask her. She does not have one |
| 15 | | with me. |
| 16 | Q | Has she had one with any of your law firms? |
| 17 | A | She has not had a contingency fee agreement with any |
| 18 | | of my law firms, to the best of my knowledge. |
| 19 | Q | Okay. And I ask that because I see in the objector |
| 20 | | Memorandum of Law in opposition to the motion, |
| 21 | | et cetera, that you filed you're citing a case |
| 22 | | saying the contingent fee lawyer is not a joint |
| 23 | | owner in his client's claim and it goes on after |
| 24 | | that. Are you telling me that you're unaware of any |
| 25 | | contingent fee agreement between Ms. Brown and |

8

| 1 | | anyone with respect to the Groupon case? |
| 2 | A | My testimony is that whatever Ms. Brown's agreement |
| 3 | | is with other attorneys in the case, I can tell you |
| 4 | | that she did not have one with me or any law firm |
| 5 | | that I owned. |
| 6 | Q | Okay. And is it right that she, through you as the |
| 7 | | attorney, is seeking something in excess of $200,000 |
| 8 | | in attorney's fees here? |
| 9 | A | I believe that's the correct figure. She's seeking |
| 10 | | an award of 10 percent of the amount awarded to |
| 11 | | class counsel under the common fund theory of |
| 12 | | recovery. |
| 13 | Q | And what are the terms of your retention in |
| 14 | | representing her now? |
| 15 | A | I don't have a specific agreement with her. All I'm |
| 16 | | doing right now is filing the paperwork on her |
| 17 | | behalf to seek the award. |
| 18 | Q | Do I recall right that she bought a $5 Groupon |
| 19 | | certificate; is that what happened? |
| 20 | A | I'm not going to answer questions about the facts of |
| 21 | | the case because I am representing her and I believe |
| 22 | | that it goes to attorney-client privilege. I |
| 23 | | believe if you look at the documents, her original |
| 24 | | objection, she clarifies what her basis or standing |
| 25 | | is in the case. |

9

1  Q  Well, you know what that is, though, sir. And it's
2      a matter of public record, so I don't think there's
3      any attorney-client privilege here. So what was her
4      original Groupon purchase?
5  A  I don't recall the specifics there. It's set forth
6      very specifically in her original objection.
7  Q  And you just don't have any independent recollection
8      of that?
9  A  I -- I recall that she purchased Groupons and that
10     was her basis for standing.
11  Q  So how do you come up with this over $200,000 you're
12     telling the Court she should be paid as attorney's
13     fees, you say?
14  A  Well, as explained in her motion for attorney's
15     fees, it's based on the common fund principle, which
16     allows an objector who brings benefits to the class
17     to receive some of the benefits of that amount in
18     return.
19  Q  Yeah, but it's attorney's fees. I mean, has she
20     paid somebody 200,000 in attorney's fees?
21  A  I don't think she's come out of pocket for $200,000
22     in attorney's fees, no.
23  Q  So how do you justify asking for 200,000 in
24     attorney's fees if she hasn't paid any attorney's
25     fees?

10

1  A  Well, just as in any case where attorney's fees
2     don't come out of pocket, for example, a contingency
3     fee arrangement or an action where someone may
4     represent somebody in a civil rights case where
5     there's statutory attorney's fees, at the end of the
6     case the attorney, even if the client does not come
7     out of pocket, is entitled to recover fees -- Or the
8     client, actually, is entitled to recover the fees.
9  Q  Have you ever seen any written agreement between
10     Padraigin Brown and any law firm regarding the
11     representation of her in this Groupon case?
12  A  I have not.
13  Q  Let me just give you a copy of an email that Ms. May
14     sent over to Matthew Swanson my firm earlier this
15     week. In this email Ms. May is talking about one of
16     Mr. Hansmeier's appeals involving Anthony Smith and
17     the $65,000 sanction. And she says, this case has a
18     supersedeas bond.
19         Have you seen a copy of this email
20     before?
21  A  I have.
22  Q  Okay. Is everything in here accurate?
23  A  Yeah, I believe so.
24  Q  Okay. And just so we know what email it is, because
25     we don't have exhibits here at a 341 meeting, this

11

1     is one that Ms. May sent over to Matthew Swanson at
2     my office on February 22, 2016 at 9:34 a.m.,
3     correct?
4  A  That's correct.
5  Q  Okay. Here, let me just show you the docket. I've
6     printed the docket for the Lightspeed matter. And
7     the bond is in the Lightspeed case, right?
8  A  That's correct.
9  Q  Okay.
10  A  Well, I should be clear. It's money on deposit with
11     the Court, not a bond.
12  Q  Right, okay. And if you turn to the next to last
13     page of this docket sheet, there's a long carry-over
14     court entry there talking about posting -- I don't
15     know if you use the word bonds -- I guess deposit
16     with the Court. Is this the bond or the money
17     posted with the Court that we're talking about here?
18  A  Yes, it is --
19  Q  Okay.
20  A  -- referring to Entry Number 216.
21  Q  Yeah, thank you. Yeah, it is 216. So is it
22     accurate to say that it was on or about August 10 of
23     2015 that the $65,000 got paid into the Court?
24  A  Yes.
25  Q  Okay. And you weren't present at this hearing that

12

1     Ms. May is referring to, correct?
2  A  I was not present at the hearing.
3  Q  Okay. As far as you know, the Court hasn't yet
4     ruled on that?
5  A  The Court has not ruled. The appeal has now been
6     taken under advisement.
7  Q  Okay. Have you reviewed the deposition transcript
8     of the 2004 examination of Padraigin Brown that was
9     taken last week?
10  A  No.
11  Q  Have you looked at any part of it?
12  A  I have looked at some of it, yes.
13  Q  All right. What parts did you look at, generally
14     what areas?
15  A  I read through the first maybe half of it.
16  Q  Okay. Let me just give you a few pages that I'd
17     like you to read through. I just want to confirm
18     some things with you. What I've given you, it's a
19     condensed transcript. And I'd just like you to read
20     through pages 60 to the top of page 68 to yourself.
21     You don't need to read it out loud. Let me know
22     when you're done.
23  A  Okay. I've read through it.
24  Q  All right. Thanks. Do you see any of her testimony
25     there that you believe is not accurate?

### 13

1  A    Well, some of it I have no personal knowledge of.
2       The -- I don't think her testimony regarding -- She
3       had some questions about the dates when Mr. Steele
4       came over.  I don't think August of 2015 is
5       accurate.
6  Q    Okay.
7  A    I don't know.  It was --
8  Q    Well, the bond or the cash was posted with the
9       Court, the $65,000, in August of 2015, correct?
10 A    Well, there's been multiple bonds in the case.
11      There was the original bond that was associated with
12      the sanction amount, about a quarter million
13      dollars.
14 Q    And you didn't participate in that one at all,
15      right?
16 A    That one was money that was loaned to us or
17      essentially loaned to John by Mr. Bellsbray
18      (phonetic).  And then I think -- I think the cash,
19      the 60, may have been some effort to pay back Mr.
20      Bellsbray.  So that's why I think August of 2015 may
21      not be the correct date.  I think August 2014 may be
22      correct.
23 Q    Well, let's go back to the docket entry that we saw,
24      though.  You remember that's August 10 of 2015 --
25 A    Yes.

### 14

1  Q    -- that the $65,000 gets put into court, correct?
2  A    Yes, that's August of 2015.
3  Q    Right.  And you don't believe that's the money that
4       you and Ms. Brown gave to Mr. Steele?
5  A    No, I don't believe so.
6  Q    So when is it that you believe the money was given
7       to Mr. Steele?
8  A    In mid-2014.
9  Q    In mid-2014?
10 A    Yes.
11 Q    And other than the date, is her testimony accurate
12      about the discussion that you and she had about that
13      before the money was given to him?
14 A    My recollection of that was I had asked her, is
15      there any way we can put money towards this
16      sanction.  And it was at a point where the judge was
17      threatening I don't know if it was $5,000 a day, but
18      a monetary sanction every single day it didn't get
19      paid.  And she had previously said, no, I'm not
20      going to allow you to use any of that money; you can
21      figure out your own way to do it, if it means having
22      to file for bankruptcy or doing whatever.
23           And we had a talk and we finally -- She
24      finally allowed me to use 60,000 of it to at least
25      offset some of the amount that John ended up paying.

### 15

1  Q    Okay.  So you think that was when, sir?
2  A    I believe that was mid-2014, but I don't have a
3       specific recollection of when it was.
4  Q    Okay.
5  A    Or I suppose it could have been mid-2013, as well,
6       because that's when everything was more immediate.
7       The sanction was imposed --
8  Q    Well, had she taken the 180,000 in cash out of the
9       bank in mid-2013?
10 A    No.  I guess because the sanction was imposed at the
11      end of 2013, so it would have been at some point
12      from early to mid-2014.
13 Q    Okay.  Here, let me show you a few pages of a
14      transcript from the first session of this Meeting of
15      Creditors.  This is not a condensed one.  This is
16      page 23.  And starting at line 15 at page 23, well,
17      just read through that to yourself, please.
18 A    I'm sorry.  Starting at line?
19 Q    Oh, sure.  Page 23, if you start reading to yourself
20      at --
21           MS. MAY:  Two-thirds of the way down.
22           MR. SEAVER:  Yeah.
23           THE WITNESS:  Okay.  I've read through
24      it.
25 BY MR. SEAVER:

### 16

1  Q    Okay.  What you're referring to there, in this
2       section, where you say, John Steele has provided an
3       appellate bond to fully secure the amount on appeal,
4       is that the original bond that you're talking about?
5  A    The bond I'm referring to in this testimony is the
6       amount that's referred to at Docket 216 of the
7       Lightspeed case.
8  Q    Okay.  So what you're referring to there, in that
9       testimony, is, like you say, at Item 216, that's
10      August 10 of 2015?
11 A    Yes.
12 Q    All right.  So to come back to the other, was it
13      exactly $60,000 that was paid to Mr. Steele?
14 A    I think that's my wife's estimate.  I don't recall
15      if it was 60 or if it was 50.  It was somewhere in
16      that neighborhood.
17 Q    Okay.  Did you and she, Ms. Brown, count out the
18      money before you gave it to Mr. Steele?
19 A    She would have counted it out and given it to
20      Mr. Steele.
21 Q    And she got it out of that box in the closet where
22      the original 180,000 in cash or so was?
23 A    Right.
24 Q    Okay.  And let's back up a little bit.  She withdrew
25      150,000 in cash from TCF Bank after you wired

**17**

1 175,000 into an account held in her name, correct?
2 A If that's her testimony. I did not participate in
3 the transaction.
4 Q But you knew that she was withdrawing 150,000 in
5 cash, correct?
6 A I was aware that she was withdrawing cash. I wasn't
7 aware of the precise amounts.
8 Q You knew it was a large amount of money?
9 A Yes.
10 Q Okay. And then you knew that after you made the
11 $70,000 transfer to her, you knew that she was
12 withdrawing a good amount of that in cash, as well,
13 correct?
14 A I don't recall the specifics of that. I know she
15 did the initial large withdrawal. And from that
16 point on -- I know she was -- Her intention was to
17 get it into cash, yes.
18 Q Okay. Did you help her count the $150,000 cash
19 withdrawal?
20 A No.
21 Q But you knew it was in a box, stored in a box in
22 your house after she withdraw it, correct?
23 A Yes.
24 Q Did you ever take any money out of that box?
25 A No.

**18**

1 Q Did you ever look in that box?
2 A No.
3 Q So you certainly knew by early 2014 that all that
4 money had been taken out in cash, didn't you?
5 A I can't say I would have specifically known. I know
6 that she was -- Her intention was to reduce it to
7 cash.
8 Q Well, you certainly knew by the time that you and
9 she paid the 60,000, or whatever it was, to
10 Mr. Steele, correct?
11 A No, because if you have 150, the initial withdrawal,
12 I knew she was taking out a large amount. That
13 certainly would have covered the 60.
14 Q Okay. So you knew by the time you gave the money to
15 Mr. Steele, you knew there was at least 150,000 in
16 cash, right?
17 A Well, I knew there was at least 60,000 in it cash or
18 50,000, whatever amount was given to him.
19 Q And you knew the source of that funds was one of the
20 two large wire transfers that you had sent to her
21 TCF account, didn't you?
22 A That would be fair to say, yes.
23 Q Okay. And from that docket that you still have in
24 front of you, I'm just trying to find when the
25 original bond was posted. If you turn to Item 149,

**19**

1 which is April 8 of 2014, you see that it says,
2 supersedeas bond in the amount of $287,300 posted by
3 John Steele.
4 Do you see that?
5 A Yes.
6 Q And is it your testimony that the 60,000 or whatever
7 the exact amount of cash was that you and Ms. Brown
8 gave to John Steele went to that bond?
9 A Yeah, to offset what he had to post, yes.
10 Q So how long before April 8, 2014 did you and
11 Ms. Brown give him this cash?
12 A It was either -- Well, it would have been
13 immediately before or slightly after.
14 Q Okay. So in April of 2014?
15 A I don't recall if it was in April or if it was in
16 May or...
17 Q Or February or January?
18 A It was either -- It was around the time. I don't
19 recall specifically when it was.
20 Q And you agree with your -- With Ms. Brown's
21 testimony that Mr. Steele was in town and the money
22 was given to him in cash?
23 A Yeah. He was visiting in town and -- Yes.
24 Q All right. So back to Ms. May's email that's
25 talking about the $65,000 bond that will come to the

**20**

1 estate, as I understand what you're saying here
2 today, that has to do with the Docket Entry 216?
3 A Yes.
4 Q All right. And you agree that's estate property as
5 well; you agree with her email?
6 A What I understand is that we would not object to
7 that money being turned over to the estate.
8 Q And what's the source of that money?
9 A The source of the money is John Steele's funds being
10 transferred to the court administrator for the
11 Southern District of Illinois.
12 Q And those are all John Steele's money; it doesn't
13 include any money from you or Ms. Brown?
14 A That's correct. It's money from John Steele's bank
15 account to the Court.
16 Q Right. Did you or Ms. Brown give Mr. Steele any
17 money to put into that bank account that constituted
18 that payment to the Court in August of 2015?
19 A The major transfer I made to John Steele was the
20 cash in approximately 2014. So I don't know if it's
21 the Trustee's position that that's somehow my money
22 that John Steele put in there or not, but we did not
23 cut him a check, for example, immediately before him
24 posting the bond with the Southern District of
25 Illinois.

21

1  Q   Let's go back to my question, though. Other than
2      the 60,000 or so that you and Ms. Brown gave to him
3      in 2014, around April, as I understand it, did you
4      give any money, transfer any money, cause any money
5      to be transferred to Mr. Steele after April of 2014?
6  A   If I did, it was smaller amounts. It wasn't a large
7      amount.
8  Q   What does that mean, smaller amounts? Less than
9      $5,000 a transfer?
10 A   Most likely. I mean, it would not have been a
11     series of transfers. It may have been a one-off
12     expense. For example, I don't recall when we had --
13     We had some appellate fees at the time. And so, for
14     example, if he would have paid the appellate fees, I
15     would have paid half of it.
16 Q   All right. So as I understand your testimony, the
17     $65,000 posted with the Court in August of 2015 was
18     all Mr. Steele's money?
19 A   It came from Mr. Steele's bank account, yes.
20 Q   And you know that for sure?
21 A   Actually, I should qualify that. I don't know if he
22     had to borrow some money from a family member to
23     post it, but I believe that it came from his bank
24     account.
25 Q   So then what you're telling me is that you believe

22

1      the estate is entitled to this money that Mr. Steele
2      put up?
3  A   My position is I would have no objection to it being
4      turned over to the estate. I understand that
5      Mr. Steele may have a different position, but my
6      position is that if the estate sought turnover of
7      those funds, I would have no basis for objecting to
8      it.
9  Q   By what point in time did you know that there was at
10     least $150,000 in cash in your house, in the
11     condominium?
12 A   I guess my testimony would be my wife handled all of
13     the cash and all of those positions. I did not
14     inquire into where she was keeping the money. I
15     understood that there was at least some cash in the
16     box. I don't know if she had other places where she
17     stored the money, but the point is that she
18     controlled that. I did not have knowledge about
19     those.
20 Q   Well, by April of 2014, at least, you knew that
21     there was in excess of $60,000 of cash in your
22     condominium?
23 A   I knew there was at least the amount that John
24     Steele received.
25 Q   All right. Going back to Ms. Brown's testimony and

23

1      focusing now on page 66 to 67, you read through
2      that, I know, earlier. And this testimony has to do
3      with cash at the time of the bankruptcy filing. And
4      in summation, what she testified was that you and
5      she sat down and counted the cash that was there at
6      the time of your bankruptcy filing. Is that true?
7  A   That's true. The amount that we counted up was the
8      amount that I put in my schedules.
9  Q   Well, her testimony is that there -- So was her
10     testimony not true when she's talking about the
11     process?
12 A   Well, I can tell you what happened and then you can
13     make the decision for yourself if it's consistent or
14     not consistent with her testimony. What happened is
15     I said, what money is in the trust; we need to
16     disclose that money on the bankruptcy schedule.
17 Q   Wait a minute. When you say in the trust, you mean
18     in a box sitting in your condominium?
19 A   The trust.
20 Q   It's cash sitting in a box in your condominium.
21     What trust is it in?
22 A   The Mill Trust.
23 Q   So it's your testimony, as an attorney, that cash
24     sitting in a box in your condominium was in the Mill
25     Trust?

24

1  A   Legally speaking, yes.
2  Q   Okay. So go ahead and finish telling me what it was
3      you did.
4  A   I asked her what money is left in the trust because
5      we need to disclose that on the bankruptcy filing.
6      She said, that's not your money. And I said, well,
7      we're going to disclose it out of an abundance of
8      caution to ensure that we're being as -- We're
9      disclosing everything possible; and if you want to
10     have a fight over that, you can have a fight over
11     that at the appropriate time. So I said, get
12     whatever money is left in there, let's count it up
13     and we can disclose it on the schedules. She came
14     back and she had whatever amount it was that I
15     disclosed on the schedules.
16 Q   So her testimony would indicate that you folks
17     counted up the money that was there and then
18     deducted from that total amount money that she was
19     going to keep to pay some bills. You see that,
20     right?
21 A   I don't agree that that's a correct characterization
22     of her testimony. What her testimony is, is that
23     she had the 20,900; but when she brought the money
24     out, she had the amount that we disclosed on the
25     schedules.

25

1  Q   Where does she say that, sir?  Would you just point
2      that out to me?
3              MS. MAY:  Line 18, 66.
4              MR. SEAVER:  Line 18 on page --
5              MS. MAY:  That's where she's talking
6      about 29,900, it looks like.  Is that where we're
7      coming up with the 29,900 hundred?
8              THE WITNESS:  Yep.
9  BY MR. SEAVER:
10  Q   So then I go on to say, I'm on page 67, line 4, so
11     you and Mr. Hansmeier sat down and counted out how
12     much money was left there, correct?  And she says,
13     yes.  I say, okay.  She says, pretty close; I mean,
14     there was probably some ones and stuff lying around.
15     And I say, what did you come up with for a total?
16     She says, I don't remember exactly how much it was.
17     I say, okay, then you and he talked and decided
18     rather than stating how much cash was actually
19     there, you would deduct for cash for things that you
20     were going to pay in the future?  And then she says,
21     for things that had already been purchased on my
22     credit cards and that needed to be paid off, they
23     had already -- I had already essentially bought
24     them; we had the things.
25              So just so I'm clear on what you're

26

1      saying here, sir, you didn't have a clue that there
2      was more than $8,554 in cash in that condominium on
3      the date that you filed bankruptcy?
4  A   That's correct.  I had no idea what the balance of
5      the cash was, other than I asked her to give us
6      whatever cash is in there so we can simply disclose
7      it on the schedules.
8  Q   And I sent a letter to Ms. May on February 4th and
9      asked for all documents and receipts evidencing what
10     was done with the $150,000 in cash that was taken
11     out of that TCF account.  You haven't given me
12     anything for that, have you?
13  A   I believe you've been provided documents related to
14     my wife's bank accounts, and you've also received
15     the Scott Trade wire transfer from the Scott Trade
16     account to my wife's personal TCF account.
17  Q   I haven't gotten any receipt for that 50 or 60,000,
18     however much money it was that you folks say that
19     you gave to the other attorney.  Is there such a
20     thing?
21  A   I don't believe we have a receipt, but we have my
22     wife's testimony of what happened, we have my
23     testimony of what happened and I'm sure Mr. Steele's
24     testimony would be consistent with that, as well,
25     plus the deposit I'm sure he made into a bank

27

1      account at some point of that amount.
2  Q   But you didn't even get a receipt from him when you
3      gave him the $60,000 or so?
4  A   We did not create a receipt and fill it out, no.
5  Q   I'm going to move on to the accounts receivable now,
6      and I'm just putting in front of you some documents.
7      I think they were on the drop box.  I think these
8      relate to accounts receivable, right?
9  A   That's correct.
10  Q   All right.  And is it accurate to say that -- Well,
11     let me just identify them.  There's a transfer into
12     your law firm account on July 30, 2015 of
13     $36,833.34, correct?
14  A   Could you repeat that, please?
15  Q   Oh, sure.  There's a transfer on July 30th of 2015
16     for $36,833.34, correct?
17  A   Yes, there's a transfer of that amount.
18  Q   And then the next page of this there's a transfer on
19     August 31st of 2015 for $17,500, correct?
20  A   Correct.
21  Q   The next page of this there's a transfer on
22     September 30 of 2015 for $28,344, correct?
23  A   That's correct.
24  Q   And then the last two pages there's a deposit slip
25     showing a $1,000 deposit, correct?

28

1  A   Correct.
2  Q   And these documents that I've just referred to, do
3      they accurately reflect the accounts receivable --
4      The collection of accounts receivable that existed
5      at the time your Chapter 13 was commenced?
6  A   Yes.
7  Q   All right.  And if you total these up, they total
8      something in excess of $83,000, correct?
9  A   That sounds correct.
10  Q   So your schedule said 72,000, but that was low,
11     correct?
12  A   No.
13  Q   How is that, sir?
14  A   Well, because these are the transfers that are paid
15     down on the accounts receivables.  The last transfer
16     included paydown of a receivable that was in excess
17     of the original amount.  So some of it is going
18     towards paying down receivables, some of it is money
19     that was not related to anything that was in the
20     estate as of the time of filing.
21  Q   But yet this is all you've given me in response to
22     my repeated requests for account receivable
23     information, isn't it, other than those four line
24     items?  And now you're telling me this doesn't
25     accurately represent accounts receivable payments?

29

| | | |
|---|---|---|
| 1 | A | It does accurately reflect account receivable |
| 2 | | payments.  The point I'm trying to make is that on |
| 3 | | the final payment, that's an amount of roughly |
| 4 | | $28,344, this is the transfer that paid down the |
| 5 | | remaining balance of the account receivables.  Some |
| 6 | | of it does not go towards account receivables; it |
| 7 | | goes towards account receivables that generated |
| 8 | | after the Chapter 13 filing. |
| 9 | Q | All right.  What I have been requesting for some |
| 10 | | time is some accounting for those pre-petition -- |
| 11 | | For the accounts receivable that existed at the time |
| 12 | | of filing, and what you're telling me is I still |
| 13 | | don't have it.  I can't possibly tell from these |
| 14 | | documents, in that last statement you were just |
| 15 | | talking about, what account -- What of those are |
| 16 | | account receivables at the time of filing, can I? |
| 17 | | Well, here, let me say it once more:  I want the |
| 18 | | records showing the post-petition collection of the |
| 19 | | accounts receivable that existed at the time of |
| 20 | | filing and I want to be able to see where those are |
| 21 | | coming from, all right? |
| 22 | A | I believe you have these, but I will ask my attorney |
| 23 | | to work with you to make sure you're getting what |
| 24 | | you're requesting.  I think this is what you're |
| 25 | | requesting.  You're telling me it's not, but I'll be |

30

| | | |
|---|---|---|
| 1 | | happy to try and provide them. |
| 2 | Q | All right.  So on the first page of this, this |
| 3 | | $36,833.34, that's all pre-petition accounts |
| 4 | | receivable, right? |
| 5 | A | It would be, yes. |
| 6 | Q | Okay.  And you got that 17 days after your |
| 7 | | bankruptcy filing, correct? |
| 8 | A | If that's the math, yes. |
| 9 | Q | Well, you filed on July 13th, right? |
| 10 | A | I believe that's correct. |
| 11 | Q | So when you got in this $36,833.34 that you knew was |
| 12 | | estate property, why didn't you just turn that money |
| 13 | | over to the Chapter 13 Trustee? |
| 14 | A | I'm not sure why I would have turned that money over |
| 15 | | to the Chapter 13 Trustee. |
| 16 | Q | Well, you scheduled it as an asset of the estate, |
| 17 | | didn't you? |
| 18 | A | Yes, but my understanding of using assets in the |
| 19 | | course of bankruptcy is that if you are operating a |
| 20 | | business, for example, in the ordinary course, which |
| 21 | | I was, the money would have gone to pay employees, |
| 22 | | pay rent, pay basic office overhead. |
| 23 | Q | So to come back to my question, so why didn't you |
| 24 | | turn it over to the Chapter 13 Trustee? |
| 25 | A | The accounts receivable were processed just as any |

31

| | | |
|---|---|---|
| 1 | | other business, to pay off -- To pay business |
| 2 | | expenses and continue operating the business. |
| 3 | Q | It just never occurred to you that perhaps you |
| 4 | | should turn it over to the Chapter 13 Trustee? |
| 5 | A | Again, I used the accounts receivable money to |
| 6 | | operate my business in the ordinary course. |
| 7 | Q | It just never -- Just answer my question, though, if |
| 8 | | you would:  Did it ever occur to you that you should |
| 9 | | turn that money over to the Chapter 13 Trustee? |
| 10 | A | I guess my answer continues to be it occurred to me |
| 11 | | to continue operating my business in the ordinary |
| 12 | | course.  And my understanding is that that was -- It |
| 13 | | was fine to operate my business in the ordinary |
| 14 | | course. |
| 15 | Q | Is your understanding that you were free to use |
| 16 | | those pre-petition assets in any way you deemed |
| 17 | | appropriate? |
| 18 | A | Nope. |
| 19 | Q | Here, let me put in front of you an affidavit that |
| 20 | | you signed, sir.  And this is an affidavit, Paul |
| 21 | | Hansmeier.  And if you go to the very last page, |
| 22 | | it's dated February 16, 2016.  Do you see that? |
| 23 | A | I do. |
| 24 | Q | And that's your signature, right? |
| 25 | A | It is. |

32

| | | |
|---|---|---|
| 1 | Q | And the second sentence or the third -- Or the |
| 2 | | second sentence up from the bottom says, the |
| 3 | | accounts receivables were used to run my law |
| 4 | | practice and to fund my Chapter 13 plan, correct? |
| 5 | A | That's what the sentence says, yes. |
| 6 | Q | So those receivables that existed at the time of |
| 7 | | filing that you collected after the bankruptcy |
| 8 | | filing were used to fund your Chapter 13 plan? |
| 9 | A | The receivables would have been used to -- |
| 10 | Q | Just answer my question, if you would, sir.  Well, |
| 11 | | let me ask you a different one:  Is this affidavit |
| 12 | | true? |
| 13 | A | Yes. |
| 14 | Q | Okay.  So it is true that the pre-petition accounts |
| 15 | | receivable were used to fund your Chapter 13 plan; |
| 16 | | is that true? |
| 17 | A | If I may answer the question. |
| 18 | Q | Is that true?  Is it true?  It's a yes-or-no |
| 19 | | question.  Is this affidavit, what I read, is it |
| 20 | | true or false? |
| 21 | A | The affidavit is true. |
| 22 | Q | Okay.  So why, when we asked Ms. May to turn over |
| 23 | | those funds that she's holding from the Chapter 13 |
| 24 | | Trustee, was that request refused? |
| 25 | A | It's my position that those are not assets of the |

**33**

1    Chapter 7 estate.
2  Q  Regardless of the fact that you have represented to
3    the Bankruptcy Appellate Panel that the pre-petition
4    receivables were used to fund the plan, you're
5    saying here, under oath, that they're not property
6    of the Chapter 7 estate?
7  A  My legal position is those funds --
8  Q  Is that what you're saying?
9  A  My legal position is that those funds are not
10   property of the converted Chapter 7 estate.
11  Q  And why is that, sir, if they were accounts
12   receivable that existed at the time the case was
13   filed?
14  A  I believe the Supreme Court's decision in -- I can't
15   remember the name of the case --
16         MS. MAY:  Harris.
17         THE WITNESS:  Harris -- states that
18   post-petition wages are not properly part of the
19   converted Chapter 7 estate.
20  BY MR. SEAVER:
21  Q  So you're saying when you took those accounts
22   receivable that existed at the time of filing and
23   ran them through your law firm, you somehow
24   transformed them into assets that are no longer
25   property of the bankruptcy estate; is that it?

**34**

1  A  That's my legal position, that these funds are not
2    property of the converted Chapter 7 estate.
3  Q  For the reason I just said; is that true?
4  A  Well, I don't think it's very fair to go through a
5    fully developed legal argument.  I believe this is
6    something we can brief and present to the Court and
7    receive a decision.
8  Q  Yeah, but I want your factual position here, sir.
9    Because you've made a representation to the
10   Bankruptcy Appellate Panel that the pre-petition
11   funds were used to fund your Chapter 13 plan, but
12   yet you won't turn the money over to me and I'm
13   entitled to know why that is.
14  A  It's a legal position.  And we can certainly brief
15   it before the Court and have the Court make a
16   determination whether my legal position is sound or
17   whether your legal position is sound.
18  Q  Well, let me just tell you that it's going to come
19   on very quickly.  The issue is going to be brought
20   to the Court very quickly.
21        So is it your view, sir, that you don't
22   have to pay the Chapter 7 -- You don't have to pay
23   any of the $72,000 in accounts receivable that
24   existed at the time of filing; there's no reason for
25   you to ever pay any of that money to the Chapter 7

**35**

1    estate?
2  A  I believe the accounts receivable --
3  Q  Is that your position, sir?
4  A  If you may allow me to talk through my position so I
5    can provide an answer to your question, is that
6    okay?
7  Q  Go ahead.
8  A  It's my understanding that the accounts receivable
9    were used in the ordinary course of operating a
10   business, just as they had been used prior to filing
11   and post-filing.  And due to their use in the
12   ordinary course of business, I don't believe they
13   are part of the converted Chapter 7 estate.
14  Q  Okay.  So when your Chapter 13 was filed, there was
15   $72,000 sitting right there that would have been
16   available to creditors, right?
17  A  There was $72,000 in accounts receivables.  The
18   creditors, I don't think, could have done much with
19   them.
20  Q  Well, you collected them all by August, right?
21  A  Yes.  The accounts receivables were -- Well, not by
22   August.  Whatever the last date of the -- September
23   I guess --
24  Q  Okay.
25  A  -- end of September.

**36**

1  Q  Right.  So by the end of September, that whole
2    $72,000 had come in.  And if you'd been in a
3    Chapter 7, it would have been paid to creditors.
4  A  If it was in a Chapter 7 at the time of the filing,
5    then, yes, I believe the creditors would have -- I
6    assume the Trustee would have taken an action to
7    liquidate those accounts receivables and pay them
8    off to the estate.
9  Q  And now they're just gone, in your view?
10  A  In the ordinary course of operating the law firm,
11   the accounts receivables were collected and they
12   were used to pay off ordinary business expenses.
13  Q  And in your view, the Chapter 7 Trustee just has no
14   ability to get that $72,000 back?
15  A  Yes.  I think that's one of the consequences of
16   converting an estate.  I think the law is pretty
17   clear that if you convert an estate and there was
18   assets that were used between the time of the
19   original filing and the time of conversion, that the
20   estate gets everything that was there at the time of
21   filing with the exception of assets that were used
22   in the ordinary course.
23        MR. SEAVER:  Mr. Kreuziger, I'm just
24   about done here.  Do you have anything?
25        MR. KREUZIGER:  I do have just a few

37

1    questions.

3                      EXAMINATION
4    BY MR. KREUZIGER:
5    Q   Mr. Hansmeier, my name is Colin Kreuziger.  I'm with
6        the United States Department of Justice and I
7        represent the U.S. Trustee.
8                      Following up on Mr. Seaver's questions
9        about the accounts receivable, do you have any
10       records that would substantiate your claim that you
11       used those accounts receivable that you collected to
12       pay business expenses?
13   A   Yes.  I believe the operating accounts of the law
14       firm, which I believe are in Mr. Seaver's
15       possession, would show how the funds were used.
16   Q   Do you have any other records that your law firm
17       keeps that would show the use of those funds to pay
18       the business expenses?
19   A   For example, ADP, the payroll processor, would show
20       funds being used, paying employees, for example.
21   Q   Does your law firm keep any kind of ledger?
22   A   I don't believe we do, but that's something I could
23       double check on.
24   Q   Can you provide any ledger or similar document to
25       me?

38

1    A   Yeah.  If I -- I'll go back and see if we have a
2        ledger.  And if I have a ledger, I'll -- Do you have
3        access to the drop box?
4    Q   I don't, but I'm sure that Mr. Seaver could provide
5        it.
6                MR. SEAVER:  Sure.
7                MR. KREUZIGER:  Mr. Seaver, do you have
8        the operating accounts for the law firm, as Mr.
9        Hansmeier has indicated?
10               MR. SEAVER:  You know, I don't remember
11       right offhand, Mr. Kreuziger, if they're in the drop
12       box or not.  There are some bank statements there
13       for sure, but I don't know if -- Are there operating
14       accounts, sir, I mean, as opposed to just bank
15       account statements?
16               THE WITNESS:  When I say operating, I'm
17       just distinguishing between like the IOLTA Trust
18       account and the operating account, so it would be
19       the bank account.
20   BY MR. KREUZIGER:
21   Q   So you also testified that some of the funds that
22       were collected that are attributed to these accounts
23       receivable were used to make Chapter 13 plan
24       payments, correct?
25   A   They were -- They were paid as post-petition wages

39

1        to me and then I used my post-petition wages to make
2        Chapter 13 payments.
3    Q   Okay.  And do you have documentation of -- Well,
4        strike that question.
5                      When the funds were delivered to you as
6        post-petition wages, how did they come to you?
7    A   They would have gone from my business account to my
8        joint checking account.
9    Q   Okay.  And have you provided bank statements to
10       Mr. Seaver that would evidence that?
11   A   I believe we have.
12               MR. SEAVER:  There aren't any payroll
13       checks, are there, sir?  There are just checks in
14       even amounts written by you to you drawn on the
15       Class Justice account?
16               THE WITNESS:  I would have withdrawn them
17       by checks, yes.
18               MR. SEAVER:  So there's no withholding on
19       any of those.  They're just checks that you wrote on
20       the Class Justice account, Paul Hansmeier, and then
21       you deposited into your account, right?
22               THE WITNESS:  I don't believe there's
23       withholding on those.  They were checks that I wrote
24       from my business account to myself and then
25       deposited them into the joint checking account with

40

1        my wife.

3    BY MR. KREUZIGER:
4    Q   Which checking account is that; what bank is that
5        held on?
6    A   It's Associated Bank.
7    Q   Now, you had testified about various bonds in the
8        Lightspeed case earlier and I just wanted to clarify
9        a few matters there.  With respect to the $60,000
10       that was paid to Mr. Steele --
11   A   Uh-huh.
12   Q   -- your testimony is that Ms. Brown gave those funds
13       in cash to Mr. Steele, correct?
14   A   That's correct.
15   Q   And you believe that would have been approximately
16       April of 2014?
17   A   Yes.
18   Q   And is it your testimony that those funds belonged
19       to Ms. Brown at the time of that transfer?
20   A   My testimony is that they belonged to the Mill Trust
21       at the time.
22   Q   And all the funds that went into the Mill Trust were
23       your funds originally, correct?
24   A   I believe that's correct, yes.
25               MR. SEAVER:  The funds had been paid out

41

```
 1    of the Mill Trust to Ms. Brown's personal account,
 2    though, you know that, right?
 3            THE WITNESS:  The custody of the funds
 4    was held in Ms. Brown's personal account, yes.
 5            MR. SEAVER:  Right.  The funds were
 6    transferred into her personal account, she took it
 7    out in cash?
 8            THE WITNESS:  Yes.  She had custody of
 9    the funds, that's correct, as the Trustee for the
10    Mill Trust.
11            MR. SEAVER:  The account that you had
12    those funds transferred into, sir, does it say that
13    it's an account held as trustee for the Mill Trust?
14            THE WITNESS:  Does Ms. Brown's personal
15    account say?
16            MR. SEAVER:  The personal account of
17    Ms. Brown that you had those funds transferred into,
18    does it say it's an account held in her capacity as
19    trustee of the Mill's Trust?
20            THE WITNESS:  I don't know.  I've never
21    reviewed the account document she has.
22            MR. SEAVER:  You don't know; is that your
23    testimony?
24            THE WITNESS:  My testimony is I've never
25    reviewed the account documents associated with my
```

42

```
 1    wife's account at TCF Bank.
 2            MR. SEAVER:  Go ahead, Mr. Kreuziger.
 3            MR. KREUZIGER:  Thank you, Mr. Seaver.
 4    BY MR. KREUZIGER:
 5    Q    With respect to -- I believe it's a $65,000 bond
 6         that was posted in August of 2015?
 7    A    Yes.
 8    Q    Okay.  So with respect to that bond, it's your
 9         testimony that none of the funds that were used to
10         post that bond were your funds, correct?
11    A    Mr. Steele posted the bond, yes.
12    Q    Well, that's not my question.  My question is, is
13         were any of the funds that were used to post the
14         bond your funds?
15    A    I don't claim ownership to any of those funds.
16    Q    Okay.  Did any of the funds that Mr. Steele used to
17         post that bond originate with the Mill Trust?
18    A    This is the point I was trying to make to Mr. Seaver
19         before:  I obviously transferred cash to him in the
20         amount of about 50 to $60,000 sometime in 2014.  I
21         don't know if any of that is traceable to the money
22         that he deposited with the Court for the bond, for
23         the $65,000 August 2015 bond.
24    Q    The way I understood your earlier testimony was that
25         the roughly $60,000 that Ms. Brown gave to
```

43

```
 1         Mr. Steele in cash was then used by Mr. Steele to
 2         post an earlier bond in the same case; is that
 3         right?
 4    A    That's my understanding of how he used those funds.
 5         When we gave him the funds, he was going to
 6         contribute it towards the approximately $260,000
 7         bond that was posted with the Court.  I can't --
 8         Obviously I can't tell you what Mr. Steele
 9         physically did with it after he took possession of
10         the cash and whether any of those funds that he
11         received would in some manner be traceable to the
12         amount he posted with the Court.  That's my only
13         point I'm trying to make.
14    Q    So what you're saying, then, is that it's possible
15         that the $60,000 in cash perhaps wasn't used for the
16         earlier bond because you don't know --
17            MS. MAY:  Only Mr. Steele would know
18         that.
19            THE WITNESS:  That's my testimony.  Only
20         Mr. Steele would know how he used the money.
21    BY MR. KREUZIGER:
22    Q    Okay.  So you can't really say, sitting here today,
23         whether or not any of the funds that Mr. Steele
24         posted in August of 2015 for that bond are
25         attributable to you, to the Mill Trust, to your wife
```

44

```
 1         or to Monyet, LLC; is that right?
 2    A    I think that's a fair statement because I don't know
 3         how he used the funds that he received and whether
 4         any of those funds are traceable to the amount
 5         that's on deposit with the Court right now.
 6    Q    Okay.  But to your knowledge, after -- This is a
 7         question about your knowledge:  After the $60,000
 8         was given by Ms. Brown to Mr. Steele in cash, to
 9         your knowledge neither you nor Ms. Brown gave
10         Mr. Steele any other money; is that right?
11    A    No.  I believe what my testimony was before was that
12         there may have been modest expenditures that came up
13         in connection with, for example, appellate costs or
14         something along those lines.  So I may have paid
15         half of something to him at a certain point in time,
16         but nothing -- Not a major transfer like a $60,000
17         transfer.
18    Q    So any of those transfers would be directly
19         attributable to reimbursing him for the costs of
20         pursuing the appeal; is that right?
21    A    Or something else would be similar to that, yes.
22    Q    Well, what else would be similar to that?
23    A    Well, I believe we paid some money to -- I guess I
24         can't think of anything in specific.  I know
25         appellate costs are one thing that comes up, but I
```

45

| | | |
|---|---|---|
| 1 | | can't think of any other specifically. |
| 2 | Q | Okay. With respect to the Groupon case that you |
| 3 | | testified about at the beginning of the meeting |
| 4 | | today, my understanding is that the request for |
| 5 | | attorney's fees is a request for approximately |
| 6 | | $200,000? |
| 7 | A | That's correct. |
| 8 | Q | Who does Ms. Brown owe the $200,000 to? |
| 9 | A | It's my understanding that first she'll get the |
| 10 | | money and the money is taxable, so she owes some to |
| 11 | | the federal government to pay off taxes on it. And |
| 12 | | then a significant portion, if not the remaining |
| 13 | | portion, would go to an attorney Nathan Worzel, who |
| 14 | | prosecuted the appeal on her behalf before the Ninth |
| 15 | | Circuit. |
| 16 | Q | Okay. Who is Nathan Worzel? |
| 17 | A | He's an attorney. |
| 18 | Q | Do you know him personally? |
| 19 | A | I do. |
| 20 | Q | And has he ever been an attorney in any firm that |
| 21 | | you've operated? |
| 22 | A | He's been employed by me in the past. |
| 23 | Q | Now, you said that she would owe the federal |
| 24 | | government money, but aren't you asking for, on her |
| 25 | | behalf, aren't you asking for $200,000 in attorney's |

46

| | | |
|---|---|---|
| 1 | | fees? |
| 2 | A | Yes. |
| 3 | Q | So is it your testimony that she owes Mr. Worzel |
| 4 | | $200,000 in attorney's fees? |
| 5 | A | I don't believe -- Whether she owes him that amount |
| 6 | | or not, I'm not sure of the exact number, but I do |
| 7 | | know that the theory behind the 10 percent -- I'm |
| 8 | | sorry -- Behind the request for $200,000 is on a |
| 9 | | common fund basis, which means that it's not |
| 10 | | necessarily directly tied to the amount of fees |
| 11 | | she's incurred, although it has to bear some logical |
| 12 | | relationship. It's more about the benefit she |
| 13 | | provided to the class and taking a percentage of it |
| 14 | | than anything else. |
| 15 | Q | So she doesn't actually owe somebody $200,000 in |
| 16 | | attorney's fees? |
| 17 | A | I guess you'd have to ask Ms. Brown. Just |
| 18 | | speculating at this point. |
| 19 | Q | Well, have you reviewed any invoices or billings |
| 20 | | that she's received from any attorneys in order to |
| 21 | | draft whatever you filed with the Court on her |
| 22 | | behalf? |
| 23 | A | No, I did not review billings or invoices. |
| 24 | Q | So the number is purely based off of this percentage |
| 25 | | recovery that you've described? |

47

| | | |
|---|---|---|
| 1 | A | It's based off the common fund. Oftentimes the |
| 2 | | Court will perform a cross-check to see if this is |
| 3 | | reasonable, given the amount of time expended to do |
| 4 | | a particular action. In here the cross-check is the |
| 5 | | reference to the plaintiff's attorneys' billings, |
| 6 | | which, for their appeal, I believe it exceeded over |
| 7 | | a million dollars to do not just the appeal, but all |
| 8 | | of the post-original settlement filing work. |
| 9 | Q | So would it be accurate to say, then, that you don't |
| 10 | | really know how much she owes in attorney's fees? |
| 11 | A | Do I personally know? No. |
| 12 | Q | Okay. And you haven't seen any records that would |
| 13 | | tell you that? |
| 14 | A | That's correct. |
| 15 | Q | Okay. |
| 16 | | MR. KREUZIGER: I have nothing further, |
| 17 | | Mr. Seaver. |
| 18 | | MR. SEAVER: And I don't think that I do. |
| 19 | | But, once again, on these accounts receivable, what |
| 20 | | I have been asking for and I thought I was clear on, |
| 21 | | I want to be able to track those accounts |
| 22 | | receivable. I want to see when they were paid, when |
| 23 | | they came in, I want to see the existence of them at |
| 24 | | the time of filing. And all I've gotten are those |
| 25 | | first thing, the four line items, and then these |

48

| | | |
|---|---|---|
| 1 | | documents that we looked at today. So that's what I |
| 2 | | want. |
| 3 | | MS. MAY: You were also talking about the |
| 4 | | bank account statements, personal and business. Can |
| 5 | | you give me better times and dates you want those |
| 6 | | for and then I can check the drop box and make sure |
| 7 | | you've got them? |
| 8 | | MR. SEAVER: Today I was talking about |
| 9 | | that, Ms. May? |
| 10 | | MS. MAY: Well, it was -- |
| 11 | | MR. SEAVER: It was when Mr. Kreuziger |
| 12 | | and Mr. Hansmeier were talking? |
| 13 | | MR. KREUZIGER: Yeah. I mean, if there's |
| 14 | | anything you think I need, just let me know. |
| 15 | | MS. MAY: Yeah, let me know. Because the |
| 16 | | question was did the AR go into his account and can |
| 17 | | we track it from the business account to the |
| 18 | | personal account. You asked if he had gotten the |
| 19 | | bank statements and he said he put it in your drop |
| 20 | | box. |
| 21 | | MR. SEAVER: Okay. |
| 22 | | MR. KREUZIGER: I can get you a specific |
| 23 | | request. |
| 24 | | MS. MAY: If you would, thanks, Colin, |
| 25 | | because I can come up with those. |

49

1          MR. SEAVER:  All right.  So I'm going to
2     conclude the 341 meeting.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

50

1     STATE OF MINNESOTA)
                     )  ss.
2     COUNTY OF HENNEPIN)
3
4
5                    REPORTER'S CERTIFICATE
6
7
8               I, Julie Rixe, do hereby
9     certify that the above and foregoing transcript of the
10    digitally-recorded proceeding, consisting of the
11    preceding 48 pages, is a full, true and complete
12    transcript of the digitally-recorded proceedings to the
13    best of my ability.
14               Dated February 29, 2016.
15
16
17
18    _____
      JULIE RIXE
19    Court Reporter
20
21
22
23
24
25

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

---

Bky No. 15-42460

In re:                                                          Chapter 7 Case

Paul Hansmeier,

      Debtor.

---

### Memorandum in Support of Trustee's Motion for Turnover

---

### <u>INTRODUCTION</u>

The trustee's motion seeks entry of an order requiring the debtor's counsel, Barbara May, to turn over to the trustee, the $10,169.81 of Chapter 13 plan payments (the "Funds") currently in her possession, pursuant to this Court's December 29, 2015 Order.  The relevant facts for this matter are set forth in the trustee's Motion for Turnover.

### <u>BACKGROUND</u>

The facts relevant to this motion are simple.  According to the debtor's Schedule B, at the time he filed the Chapter 13 petition, he had $72,000 in accounts receivable.  According to the debtor, by the time this court converted the case to one under Chapter 7, he had collected all of the accounts receivable. The debtor admitted, at the second session of his §341 meeting that, had the case been a Chapter 7 case, the trustee would simply have collected those accounts receivable and the monies would have been available for creditors.  A copy of the February 25, 2015 §341 transcript is attached to the Turnover Motion as Exhibit 5.

After this Court denied his motion for a stay pending appeal, the debtor sought such a stay from the Eighth Circuit BAP.  In support of that motion, the debtor clearly, and unequivocally, represented to the Eighth Circuit BAP as follows:

"The accounts receivables were used to run my law practice and <u>to fund my Chapter 13 plan.</u>" (Emphasis Added).

See Exhibit 4 to Motion for Turnover.

## ARGUMENT

The only issue in front of the court on this matter is whether or not the funds held by Ms. May are property of the debtor's Chapter 7 bankruptcy estate.  If the funds are property of the debtor's bankruptcy, the trustee is entitled to the immediate turnover of those funds pursuant to 11 U.S.C. § 542(a).

The debtor has asserted that the Funds are post-petition wages and, therefore, are excluded from the debtor's chapter 7 bankruptcy estate, citing to the Supreme Court's decision in *Harris v. Viegelahn*, 135 S.Ct. 1829 (2015).  The Supreme Court in *Harris* found that post-petition wages are property of the bankruptcy estate pursuant to 11 U.S.C. § 1306(a), however, those funds do not come into the Chapter 7 estate upon a voluntary conversion, absent bad faith. The trustee objects to the debtor's contention that when, essentially, he moved the accounts receivable from one of his pockets to another one of his pockets they ceased to be estate property.

A.    The Debtor's Estate

The commencement of the debtor's case under Bankruptcy Code § 301 created an estate comprised of virtually all legal or equitable interests of the debtor in property wherever located. 11 U.S.C. § 541(a).  According to the debtor's bankruptcy schedules, at the commencement of his case he had accounts receivable valued at $72,000.  See Exhibit 2 to Trustee's Motion.  The accounts receivable were owed to him for services he had performed prior to the filing of his Chapter 13 petition.

Pursuant to 11 U.S.C. § 541(a)(6) the bankruptcy estate is also comprised of any "proceeds, product, offspring, rents, or profits of or from property of the estate, …"  Therefore, any monies received on behalf of the pre-petition account receivables would unquestionably constitute proceeds of an estate asset, the accounts receivable. Id. See *In re HMH Motor Servs.,*

2

*Inc.,* 259 B.R. 440, 452 (Bankr. S.D. Ga. 2000).  The debtor has admitted that the Funds are

proceeds from the scheduled accounts receivables, as such they are property of the debtor's

bankruptcy estate.

Upon conversion of the debtor's case to one under Chapter 7, the property of the estate

for the converted case includes all property of the estate as of the Chapter 13 petition date, which

still remains as of the conversion. 11 U.S.C. § 348(f); See *In re Harris*, 135 S.Ct. at 1837.

Accordingly, any remaining accounts receivable, or proceeds from accounts receivable, are

property of the Chapter 7 bankruptcy estate upon conversion of the debtor's case.  *Id.*

B.      The Funds are not Post-Petition Wages Excluded from the Estate

In order for the Funds to be excluded from the Chapter 7 bankruptcy estate, they would

have to be post-petition wages, which although includable in the estate in a Chapter 13, pursuant

to § 1306(a), would be excluded from the bankruptcy estate in a Chapter 7 or converted case

under § 541(a)(6).  Pursuant to earnings exception of 11 U.S.C. § 541(a)(6), post-petition

earnings are excluded from the bankruptcy estate when they are "earnings from services

performed by an individual debtor after the commencement of the case."  See *In re Powell,* 187

B.R. 642, 644 (Bankr. D. Minn. 1995)(This exclusion from the bankruptcy estate is embodied in

§ 541(a)(6) and is commonly referred to in bankruptcy parlance as the "earnings exception.").

The debtor's assertion that the Funds are post-petition wages does not satisfy the exception

provided by §541(a)(6).  Any funds paid to the debtor on the account of the pre-petition accounts

receivable are derived from pre-petition services, not post-petition services as argued by the

debtor.

C.      Representation by the debtor to the Eighth Circuit BAP

The debtor attempted to convince the Eighth Circuit BAP to issue an order staying this

Court's order converting the case to a Chapter 7.  By the time this Court had ruled on the stay

motion, the trustee had discovered that the debtor had liquidated $72,000 in accounts receivable

3

during the Chapter 13.  In an effort to convince the Eighth Circuit BAP to issue the order that

this Court refused to issue, the debtor tried to convince the Eighth Circuit BAP that his use of the

accounts receivable was appropriate.  In so doing, he clearly and unequivocally represented to

the Eighth Circuit BAP that "the accounts receivables were used to run my law practice and <u>to

fund my Chapter 13 plan</u>." (Emphasis Added).  Of course, he made no mention to the Eighth

Circuit BAP of his intention to keep the receivable monies he used to fund his Chapter 13 plan,

because that would undermine his plea to the Eighth Circuit BAP.  Now, however, because he

would like to get his hands on the account receivable monies which he admitted that he used to

fund the Chapter 13 plan, he is attempting to impeach his own representation to the Eighth

Circuit BAP.

<u>**CONCLUSION**</u>

The accounts receivable scheduled by the debtor were estate property as of the filing

date.  The debtor's collection and liquidation of those assets did not remove that interest from the

bankruptcy estate, and the transfer of those funds to the debtor did not somehow transform that

interest into post-petition wages.  As set forth above, the $10,169.81 held by Barbara May is

property of this bankruptcy estate and the Trustee is entitled to an order compelling the turnover

of those funds.

**FULLER, SEAVER, SWANSON & KELSCH, P.A.**

Dated: March 4, 2016                    By:  /e/ Matthew D. Swanson
                                        Matthew D. Swanson            390271
                                        Randall L. Seaver            152882
                                        12400 Portland Avenue South, Suite 132
                                        Burnsville, MN 55337
                                        Telephone: 952-890-0888

4

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

BKY No. 15-42460

In re:

Paul Hansmeier,

                    Debtor.

## UNSWORN CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2016, I caused the following documents:

  1.    Notice of Hearing and Motion for Turnover of Property;
  2.    Memorandum in Support of Trustee's Motion; and
  3.    Order Regarding Turnover of Property (proposed).

to be filed electronically with the Clerk of Court through ECF, and that the above documents will be delivered by automatic e-mail notification pursuant to ECF and this constitutes service or notice pursuant to Local Rule 9006-1(a).

I further certify that I caused a copy of the foregoing documents to be mailed by first-class mail, postage pre-paid to the following:

| Paul Hansmeier | Barbara J May |
|---|---|
| 3749 Sunbury Cove | Attorney at Law |
| Woodbury, MN 55125 | 2780 Snelling Ave N, Suite 102 |
| | Roseville, MN 55113 |

**FULLER, SEAVER, SWANSON & KELSCH, P.A.**

Dated: March 4, 2016

By: /e/ Matthew D. Swanson
    Matthew D. Swanson
    12400 Portland Avenue South, Suite 132
    Burnsville, MN 55337
    (952) 890-0888

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MINNESOTA

BKY No. 15-42460

In re:

Paul Hansmeier,

        Debtor.

## ORDER

This case is before the court on the trustee's motion for the turnover of property of the bankruptcy estate.  Appearances, if any, were noted upon the record.

Upon the motion and the files,

IT IS ORDERED:

Barbara May shall turn over to the trustee, immediately upon entry of this Order, the sum of $10,169.81, currently in her possession pursuant to this court's order of December 29, 2015.

Dated:                                        _____

                                       Kathleen H. Sanberg
                                       United States Bankruptcy Judge