## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

---

In re:                                                     BKY No. 15-42460
                                                            Chapter      7
Case

      Paul Hansmeier,

      Debtor.

---

### NOTICE OF HEARING AND MOTION FOR ORDER
### COMPELLING JOHN L. STEELE
### TO TURN OVER DOCUMENTS

---

1.       Randall L. Seaver, the Chapter 7 trustee herein, moves the court for the relief request below and gives notice of hearing herewith.

2.       The Court will hold a hearing on this motion at 9:30 a.m. on April 13, 2016.  The hearing will be held in Courtroom 8W, U.S. Bankruptcy Court, 300 South Fourth Street, Minneapolis, MN 55415.

3.       Any response to this motion must be filed and served by delivery not later than April 8, 2016 which is five days before the time set for the hearing (including Saturdays, Sundays and holidays).   UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.

4.       This Court has jurisdiction over this motion under 28 U.S.C. §157 and §1334 and Bankruptcy Rule 5005.  This motion is filed under Local Rule 9013-2, this proceeding arises under 11 U.S.C. § 542(e) and Local Rule 6072-1.

5.       The petition commencing the Chapter 13 case was filed on July 13, 2015.  The case was converted to one under Chapter 7 on December 3, 2015.  The case is now pending in this court.

6.       John L. Steele ("Steele") and the debtor were apparently shareholders in a law firm, or law firms.  Their law practice activities resulted in large sanctions issued against them by

various courts.  It appears that monies were posted, either in the form of bonds or through cash filings, with various courts as a result of some of the sanctions awarded.  The trustee believes that John Steele is an insider of the debtor.

7.      In 2013, the debtor had sole control over a Scottrade account held in the name of Monyet, LLC ("Scottrade Account").  On or about November 22, 2013, the debtor transferred $175,000 from the Scottrade Account to a TCF bank account held in the name of Padraigin Browne ("TCF Account").  In December, 2013, Browne withdrew $150,000 in cash from the TCF Account and hid it in a box in a closet in the condominium occupied by the debtor and Browne.

8.      On or about February 7, 2014, the debtor caused a $70,000 wire transfer to be made from the Scottrade Account to the TCF Account.  Browne then began a series of $2,000 cash withdrawals from the TCF Account.  As a result of the $150,000 cash withdrawal and the other $2,000 cash withdrawals, by March, 2014, approximately $180,000 in cash was hidden in a box in the condominium occupied by the debtor and Browne.  On February 16, 2016, after obtaining bank records, the trustee conducted the examination of Browne and made specific inquiry regarding the transfers into the TCF Account, and the withdrawal and use of cash from the TCF Account.  A copy of the transcript of the February 16, 2016, examination of Padraigin Browne is attached as Exhibit 1.  See pages 21 – 25, 29 – 32, 59 – 68.

9.      An approximate timeline of events showing the timing of these transfers with relation to the dates that the courts were entering sanction orders against the debtor, is attached hereto as Exhibit 2.

10.      After the trustee discovered over $180,000 in cash withdrawals made by Browne from the TCF Account, the debtor admitted as follows:

Q. Okay. Did you help her count the $150,000 cash withdrawal?
A. No.
Q.  But you knew it was in a box, stored in a box in your house after she withdrew it, correct?
A. Yes.

A copy of the transcript of the February 25, 2016 Hansmeier §341 meeting is attached hereto as Exhibit 3.  See pages 17 – 20.

11.     After commencement of the debtor's Chapter 13 case, both the debtor and Browne were questioned, under oath, by attorney, Edward Sheu.  Copies of pages 43 - 47 of the transcript of testimony of the debtor, and pages 40-42 of the transcript of testimony of Browne regarding the use of the $245,000 transferred into the TCF Account by the debtor are attached hereto as Exhibits 4 and 5.

12.     After this case was converted to a Chapter 7, but before the trustee uncovered the cash withdrawals from the TCF Account, the debtor appeared for the initial phase of the §341 meeting on January 21, 2016, and was questioned by the trustee under oath.  At that meeting, the debtor testified about the purpose of the transfers of monies to the TCF Account.  Copies of pages 41 – 42 and 49 - 50 from that examination are attached as Exhibit 6.

13.     According to the February 16, 2016, testimony of Browne, perhaps $60,000 in cash was paid to Steele to post a bond.  It appears that Browne believes the transfer occurred not earlier than December 14, 2013.  Exhibit 1, pages 60 - 63.

14.     On February 22, 2016, just days after the trustee had discovered the alleged cash payment to Steele, the debtor's attorney, Barbara May, sent an email to Matthew Swanson, an attorney for the trustee.  A copy of the email is attached hereto as Exhibit 7.  The email disclosed, for the first time, the apparent interest of the estate in a $65,000 supersedeas bond.  Ms. May stated in the email as follows:

"This case has a $65000 supercedeas bond.  It is in the estate's interest to have this appeal come down in Mr. Hansmeier's favor, so that the bond can be paid over to the estate."

15.     At the continued §341 meeting held on February 25, 2016, the trustee showed the debtor a copy of the email and asked the debtor if he had seen it before.  The debtor confirmed that he had.  The trustee then asked the debtor:

Q.  Okay.  Is everything in here accurate?

A. Yeah, I believe so.

See pages 10 – 11, Exhibit 3.

16.     After Browne admitted that cash was given to Steele, the debtor admitted, at the second phase of the §341 meeting held on February 25, 2016, as follows:

Q.  Okay.  Did any of the funds that Mr. Steele used to post that bond originate with the Mill Trust?

A.  This is the point I was trying to make to Mr. Seaver before:  I obviously transferred cash to him in the amount of about 50 to $60,000 sometime in 2014.  I don't know if any of that is traceable to the money that he deposited with the Court for the bond, for the $65,000 August 2015 bond. (Emphasis Added).

See pages 41 – 44, Exhibit 3.

17.     Additional testimony from the debtor at the February 25, 2016 §341 meeting was as follows:

Q.  Right.  Did you or Ms. Browne give Mr. Steele any money to put into that bank account that constituted that payment to the Court in August of 2015?

A.  The major transfer I made to John Steele was the cash in approximately 2014.  So I don't know if it's the Trustee's position that that's somehow my money that John Steele put in there or not, but we did not cut him a check, for example, immediately before him posting the bond with the Southern District of Illinois.  (Emphasis Added)

See pages 20 – 21 at Exhibit 3.

18.     During early 2014, the debtor received monthly checks from Steele in the amount of $2,500.  Redacted copies of two such checks are attached hereto as Exhibit 10.

4

19.     Steele has information regarding monies paid to him by the debtor and/or Browne, and also has information regarding monies, if any, paid by Steele to the debtor.

WHEREFORE, the trustee requests an order of the court compelling John L. Steele to turn over to the trustee, within seven (7) days from the entry of the order on this motion, the following records:

1.      All communications between John L. Steele and any of the following from January 1, 2013 to date:

    a.  Paul Hansmeier;
    b.  Monyet, LLC;
    c.  Padraigin Browne;
    d.  Class Justice, PLLC;
    e.  Class Action Justice Institute; and
    f.  Alpha Law Firm.

2.      Copies of any and all documents relating to or evidencing the purpose for the $2,500 monthly transfers to Paul Hansmeier as evidenced by check nos. 1903 and 1904 attached hereto as Exhibit 10.

3.      Copies of any and all documents evidencing or relating to all transfers and the reason for all transfers, of any monies to John L. Steele by any of the following from January 1, 2013 to date:

    a.  Paul Hansmeier;
    b.  Monyet, LLC;
    c.  Padraigin Browne;
    d.  Class Justice, PLLC;
    e.  Class Action Justice Institute; and
    f.  Alpha Law Firm.

4.      Copies of any and all bank statements, money orders, wire transfers and any and all other documents evidencing or relating to the receipt, deposit and use of any monies transferred to John L. Steele by any of the following from January 1, 2013 to date:

      a.  Paul Hansmeier;
      b.  Monyet, LLC;
      c.  Padraigin Browne;
      d.  Class Justice, PLLC;
      e.  Class Action Justice Institute; and
      f.  Alpha Law Firm.

5.     Copies of any and all other documents evidencing the transfer of any monies from John L. Steele to, on account of or on behalf of any of the following from January 1, 2013 to date:

      a.  Paul Hansmeier;
      b.  Monyet, LLC;
      c.  Padraigin Browne;
      d.  Class Justice, PLLC;
      e.  Class Action Justice Institute; and
      f.  Alpha Law Firm.

6.     Copies of any and all bank statements, money orders, wire transfers and any all other documents relating to or evidencing the receipt, deposit and use of approximately $60,000 in cash allegedly given to John L. Steele by the debtor and/or Padraigin Browne.

7.     Copies of any and all documents including, without limitation, bank account statements from which funds were drawn, money orders, checks and wire authorizations relating to or evidencing the source of funds used to pay all of the following:

      a.  Wire transfer in the amount of $65,000 filed with the court on or about August 10, 2015 in the case of Light Speed Media Corporation v. Smith, et al., civil docket no. 3:12-CV-00889;

      b.  Wire transfer in the amount of $47,171.75 filed with the court on or about August 10, 2015 in the case of Light Speed Media Corporation v. Smith, et al., civil docket no. 3:12-CV-00889; and

      c.  Supersedeas bond in the amount of $287,300 filed with the court on or about April 8, 2014 in the case of Light Speed Media Corporation v. Smith, et al., civil docket no. 3:12-CV-00889.

**FULLER, SEAVER,
SWANSON & KELSCH, P.A.**

Dated: March 30, 2016                    By: /e/ Matthew D. Swanson
                                         Matthew D. Swanson          390271
                                         Randall L. Seaver           152882
                                         12400 Portland Avenue South, Suite 132
                                         Burnsville, MN 55337
                                         (952) 890-0888

                                         Attorneys for Randall L. Seaver, Trustee


## <u>VERIFICATION</u>

I, Randall L. Seaver, trustee for the Bankruptcy Estate of Paul Hansmeier named in the foregoing notice of hearing and motion for turnover of property declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information and belief.


Executed on March 30, 2016              /e/ Randall L. Seaver
                                         Randall L. Seaver, Trustee

# In The Matter Of:

*In re: Paul Hansmeier*

---

*Padraigin Browne*
*February 18, 2016*

---

*Shaddix & Associates*
*9100 West Bloomington Freeway*
*Suite 122*
*Bloomington, Minnesota 55431*

Min-U-Script® with Word Index

# EXHIBIT 1

**Page 1**

1                   UNITED STATES BANKRUPTCY COURT
2                        DISTRICT OF MINNESOTA
3    -----------------------------------------------------
4    In re:
5    Paul Hansmeier,                    BKY No. 15-42460
6              Debtor.
7    -----------------------------------------------------
8              DEPOSITION and EXHIBITS of PADRAIGIN BROWNE,
9    taken in the above-styled cause pursuant to Notice at Suite 132,
10   12400 Portland Avenue South, City of Burnsville, County of
11   Dakota, State of Minnesota, before Colleen M. Sichko, Registered
12   Professional Reporter and notary public, on the 18th day of
13   February, 2016, commencing at approximately 12:30 p.m.
14                         *    *    *
15
16
17
18
19
20
21
22
23
24
25

**Page 2**

1    APPEARANCES:
2              RANDALL L. SEAVER, Attorney at Law,
3    FULLER, SEAVER, SWANSON & KELSCH, PA, Suite 132,
4    12400 Portland Avenue South, Burnsville, Minnesota
5    55337, rseaver@fsgklaw.com, appeared as counsel for and
6    on behalf of the trustee.
7              DAVE BURNS, Attorney at Law, DAVE BURNS
8    LAW OFFICE, LLC, 475 Grain Exchange North, 301 Fourth
9    Avenue South, Minneapolis, Minnesota 55415,
10   dave@daveburnslaw.com, appeared as counsel for and on
11   behalf of the witness.
12
13
14
15
16
17
18
19
20
21
22
23              (Whereupon, the following proceedings were
24   duly had, and entered of record, to-wit:)
25

**Page 3**

1                          I N D E X
2    WITNESS                                              PAGE
3    PADRAIGIN BROWNE
4         Examination by Mr. Seaver                        4
5
6    BROWNE DEPOSITION EXHIBITS                          MARKED
7    1 - Letter to Ms. Browne from Mr. Swanson            7
         dated 12/23/15
8    2 - Email to Mr. Swanson from Mr. Burns              8
         dated 2/5/16
9    3 - Letter to Mr. Burns from Mr. Swanson            11
         dated 1/12/16
10   4 - Scottrade Authorization to Wire Brokerage       12
         Funds dated 7/30/13
11   5 - Schedule B - Personal Property                  14
12   6 - TCF account statements                          15
13   7 - TCF Bank (3276) Deposits and Cash Withdrawn     16
14   8 - Associated Bank statements 2013                 32
15   9 - Associated Bank (1853) Possible Cash Deposits   36
         2014
16   10 - Associated Bank statements 2014                37
17   11 - Associated Bank statements 2015                43
18   12 - Associated Bank (1853) Possible Cash Deposits  43
          2015
19   13 - Associated Bank deposit slip and GL Debit slip 63
20   14 - Lakes Sotheby's Listing Contract dated 9/16/15 70
21   15 - Coldwell Banker Burnet Purchase Agreement      76
          dated 11/9/15
22   16 - Residential Lease dated 9/26/15                77
23
24
25

**Page 4**

1                     I N D E X   (CONTINUED)
2    BROWN DEPOSITION EXHIBITS (Continued)               MARKED
3    17 - ALTA Settlement Statement - Seller, dated 12/15/15  79
4    18 - Fix Design Haus invoice dated 10/5/15          82
5    19 - Duane's Floor Service invoice dated 10/9/15    82
6    20 - Midwest Interiors invoice dated 11/3/15        82
7    21 - Pride Electric invoice dated 10/30/15          82
8    22 - CR Heating invoice dated 12/1/15               82
9    23 - Polina's Cleaning invoice, undated             82
10   24 - J. Nordstrom Plumbing invoice dated 10/7/15    82
11   25 - Roell Painting Company invoice dated 10/20/15  82
12   26 - Letter to Mr. Seaver from Mr. Burns dated 2/17/16  86
13   27 - Transcript of proceedings held 10/28/15        88
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1                  PADRAIGIN BROWNE,
2          having been first duly sworn, was
3      examined and testified on her oath as follows:
4                   EXAMINATION
5  BY MR. SEAVER:
6  Q    Would you state your name, please?
7  A    Padraigin Browne; P-a-d-r-a-i-g-i-n; Browne, B-r-o-w-n-e.
8  Q    And Ms. Browne, you're here pursuant to a subpoena that I
9      had served on you, correct?
10 A    That is correct.
11 Q    And you've had your deposition taken -- was it just once
12     before this --
13 A    Yes.
14 Q    -- in this bankruptcy case?
15 A    That's correct.
16 Q    All right. The testimony that you gave at that time, was
17     that truthful testimony?
18 A    Yes.
19 Q    Okay. You're an attorney; is that correct?
20 A    Yes.
21 Q    Are you currently practicing?
22 A    I'm currently doing some doc review.
23 Q    Okay. For what law firm?
24 A    For Kroll On Track.
25 Q    What's Kroll On Track?

Page 6

1  A    They are a very large company that does a variety of
2      support services, not just in the legal field, but they
3      have a legal support division.
4  Q    Okay. You're no longer, at least at this point, you're not
5      employed as a patent attorney?
6  A    That's correct.
7  Q    The law firm that you were employed with as a patent
8      attorney, when they paid you, did they do withholding?
9  A    Do you mean on taxes?
10 Q    Right, that's what I mean, did they do federal and state
11     withholding?
12 A    No.
13 Q    Okay. You weren't an independent contractor?
14 A    No, I got a paycheck.
15 Q    Okay, okay. So I know you've had your deposition taken
16     once, but I'll just run through it again. You understand
17     that you're answering questions under oath, right?
18 A    Yes.
19 Q    If I ask you a question that you don't understand, just
20     tell me that and I'll rephrase it. All right?
21 A    Okay.
22 Q    And we have to try not to talk at the same time.
23 A    Okay.
24 Q    All right. One last thing: Don't shake or nod your head
25     yes or no because the court reporter can't take that. All

Page 7

1      right?
2  A    Okay.
3          (Browne Deposition Exhibit 1 was marked for
4            identification by Mr. Seaver and attached
5            hereto.)
6  BY MR. SEAVER:
7  Q    All right. I'm showing you what has been marked as
8      Deposition Exhibit Number 1, and the first page of that,
9      ma'am, if you would look at it, is a copy of a letter from
10     Matthew Swanson of my law firm to you dated December 23,
11     2015, sending to you a copy of the subpoena that had --
12     that was served in this case, correct?
13 A    Yes.
14 Q    Did you receive this letter?
15 A    I believe so, yes.
16 Q    All right. And he's saying in the letter, in the third
17     sentence, "I want to make sure you get a copy of this
18     subpoena as soon as possible because some of the
19     information sought by the subpoena relates to the recent
20     sale of the property at 100 Third Avenue South, #3201,
21     Minneapolis," correct?
22 A    Yes.
23 Q    And he's telling you, "We need all of the information
24     relating to that sale as soon as possible in order to
25     analyze rights and claims," correct?

Page 8

1  A    Yes.
2  Q    Now let's turn to the attachment to the subpoena that has
3      the list of documents to be produced. Ma'am, do you know
4      the day that the documents were actually produced per the
5      subpoena?
6  A    No, I don't.
7  Q    Does February -- even if you don't, does February 5th sound
8      correct to you?
9  A    It seems reasonable.
10         MR. SEAVER: Okay. Mr. Burns, could you just
11     confirm that was the day the documents --
12         MR. BURNS: I would have to look at my
13     records.
14         MR. SEAVER: Sure, let me just -- we can just
15     mark this while we're talking.
16         (Browne Deposition Exhibit 2 was marked for
17           identification by the court reporter and
18           attached hereto.)
19 BY MR. SEAVER:
20 Q    So I'm marking what is just an email that I'm marking as
21     Exhibit Number 2, and it's an email from Mr. Burns. He's
22     your attorney, correct?
23 A    He is.
24 Q    All right. It's an email from him to Mr. Swanson
25     indicating that documents are available in a dropbox,

**Page 9**

1 correct?
2 A Yes.
3 Q Okay. Now, back to the subpoena itself, item 1 -- I'm not
4 going to read through it all, but it's checking account
5 statements. Did you provide all the checking account
6 statements and registers for the sorts of accounts
7 indicated?
8 A I believe so.
9 Q Okay.
10 A I believe that I had not put in the most recent one and you
11 asked for those and we gave those to you this morning.
12 Q Okay. Then down at item number 4, it's the copies of
13 documents relating or evidencing moneys contributed by you
14 for the payment of any of the following and, specifically,
15 I am directing your attention to item 4A at this point.
16 When you -- when the original purchase occurred, that was
17 in March of 2013, correct?
18 A Yes, March 15th, I believe.
19 Q All right. When that occurred, the money to close on it
20 came from two sources, a check from Mr. Hansmeier and the
21 mortgage that you both signed; is that correct?
22 A I believe so, yes.
23 Q Okay. And there had been an earlier earnest money payment,
24 too, just to be absolutely correct?
25 A Yes.

**Page 10**

1 Q Okay. In item 6 of this Exhibit A is the -- looking for
2 documents relating to payment of any student loans by
3 Mr. Hansmeier, any of your student loans by Mr. Hansmeier.
4 A Mm-hmm.
5 Q I didn't see any documents in there other than bank account
6 statements showing some student loan payments. Other than
7 that, I didn't see anything indicating -- confirming
8 Mr. Hansmeier's payments of any of your student loans.
9 A So he gave me money. I believe there's -- I don't have --
10 I don't have the deposit slips, but he gave me money and
11 then I deposited that in my account and paid off my student
12 loans with that money.
13 Q Okay. And when did the student loan payoff actually
14 happen?
15 A In 2012, I believe.
16 Q Okay. And what was the rough amount? I'm not looking for
17 an exact amount. Was it less than 10,000?
18 A I think it was -- I think it was closer to 40, but I'm
19 not --
20 Q Okay.
21 A I'm not positive how much it was.
22 Q Okay, okay. Under 50,000 do you think?
23 A I think so. I know that my total was 80 when I graduated,
24 it was around 80, and I know that I had been making
25 payments for a while.

**Page 11**

1 Q Okay.
2 A So I think it was probably under 50.
3 Q Okay. Under 60,000 for sure; could that be right?
4 A Yeah.
5 Q Okay. And then the last page of the exhibit to the
6 subpoena, if you would just turn to it, it's item number 9
7 and it's "Copies of checks or other instruments by which
8 the security deposit and all lease payments were made," and
9 specifically the security deposit, how was that paid?
10 A With a certified check. If you don't have -- I don't have
11 I don't have -- I don't have the little slip that's left.
12 Q Sure.
13 A But you can see the withdrawal that occurred to make the
14 certified check out of the Associated Bank account.
15 Q Okay. Is it a withdrawal out of the account just in your
16 name?
17 A I'm 95 percent sure it was out of mine.
18 Q Okay. It wasn't a cash transaction?
19 A That's correct.
20 Q Okay.
21 (Browne Deposition Exhibit 3 was marked for
22 identification by Mr. Seaver and attached
23 hereto.)
24 BY MR. SEAVER:
25 Q All right. I'm showing you now what has been marked as

**Page 12**

1 Exhibit Number 3. Exhibit Number 3 is a letter to your
2 attorney, Mr. Burns, from Matthew Swanson at my firm
3 attempting to reschedule your examination in this case and
4 talking about the document production, correct?
5 A Yes.
6 Q Have you seen this letter before today?
7 A Yes.
8 Q Okay. So you were aware that my office was trying to get
9 these documents and get your deposition scheduled earlier?
10 A Yes.
11 (Browne Deposition Exhibit 4 was marked for
12 identification by Mr. Seaver and attached
13 hereto.)
14 BY MR. SEAVER:
15 Q All right. I'm putting in front of you now what has been
16 labeled as Exhibit Number 4, and Exhibit Number 4 is just
17 four of the Scottrade authorization forms stapled together;
18 and you've seen these before, haven't you?
19 A I have.
20 Q All right. And the first page of Exhibit 4 is a -- it's a
21 $5,000 wire transfer from a Scottrade account held in the
22 name of -- is it pronounced Monyet?
23 A I don't know.
24 Q Okay. It's a wire transfer to your account at Associated
25 Bank, correct?

Page 13

1  A    I believe so, yes.
2  Q    And that's -- it says that it's dated July 30, 2013,
3       correct?
4  A    Yes.
5  Q    All right. And then turn to the second page of this
6       exhibit, if you would. This is another authorization to
7       transfer money and this is a $30,000 transfer to your TCF
8       account from the Monyet account, correct?
9  A    Yes.
10 Q    And it's your husband who signed both of those transfer
11      authorizations at the bottom, correct?
12 A    I believe so, yes.
13 Q    Okay. The third page of this exhibit is a $17,500 wire
14      transfer to your TCF account from the Monyet Scottrade
15      account, correct?
16 A    Yes.
17 Q    All right. And that's your husband's signature down there
18      again, correct?
19 A    I believe so, yes.
20 Q    And Paul Hansmeier is your husband?
21 A    Yes, he is.
22 Q    All right. The last page of this exhibit is another wire
23      transfer authorization and this is transferring $70,000 to
24      your TCF account on February 7 of 2014, correct?
25 A    Yes.

Page 15

1  A    In a box in our bedroom.
2  Q    In the condominium you were living in at the time?
3  A    Yes.
4  Q    What kind of box was it in?
5  A    One that came from the bank, just like a normal box.
6  Q    Okay. And has that money all been spent?
7  A    I think there's a little bit left, but not very much.
8  Q    What does that mean?
9  A    Under 500.
10 Q    Under 500 left?
11 A    Yes.
12 Q    Are those in $100 bills?
13 A    No.
14 Q    No?
15 A    There might be one, but it's mainly twenties at this point.
16 Q    Okay. I'm sorry, what did you say again? Under 500, is
17      that what you said?
18 A    Yeah.
19 Q    Okay.
20        (Browne Deposition Exhibit 6 was marked for
21         identification by Mr. Seaver and attached
22         hereto.)
23 BY MR. SEAVER:
24 Q    I'm showing you what's been marked as Deposition Exhibit
25      Number 6, and Exhibit Number 6 is a group of statements

Page 14

1  Q    So, Ms. Browne, you had received 175,000 in November. You
2       hadn't spent all that money by February, had you?
3  A    No, I had not.
4  Q    Okay. So why was there another $70,000 being wired to you in
5       February of 2014?
6  A    I believe that we had liquidated the stocks that were in
7       Monyet and so we were taking the money out of Scottrade.
8  Q    Okay. And why was it being taken out of Scottrade?
9  A    So that we could use it for our living expenses going
10      forward when necessary.
11        (Browne Deposition Exhibit 5 was marked for
12         identification by Mr. Seaver and attached
13         hereto.)
14 BY MR. SEAVER:
15 Q    Let me show you what I'm marking as Exhibit 5, and this is
16      one page from Mr. Hansmeier's bankruptcy schedules in
17      his -- well, what was a Chapter 13 at the time, and you'll
18      see one line there at item 2 that says "Self settled trust
19      Monyet." Do you see where I am?
20 A    Yep.
21 Q    And it says $8,554 and he has a J there next to it. Is
22      this $8,554, is that the amount of cash that was left at
23      the time he filed bankruptcy?
24 A    Yes.
25 Q    Okay. And that was cash -- where was that cash?

Page 16

1       stapled together that are TCF statements for an account
2       held in your name.
3        (Browne Deposition Exhibit 7 was marked for
4         identification by Mr. Seaver and attached
5         hereto.)
6  BY MR. SEAVER:
7  Q    Let me also put in front of you what I'm marking as
8       Deposition Exhibit Number 7, and Exhibit Number 7 is a
9       document that I had prepared in my office to try and track
10      moneys going into and out of the TCF account during a
11      certain time period.
12        So Exhibit 6, which is the group of account
13      statements from TCF that are stapled together --
14 A    Mm-hmm.
15 Q    -- the top page of that is a statement date of 6/23/2014,
16      correct?
17 A    Yes.
18 Q    And that has an ending balance of zero, correct?
19 A    Yes.
20 Q    All right. And then if you go to the very last page of
21      this exhibit, there is a statement date of 8/21/2013, and
22      that shows the opening deposit into this account, correct?
23 A    Yes.
24 Q    And why was this account opened?
25 A    TCF Bank asked us to open an account or asked us to do our

In re: Paul Hansmeier

Page 17

1   mortgage payments out of a TCF account for a quarter
2   percentage point cut on our mortgage rate.
3 Q   All right. And let's turn -- let's start at the back of
4   this exhibit, the page next to the very last page. There
5   is a -- do you have that in front of you?
6 A   So I'm just flipping one forward?
7 Q   That's it.
8 A   Okay.
9 Q   So the statement date is 9/20 up at the top. Do you see
10   that? They are up here (indicating).
11 A   Yes.
12 Q   All right. And there is a $30,000 deposit. It's a
13   transfer deposit made on September 27, 2013. Do you see
14   that?
15 A   Yes.
16 Q   And that's one of the transfers from the Monyet Scottrade
17   account, correct?
18 A   Yes.
19 Q   All right. And if you look at this Exhibit 7, the sheet I
20   had prepared, the first line is showing that $30,000
21   deposit, correct?
22 A   Yes.
23 Q   All right. Let's continue on with this exhibit. Turn one
24   more page towards the front or two more pages towards the
25   front so you have the 10/22/2013 statement in front of you.

Page 18

1 A   Okay.
2 Q   So there's an automatic withdrawal out of here and that's
3   the 4,200? It's hard to read this, it's faint print, but
4   that 4,200 roughly, that's your mortgage payment, correct?
5 A   That is correct.
6 Q   What is the other -- it's five thousand something and it
7   says "authorized withdrawal"?
8 A   I believe it says "State of Minnesota," so I'm guessing
9   that was our State taxes.
10 Q   Okay. Your best --
11 A   That's my best guess, particularly in light of the fact
12   that the check was to the tax preparer.
13 Q   Oh, the page before -- the page towards the back that says
14   at the bottom "General Page 13," that's a check to the tax
15   preparer --
16 A   Yes.
17 Q   -- for you and your husband's tax returns?
18 A   Yes.
19 Q   All right. And then go -- keep going towards the front a
20   couple more pages to the 11/20/2013 statement, and down in
21   the Deposit section of this statement there is -- again,
22   it's very hard to read this, but it looks like it's a
23   number over 9,000 and it says "Automatic Deposit, IRS." Do
24   you know what that deposit is?
25 A   I'm going to guess it was a tax refund, but I'm not

Page 19

1   positive.
2 Q   If it's coming from the IRS -- would that be the only
3   possible thing that could be coming from the IRS?
4 A   As far as I know, yes.
5 Q   You didn't work for the IRS?
6 A   I did not work for the IRS.
7 Q   Okay. And then continuing going towards the front here, I
8   want to go up to the November 20, 2013 TCF statement.
9 A   I'm sorry, what --
10 Q   November 20, 2013.
11 A   Weren't we just on November? Do you want December?
12 Q   I think I said December, didn't I? Let's go to December.
13   I meant to say December.
14 A   Okay.
15 Q   It says "General Page 8" at the bottom of it.
16 A   Okay.
17 Q   Do you have that in front of you?
18 A   I do.
19 Q   And on this statement, in the Withdrawals section, we see
20   an $11,987 and some cent automated withdrawal to Citi Card.
21   What is that?
22 A   A credit card payment.
23 Q   Okay. Is the credit card held in both of your names?
24 A   No.
25 Q   Is it just you, ma'am?

Page 20

1 A   Yes.
2 Q   Okay. And then there's -- further down in the withdrawals
3   there's an automated withdrawal to the Bank of America for
4   $5,000. Is that another credit card payment?
5 A   Yes.
6 Q   And is that in both of your names?
7 A   No.
8 Q   Just yours?
9 A   That's correct.
10 Q   And then there's the TCF withdrawal and that's the
11   mortgage, right?
12 A   Yes.
13 Q   All right. And then up in the section right above that,
14   the Checks Paid, you see there are two separate $2,000
15   checks? Do you see those?
16 A   Yes.
17 Q   And if we turn one page towards the back, which says
18   "General Page 9," those two checks for 2,000 each are
19   checks to you, correct?
20 A   Yes.
21 Q   Did you get cash for those checks?
22 A   I don't remember what -- I don't remember. I'm guessing I
23   deposited them in a different -- my other account.
24 Q   When you say "other account," what account are you --
25 A   Associated, but I don't remember.

**Page 21**

1 Q   Okay.  So would it be two things, it's either cash that
2     you're getting or those checks are deposited into the other
3     Associated account held in the name of -- or held in your
4     name?
5 A   Yes.
6 Q   Okay, okay.  And then continuing on, down at the bottom --
7     oh, go back to General Page 8 if you would, which is the
8     statement, you'll see down there there is the deposit
9     coming in of $175,000, correct?
10 A   Yes.
11 Q   And that's a wire transfer from the Monyet Scottrade
12     account, correct?
13 A   Yes.
14 Q   And then there's -- back in the Withdrawals section, there
15     is a $150,000 withdrawal.  Do you see that?
16 A   Yep.
17 Q   And that's a cash withdrawal, isn't it?
18 A   That is correct.
19 Q   So you withdrew $150,000 in cash from this account on
20     December 13, correct?
21 A   Yes.
22 Q   Did you call ahead to TCF to tell them that you were going
23     to come in and take 150,000 in cash out?
24 A   Yeah.  It took about a week.
25 Q   Okay.  So you had called about a week before that?

**Page 22**

1 A   Well, I stopped by the branch.
2 Q   Okay.
3 A   And talked to them about it.
4 Q   And why did you take out 150,000 in cash?
5 A   Because we were -- I wanted to make sure that we were still
6     able to make our payments on our everyday living expenses.
7     We had recently had a judgment entered against Paul without
8     him being served at all or being aware of it and I was
9     concerned that, because the attorneys that were
10     representing people against him were getting things without
11     letting us know, that they would freeze my account without
12     ever letting us know and we wouldn't be able to pay for
13     things.
14 Q   So you were concerned if you left the money in the account,
15     that somehow it would get tied up by some creditor?
16 A   Without notice.
17 Q   Okay.
18 A   So in Massachusetts -- I think it was in Massachusetts,
19     there was a case that we never heard of, neither of us were
20     ever aware of, and then they got a judgment for over
21     $70,000 entered against Paul in his name, and so I was very
22     concerned that if they could get a judge to do that without
23     ever serving him with anything, that they could also get
24     our -- get my bank accounts frozen without me being made
25     aware of and being able to contest their right to access

**Page 23**

1     that money.
2 Q   Okay.  So what did you tell TCF when you called them and
3     told them that you were coming in to get 150,000 in cash?
4     Did you explain it to them that way?
5 A   No, I just said I wanted the money in cash.
6 Q   Okay.  And what did you tell them you wanted the
7     denominations of the bills to be?
8 A   I didn't specify.
9 Q   Did they all end up being $100 bills?
10 A   They did.
11 Q   All right.  What branch was this at?
12 A   The one in the IDS Center in downtown Minneapolis.
13 Q   Okay.  So I would like you to just walk me through you
14     going over to get that money.  Did you bring some sort of
15     something to carry that money in?
16 A   A large purse.
17 Q   And so you went into the bank and did you do a
18     counter check for the 150,000; is that what you did?
19 A   I'm not sure what you mean by that.
20 Q   Sure.  You filled out some form to authorize them to take
21     the 150,000 out of your account?
22 A   Yeah.  I don't remember what the form looked like or
23     anything, but yes.
24 Q   Sure, okay.  And it was all in $100 bills?
25 A   Yes.

**Page 24**

1 Q   And did they put it in a box for you?
2 A   Yes.
3 Q   Okay.  How big was the box?
4 A   About the size of a sheet of paper.
5 Q   A sheet of paper?
6 A   Yeah.
7 Q   Okay.  And then what did you do with it after that?  What
8     did you do with the box of money after that?
9 A   I put it in the closet.
10 Q   Okay.  So it was sitting in the closet.  It wasn't locked
11     up or anything in the closet?
12 A   That's correct.
13 Q   Okay.  So both you and Mr. Hansmeier had access to it in
14     the closet?
15 A   Yeah.
16 Q   Okay.  And you had -- at the time that you took that
17     $150,000 in cash out of the bank, you also had accounts --
18     you had an account at Associated Bank, right?
19 A   Yes.
20 Q   And you had an account at Capital One, correct?
21 A   I think it was called ING at the time.
22 Q   Okay.  But you had an open account there?
23 A   Yes.
24 Q   Okay.  And you had one -- it was -- oh, State Farm Bank,
25     you had an open account there, as well, correct?

Page 25

1  A    Yes.
2  Q    But you thought having $150,000 in a box in your closet was
3       safer than having it in any one of those accounts?
4  A    Yes. The Carlyle has a 24-hour doorman and you need a fob
5       to get up to our place and no one would be able to freeze
6       the account and stop me from being able to access it.
7  Q    Okay. Whose money did you think that was?
8  A    I thought it was mine to spend on myself and my family.
9  Q    But Mr. Hansmeier had equal access to the cash in that box
10      in your closet, correct?
11 A    He had -- in the respect that he could have stuck his hand
12      in there, yes, but the ability to determine how it was
13      spent, no.
14 Q    That was solely up to you?
15 A    Yes.
16 Q    And you made all the decisions on how to spend that money?
17 A    Yes.
18 Q    Okay. Let's go back to Exhibit 6, if you would, which
19      is -- again, it's the -- yeah, you have it in front of you.
20      So we just looked at the December payment or December
21      statement and go to -- well, it says "General Page 6" down
22      at the bottom. That's the 1/23/2014 statement. Do you
23      have that in front of you?
24 A    Yes.
25 Q    And that is -- that statement shows an automatic withdrawal

Page 26

1       for the mortgage loan, correct?
2  A    Yep.
3  Q    And an automatic withdrawal for Gittleman. Is that the
4       condo association?
5  A    Yes.
6  Q    Okay. And no deposits that month, correct?
7  A    I don't see any deposits.
8  Q    Okay. And then go about one more page towards the front to
9       General Page 5. That's what it says at the bottom.
10 A    Okay.
11 Q    And this is the February 21st, 2014 statement, correct?
12 A    Yes.
13 Q    All right. Before we look at that, though, just look at
14      this Exhibit 7 that you have there and still up at the top
15      in the Deposits section, there's the $17,500 deposit that
16      we just looked at in the TCF account, correct?
17 A    Yes.
18 Q    So that second line is accurate, right?
19 A    Yes.
20 Q    All right. Now we can see on the TCF statement, General
21      Page 5, Exhibit 6, there is a $70,000 deposit on
22      February 10 of 2014, correct?
23 A    Yes.
24 Q    And that's another wire transfer from the Scottrade Monyet
25      account, correct?

Page 27

1  A    Yes.
2  Q    All right. So if you look at Exhibit 7, we see the $70,000
3       coming in there, correct?
4  A    Yes.
5  Q    So that brings the total of moneys transferred into your
6       accounts from September of 2013 to February of 2014 to
7       275,000, correct?
8  A    Yes.
9  Q    All right. And that's all into the TCF account, right?
10 A    Yes.
11 Q    All right. So this money is coming over from the Scottrade
12      account in February and that's about three months after the
13      175,000 came over, correct?
14 A    Yes.
15 Q    So if you folks were so worried about someone seizing the
16      money, so worried that you had to put $150,000 in cash in
17      your home, why did you just leave 70,000 sitting in the
18      Scottrade account?
19 A    Well, I didn't. I started withdrawing it in smaller
20      amounts.
21 Q    No, in the Scottrade account. It was still in the
22      Scottrade account until February.
23 A    Oh.
24 Q    Do you see?
25 A    I'm pretty sure we needed to do some liquidation between

Page 28

1       those times.
2  Q    Okay. So that's your belief?
3  A    I think so, yes.
4  Q    Okay. And so you put the $70,000 deposit in or it goes in
5       on February 10, correct?
6  A    Yes.
7  Q    All right. And then you start withdrawing cash from that
8       account, correct?
9  A    Yes.
10 Q    And tell me why you're withdrawing cash from that account
11      then?
12 A    For the same reason as the previous money, to make sure
13      that we had it in cash.
14 Q    Okay. For the same reasons you testified to --
15 A    Yes.
16 Q    -- about the $150,000 withdrawal?
17 A    Yes.
18 Q    Okay. So I want to just go through these, ma'am, and just
19      match up the cash withdrawals with what I have on
20      Exhibit 7. So looking in the cash withdrawn -- at
21      Exhibit 7, now, the cash withdrawn on and after
22      November 22, 2013, you see those two November 22, 2013,
23      those are the two checks that we saw, correct?
24 A    Yes.
25 Q    Which may -- as I understand your testimony, it's either

Page 29

1   cash or it went into your Associated Bank account?
2 A   Right.
3 Q   Okay. And then we see the December 13 $150,000 withdrawal,
4     right?
5 A   Yes.
6 Q   All right. So now in February, that $2,000 withdrawal on
7     the 13th, that's a cash withdrawal, correct?
8 A   Yes.
9 Q   And then there's a $2,020 withdrawal on the 17th. Is that
10    a cash withdrawal?
11 A   Yes.
12 Q   And a $2,000 withdrawal on the 20th. Is that a cash
13    withdrawal?
14 A   Yes.
15 Q   And a $2,000 withdrawal on the 21st. Is that a cash
16    withdrawal?
17 A   Yes.
18 Q   Why didn't you just withdraw all this money at once? Why
19    did you just keep withdrawing in increments of $2,000?
20 A   Because the first time I did a large one it stressed me out
21    and it took a lot -- you have to do a lot of working with
22    the bank. It's much easier to just be able to go in and
23    get some money.
24 Q   Well, I understand a $150,000 withdrawal would be like
25    that, but my question -- and I didn't articulate it very

Page 30

1     well. So over the course of eight days, you made four
2     withdrawals, which totaled $8,020. Why not just take out
3     $8,000?
4 A   Because the bank doesn't have that much money on hand. You
5     can't just go in and ask for $8,000.
6 Q   Did you try that?
7 A   Well, I asked them what was something that was reasonable
8     for me to be able to get if I just walked into the door.
9 Q   Okay. And they told you 2,000?
10 A   Yeah.
11 Q   All right. So back just looking at Exhibit 7, so those
12    first four withdrawals under Cash Withdrawn 2014 on
13    Exhibit 7, we have confirmed those, right?
14 A   Yes.
15 Q   So let's turn another one page towards the front of this
16    statement. It says "General Page 4" at the bottom, it's
17    Exhibit 6, and there are a series of cash withdrawals here
18    and every one of those withdrawals is in the amount of
19    $2,000, correct?
20 A   Yes.
21 Q   So on 2/24, the $2,000, that's a cash withdrawal?
22 A   Yes.
23 Q   2/28 is a cash withdrawal?
24 A   Yes.
25 Q   March 3rd is a cash withdrawal?

Page 31

1 A   Yes.
2 Q   March 4th is a cash withdrawal?
3 A   Yes.
4 Q   And then all of those, all of those $2,000 withdrawals from
5     March 6 to March 18th, those are all cash withdrawals,
6     right?
7 A   Yes.
8 Q   All right. So that gets us down, back on Exhibit 7, if you
9     just want to -- if you would just correlate those
10    withdrawals, I just want to make sure Exhibit 7 is
11    accurate. That indicates the withdrawals for the March
12    statement accurately, correct?
13 A   I believe so, yes.
14 Q   All right. So we can see -- and we're looking at -- I'm
15    looking at Exhibit 7 now, the total cash out, which
16    includes those two $2,000 checks that you're not sure of,
17    and we'll look at that in a minute, but the total cash out
18    at the bottom, if the addition is correct, is $182,020,
19    correct?
20 A   Yes. I mean, I haven't done the math, but I'm going to
21    trust you on that.
22 Q   I'm just asking you to trust that the addition is correct.
23 A   Yes.
24 Q   And if it's not correct, then that's not the right number,
25    correct?

Page 32

1 A   Right.
2 Q   So did you have -- again, we have to look at those two
3     checks for $2,000, but did you have about $180,000 sitting
4     in that box at the end of March of 2014?
5 A   I believe so, yes.
6          (Browne Deposition Exhibit 8 was marked for
7               identification by the court reporter and
8               attached hereto.)
9 BY MR. SEAVER:
10 Q   All right. I'm showing you now what's been marked as
11    Exhibit 8, and Exhibit Number 8 is -- it's a group of
12    Associated Bank statements that are stapled together and
13    I'll just tell you what I did. I stapled together -- the
14    Associated Bank statements, there was a large number of
15    them, so I stapled together the statements roughly for 2013
16    and roughly for 2014.
17 A   Okay.
18 Q   So this one, the front page of this Exhibit Number 8 is the
19    statement ending 6/20 of 2013, correct?
20 A   Yes.
21 Q   And then the very last -- the next-to-last page of this
22    exhibit is the first page of a statement ending on
23    January 20 of 2014, correct?
24 A   Yes.
25 Q   All right. So in this statement, turn, if you would, to --

---

**Page 33**

1   I handwrote page numbers on there, just to make it easy,
2   too.
3  A   Okay.
4  Q   Turn to page 13, if you would.  Do you see there in the
5   Deposits section on this page, which is the statement
6   ending 12/22/2013, there is an 11/21/2013 deposit for
7   $2,000.  Do you see that?
8  A   I do.
9  Q   Do you think that's one of those $2,000 checks?
10 A   Probably.
11 Q   Okay.  And so it looks like, if that's what it was, then
12   one of the $2,000 checks got deposited into this account,
13   correct?
14 A   Yes.
15 Q   And then look at the next -- page 15 of this Exhibit
16   Number 8.
17 A   Mm-hmm.
18 Q   And that's the December -- well, it ends on January 20th,
19   2014, and there is a customer deposit there for $258.  Do
20   you know the source of that deposit?
21 A   I have no idea.
22 Q   You don't know if it was cash or --
23 A   I don't know.
24 Q   You just don't know?
25 A   I literally have no idea.

---

**Page 34**

1  Q   Okay.  So going back to Exhibit Number 7, that was that
2   summary that we went through of the deposits, so it looks
3   like, if you go up to the November cash withdrawals, it
4   looks like one of those checks got deposited into
5   your Associated account, right?
6  A   Yes.
7  Q   Okay.  So assuming that's the case, one of those checks
8   didn't get turned into cash?
9  A   I have no idea.  I just don't remember.
10 Q   You aren't sure?
11 A   I have literally no idea.
12 Q   And I'm not trying to -- well, so if one of those two
13   check, $2,000 checks is, in fact, that $2,000 deposit into
14   your Associated account, that would mean that you didn't
15   get cash that day at TCF?
16 A   Right, for that check, yeah.  I mean --
17 Q   All right.  What would be -- the $258, what would be the
18   source of that money other than cash?  Do you have any
19   idea?  I'm talking about the $258 deposit.
20 A   I really have no idea.  I mean, it's an odd number.  I have
21   no idea.
22 Q   Okay.  In the same Exhibit 8, turn to page 9, if you would.
23 A   I'm sorry, did you say 9?
24 Q   Yeah, 9, and that's the statement that ends on 10/20 of
25   2013.  There are a number of Ticketmaster resale ticket

---

**Page 35**

1   deposits there.  What are those?
2  A   Vikings tickets that were put up for sale on Ticketmaster
3   and sold.
4  Q   Are those the Vikings tickets that are in Mr. Hansmeier's
5   grandfather's name?
6  A   They were at that time, yes.
7  Q   Whose name are they in now?
8  A   I'm not sure.  I'm not sure what happens when the -- with
9   the new stadium.
10 Q   Oh, okay.  Up until the new stadium thing, they were
11   tickets in his father's name?
12 A   His grandfather's name.
13 Q   I'm sorry, his grandfather's name?
14 A   Yes.
15 Q   Okay.  So do you know what, if anything, has been done with
16   those tickets with respect to the new stadium?
17 A   I believe that we put down a deposit to purchase, but --
18 Q   Would "we" be you and Mr. Hansmeier?
19 A   Yes, but I don't -- I don't think -- I think there's a
20   significant balance on the seat license still.
21 Q   Okay.  So how much do you think the deposit was that was
22   put down?
23 A   I really can't remember if they asked for -- they might
24   have asked for 25 percent.  I'm not sure.  I don't
25   remember.

---

**Page 36**

1  Q   Okay.  If it was, I'm not -- I understand you don't
2   remember if it was 25 percent, but I'm just trying to get a
3   range of a number if it was 25 percent.
4  A   I'm not even positive, so I think --
5  Q   Was it less than $5,000 down?
6  A   Yes, for sure.  I'm pretty sure the total cost was 10.
7  Q   Okay.
8  A   I don't think it was more than 25 that was put down.
9  Q   Okay.  You think it was probably less than 2,500 put down?
10 A   Yeah.
11 Q   And when would that have been put down?
12 A   I'm so bad at dates.
13 Q   Okay.  If we can --
14 A   Whenever they first started selling tickets.
15 Q   Okay.  Was that before Mr. Hansmeier filed bankruptcy?
16 A   It would have been, like, 2013 possibly.  Like, when they
17   literally announced the stadium, they started selling
18   tickets.
19 Q   Okay, okay.
20 A   So it was a long time ago.
21 Q   Okay.
22        (Browne Deposition Exhibit 9 was marked for
23         identification by the court reporter and
24         attached hereto.)
25 BY MR. SEAVER:

---

Page 37

1 Q    I'm putting in front of you now what's been marked as
2      Exhibit Number 9 and this is another document that I had
3      prepared at my firm and it says "Padraigin Browne,
4      Associated Bank, Possible Cash Deposits 2014," and what I
5      did, just so you understand, I went through your Associated
6      Bank account and I looked at deposits and tried to figure
7      out the source of them and created this document.
8           (Browne Deposition Exhibit 10 was marked for
9           identification by the court reporter and
10          attached hereto.)
11 BY MR. SEAVER:
12 Q    So I next want to go to Exhibit Number 10, which --
13 A    Am I done with 8?
14 Q    Yeah, you're done with 8, so if you keep 9 and 10 in front
15     of you, that would be great.  So 9 is the document that I
16     had prepared and 10 is a group of Associated Bank
17     statements stapled together and I've put handwritten
18     numbers on the bottom, 1 through 21, and it's for the
19     account ending in 1853.  I want to run through this with
20     you starting with the top page, which has the handwritten
21     number 1.  There's a deposit there for $484.  Do you know
22     if that was cash or do you know the source of it?
23 A    I don't.
24 Q    Okay.  And then there's another deposit of 2/13/2014 for
25     $400 even.  Do you know if that was cash?

Page 38

1 A    I don't -- I have no idea.
2 Q    Don't know, okay.  So on my Exhibit 9 where I have question
3      marks there, we can keep the question marks there for those
4      three, right?
5 A    Yes.
6 Q    All right.  Then turn, if you would, to the page that has
7      number 3 on it, the handwritten number 3.  There's a
8      deposit there that says it's a customer deposit of $134.99.
9      You don't know the source of that, do you?
10 A    No.
11 Q    Okay.  And the other deposits here are coming from your
12     employment, correct?
13 A    Yes.
14 Q    All right.  Turn to page 5 of this, if you would, of
15     Exhibit 10.
16 A    Okay.
17 Q    And that's the statement that ends on 4/20 of 2014 and
18     there's a deposit there of $100.  Do you know if that was a
19     cash deposit?
20 A    I don't know.
21 Q    Don't know, okay.  And then turn to -- still in this same
22     exhibit, turn to page 7, if you would.  There are no cash
23     deposits there, correct?  That's the month ending 5/20 of
24     2014?
25 A    I don't see any.

Page 39

1 Q    Okay.  It's just your employment deposits?
2 A    Yes.
3 Q    All right.  And then go to the next page, which -- go to
4      page number 9, handwritten number 9.  It's the statement
5      ending 6/22/2014, and there's a deposit there on June 18 of
6      2014 for $4,055.88.  Do you know the source of that?
7 A    No.
8 Q    Okay.  So back on my sheet, I have -- that's one that I
9      have a question mark by.
10 A    Mm-hmm.
11 Q    So the question mark stays there, right?
12 A    Yes.
13 Q    All right.  And then continue on with this exhibit, if you
14     would, to page 11, which is the statement ending 7/20 of
15     2014, and you'll see a deposit there on July 17 of 2014 of
16     $4,300.  Do you see that?
17 A    I do.
18 Q    Is that a cash deposit?
19 A    Probably.
20 Q    Okay.  So over on this other side, on this sheet that I had
21     prepared, I had 43 -- I had the $100 one that's a question
22     mark, but the $4,300 you're sure was a cash deposit.  You
23     said probably a cash deposit?
24 A    Yeah.
25 Q    You're pretty sure it is, though, aren't you?

Page 40

1 A    Yeah.
2 Q    Are you positive it is?
3 A    Not -- I mean, I'm -- I would say that it's much more
4      likely than not that it is.
5 Q    Okay.  And then turn to page 13 of this exhibit, if you
6      would.  The only deposit there is your payroll, correct?
7 A    Yes.
8 Q    All right.  And then turn to page 15 of this exhibit, and
9      that's the statement ending 9/21 of 2014.  There's a $5,000
10     deposit there; do you see that?
11 A    I do.
12 Q    Is that a cash deposit, do you think?
13 A    Probably.
14 Q    Okay.  And then turn, if you would, to the page with
15     handwritten number 17 on it, and that's the statement
16     ending 10/20 of 2014, and you'll see that there's a $4,400
17     even deposit.  Do you believe that's a cash deposit?
18 A    I do.
19 Q    Okay.  So back here on my sheet again, that $4,400 you
20     believe would be accurate as a cash deposit?
21 A    Yes.
22 Q    Okay.  And then there is the 10/2 Minnesota Department of
23     Revenue deposit of $3,796.  What's that?
24 A    I'm not positive, but based on the time of year, I would
25     guess it's our property tax refund.

Page 41

1  Q    Oh, yeah, okay. You didn't work for the Department of
2       Revenue?
3  A    No, I did not.
4  Q    Okay. So it's a refund of some sort and probably the
5       property tax refund?
6  A    Probably.
7  Q    Okay.
8  A    But -- yeah.
9  Q    All right. And then continue with this exhibit, go to
10      page 19, if you would, and that is -- it's the statement
11      ending 11/20 of 2014 and there is a $4,000 deposit there on
12      10/27. Do you believe that would be a cash deposit?
13 A    Yes.
14 Q    All right. So over here on the list I had prepared again,
15      that would be right, the $4,000, correct?
16 A    Yes.
17 Q    And then there's a deposit of $3,300. Does it appear to
18      you that would be a cash deposit?
19 A    Probably.
20 Q    All right. So, again, on Exhibit 9 you'll see the $3,300
21      and that would be right, correct?
22 A    Yes.
23 Q    And then there's a deposit for $11,079. Do you know the
24      source of that deposit?
25 A    No.

Page 42

1  Q    Okay.
2  A    I'm -- no.
3  Q    Do you think it's cash?
4  A    It's quite possible it is, but I'm --
5  Q    The odd number is throwing you?
6  A    Right, that's -- I mean, for all the ones that are odd
7       numbers, I'm just not as positive and I just don't
8       remember.
9  Q    All right. And then go to page 21, if you would, of the
10      same exhibit, which is the statement ending 12/21 of 2014.
11      The only deposit there is from your employment, correct?
12 A    Yes.
13 Q    All right. So back -- let me just go back to Exhibit 9, if
14      you would. That's the summary?
15 A    Yep.
16 Q    So the $11,079 deposit which I have in the right column
17      with a question mark, you don't know, it could be cash, it
18      might be --
19 A    I mean, for any of the odd number ones, I think it might be
20      a mix of cash and a check.
21 Q    Okay, okay.
22 A    Just -- I mean, but that's just a guess.
23 Q    Sure, I understand, but the for sure cash deposits, at
24      least that we've looked at so far, they are the -- here,
25      let me just do this real quickly and run through them. The

Page 43

1       ones that we know for sure from your testimony are cash
2       deposits are the ones that I have drawn that really rough
3       circle around, right?
4           MR. BURNS: I would just object that that
5       misstates the testimony. I don't think there's been any
6       for sure cash deposits.
7  BY MR. SEAVER:
8  Q    Okay. More probable than not or most likely, what I have
9       drawn a circle around were cash deposits?
10 A    Yes.
11 Q    Okay. And the other ones that are on this sheet you just
12      aren't sure of?
13 A    Correct.
14          (Browne Deposition Exhibit 11 was marked for
15          identification by the court reporter and
16          attached hereto.)
17 BY MR. SEAVER:
18 Q    I'm having marked Exhibit 11 now, which is -- it's
19      another -- it's a group of bank statements stapled
20      together.
21          (Browne Deposition Exhibit 12 was marked for
22          identification by the court reporter and
23          attached hereto.)
24 BY MR. SEAVER:
25 Q    And then I'm also putting in front of you Exhibit

Page 44

1       Number 12, which is another one of these documents that was
2       prepared by my firm when I looked at deposits and I was
3       trying to figure out what were cash deposits, and so we'll
4       run through this in the same way we've been doing these
5       others. So Exhibit 11 is a group of Associated Bank
6       statements for the account held in your name?
7  A    Yep.
8  Q    Starting -- the first page is the statement ending 2/20 of
9       '14 and then the last -- or the next-to-last page is the
10      first page of the statement ending 12/21 of 2014, correct?
11 A    Of 2016?
12 Q    I think I might be looking at the -- I might have the wrong
13      exhibit that I'm looking at here. Yep, I'm looking at the
14      wrong one.
15          All right, let me go over that again. So the
16      Exhibit Number 11 is a group of Associated Bank statements
17      for the account in your name, correct?
18 A    Yes.
19 Q    And the front page ends on 1/20 of 2015, correct?
20 A    Yes.
21 Q    And the next-to-last page is the first page of the
22      statement ending on 1/20 of 2016, correct?
23 A    Yes.
24 Q    And those last two pages are the ones that you provided
25      today, correct?

Page 45

1 A   Yes.
2 Q   Okay, thank you. All right. Then what is Exhibit
3   Number 12 is, again, a compilation of when I looked through
4   and saw deposits, I was trying to determine what they were.
5   So the first one, let's go to page 1 of Exhibit 11.
6   There's a $100 deposit there on 12/23 of 2014. Do you know
7   if that was cash or not?
8 A   I have no idea.
9 Q   Okay. And then continuing on in the statement, go to the
10   page with number 3, handwritten number 3 on it and
11   handwritten number 3, there's a $4,400 deposit. Is that a
12   cash deposit?
13 A   Probably.
14 Q   More likely than not?
15 A   Yes.
16 Q   All right. And right under that, a $3,000 deposit, more
17   likely than not cash?
18 A   Yes.
19 Q   And then there are two deposits, one on 2/13 of $1,000 and
20   one on 2/18 of $2,000. More likely than not, those are
21   cash deposits?
22 A   Yes.
23 Q   Okay. And this is the cash coming from that box at your
24   house?
25 A   Yes.

Page 46

1 Q   Okay. On this same page, ma'am, on 2/6, in the Withdrawals
2   section on 2/6 of 2015, there is something that says Browne
3   Padraigin Transfers, $836.99, and I see a recurring
4   transfer that says something like that. What is that?
5 A   That is being transferred from this account to my State
6   Farm account to pay for my car.
7 Q   Okay. So was that your monthly car payment?
8 A   Yes, that's my monthly car payment.
9 Q   Okay. And then go to page 5 of this exhibit, if you would,
10   and on page 5 there is a -- in the deposits -- this is a
11   3/22/2015 ending statement?
12 A   Mm-hmm.
13 Q   There is a deposit of $14,565. Is that a tax refund?
14 A   Possibly. I'm not sure.
15 Q   All right. Then let's go to the -- so just to finish off
16   on that, though, it's possibly a tax refund, you're just
17   not sure as you sit here today?
18 A   Yeah.
19 Q   If the documents show it was a tax refund, that's what it
20   is?
21 A   Right.
22 Q   Okay. Then go to page 7 of this, if you would, and in the
23   Deposits section there is a $4,164 deposit from the
24   Minnesota Department of Revenue. Do you see that?
25 A   Yes.

Page 47

1 Q   That is a tax refund, right?
2 A   I believe so, yeah.
3 Q   And it would be the joint refund for you and Mr. Hansmeier?
4 A   Yep, we filed joint taxes.
5 Q   Right. And then right under that there is a customer
6   deposit of $3,000. More likely than not, that's a cash
7   deposit, correct?
8 A   Yes.
9 Q   And on this list -- I forgot to do this last time -- the
10   January and February numbers -- and we can go back and look
11   at it, but those numbers are accurately depicting what is
12   more likely than not cash deposits, correct?
13 A   Yes.
14 Q   Okay. And now for these deposits, March 27, $3,000, and
15   April 17th of 2,000 on this list, those are more likely
16   than not cash payments -- or deposits, right?
17 A   Yes.
18 Q   Then turn to the page that has number 9 on it here and the
19   page with number 9 is the first page of the statement
20   ending 5/20/15, and there's a cash deposit on 4/27 of 2015
21   of $3,000, correct?
22 A   Yes.
23 Q   More likely than not a cash deposit, right?
24 A   Yes.
25 Q   And that is reflected on this sheet, this Exhibit 12,

Page 48

1   right?
2 A   Yes.
3 Q   And then, again, on 5/6 of 2015, another $2,000 deposit,
4   correct?
5 A   Yes.
6 Q   More likely than not a customer deposit, correct?
7 A   Yes.
8 Q   And that's accurately reflected on Exhibit 12, correct?
9 A   Yes.
10   MR. BURNS: I think you may have misspoke,
11   Randy. On 4/27 of 2015, you said that was a cash deposit,
12   but it does say "customer deposit."
13   MR. SEAVER: Okay. If I said that it said
14   cash deposit, I'm wrong.
15   MR. BURNS: You did.
16 BY MR. SEAVER:
17 Q   It says "customer deposit." What I meant to say was it's
18   more likely than not that was a customer deposit of cash,
19   right?
20 A   Yes.
21 Q   Okay. And then on page 5 -- moving to page 11 of these
22   statements, on 5/22 of 2015 there's a deposit of $3,000,
23   correct?
24 A   Yes.
25 Q   More likely than not, that is a deposit of cash?

Page 49

1  A   Yes.

2  Q   And that is accurately reflected on Exhibit 12, correct?

3  A   Yes.

4  Q   And then on 5/27, there is a $5,100 deposit and more likely
5      than not, that is a cash deposit, correct?

6  A   Yes.

7  Q   And in the cash -- when I ask you about these cash
8      deposits, you understand I'm referring to the cash coming
9      from the box in your room, right?

10 A   Yes.

11 Q   Okay. And that second one, the $5,100 is accurately
12     reflected on Exhibit 12, correct?

13 A   Yes.

14 Q   All right. Page 13 of this exhibit now, which is the
15     statement ending 7/20 of 2015 -- and just for reference as
16     we go through this, Mr. Hansmeier's filing date for the 13
17     was July 13th of 2015.

18 A   Okay.

19 Q   So on your statement, we see a deposit of $5,900 on 6/23
20     and more likely than not, that's a cash deposit, correct?

21 A   Yes.

22 Q   And that's accurately reflected over on Exhibit 12?

23 A   Yes.

24 Q   All right. And then on June 25th, there's a $3,000
25     deposit, correct?

Page 50

1  A   Yes.

2  Q   More likely than not, that's a cash deposit, correct?

3  A   Yeah, I think so.

4  Q   And that's accurately reflected on Exhibit 12, correct?

5  A   Yes.

6  Q   All right. And then there's a $20,000 deposit on July 9 of
7      2015, correct?

8  A   Yes.

9  Q   And that is a cash deposit, correct?

10 A   Yes.

11 Q   Okay. And that's accurately reflected on this Exhibit 12,
12     correct?

13 A   Yes.

14 Q   And then turn to page 14 of this exhibit and you'll see a
15     check going out, it's check number 1309?

16 A   Yep.

17 Q   And there may be -- if you turn to page 25 of this exhibit,
18     there is a check for $15,305 going to Barbara May, correct?

19 A   Yes.

20 Q   And that's for your husband's bankruptcy?

21 A   That is correct.

22 Q   Okay. So if we look, go back to page 14, if you would, and
23     on the day of his filing, July 13, there was a balance in
24     this account of $7,709.64, correct?

25 A   I'm sorry, where am I looking?

Page 51

1  Q   Page 14, look at the running Balance Summary section and
2      you'll see on July 13, there's a balance of $7,709.64,
3      correct?

4  A   Yes.

5  Q   All right. And then go back, if you would, to page 13, the
6      page right before that, and the very last deposit showing
7      up there is the 7/9/2015 of $20,000 in cash, correct?

8  A   Yes.

9  Q   And that $20,000 is represented accurately in Exhibit 12,
10     correct?

11 A   Yes.

12 Q   Okay. Now, continuing on with Exhibit 11 -- and say, if
13     you need a break at any time, just let me know.

14 A   Okay.

15 Q   So continuing on with this, at page 17 -- I'm sorry, it's
16     two pages back, page 19, this is the statement -- no, let's
17     go back. I got ahead of myself here. Let's go back to
18     page 15 of Exhibit 11, and that's the statement that has an
19     end date of August 20, 2015, correct?

20 A   Yes.

21 Q   And there is a $5,900 deposit on 7/27. Do you see that?

22 A   Yes, I do.

23 Q   And more likely than not, that's a cash deposit, correct?

24 A   Yeah, I think so.

25 Q   And that's -- you aren't certain, but it's more likely than

Page 52

1      not, right?

2  A   Yeah.

3  Q   Where else would you get $5,900 to deposit, then?

4  A   It might have been a check from Paul.

5  Q   If it was a check from Paul, what account would it have
6      been coming out of?

7  A   His Class Justice.

8  Q   So there are two possibilities for that $5,900, either cash
9      or a check from Class Justice?

10 A   Yes.

11 Q   If it was a check from Class Justice, why would you be
12     getting a check from Class Justice?

13 A   Because our mortgage payment comes out of my account, or it
14     came out of my account and I may have just deposited it in
15     there.

16 Q   You aren't certain?

17 A   No, I'm not.

18 Q   And then on page 16, there is --

19 A   Yeah, I really am not certain about what that payment is at
20     all.

21 Q   Okay. Let's go back just to make sure we're clear on what
22     you're talking about.

23 A   Right.

24 A   The $5,900 --

25 A   Right.

In re: Paul Hansmeier

---

Page 53

1 Q   -- you're not clear on?
2 A   I am not clear at all.
3 Q   There are two possibilities, cash or a check from Class
4       Justice?
5 A   Yeah, I think, or a check from -- yeah, because he doesn't
6       have -- yeah. Yeah, but I'm really not sure.
7 Q   Sure. And then on page 16, there is a deposit there of
8       $2,120. Do you see that?
9 A   I do.
10 Q   And is that your property tax refund?
11 A   I believe so.
12 Q   Okay. So it would have been a joint property tax refund
13       for you and Mr. Hansmeier, correct?
14 A   Yes.
15 Q   All right. And then continuing on with this exhibit at
16       item -- at page 17, looking at deposits again, and this is
17       a statement ending 9/20 of 2015, there is a $10,000 deposit
18       on September 2, 2015. Do you see that?
19 A   Yes.
20 Q   More likely than not, that is a cash deposit, correct?
21 A   Yes.
22 Q   All right. And then continuing on here going to page 19 of
23       this exhibit, there are some Ticketmaster resales in the
24       Deposits section?
25 A   Yes.

---

Page 54

1 Q   And those are the Vikings tickets, correct?
2 A   Yes.
3 Q   Okay. There's also a payment, a withdrawal to Maplewood
4       Toyota for $1,000 on October 6 of 2015. Do you see that?
5 A   Yes.
6 Q   What's that for?
7 A   When -- it's for a car, a Prius.
8 Q   Is that a purchase of a car? Is it towards a purchase?
9 A   It's a lease, so it's the down payment, you know, like the
10       first payment and tax, title or whatever.
11 Q   Is that different than the car, the State Farm payment?
12 A   Yes.
13 Q   Okay. Is this a new lease?
14 A   Yes.
15 Q   Okay. The State Farm payment, what was that going for,
16       what vehicle?
17 A   The Audi Q7.
18 Q   Okay. Is that -- was that a lease payment?
19 A   No, that car is a purchase.
20 Q   Okay. So the Prius, is that Paul's car or is that your
21       car?
22 A   We switch off. Until this past weekend, we only had one
23       set of car seats, so depending on who was doing dropoff, we
24       switched.
25 Q   So those are the two vehicles you folks have?

---

Page 55

1 A   Yes.
2 Q   And then continuing with this exhibit, at page 20, there is
3       a check number 1315 in the amount of $3,000. Do you see
4       that?
5 A   I do.
6 Q   Do you know what that is?
7 A   I don't.
8 Q   All right. And then was this about -- let me go back and
9       just see if I can help you. Is this about the time you
10       guys did the lease? It's a little after the lease, right?
11           MR. BURNS: The lease for what?
12           THE WITNESS: No, because the 1,635 is our
13       first month's rent.
14 BY MR. SEAVER:
15 Q   Okay. So the 1,635 is your first month's rent?
16 A   Yep.
17 Q   Okay. Can you show me -- is this the account that you
18       thought the deposit came out of, the security deposit?
19 A   Yes.
20 Q   Okay. Can you show me where that is, ma'am?
21 A   Let's see, I think it came out of this one. It would have
22       been for, like, $2,200 about, give or take.
23 Q   And I think it's 2,150 if it's --
24 A   Right, but it was 2,150 plus, like, 35 or something for the
25       fee for the certified check.

---

Page 56

1 Q   Okay.
2 A   So -- but I could be wrong. I mean, it could have come out
3       of our joint account, I just don't remember.
4 Q   You're pretty sure it came out of one of the Associated
5       accounts?
6 A   Well, I know it came out of one of the Associated accounts,
7       that I'm very comfortable saying. I'm not as positive on
8       which one.
9 Q   You're not seeing it as you quickly look through?
10 A   No, I'm not seeing it as I quickly look through.
11 Q   Okay. And then continuing on with this exhibit, Exhibit
12       Number 11, if you would go to page number 23, there are two
13       deposits there, and this is the statement ending 12/20 of
14       2015. There are two deposits there, one for $5,000 and the
15       other for $3,000. Do you see that?
16 A   I do.
17 Q   Where is the $5,000 deposit -- what's the source of that;
18       do you know?
19 A   Cash.
20 Q   Okay. And the $3,000, where did that come from?
21 A   My personal Scottrade account.
22 Q   I don't recall seeing copies of a Scottrade account -- are
23       those Scottrade accounts statements in the documents
24       produced? Did you produce those?
25 A   I thought I did, but maybe I didn't.

---

Page 57

1 Q   Okay, and I could have missed them too. How much do you
2      have in your Scottrade account?
3 A   Now there's approximately $800. There was 3,800,
4      approximately, and now there's approximately 800 in cash
5      and there's some stock, but the total amount is -- it's
6      very little in stock, so it's maybe 2,000 total.
7 Q   When did that -- I'm sorry, go ahead.
8 A   So there's maybe, like -- between stock and cash, there's
9      maybe $2,000 in there total.
10 Q   When did that Scottrade account get opened?
11 A   2007.
12 Q   Okay.
13 A   2008, somewhere around there. I was still in law school
14      when it was opened.
15 Q   Okay. I'm just going to pick -- because I haven't seen the
16      statements and maybe they are there, but in 2013, would
17      there have been over 30,000 in there?
18 A   No. The amount in there was never over 10,000 at any time.
19 Q   Okay.
20 A   One of the investments went very south, so.
21 Q   Okay. So back here on this list that I'm working on or
22      this Exhibit 12 trying to track cash, the $3,000 came from
23      your Scottrade account and the $5,000 was cash, right?
24 A   Yes.
25 Q   Okay. So I'll just pen that change in there and so here

Page 58

1      (indicating), the $5,900 on Exhibit 12, I'll just circle
2      that, you just don't know about that?
3 A   Right.
4 Q   And I just put a question mark sideways there. These other
5      two, the 10 and the 5, those are both cash deposits,
6      though?
7 A   Right.
8 Q   Okay. So, Ms. Browne, we can see -- let me get these
9      exhibits out for you, it will make it easier. So I'm
10      getting Exhibit 9, Exhibit 7 and you already have
11      Exhibit 12 in front of you. These are the summaries --
12 A   Okay.
13 Q   -- that we went through as we looked at the statements. So
14      on Exhibit 7, that's the original -- it's right here in the
15      middle for you.
16 A   Okay.
17 Q   The $2,000 -- one of those $2,000 checks, it appears to be
18      a deposit just going over, right?
19 A   Okay.
20 Q   I'll just cross one of those out, and it could be either
21      one, we don't know?
22 A   Right.
23 Q   So assuming my addition of these numbers is accurate, that
24      would reduce the amount out -- I mean assuming these
25      numbers are added up correctly, that would reduce the cash

Page 59

1      out to about $180,020, correct?
2 A   Yes.
3 Q   So, Ms. Browne, I'm trying to figure out what happened to
4      that cash, and so we've gone through your bank accounts
5      trying -- and I'm trying to figure out the cash; and in
6      2014, this Exhibit Number 9, there are a number of question
7      marks, you just didn't know if those deposits in were cash?
8 A   Right.
9 Q   And the biggest one was eleven thousand some?
10 A   Right.
11 A   And some of these, the five over on the other side that are
12      circled, those were all for sure cash going in?
13 A   Mm-hmm.
14 Q   So even if you take -- even if you assume the 11,000 on
15      Exhibit 9 is cash in and you add that to 21,000, that gets
16      you to, let's just say, $32,000, and I'm just doing rough
17      numbers here?
18 A   Yep.
19 Q   With the understanding that these things with question
20      marks could be cash, we just don't know?
21 A   Yep.
22 Q   So on this Exhibit Number 9, let's just say it's 32,000 in
23      cash, or let's just say it's 35,000, so that would cover --
24      other than the $4,000 deposit, it would cover that. Then
25      go to Exhibit Number 12.

Page 60

1 A   Yep.
2 Q   And we see 60,000 in cash for sure in deposits?
3 A   Yep.
4 Q   Sixty thousand four hundred?
5 A   Yep.
6 Q   And then down below that, there is for sure 15,000 --
7 A   Yep.
8 Q   -- and 5,900 you just don't know about?
9 A   Right.
10 Q   But even if it were, even if the 5,900 were a cash deposit,
11      we end up with in the range of 79,000 there?
12 A   Yep.
13 Q   Even if that is cash. So 79 and 35 gets you to 114,000.
14      That leaves $66,000 of cash that we don't see coming into
15      any of these accounts?
16 A   Yeah.
17 Q   Where is the money?
18 A   It went to John Steele to pay for one of the bonds for the
19      appeal.
20 Q   How much went to Mr. Steele?
21 A   I think 60.
22 Q   When did that go to him?
23 A   I don't remember the date.
24 Q   Can you give me a rough idea?
25 A   It would have been in 2013 or 2014 and it would have -- I

**Page 61**

1  believe it was for the Lightspeed appeal, so you should be
2  able to figure out -- I mean, I don't know the dates,
3  but --
4 Q  Okay. So we've got the -- you took out the $150,000 in
5  cash?
6 A  Yeah.
7 Q  -- in December of two thousand -- I'm sorry, let me see.
8  Yeah, December of 2013?
9 A  Yeah.
10 Q  So how long after that did you --
11 A  I don't remember.
12 Q  Okay. So the very earliest it could have happened is
13  December 14th or so of 2013, right?
14 A  Yeah, it wasn't right away.
15 Q  So somehow did you get that money to Mr. Steele?
16 A  He was coming up to visit, so instead of going in,
17  depositing the money and writing him a check, we just gave
18  him the cash.
19 Q  When you say "we," it's you and Mr. Hansmeier that you're
20  referring to?
21 A  Yes.
22 Q  Who actually got the cash out and handed it to him?
23 A  I did.
24 Q  Okay. So Mr. Steele comes over to your place, the
25  condominium, right?

**Page 62**

1 A  Yes.
2 Q  And Mr. Hansmeier says, Go get out $60,000 in cash and give
3  it to Mr. Steele?
4 A  Well, we talked about it before he came over.
5 Q  Okay. And what was that talk?
6 A  The talk was about whether we should -- whether we should
7  contribute to the bond.
8 Q  Okay.
9 A  And the fact that he did not have the money to do it
10  himself so that if we were going to contribute to the bond,
11  it would have to come out of the trust money that was in
12  the closet.
13 Q  Okay. So there's no record?
14 A  No.
15 Q  Okay. Are there sanctions against Mr. Hansmeier in the
16  Lightspeed case?
17 A  There are -- there were -- can you be more specific?
18 Q  Was this to cover -- the $60,000 that you and Mr. Hansmeier
19  gave to Mr. Steele, was it to cover a bond for
20  Mr. Hansmeier?
21 A  Yes. So he would have been one of the people on -- that
22  was put on a judgment and, again, I'm not positive it's the
23  Lightspeed one, but I think it was.
24 Q  Okay.
25 A  Because I'm pretty sure that one had a bond. So if it was

**Page 63**

1  that one, they would have been -- they would have been
2  sanctioned and then there were about -- if I'm correct,
3  they were told if they didn't put up a bond, that they
4  would be fined, like, $5,000 a day until they did and
5  then -- so that was, like, well -- and then so they
6  eventually put up a bond.
7 Q  Okay.
8 A  I think that was the one, and then that one went up on
9  appeal and they lost it, so the money went to the people
10  that the money was for.
11 Q  And when did that all happen? I mean, when did --
12 A  I feel like the appeal thing came down in August of 2015,
13  like the -- whatever.
14 Q  Okay.
15 A  But I'm completely guessing on when the order came down.
16 Q  Sure, okay. How much was the sanction against
17  Mr. Hansmeier?
18 A  I don't remember at all.
19 Q  Okay.
20      MR. BURNS: We've been going a little over an
21  hour, Randy. Might this be a good time for a break?
22      MR. SEAVER: No problem.
23      (Short break taken.)
24      (Browne Deposition Exhibit 13 was marked for
25      identification by the court reporter and

**Page 64**

1      attached hereto.)
2 BY MR. SEAVER:
3 Q  We're back on the record now and you understand you're
4  still under oath?
5 A  Yes, I do.
6 Q  And I'm putting in front of you what's been marked as
7  Exhibit 13, and Exhibit 13 is a copy of a deposit slip that
8  Associated Bank produced pursuant to a subpoena.
9 A  Okay.
10 Q  And this is the $5,900 deposit on July 27 of 2015, correct?
11 A  Yes.
12 Q  So this indicates it is a cash deposit, right?
13 A  Yes.
14 Q  Okay. So look at Exhibit 12 again, if you would. It's --
15  okay, you have that, right?
16 A  Yep, I got it.
17 Q  So down there at the bottom, now we know the 5,900 is cash,
18  right?
19 A  Yes.
20 Q  So that's accurate. The September 2 $10,000 is cash?
21 A  Yes.
22 Q  And the December 10, $5,000 is cash, right?
23 A  Yes.
24 Q  Okay. So that's a total of $20,900, correct?
25 A  Yep -- yes.

**Page 65**

1  Q   That was deposited by you on those dates?
2  A   Yes.
3  Q   All right. I'm putting back in front of you Exhibit
4       Number 5.
5  A   Yep.
6  Q   And Exhibit Number 5 is the page from Mr. Hansmeier's
7       bankruptcy that we looked at earlier where it said trust
8       money of 8,554 --
9  A   Yes.
10 Q   -- on the date of his filing, correct?
11 A   Yes.
12 Q   But we know that's not true, don't we?
13 A   No.
14 Q   Okay. Well, let's look again at how much cash you
15      deposited after -- on or after July 27. It's $20,900,
16      correct, right here (indicating), Exhibit 12?
17 A   Yes.
18 Q   And that far exceeds $8,554 that's on Exhibit 5, doesn't
19      it?
20 A   Yes.
21 Q   So we know Exhibit 5 isn't true, don't we?
22 A   No.
23 Q   Why?
24 A   Well, because -- well, I'm not positive where the 10,000 --
25      I'm assuming it came out of this stuff, but --

**Page 66**

1  Q   Where else would --
2  A   Excuse me, let me finish. I know the 5,900 I deposited
3       since you said it was cash was to pay off credit cards that
4       I had previously incurred and I believe the same thing
5       happened for September 2nd, so although the cash had not
6       been deposited yet to go out, it had already been spent.
7  Q   Where did the cash come from for those three deposits?
8       July 27th is from the 180,000, isn't it --
9  A   Yes, and I'm saying that --
10 Q   Okay, now let me finish. September 2, 2015, 10,000 is from
11      the 180,000, correct?
12 A   Yes.
13 Q   The December 10 $5,000 deposit is from the 180,000,
14      correct?
15 A   Yes.
16 Q   Okay. And that totals 20,900, correct?
17 A   Yes.
18 Q   So you had to have at least 20,900 in cash in your
19      possession on July 13 of 2015?
20 A   Yes, and I'm saying when we filed, I had spent that money,
21      the 15,000 already, approximately, on various things and
22      was paying -- so I said that's not there because I need to
23      pay off my credit card, and then I deposited it afterwards.
24      Just because he hadn't -- just because he listed 8,500, we
25      said, well, we've already spent that money on a credit

**Page 67**

1       card, we just haven't paid it off yet, so we're going to
2       say that that's not there, and then the 5,000 is part of
3       the 8,000 that we were still saying was part of the trust.
4  Q   So you and Mr. Hansmeier sat down and counted out how much
5       money was left there, correct?
6  A   Yes.
7  Q   Okay.
8  A   Pretty close. I mean, there was probably some ones and
9       stuff lying around.
10 Q   And what did you come up with for a total?
11 A   I don't remember exactly how much it was.
12 Q   Okay. And then you and he talked and decided rather than
13      stating how much cash was actually there, you would deduct
14      for cash that was -- for things that you were going to pay
15      in the future?
16 A   For things that had already been purchased on my credit
17      cards that needed to be paid off. They had already -- I
18      had already, essentially, bought them, we had the things.
19 Q   You charged them on your cards?
20 A   Yes, and it needed to be paid off.
21 Q   All right. But we know there's at least an additional $500
22      or so that you testified earlier today that still exists,
23      right?
24 A   Yes.
25 Q   So we know that there was over $21,000 in cash on the day

**Page 68**

1       you filed bankruptcy, correct?
2  A   Yes.
3  Q   Okay. If there's any of that cash left, Ms. Browne, I
4       believe it's property of this estate, so don't spend it.
5       You can talk to your attorney about this, but that's the
6       way it appears to me.
7  A   I disagree with your assessment of that.
8  Q   Why do you disagree with that?
9  A   Because it's part of the trust and the trust was one where
10      he didn't -- his money was the trust money and, therefore,
11      it's not actually part of the estate until you -- well, you
12      would have to --
13 Q   Tell me why?
14 A   You would actually have to break the trust. You would have
15      to legally break the trust before it would become part of
16      the estate.
17      MR. BURNS: I would now just wait until
18      Mr. Seaver asked a question and then you can answer the
19      questions that he asks.
20      BY MR. SEAVER:
21 Q   So that's why you think this cash isn't bankruptcy estate
22      property?
23 A   That's correct.
24 Q   Okay. Ms. Browne, did you use any of the cash, any of the
25      180,000 or so in cash that was taken out of those accounts

**Page 69**

1   to purchase any cashier's checks?
2 A   No.
3 Q   Did you use it to purchase any money orders or anything
4   like that?
5 A   No.
6 Q   Did you deposit any of those funds -- well, tell me any
7   bank account that you deposited any of those funds, the
8   cash into?
9 A   Only -- it would have only been into an Associated Bank
10   account.
11 Q   One of those two Associated Bank accounts?
12 A   Yes.
13 Q   And by that I mean the one in your name and the one in your
14   and Paul's names?
15 A   That's correct.
16 Q   Did you put any of it into a brokerage account?
17 A   No.
18 Q   So other than the cash, the 60,000 -- was it 60,000 even
19   that you folks gave to Mr. Steele?
20 A   I think so.  I'm not positive on that.
21 Q   Okay.  So there's the 60,000, roughly, to Mr. Steele.
22   There's the money that we saw redeposited into the account.
23   Is that the world of what happened to the cash that you
24   took out?
25 A   No, we spent cash on things.

**Page 70**

1 Q   Like what things?
2 A   Like babysitters, going out, paying a handyman who came to
3   fix stuff at the condo.
4 Q   Anything else?
5 A   I mean, anything we would -- that I would have spent cash
6   on, groceries possibly, coffee.
7 Q   Other than the Steele payment, the deposits into the two
8   Associated Bank accounts, was there anything that exceeded
9   $1,000 --
10 A   No.
11 Q   -- to any single person or entity?
12 A   Sorry.  No, not that I -- no.
13 Q   Okay.
14       (Browne Deposition Exhibit 14 was marked for
15        identification by the court reporter and
16        attached hereto.)
17 BY MR. SEAVER:
18 Q   All right.  I'm putting in front of you what has been
19   marked as Exhibit 14, and Exhibit 14 is a copy of a listing
20   agreement.
21       MR. BURNS: Can you just wait until I catch
22   up?  I've been going backwards through your -- is it --
23       MR. SEAVER: It's the Lake Sotheby's --
24       MR. BURNS: Okay, got it, and that's 15?
25       MR. SEAVER: It's 14.

**Page 71**

1       MR. BURNS: Fourteen, okay.
2 BY MR. SEAVER:
3 Q   Do you have that in front of you?
4 A   I do.
5 Q   Can you tell me what this is, ma'am?
6 A   I believe this is the listing agreement for our condo or
7   our former condo.
8 Q   Okay.  And that was for the listing for the condo in the
9   Carlyle?
10 A   That's correct.
11 Q   All right.  And there's a date -- on the first page of this
12   Exhibit 14, there's a date up there of September 16, 2015.
13   Do you see that?
14 A   I do.
15 Q   Is that the date that you and Mr. Hansmeier signed the
16   listing agreement?
17 A   I'm going to assume, yes.
18 Q   Okay.  And in the -- on the front of this -- well, let's
19   look at the signatures for a minute here.  They appear to
20   me to be e-signatures on here?
21 A   That is correct.
22 Q   How was -- how did you go about signing it?
23 A   It was electronic, whatever that -- some document thing.
24   We got a link and you went to it and read through it and
25   typed in your name.

**Page 72**

1 Q   Okay.  And to the best of your knowledge, it's September 16
2   that you would have put your e-signature --
3 A   I know it was in September, so that seems reasonable.
4 Q   Okay.  And this is -- the only two people signing this as
5   the people selling the property are you and Mr. Hansmeier,
6   correct?
7 A   That is correct.
8 Q   The Chapter 13 trustee never agreed to pay any commission,
9   did he?  He's not a signatory to this?
10 A   No, he's not a signatory.
11 Q   Nor am I, of course, right?
12 A   Right.
13 Q   In fact, there was no Chapter 7 until after this listing
14   agreement was signed?
15 A   That's correct.
16 Q   Okay.  And turn to the second page of this, if you would.
17   I'm at line 59 there and it says, "Seller --" and that's
18   you and Mr. Hansmeier, correct?
19 A   Yes.
20 Q   "-- shall pay Broker, as Broker's compensation, 6 percent,"
21   correct?
22 A   Yes.
23 Q   And so you and Mr. Hansmeier agreed to pay to the broker
24   6 percent of the -- a 6 percent commission on the sale
25   price, correct?

---

Page 73

1  A    Yes.
2  Q    And then it says that the commission shall be reduced to 5
3       percent if the seller purchases the next home with, and
4       there are a couple of names, correct?
5  A    Yes.
6  Q    But the actual commission paid at closing was the
7       6 percent, wasn't it?
8  A    That is my understanding, yes.
9  Q    Okay. And then down at line 63, starting at line 63, it
10      goes on to set out conditions upon which you and
11      Mr. Hansmeier would become obligated to pay the commission,
12      correct? That's --
13  A   I'm sorry?
14  Q    Yeah, and take time to read through it. Lines 63 through
15      70, if you will just read through those and then let me
16      know when you're done and I'll ask you the question.
17  A    And where am I supposed to read through?
18  Q    Lines 63 through 70, those lines.
19  A    Okay.
20  Q    So those lines, in summary, they set forth conditions under
21      which you and Mr. Hansmeier would become obligated to pay
22      the commission, correct?
23  A    Yes.
24  Q    Okay. And what actually happened was the sale closed,
25      right?

Page 74

1  A    Yes.
2  Q    And the commission was paid at closing?
3  A    Yes.
4  Q    Okay. This listing agreement contains an exclusion for
5       MLS, it doesn't go on MLS?
6  A    It did go on MLS, though.
7  Q    Oh, it did?
8  A    It did. We ended up not doing the exclusion.
9  Q    Okay. There is a certification to withhold property --
10  A   Right.
11  Q    -- but your testimony is that you changed your mind on
12      that?
13  A   Yes. It took longer to get the house ready to be put up,
14      so because it was getting towards the end of the selling
15      season, we skipped the pocket listing portion and went
16      directly to MLS.
17  Q    Okay. Do you know when it went on MLS?
18  A   I want to say right around the 1st of November, but I'm not
19      positive.
20  Q    Okay. So the buyer came along quickly after it went on
21      MLS?
22  A    She did, in approximately ten days, I believe.
23  Q    And just so you know, we aren't mentioning her name here,
24      right?
25  A    That's fine.

Page 75

1  Q    And I say that because while I wasn't present at the
2       hearing, I understand at the hearing on the sale
3       authorization that the bankruptcy court judge, you know,
4       wanted that maintained.
5  A    Yes.
6  Q    Okay. And I'm sorry, tell me again, you think it was
7       around November 1st that it went on MLS?
8  A    Right. Well, I know that it wasn't listed yet when I
9       testified on October 28th in my previous examination.
10  Q    It wasn't on MLS yet?
11  A    It hadn't been listed yet on October 28th.
12  Q    But you had signed a listing agreement?
13  A    But we hadn't listed it yet. We signed the agreement with
14      them and then we needed to finish doing what we were doing
15      to the property, so it wasn't ready for pocket listing yet,
16      it wasn't staged yet when we listed it, it was simply this
17      is the person that we're going to go forward with and they
18      hooked us up with the person that did our -- coordinated
19      getting the house ready to go.
20  Q    But just so we're clear on this, though, you knew that once
21      you signed this listing agreement, Exhibit 14, you and
22      Mr. Hansmeier were obligated to perform as required by the
23      agreement?
24  A    Yes.
25  Q    Okay.

Page 76

1           (Browne Deposition Exhibit 15 was marked for
2              identification by the court reporter and
3              attached hereto.)
4  BY MR. SEAVER:
5  Q    I'm showing you now what's been marked as Exhibit
6       Number 15, and Exhibit Number 15 is a copy of the Purchase
7       Agreement. It's a redacted copy of the Purchase Agreement.
8       I've redacted the buyer's name, that's the extent of the
9       redaction here.
10  A   Okay.
11  Q    And just look at it, but does this appear to be the
12      Purchase Agreement that you and Mr. Hansmeier signed?
13  A    Yes.
14  Q    All right. And you and Mr. Hansmeier are the only people
15      signing as sellers here, correct?
16  A    That is correct.
17  Q    The Chapter 13 trustee is not a signatory to this?
18  A    That is correct.
19  Q    And it's dated -- on the front page it says November 9 of
20      2015. Does that sound like the date to you that you and
21      Mr. Hansmeier signed off on this?
22  A    It depends on what time of day. I can't remember if we
23      signed it the same day or the next day.
24  Q    Okay. And it was an e-signature, so you did it at home?
25  A    Yes.

Page 77

1 Q   And home at that time was the rental property, right?
2 A   Yes.
3 Q   Okay. So it was either the 9th of November or the 10th of
4      November?
5 A   Yes.
6 Q   All right. And the sale price was $1.2 million, correct?
7 A   That is correct.
8             (Browne Deposition Exhibit 16 was marked for
9             identification by the court reporter and
10            attached hereto.)
11 BY MR. SEAVER:
12 Q   All right. I'm showing you what's been marked as
13     Exhibit 16, and this is a copy that I received, I think it
14     was from Mr. Hansmeier's documents in the dropbox. It's
15     the Residential Lease?
16 A   Yes.
17 Q   You recognize it as that, don't you?
18 A   I do, yes.
19 Q   All right. And this is the lease that you and
20     Mr. Hansmeier signed for the property at -- what's the
21     address there?
22 A   3749 Sunbury Alcove.
23 Q   Okay. And if you turn to the very last page of this,
24     that's where -- these are actual signatures, and it appears
25     that you and Mr. Hansmeier both signed this on

Page 78

1      September 26th, 2015, correct?
2 A   Yes.
3 Q   So it was signed several days after you folks signed the
4      listing agreement?
5 A   Yes.
6 Q   When did you actually move into this property, then?
7 A   October 5th.
8 Q   Okay. Oh, that's the start date on the lease?
9 A   Yes.
10 Q   Okay. Did you have a moving company move you?
11 A   We did.
12 Q   Who was that?
13 A   I don't remember what their name was.
14 Q   How much did the move cost?
15 A   Approximately a thousand dollars.
16 Q   That's a good deal.
17 A   Yeah.
18 Q   How did you pay them?
19 A   Credit card.
20 Q   Okay. Was it your card or --
21 A   It is.
22 Q   -- Mr. Hansmeier's?
23 A   It was mine.
24 Q   Which one was it?
25 A   I'm not sure, but I believe you have a copy of that

Page 79

1      statement, actually.
2 Q   Okay. Did it come directly out of your account?
3 A   So it was either a Bank of America or -- I'm not sure, I
4      really don't remember which one it was.
5 Q   Do you and Mr. Hansmeier have any joint credit cards?
6 A   No.
7 Q   And have you since -- let's just say since January of 2014?
8 A   We have never had a joint credit card.
9 Q   Okay, that makes it easy.
10            (Browne Deposition Exhibit 17 was marked for
11            identification by the court reporter and
12            attached hereto.)
13 BY MR. SEAVER:
14 Q   All right. I'm putting in front of you what has been
15     marked as Exhibit 17 and Exhibit 17 is -- it's a copy of
16     the closing statement from the sale of the condo and,
17     again, I redacted this to the extent of taking out the name
18     of the buyer. You have seen this before, right?
19 A   I have.
20 Q   And you actually signed off on this same HUD statement?
21 A   Yes.
22 Q   And I'm -- looking at the first page, there is the -- there
23     is the judgment payoff to Best & Flanagan and that was a
24     judgment against Mr. Hansmeier, correct?
25 A   Yes.

Page 80

1 Q   Okay. I mean, you weren't --
2 A   I was not on the judgment.
3 Q   Okay. And then down in the Commission section, there are
4      the commission numbers there. You agree that those numbers
5      were correct, right?
6 A   Yes.
7 Q   And those are the commissions that you and Mr. Hansmeier
8      agreed to pay when you signed the listing agreement,
9      correct?
10 A   Yes.
11 Q   All right. The next page of this, go to the Miscellaneous
12     section here and there is a balance of HOA dues to the
13     Carlyle for a little over 1,100. That's the homeowners
14     association, right?
15 A   Yes.
16 Q   And then there's a contractor's invoice to J. Nordstrom
17     Plumbing for $150. Was that a contract that you had with
18     Nordstrom?
19 A   Yes.
20 Q   And then there's an electrical usage to the Carlyle.
21     That's just you and Mr. Hansmeier using electricity at the
22     Carlyle; is that what it is?
23 A   That's correct.
24 Q   Okay. And then there's an escrow for Nicollet Mall and it
25     goes on. Do you know what that is?

**Page 81**

1  A   I believe it's because they are doing some beautification
2      stuff and there was an assessment because we lived by it.
3  Q   Okay. And then there's the HOA dues and those are just the
4      dues that were current as of the day of closing; is that
5      your understanding?
6  A   Yes.
7  Q   Okay. And then the invoice for carpet to Midwest
8      Interiors, was that a contract you had with Midwest
9      Interiors?
10 A   Yes.
11 Q   The invoice for flooring to Duane's Floor Service, is that
12     a contract that you had with Duane's Floor Service?
13 A   Yes.
14 Q   The invoice for painting to Roell, is that a contract you
15     had with Roell?
16 A   Yes.
17 Q   Invoice to Pride Electric, is that a contract you had with
18     Pride Electric?
19 A   Yes.
20 Q   Lights and cleaning to Fix Design Haus, is that a contract
21     you had with Fix Design Haus?
22 A   Yes.
23 Q   And then the "reimburse realtor for resale disclosure,"
24     what's that?
25 A   I don't know. I --

**Page 82**

1  Q   But it was only $160?
2  A   Yes.
3  Q   So these items in the Miscellaneous and -- let me just
4      delineate them. The items on the exhibit that I've put the
5      checkmarks next to --
6  A   Yeah.
7  Q   -- and they show there on the exhibit in blue ink, those
8      are all items that you were personally obligated to pay,
9      correct?
10 A   Yes.
11 Q   And they were paid at closing, correct?
12 A   Yes.
13         (Browne Deposition Exhibits 18 through 25 were
14          marked for identification by the court
15          reporter and attached hereto.)
16 BY MR. SEAVER:
17 Q   All right. I'm showing you what's been marked as Exhibit
18     Number 18 and this is -- it's an invoice from Fix Design
19     Haus and it says, "Bill to: Padraigin Browne," and it was
20     for $4,519.75. Do you see that?
21 A   I do.
22 Q   And this invoice indicates, or at least appears to
23     indicate, that it was paid, correct?
24 A   Yes.
25 Q   How was that paid?

**Page 83**

1  A   Credit card.
2  Q   Okay. One of your credit cards?
3  A   That's correct.
4  Q   All right. The next one, I'm putting Exhibit 19 in front
5      of you and this is an invoice from Duane's Floor Service
6      and this was -- this was one of the ones that got paid at
7      closing?
8  A   I believe so.
9  Q   The invoice is saying $3,740 on this one, but the Duane's
10     closing line item is $4,065, but it's close?
11 A   Well, they had to come back in and do a little bit extra.
12 Q   Oh, so there's probably a little invoice after this one?
13 A   Yeah, and I may have even approved it over the phone. I'm
14     not sure I even got --
15 Q   But at any rate, that's the Duane's Floor Service on the
16     closing statement?
17 A   Yeah.
18 Q   Okay. And I'm putting in front of you Exhibit 20 now.
19     This is an invoice from Midwest Interiors. The original
20     amount was $3,700 and then there was a deposit of $1,900,
21     correct?
22 A   Yes.
23 Q   How was the $1,900 paid?
24 A   Credit card.
25 Q   Okay. And this is one of the items that got paid, the

**Page 84**

1      balance, at closing, correct?
2  A   Yes.
3  Q   I'm putting Exhibit 21 in front of you now, which is a
4      Pride Electric invoice, and this is -- it's showing a
5      balance of $760 on this invoice. The closing statement
6      shows $450. Was there some money paid along the way?
7  A   I'm assuming I must have made a credit card payment.
8  Q   Okay. That's where it would have come from if you did?
9  A   Yeah. I -- yeah. The only other thing I can think of is
10     that Fix Staging paid them also, because this one, the
11     customer is actually Fix Staging.
12 Q   Okay. So they could have paid something on it for the
13     difference?
14 A   Yeah, from, like, my -- because we made a first payment to
15     Fix Haus, so they may have made a payment.
16 Q   Okay.
17 A   Because I don't remember making a payment on that one,
18     but --
19 Q   Okay. The Fix Haus payment or the Fix payment, the initial
20     payment, is that one we already looked at?
21 A   Yeah, that's the one where it was -- it's Exhibit 18.
22 Q   The credit card?
23 A   Yeah, the credit card.
24 Q   Okay. All right, I'm putting in front of you now Exhibit
25     Number 22.

Page 85

1  A    Yes.
2  Q    And that's a bill or invoice from CR Heating?
3  A    Yes.
4  Q    And that's one of -- was that one paid at closing?
5  A    No, I paid that with a check.
6  Q    Okay. It was coming out of your Associated Bank account?
7  A    Yes.
8  Q    Okay. And I'm putting Exhibit Number 23 in front of you
9       now, and this is -- it says -- I can't really read exactly
10      what it says over there on the right side, but do you
11      recognize this bill?
12 A    Yes, it's for the cleaners.
13 Q    Okay. And did you pay them directly?
14 A    No. You see lights and cleaning for the 4,861 --
15 Q    Oh, that's this one?
16 A    Yeah, that's been rolled in.
17 Q    Okay. And I'm showing you now what's been marked as
18      Exhibit 24. This says "Contractors Invoice" up at the top,
19      J. Nordstrom Plumbing, and that's the 150 that's on the
20      closing statement?
21 A    That's correct.
22 Q    Okay. And I'm showing you now Exhibit Number 25. This is
23      the Roell Painting Company invoice and this is showing a
24      $3,000 previous payment. Was that a credit card payment?
25 A    It looks like that was that check that we didn't know,

Page 86

1       1315. It looks like that's what that check was.
2  Q    Oh, okay, yep. So you think this was a check coming out of
3       your personal -- your Associated Bank account?
4  A    Yes.
5  Q    Okay. And then the balance of this invoice was paid at
6       closing, correct?
7  A    That's correct.
8            (Browne Deposition Exhibit 26 was marked for
9             identification by the court reporter and
10            attached hereto.)
11 BY MR. SEAVER:
12 Q    I'm putting in front of you Exhibit Number 28 (sic). This
13      is a copy of a letter that was faxed over to me yesterday
14      by your attorney, Mr. Burns, talking about proceeds that
15      are being held per the court order on the sale of the
16      property, and he has a number in there of $253,763.56. Do
17      you know how that number is calculated?
18 A    I believe it is the purchase price of the house minus TCF.
19 Q    Okay.
20 A    Minus all -- everything -- I guess maybe the better way to
21      say it would be the amount that you received, the 435 --
22 Q    Yeah.
23 A    -- plus the amount of the Chowdhury lien divided by two.
24 Q    Okay. So when you -- did you -- I'm not asking for your
25      communications here with Mr. Burns, I'm just trying to get

Page 87

1       your understanding of this amount, but did you go through
2       and figure this out, what you thought you were owed out of
3       this?
4  A    Yes, I did a little look at what I thought was appropriate.
5  Q    And did you deduct from what you thought was owed to you
6       your share of the commission?
7  A    This number is after the commission is taken out of the
8       purchase price, after all the payments. This number is --
9  Q    You're looking at Exhibit Number 17 now?
10 A    I am. Let's see, where is it? This number is the
11      435,906.21 plus 71,620.90 divided by 2, I believe.
12 Q    Okay. Just so we're clear, though, and I think we were
13      earlier, you agree with me that you and Mr. Hansmeier are
14      responsible for payment of the commission, don't you?
15 A    I believe that that was what was listed on the -- on our
16      Purchase Agreement.
17 Q    And you agree with that, don't you?
18 A    Yes, and it was paid.
19 Q    And the only two people who agreed to pay it were you and
20      Mr. Hansmeier?
21 A    That is correct.
22          MR. SEAVER: All right. Let's go off the
23          record here.
24          (Short break taken.)
25          (Browne Deposition Exhibit 27 was marked for

Page 88

1           identification by the court reporter and
2           attached hereto.)
3  BY MR. SEAVER:
4  Q    We're back on the record here now and you understand you're
5       still under oath?
6  A    I do.
7  Q    When you and Mr. Hansmeier moved into the rental home --
8       October 5th, right?
9  A    Yes.
10 Q    You didn't have any intention of returning to the Carlyle,
11      did you?
12 A    Our intent was to return if we didn't sell it, but assuming
13      that it sold, we would not be returning.
14 Q    Once the Purchase Agreement was signed, you knew you
15      wouldn't be returning, assuming it closed?
16 A    Yes.
17 Q    Okay. I'm putting in front of you what's Exhibit Number 27
18      and this is a condensed transcription of the testimony that
19      you gave during the course of the Chapter 13 on October 28,
20      2015, and just turn, if you would, Ms. Browne, to where it
21      says "Page: 13" in the upper right corner. It's pages 51
22      and 52 of your testimony, and just take some time to read
23      through pages 51 and 52 and let me know when you're done.
24 A    Yes.
25 Q    All right. So at page 51, you -- the question to you, I'm

**Page 89**

1  at line 9 now, "I understand you're going to list it for
2  $950,000, did I hear that correctly?" And your response
3  is?
4  A    "We will have a final decision on that after the repair
5      work is done."
6  Q   But you had signed the listing agreement more than a month
7      before that listing it at -- agreeing to sell it for
8      1.3 million, correct?
9  A    Yes, we signed the agreement, but --
10 Q   And -- go ahead.
11 A    But when we talked to them, they said that that's where
12     they were hoping that we would be able to do it and that's
13     where the contract would kick in where we would have to pay
14     if we didn't sell it, but that we would have to make a
15     final decision on where we should actually make the listing
16     after we saw how the house looked when everything was done.
17 Q   So why didn't you tell him that you had already signed the
18     listing agreement for $1.3 million?
19 A    He didn't ask that.
20 Q   Okay. Let's go to page 52, line 2. "Do you know when
21     you're going to make a decision on the listing price," is
22     the question, and your answer is?
23 A    "We have not scheduled a final appointment with him yet."
24 Q   And, again, why didn't you tell him you had already signed
25     a listing agreement for $1.3 million?

**Page 90**

1  A    We did tell them that we were using a realtor. It says we
2      told him we were using Ben Ganje.
3  Q   Right.
4  A    And again, the question was, when are you going to make a
5      final decision for what you're going to list at, and we had
6      not made that decision yet. We had not met with him and we
7      had not scheduled a final appointment when we would make the final
8      determination based on how things were looking, if we could
9      actually do the 1.3 or if we needed to go lower.
10 Q   So you didn't think that either of those questions required
11     you to disclose to him the fact that you had already signed
12     a listing agreement for 1.3 million?
13 A    No, because it doesn't say that. He did not ask those
14     questions.
15 Q   Well, how would he know the sale price? That's what he was
16     trying to get from you, the listing price, isn't it?
17 A    It's not my job to do his job for him. If he wants to
18     know, he needs to ask the correct question.
19 Q   I see. And you didn't feel any obligation to tell him, in
20     response to those questions, that a listing agreement had
21     already been signed?
22 A    That's correct.
23 Q   Okay. I do not have anything -- well, let me ask you,
24     this: So this deposition was October 28 of 2015. It went
25     on MLS four days later?

**Page 91**

1  A    I believe so, yes.
2  Q   All right. So when did you make this final decision to
3      list it for exactly the same price that you had in the
4      listing agreement that you signed back in September?
5  A    About two hours before it went on.
6  Q   Okay. And I'm right on that, right, it was the same
7      price -- it was listed for exactly the same price --
8  A    It did.
9  Q   -- that's in the listing agreement that's signed in
10     September?
11 A    Yes, which was actually a change from what we had discussed
12     with him. We had discussed originally with Mr. Ganje that
13     the pocket listing would be at 1.3 and then we would put it
14     on MLS for less than that, for 1.2, but because things
15     changed, we ended up listing on MLS for 1.3, which was
16     different than what our original verbal agreement had been.
17 Q   But not different than what your written agreement that you
18     and Mr. Hansmeier had signed was?
19 A    Right, not different than the max amount that we had to
20     accept. What it says is we are not going to definitely
21     list for 1.3, it says if we get an offer of 1.3, then we
22     have to pay him whether or not we decide to sell.
23         MR. SEAVER: Okay. I don't have anything
24     further.
25         MR. BURNS: Okay. We have no questions.

**Page 92**

1  We'll read and sign.
2  (Deposition concluded at 3:05 p.m.)

Page 93

```
1              VERIFICATION OF DEPONENT TO TRANSCRIPT
2              I, PADRAIGIN BROWNE, do hereby verify that I
3      have read the foregoing transcript consisting of the
4      preceding 92 pages and do further verify that it is a true
5      and complete transcript of the testimony given by me on
6      February 18, 2016, (except for the following, stating page
7      and line number and the reason for the change).
8      Page      Line      Change or Addition      Reason
9   1.
10  2.
11  3.
12  4.
13  5.
14  6.
15  7.
16  8.
17  9.
18  10.
19
20                        PADRAIGIN BROWNE
                   DATED:_____
21
22  _____
            Notary
23  Signed before me this _____ day of _____, 20___.
24
25              COLLEEN M. SICHKO, RPR
```

February 19, 2016

Dave Burns, Esq.
475 Grain Exchange North
301 Fourth Avenue South
Minneapolis, MN  55415

    In re:  Paul Hansmeier, Debtor

    Deposition of PADRAIGIN BROWNE, taken February 18, 2016

Dear Mr. Burns:

A copy of the above-referenced deposition is enclosed, along with the reading and signing certificates. When Ms. Browne has completed the reading and signing, please return all but your copy of the executed certificate to me for proper distribution.

In accordance with the Rules of Civil Procedure, if I do not receive the executed certificate within thirty (30) days of the date hereon, I will send the unsigned original transcript to Mr. Seaver for proper filing.

Should you have any questions, do not hesitate to contact me.

Sincerely,

SHADDIX & ASSOCIATES


Colleen M. Sichko
Registered Professional Reporter

Enclosure

cc:  Randall L. Seaver, Esq.

Page 94

```
1   STATE OF MINNESOTA)
                      )  ss.
2   COUNTY OF DAKOTA  )

3              Be it known that I took the deposition of
4   PADRAIGIN BROWNE on the 18th day of February, 2016, at Suite 132,
    12400 Portland Avenue South, Burnsville, Minnesota;
5
           That I was then and there a Notary Public in
6   and for the County of Dakota, State of Minnesota, and that I was
    duly authorized to administer an oath;
7
           That the witness, before testifying, was first
8   duly sworn to testify the truth and nothing but the truth;
9              That the testimony was recorded by myself and
    transcribed into a computer-aided transcript and that the
10  deposition is a true record of the testimony given by the witness
    to the best of my ability;
11
           That the cost of the original transcript has
12  been charged to the party noticing the deposition, unless
    otherwise agreed upon by Counsel; and that copies have been made
13  available to all parties at the same cost, unless otherwise
    agreed upon by Counsel;
14
           That I am not related to any of the parties
15  hereto nor interested in the outcome of the action;
16             That the reading and signing of the deposition
    by the witness was not waived, and that the original transcript
17  will be retained by Mr. Seaver;
18             WITNESS MY HAND AND SEAL THIS 19th day of
    February, 2016.
19
20
21
22              COLLEEN M. SICHKO
                Registered Professional Reporter
23
24
25
```

## Hansmeier Timeline

| Date | Case | Event |
|---|---|---|
| | | |
| August 9, 2012 | Lightspeed[1] | Case Opened |
| September 27, 2012 | Ingenuity 13, LLC[2] | Complaint filed against John Doe |
| December 3, 2012 | Ingenuity 13, LLC | Morgan Pietz files notice of related cases, identifying 49 similar cases filed by related shell companies. |
| December 20, 2012 | Ingenuity 13, LLC | Cases consolidated or assigned to Judge Otis Wright. |
| December 31, 2012 | Ingenuity 13, LLC | Plaintiff (Ingenuity 13) files motion to disqualify Judge Wright. |
| January 25, 2013 | Guava[3] | Hearing held, court tells Hansmeier case will be dismissed. |
| January 28, 2013 | Ingenuity 13, LLC | Notice of dismissal filed by Plaintiff |
| February 6, 2013 | Guava | Hansmeier moves $65K from Alpha Law Firm account to Class Action Justice, PLLC |
| February 7, 2013 | Ingenuity 13, LLC | Order to Show Cause re Sanctions for Rule 11 and Local Rule 83-3 Violations (specifically for Plaintiff's counsel Gibbs). |
| February 29, 2013 | Guava | Hansmeier dismisses Guava case. |
| March 1, 2013 | Guava | Defendant moves for order to show cause on 4/23/13 |
| March 3, 2013 | Guava | Hansmeier sends $80K from Alpha to himself for his house, largely depleting Alpha's account. |
| March 5, 2013 | Ingenuity 13, LLC | Order from court requiring Hansmeier and other related parties to appear personally on March 11, 2013.  Doc 66. |
| March 11, 2013 | Ingenuity 13, LLC | Hearing continued to March 29, 2013 to allow for Hansmeier to appear. |
| March 21, 2013 | Lightspeed | Plaintiff's case voluntarily dismissed. |
| April 5, 2013 | Lightspeed | Defendant Smith files motion for attorney fees against Hansmeier. |
| April 23, 2013 | Guava | Dugas, Hansmeier's associate, appears for hearing. |
| May 6, 2013 | Ingenuity 13 | Order entered issuing sanctions against Hansmeier by Judge Otis Wright, II. ($81,319.72). |
| May 15, 2013 | Ingenuity 13 | Hansmeier files notice of appeal of sanctions award. |
| **May 15, 2013** | | **Hansmeier Transfers $51,333.50 from Monyet Scottrade Account to SureTec Insurance Agency for appellate bond.** |

[1] "Lightspeed" refers to the civil case no. 12-889-GPM, Lightspeed Media Corp. v. Anthony Smith, filed in the United States District Court for the Southern District of Illinois.

[2] "Ingenuity 13, LLC" refers to the civil case no. 2:12-cv-08333, Ingenuity 13, LLC v. John Doe, filed in the U.S. District Court for the Central District of California.

[3] "Guava" refers to civil case no. 27-cv-12-20976, Guava v. Spencer Merkel, filed in the Hennepin County District Court, Fourth District of Minnesota.

EXHIBIT A

| May 21, 2013 | Ingenuity 13 | Order Denying Ex Parte Application for Stay of Enforcement; and Order to Show Cause regarding failure to pay attorney fees.  Judge imposes a $1,000 a day penalty if fees are not paid or bond is not posted. |
| May 23, 2013 | Ingenuity 13 | Motion for Approval of Bond, it appears Hansmeier posted $51,333.50 of collateral from the Monyet account for this Bond. |
| June 4, 2013 | Navasco[4] | Motion on behalf of Navasca seeking an award of attorney's fees. |
| June 6, 2013 | Ingenuity 13 | Order from Court requiring additional bond in the amount of $135,933.66. |
| **June 27, 2013** | **Hansmeier transfer $10,000 from Monyet Scottrade Account to Livewire Holdings, LLC (JP Morgan Chase account), for "Investment/ Loan to Livewire".** | |
| **June 28, 2013** | **Hansmeier transfers $10,000 from Monyet Scottrade Account to Livewire Holdings for "Business Transfer".** | |
| July 2, 2013 | Navasco | Motion for sanctions and order holding Hansmeier liable for attorneys fees and costs. |
| **July 15, 2013** | **Hansmeier transfers $69,000 to SureTec Insurance Co. for "Suretec Appellate Bond Amount re John Steele and 12-cv-8333".** | |
| **July 19, 2013** | **Hansmeier transfers $10,000 to SureTec Insurance Co. for "Attorney's Fees Escrow"** | |
| July 23, 2013 | Ingenuity 13 | Bond posted in the amount of $135,933.66.  It appears Hansmeier posted $69,000 of collateral from the Monyet account for this Bond. |
| **July 26, 2013** | **Hansmeier transfers $25,000 from Monyet Scottrade Account to Class Justice, PLLC (transfer requests states "Capitalize Law Firm").** | |
| **July 30, 2013** | **Hansmeier transfers $5,000 from Monyet Scottrade Account to Padraign Brown for "Personal Transfer".** | |
| August 5, 2013 | Guava | Order granting sanctions against Guava, LLC |
| **August 7, 2013** | **Hansmeier transfers $2,575 from Monyet Scottrade Account to ADP Payroll Account for "Payroll Tax Wire"** | |
| August 25, 2013 | | Hansmeier dissolves Alpha Law Firm |
| **August 27, 2013** | **Hansmeier transfers $30,000 from Monyet Scottrade Account to Padraign TCF Account for "Trust Agreement".** | |
| September 6, 2013 | Guava | Hansmeier withdraws from case |
| September 23, 2013 | Guava | Fourth Judicial District of the State of Minnesota enters judgments of $4,537.50; $12,646; and $12,646 against the Debtor. |
| **September 25, 2013** | **Hansmeier transfers $10,000 from Monyet Scottrade Account to Voelker Litigation Group for "Legal Services"** | |
| **October 1, 2013** | **Hansmeier transfers $25,000 from Monyet Scottrade Account to Class Justice, PLLC for "Business Loan".** | |
| October 22, 2013 | Chowdhury[5] | United States District Court for the District of Massachusetts entered judgment against the debtor and others in the amount of $64,180.80 in favor of Sandipan Chowdhury. |
| October 30, 2013 | Lightspeed | Order entered granting defendant's motion for recovery of attorney's fees. |
| October 31, 2013 | Guava | Hansmeier appeals judgment, uses last of Alpha's money to pay appellate filing fee. |

---

[4] "Navasco" refers to civil case no. 3:12-CV-02396, AF Holdings, LLC v. Navasco, filed in the U.S. District Court for the Northern District of California.

[5] "Chowdhury" refers to civil case no. 12-12105, AF Holdings, LLC v. Chowdhury, filed in U.S. District Court for the District of Massachusetts.

| November 13, 2013 | Lightspeed | Court hears motions to vacate order of fees awarded to Smith and motions for fees and expenses filed by AT&T and Comcast. |
| **November 19, 2013** | **Hansmeier transfers $10,000 from Monyet Scottrade Account to Voelker Litigation Group for "Business"** | |
| **November 19, 2013** | **Hansmeier transfers $20,000 from Monyet Scottrade Account to Class Justice, PLLC for "Business".** | |
| **November 22, 2013** | **Hansmeier transfers $175,000 from Monyet Scottrade Account to Padraigin TCF Account  "Trust Transfer".** | |
| November 27, 2013 | Lightspeed | United States District Court for the Southern District of Illinois entered judgment against the debtor and others in the amounts of $72,367; $119,637.05; and $69,021.26(total of $261,025.31). |
| **December 9, 2013** | **Hansmeier transfers $21,250 from Monyet Scottrade Account to Robert Balzebre for "Loan"** | |
| December 12, 2013 | Lightspeed | Hansmeier Appeals award of attorney fees. |
| December 27, 2013 | Lightspeed | Defendant's file motion for contempt against Debtor. |
| January 8, 2014 | Guava | John Does move to add Hansmeier as a judgment debtor. |
| **January 17, 2014** | **Hansmeier transfers $20,000 from Monyet Scottrade Account to Class Justice, PLLC "Loan Installment".** | |
| January 29, 2014 | Lightspeed | Court enters docket order directing Defedant's to file reply to Plaintiff's response on motion for contempt by February 6, 2014, hearing to be held on February 13, 2014. |
| **February 7, 2014** | **Hansmeier transfers $70,000 from Monyet Scottrade Account to Padraigin TCF account for "Trust Transfer".** | |
| February 13, 2014 | Lightspeed | Motion for contempt taken under advisement, Hansmeier ordered to submit asset statements prepared by certified public accountant on or before 2/24/2014. At the hearing Hansmeier indicated an inability to pay. |
| **March 19, 2014** | **Hansmeier transfers $25,000 from Monyet Scottrade Account to Class Justice, PLLC for "Installment Loan"** | |
| **March 19, 2014** | **Hansmeier transfers $3,750 from Monyet Scottrade Account to Voelker Litigation Group for "Escrow"** | |
| March 20, 2014 | Lightspeed | Lightspeed v. Smith (SD IL) Defendant files renewed motion for contempt against Hansmeier. |
| **May 5, 2014** | **Hansmeier transfers all remaining funds, $39,231, from Monyet Scottrade Account to Chisholm Properties South Beach, Inc. for "Attorney's Fees Escrow"** | |
| January 20, 2015 | Guava | Fourth Judicial District of the State of Minnesota amended a prior judgment and entered judgment against the debtor in the amount of $63,386.52. |

UNITED STATES BANKRUPTCY COURT

DISTRICT OF MINNESOTA

--------------------------------------------------

In re:

Paul Hansmeier,        Bky. File No: 15-42460

Debtors.

--------------------------------------------------

The above-entitled matter came duly on for a 341 Meeting of Creditors hearing before the Honorable Randall L. Seaver, pursuant to Notice, on February 25, 2016. The hearing was electronically recorded and transcribed by Julie A. Rixe, Court Reporter.

I N D E X

| WITNESS | PAGE |
|---|---|
| Paul Hansmeier | 4 |
| Examination by Mr. Seaver | 4 |
| Examination by Mr. Kreuziger | 37 |

APPEARANCES:

BARBARA MAY, Attorney at Law, appeared for and with the Debtor.

COLIN KREUZIGER, Attorney at Law, U.S. Trustee's Office.

WHEREUPON, the following proceedings were duly had and entered of record, to wit:

**EXHIBIT 3**

4

MR. SEAVER: All right. We're on the record now. This is the Paul Hansmeier case. It's case number 15-42460. This is the continued 341 meeting. And present here are Barbara May, Mr. Hansmeier, Colin Kreuziger from the U.S. Trustee's office and other representatives of the U.S. Trustee's office.

Would you raise your right hand, sir?

PAUL HANSMEIER,

after having been first duly sworn, was examined and testified on his oath as follows:

EXAMINATION

BY MR. SEAVER:

Q    Would you state your name, please?

A    Paul Hansmeier.

Q    And, Mr. Hansmeier, I had made a request through Ms. May for you to bring your financial condition report that you submitted in the Lightspeed case and I didn't see it on the drop box. Did you bring that with you?

A    I received the request for the statement of financial condition I believe yesterday afternoon. I looked through it, through my boxes in my house from my move. I was not able to locate it; but when I do locate it, I'll drop it on the drop box.

**5**

1  Q   Okay.

2        MS. MAY:  But isn't that available on

3  Pacer?

4        THE WITNESS:  No, it's not.

5        MS. MAY:  Okay.

6  BY MR. SEAVER:

7  Q   It was a confidential thing, wasn't it?

8  A   I believe it was filed under seal.

9  Q   Yeah.

10 A   So I can't access it now.

11 Q   So you have it, you just haven't been able to locate

12     it?

13 A   I believe I have it, but I have not been able to

14     locate it --

15 Q   Okay.

16 A   -- the past 24 hours.

17 Q   All right.  The first thing I want to talk about

18     here is the Groupon case that has come to my

19     attention and the Padraign Brown objection in the

20     Groupon case.  I have seen the motion of Ms. Brown

21     for attorney's fees and a service award.  And you're

22     representing her in that, correct?

23 A   Various attorneys have represented her through the

24     pendency of the litigation.  I am representing her

25     in connection with the motion to support the request

**6**

1      for a service award and attorney's fees.

2  Q   And when the objection to the Groupon class --

3      Proposed class settlement was filed, what law firm

4      was representing her?

5  A   I believe the attorney who filed the objection on

6      her behalf was an attorney named Brett Gibbs.

7  Q   Okay.  What law firm, though?

8  A   I'm sure it shows on the pleading.  I don't recall

9      what law firm he was.

10 Q   Well, it was one of your law firms, right?

11 A   Again, I don't specifically recall which law firm

12     Brett Gibbs appeared through in connection with that

13     objection.  It would be on the caption of the

14     filing.

15 Q   Who was Brett Gibbs employed by?

16 A   Brett Gibbs is a California attorney, and I'm not

17     clear on who he's employed by at that time.

18 Q   Okay.  Who was Mr. Worzel employed by?

19 A   Mr. Worzel was employed by my law firm at the time.

20 Q   What's the name of that law firm?

21 A   It would either be -- It would be class action --

22     Well, actually, at the time that Mr. Worzel defended

23     Ms. Brown, I'm not sure if he was employed by any

24     law firm at that point in time.  There was a period

25     of time where he was representing her where he was

**7**

1      employed by a law firm and then there was a period

2      of time where he was not employed by a law firm.

3  Q   So the law firm that he was employed by at whatever

4      time, what's the name of that law firm?

5  A   I believe it would have been the Class Action

6      Justice Institute.

7  Q   All right.  And who was the shareholder of that law

8      firm?

9  A   I was the shareholder of that law firm.

10 Q   The sole one, right?

11 A   The sole shareholder.

12 Q   Okay.  And does Ms. Brown have a contingency fee

13     agreement with someone?

14 A   You would have to ask her.  She does not have one

15     with me.

16 Q   Has she had one with any of your law firms?

17 A   She has not had a contingency fee agreement with any

18     of my law firms, to the best of my knowledge.

19 Q   Okay.  And I ask that because I see in the objector

20     Memorandum of Law in opposition to the motion,

21     et cetera, that you filed you're citing a case and

22     saying the contingent fee lawyer is not a joint

23     owner in his client's claim and it goes on after

24     that.  Are you telling me that you're unaware of any

25     contingent fee agreement between Ms. Brown and

**8**

1      anyone with respect to the Groupon case?

2  A   My testimony is that whatever Ms. Brown's agreement

3      is with other attorneys in the case, I can tell you

4      that she did not have one with me or any law firm

5      that I owned.

6  Q   Okay.  And is it right that she, through you as the

7      attorney, is seeking something in excess of $200,000

8      in attorney's fees here?

9  A   I believe that's the correct figure.  She's seeking

10     an award of 10 percent of the amount awarded to

11     class counsel under the common fund theory of

12     recovery.

13 Q   And what are the terms of your retention in

14     representing her now?

15 A   I don't have a specific agreement with her.  All I'm

16     doing right now is filing the paperwork on her

17     behalf to seek the award.

18 Q   Do I recall right that she bought a $5 Groupon

19     certificate; is that what happened?

20 A   I'm not going to answer questions about the facts of

21     the case because I am representing her and I believe

22     that it goes to attorney-client privilege.  I

23     believe if you look at the documents, her original

24     objection, she clarifies what her basis or standing

25     is in the case.

**9**

1  Q   Well, you know what that is, though, sir. And it's
2      a matter of public record, so I don't think there's
3      any attorney-client privilege here. So what was her
4      original Groupon purchase?
5  A   I don't recall the specifics there. It's set forth
6      very specifically in her original objection.
7  Q   And you just don't have any independent recollection
8      of that?
9  A   I -- I recall that she purchased Groupons and that
10     was her basis for standing.
11 Q   So how do you come up with this over $200,000 you're
12     telling the Court she should be paid as attorney's
13     fees, you say?
14 A   Well, as explained in her motion for attorney's
15     fees, it's based on the common fund principle, which
16     allows an objector who brings benefits to the class
17     to receive some of the benefits of that amount in
18     return.
19 Q   Yeah, but it's attorney's fees. I mean, has she
20     paid somebody 200,000 in attorney's fees?
21 A   I don't think she's come out of pocket for $200,000
22     in attorney's fees, no.
23 Q   So how do you justify asking for 200,000 in
24     attorney's fees if she hasn't paid any attorney's
25     fees?

**10**

1  A   Well, just as in any case where attorney's fees
2      don't come out of pocket, for example, a contingency
3      fee arrangement or an action where someone may
4      represent somebody in a civil rights case and
5      there's statutory attorney's fees, at the end of the
6      case the attorney, even if the client does not come
7      out of pocket, is entitled to recover fees -- Or the
8      client, actually, is entitled to recover the fees.
9  Q   Have you ever seen any written agreement between
10     Padraigin Brown and any law firm regarding the
11     representation of her in this Groupon case?
12 A   I have not.
13 Q   Let me just give you a copy of an email that Ms. May
14     sent over to Matthew Swanson of my firm earlier this
15     week. In this email Ms. May is talking about one of
16     Mr. Hansmeier's appeals involving Anthony Smith and
17     the $65,000 sanction. And she says, this case has a
18     supersedeas bond.
19         Have you seen a copy of this email
20     before?
21 A   I have.
22 Q   Okay. Is everything in here accurate?
23 A   Yeah, I believe so.
24 Q   Okay. And just so we know what email it is, because
25     we don't have exhibits here at a 341 meeting, this

**11**

1      is one that Ms. May sent over to Matthew Swanson at
2      my office on February 22, 2016 at 9:34 a.m.,
3      correct?
4  A   That's correct.
5  Q   Okay. Here, let me just show you the docket. I've
6      printed the docket for the Lightspeed matter. And
7      the bond is in the Lightspeed case, right?
8  A   That's correct.
9  Q   Okay.
10 A   Well, I should be clear. It's money on deposit with
11     the Court, not a bond.
12 Q   Right, okay. And if you turn to the next to last
13     page of this docket sheet, there's a long carry-over
14     court entry there talking about posting -- I don't
15     know if you use the word bonds -- I guess deposit
16     with the Court. Is this the bond or the money
17     posted with the Court that we're talking about here?
18 A   Yes, it is --
19 Q   Okay.
20 A   -- referring to Entry Number 216.
21 Q   Yeah, thank you. Yeah, it is 216. So is it
22     accurate to say that it was on or about August 10 of
23     2015 that the $65,000 got paid into the Court?
24 A   Yes.
25 Q   Okay. And you weren't present at this hearing that

**12**

1      Ms. May is referring to, correct?
2  A   I was not present at the hearing.
3  Q   Okay. As far as you know, the Court hasn't yet
4      ruled on that?
5  A   The Court has not ruled. The appeal has now been
6      taken under advisement.
7  Q   Okay. Have you reviewed the deposition transcript
8      of the 2004 examination of Padraigin Brown that was
9      taken last week?
10 A   No.
11 Q   Have you looked at any part of it?
12 A   I have looked at some of it, yes.
13 Q   All right. What parts did you look at, generally
14     what areas?
15 A   I read through the first maybe half of it.
16 Q   Okay. Let me just give you a few pages that I'd
17     like you to read through. I just want to confirm
18     some things with you. What I've given you, it's a
19     condensed transcript. And I'd just like you to read
20     through pages 60 to the top of page 68 to yourself.
21     You don't need to read it out loud. Let me know
22     when you're done.
23 A   Okay. I've read through it.
24 Q   All right. Thanks. Do you see any of her testimony
25     there that you believe is not accurate?

**13**

1  A   Well, some of it I have no personal knowledge of.
2      The -- I don't think her testimony regarding -- She
3      had some questions about the dates when Mr. Steele
4      came over. I don't think August of 2015 is
5      accurate.
6  Q   Okay.
7  A   I don't know. It was --
8  Q   Well, the bond or the cash was posted with the
9      Court, the $65,000, in August of 2015, correct?
10 A   Well, there's been multiple bonds in the case.
11     There was the original bond that was associated with
12     the sanction amount, about a quarter million
13     dollars.
14 Q   And you didn't participate in that one at all,
15     right?
16 A   That one was money that was loaned to us or
17     essentially loaned to John by Mr. Bellsbray
18     (phonetic). And then I think -- I think the cash,
19     the 60, may have been some effort to pay back Mr.
20     Bellsbray. So that's why I think August of 2015 may
21     not be the correct date. I think August 2014 may be
22     correct.
23 Q   Well, let's go back to the docket entry that we saw,
24     though. You remember that's August 10 of 2015 --
25 A   Yes.

**14**

1  Q   -- that the $65,000 gets put into court, correct?
2  A   Yes, that's August of 2015.
3  Q   Right. And you don't believe that's the money that
4      you and Ms. Brown gave to Mr. Steele?
5  A   No, I don't believe so.
6  Q   So when is it that you believe the money was given
7      to Mr. Steele?
8  A   In mid-2014.
9  Q   In mid-2014?
10 A   Yes.
11 Q   And other than the date, is her testimony accurate
12     about the discussion that you and she had about that
13     before the money was given to him?
14 A   My recollection of that was I had asked her, is
15     there any way we can put money towards this
16     sanction. And it was at a point where the judge was
17     threatening I don't know if it was $5,000 a day, but
18     a monetary sanction every single day it didn't get
19     paid. And she had previously said, no, I'm not
20     going to allow you to use any of that money; you can
21     figure out your own way to do it, if it means having
22     to file for bankruptcy or doing whatever.
23         And we had a talk and we finally -- She
24     finally allowed me to use 60,000 of it to at least
25     offset some of the amount that John ended up paying.

**15**

1  Q   Okay. So you think that was when, sir?
2  A   I believe that was mid-2014, but I don't have a
3      specific recollection of when it was.
4  Q   Okay.
5  A   Or I suppose it could have been mid-2013, as well,
6      because that's when everything was more immediate.
7      The sanction was imposed --
8  Q   Well, had she taken the 180,000 in cash out of the
9      bank in mid-2013?
10 A   No. I guess because the sanction was imposed at the
11     end of 2013, so it would have been at some point
12     from early to mid-2014.
13 Q   Okay. Here, let me show you a few pages of a
14     transcript from the first session of this Meeting of
15     Creditors. This is not a condensed one. This is
16     page 23. And starting at line 15 at page 23, well,
17     just read through that to yourself, please.
18 A   I'm sorry. Starting at line?
19 Q   Oh, sure. Page 23, if you start reading to yourself
20     at --
21         MS. MAY: Two-thirds of the way down.
22         MR. SEAVER: Yeah.
23         THE WITNESS: Okay. I've read through
24     it.
25 BY MR. SEAVER:

**16**

1  Q   Okay. What you're referring to there, in this
2      section, where you say, John Steele has provided an
3      appellate bond to fully secure the amount on appeal,
4      is that the original bond that you're talking about?
5  A   The bond I'm referring to in this testimony is the
6      amount that's referred to at Docket 216 of the
7      Lightspeed case.
8  Q   Okay. So what you're referring to there, in that
9      testimony, is, like you say, at Item 216, that's
10     August 10 of 2015?
11 A   Yes.
12 Q   All right. So to come back to the other, was it
13     exactly $60,000 that was paid to Mr. Steele?
14 A   I think that's my wife's estimate. I don't recall
15     if it was 60 or if it was 50. It was somewhere in
16     that neighborhood.
17 Q   Okay. Did you and she, Ms. Brown, count out the
18     money before you gave it to Mr. Steele?
19 A   She would have counted it out and given it to
20     Mr. Steele.
21 Q   And she got it out of that box in the closet where
22     the original 180,000 in cash or so was?
23 A   Right.
24 Q   Okay. And let's back up a little bit. She withdrew
25     150,000 in cash from TCF Bank after you wired

17

1    175,000 into an account held in her name, correct?
2  A  If that's her testimony. I did not participate in
3     the transaction.
4  Q  But you knew that she was withdrawing 150,000 in
5     cash, correct?
6  A  I was aware that she was withdrawing cash. I wasn't
7     aware of the precise amounts.
8  Q  You knew it was a large amount of money?
9  A  Yes.
10 Q  Okay. And then you knew that after you made the
11    $70,000 transfer to her, you knew that she was
12    withdrawing a good amount of that in cash, as well,
13    correct?
14 A  I don't recall the specifics of that. I know she
15    did the initial large withdrawal. And from that
16    point on -- I know she was -- Her intention was to
17    get it into cash, yes.
18 Q  Okay. Did you help her count the $150,000 cash
19    withdrawal?
20 A  No.
21 Q  But you knew it was in a box, stored in a box in
22    your house after she withdraw it, correct?
23 A  Yes.
24 Q  Did you ever take any money out of that box?
25 A  No.

18

1  Q  Did you ever look in that box?
2  A  No.
3  Q  So you certainly knew by early 2014 that all that
4     money had been taken out in cash, didn't you?
5  A  I can't say I would have specifically known. I know
6     that she was -- Her intention was to reduce it to
7     cash.
8  Q  Well, you certainly knew by the time that you and
9     she paid the 60,000, or whatever it was, to
10    Mr. Steele, correct?
11 A  No, because if you have 150, the initial withdrawal,
12    I knew she was taking out a large amount. That
13    certainly would have covered the 60.
14 Q  Okay. So you knew by the time you gave the money to
15    Mr. Steele, you knew there was at least 150,000 in
16    cash, right?
17 A  Well, I knew there was at least 60,000 in it cash or
18    50,000, whatever amount was given to him.
19 Q  And you knew the source of that funds was one of the
20    two large wire transfers that you had sent to her
21    TCF account, didn't you?
22 A  That would be fair to say, yes.
23 Q  Okay. And from that docket that you still have in
24    front of you, I'm just trying to find when the
25    original bond was posted. If you turn to Item 149,

19

1     which is April 8 of 2014, you see that it says,
2     supersedeas bond in the amount of $287,300 posted by
3     John Steele.
4        Do you see that?
5  A  Yes.
6  Q  And is it your testimony that the 60,000 or whatever
7     the exact amount of cash was that you and Ms. Brown
8     gave to John Steele went to that bond?
9  A  Yeah, to offset what he had to post, yes.
10 Q  So how long before April 8, 2014 did you and
11    Ms. Brown give him this cash?
12 A  It was either -- Well, it would have been
13    immediately before or slightly after.
14 Q  Okay. So in April of 2014?
15 A  I don't recall if it was in April or if it was in
16    May or...
17 Q  Or February or January?
18 A  It was either -- It was around the time. I don't
19    recall specifically when it was.
20 Q  And you agree with your -- With Ms. Brown's
21    testimony that Mr. Steele was in town and the money
22    was given to him in cash?
23 A  Yeah. He was visiting in town and -- Yes.
24 Q  All right. So back to Ms. May's email that's
25    talking about the $65,000 bond that will come to the

20

1     estate, as I understand what you're saying here
2     today, that has to do with the Docket Entry 216?
3  A  Yes.
4  Q  All right. And you agree that's estate property as
5     well; you agree with her email?
6  A  What I understand is that we would not object to
7     that money being turned over to the estate.
8  Q  And what's the source of that money?
9  A  The source of the money is John Steele's funds being
10    transferred to the court administrator for the
11    Southern District of Illinois.
12 Q  And those are all John Steele's money; it doesn't
13    include any money from you or Ms. Brown?
14 A  That's correct. It's money from John Steele's bank
15    account to the Court.
16 Q  Right. Did you or Ms. Brown give Mr. Steele any
17    money to put into that bank account that constituted
18    that payment to the Court in August of 2015?
19 A  The major transfer I made to John Steele was the
20    cash in approximately 2014. So I don't know if it's
21    the Trustee's position that that's somehow my money
22    that John Steele put in there or not, but we did not
23    cut him a check, for example, immediately before him
24    posting the bond with the Southern District of
25    Illinois.

21

1  Q   Let's go back to my question, though. Other than
2      the 60,000 or so that you and Ms. Brown gave to him
3      in 2014, around April, as I understand it, did you
4      give any money, transfer any money, cause any money
5      to be transferred to Mr. Steele after April of 2014?
6  A   If I did, it was smaller amounts. It wasn't a large
7      amount.
8  Q   What does that mean, smaller amounts? Less than
9      $5,000 a transfer?
10 A   Most likely. I mean, it would not have been a
11     series of transfers. It may have been a one-off
12     expense. For example, I don't recall when we had --
13     We had some appellate fees at the time. And so, for
14     example, if he would have paid the appellate fees, I
15     would have paid half of it.
16 Q   All right. So as I understand your testimony, the
17     $65,000 posted with the Court in August of 2015 was
18     all Mr. Steele's money?
19 A   It came from Mr. Steele's bank account, yes.
20 Q   And you know that for sure?
21 A   Actually, I should qualify that. I don't know if he
22     had to borrow some money from a family member to
23     post it, but I believe that it came from his bank
24     account.
25 Q   So then what you're telling me is that you believe

22

1      the estate is entitled to this money that Mr. Steele
2      put up?
3  A   My position is I would have no objection to it being
4      turned over to the estate. I understand that
5      Mr. Steele may have a different position, but my
6      position is that if the estate sought turnover of
7      those funds, I would have no basis for objecting to
8      it.
9  Q   By what point in time did you know that there was at
10     least $150,000 in cash in your house, in the
11     condominium?
12 A   I guess my testimony would be my wife handled all of
13     the cash and all of those positions. I did not
14     inquire into where she was keeping the money. I
15     understood that there was at least some cash in the
16     box. I don't know if she had other places where she
17     stored the money, but the point is that she
18     controlled that. I did not have knowledge about
19     those.
20 Q   Well, by April of 2014, at least, you knew that
21     there was in excess of $60,000 of cash in your
22     condominium?
23 A   I knew there was at least the amount that John
24     Steele received.
25 Q   All right. Going back to Ms. Brown's testimony and

23

1      focusing now on page 66 to 67, you read through
2      that, I know, earlier. And this testimony has to do
3      with cash at the time of the bankruptcy filing. And
4      in summation, what she testified was that you and
5      she sat down and counted the cash that was there at
6      the time of your bankruptcy filing. Is that true?
7  A   That's true. The amount that we counted up was the
8      amount that I put in my schedules.
9  Q   Well, her testimony is that there -- So was her
10     testimony not true when she's talking about the
11     process?
12 A   Well, I can tell you what happened and then you can
13     make the decision for yourself if it's consistent or
14     not consistent with her testimony. What happened is
15     I said, what money is in the trust; we need to
16     disclose that money on the bankruptcy schedule.
17 Q   Wait a minute. When you say in the trust, you mean
18     in a box sitting in your condominium?
19 A   The trust.
20 Q   It's cash sitting in a box in your condominium.
21     What trust is it in?
22 A   The Mill Trust.
23 Q   So it's your testimony, as an attorney, that cash
24     sitting in a box in your condominium was in the Mill
25     Trust?

24

1  A   Legally speaking, yes.
2  Q   Okay. So go ahead and finish telling me what it was
3      you did.
4  A   I asked her what money is left in the trust because
5      we need to disclose that on the bankruptcy filing.
6      She said, that's not your money. And I said, well,
7      we're going to disclose it out of an abundance of
8      caution to ensure that we're being as -- We're
9      disclosing everything possible; and if you want to
10     have a fight over that, you can have a fight over
11     that at the appropriate time. So I said, get
12     whatever money is left in there, let's count it up
13     and we can disclose it on the schedules. She came
14     back and she had whatever amount it was that I
15     disclosed on the schedules.
16 Q   So her testimony would indicate that you folks
17     counted up the money that was there and then
18     deducted from that total amount money that she was
19     going to keep to pay some bills. You see that,
20     right?
21 A   I don't agree that that's a correct characterization
22     of her testimony. What her testimony is, is that
23     she had the 20,900; but when she brought the money
24     out, she had the amount that we disclosed on the
25     schedules.

25

1  Q   Where does she say that, sir? Would you just point
2      that out to me?
3          MS. MAY:  Line 18, 66.
4          MR. SEAVER:  Line 18 on page --
5          MS. MAY:  That's where she's talking
6      about 29,900, it looks like.  Is that where we're
7      coming up with the 29,900 hundred?
8          THE WITNESS:  Yep.
9  BY MR. SEAVER:
10 Q   So then I go on to say, I'm on page 67, line 4, so
11     you and Mr. Hansmeier sat down and counted out how
12     much money was left there, correct? And she says,
13     yes. I say, okay. She says, pretty close; I mean,
14     there was probably some ones and stuff lying around.
15     And I say, what did you come up with for a total?
16     She says, I don't remember exactly how much it was.
17     I say, okay, then you and he talked and decided
18     rather than stating how much cash was actually
19     there, you would deduct for cash for things that you
20     were going to pay in the future? And then she says,
21     for things that had already been purchased on my
22     credit cards and that needed to be paid off, they
23     had already -- I had already essentially bought
24     them; we had the things.
25         So just so I'm clear on what you're

26

1      saying here, sir, you didn't have a clue that there
2      was more than $8,554 in cash in that condominium on
3      the date that you filed bankruptcy?
4  A   That's correct.  I had no idea what the balance of
5      the cash was, other than I asked her to give us
6      whatever cash is in there so we can simply disclose
7      it on the schedules.
8  Q   And I sent a letter to Ms. May on February 4th and
9      asked for all documents and receipts evidencing what
10     was done with the $150,000 in cash that was taken
11     out of that TCF account.  You haven't given me
12     anything for that, have you?
13 A   I believe you've been provided documents related to
14     my wife's bank accounts, and you've also received
15     the Scott Trade wire transfer from the Scott Trade
16     account to my wife's personal TCF account.
17 Q   I haven't gotten any receipt for that 50 or 60,000,
18     however much the money it was that you folks say that
19     you gave to the other attorney.  Is there such a
20     thing?
21 A   I don't believe we have a receipt, but we have my
22     wife's testimony of what happened, we have my
23     testimony of what happened and I'm sure Mr. Steele's
24     testimony would be consistent with that, as well,
25     plus the deposit I'm sure he made into a bank

27

1      account at some point of that amount.
2  Q   But you didn't even get a receipt from him when you
3      gave him the $60,000 or so?
4  A   We did not create a receipt and fill it out, no.
5  Q   I'm going to move on to the accounts receivable now,
6      and I'm just putting in front of you some documents.
7      I think they were on the drop box.  I think these
8      relate to accounts receivable, right?
9  A   That's correct.
10 Q   All right.  And is it accurate to say that -- Well,
11     let me just identify them.  There's a transfer into
12     your law firm account on July 30, 2015 of
13     $36,833.34, correct?
14 A   Could you repeat that, please?
15 Q   Oh, sure.  There's a transfer on July 30th of 2015
16     for $36,833.34, correct?
17 A   Yes, there's a transfer of that amount.
18 Q   And then the next page of this there's a transfer on
19     August 31st of 2015 for $17,500, correct?
20 A   Correct.
21 Q   The next page of this there's a transfer on
22     September 30 of 2015 for $28,344, correct?
23 A   That's correct.
24 Q   And then the last two pages there's a deposit slip
25     showing a $1,000 deposit, correct?

28

1  A   Correct.
2  Q   And these documents that I've just referred to, do
3      they accurately reflect the accounts receivable --
4      The collection of accounts receivable that existed
5      at the time your Chapter 13 was commenced?
6  A   Yes.
7  Q   All right.  And if you total these up, they total
8      something in excess of $83,000, correct?
9  A   That sounds correct.
10 Q   So your schedule said 72,000, but that was low,
11     correct?
12 A   No.
13 Q   How is that, sir?
14 A   Well, because these are the transfers that are paid
15     down on the accounts receivables.  The last transfer
16     included paydown of a receivable that was in excess
17     of the original amount.  So some of it is going
18     towards paying down receivables, some of it is money
19     that was not related to anything that was in the
20     estate as of the time of filing.
21 Q   But yet this is all you've given me in response to
22     my repeated requests for account receivable
23     information, isn't it, other than those four line
24     items?  And now you're telling me this doesn't
25     accurately represent accounts receivable payments?

29

1  A   It does accurately reflect account receivable
2      payments. The point I'm trying to make is that on
3      the final payment, that's an amount of roughly
4      $28,344, this is the transfer that paid down the
5      remaining balance of the account receivables. Some
6      of it does not go towards account receivables; it
7      goes towards account receivables that generated
8      after the Chapter 13 filing.
9  Q   All right. What I have been requesting for some
10     time is some accounting for those pre-petition --
11     For the accounts receivable that existed at the time
12     of filing, and what you're telling me is I still
13     don't have it. I can't possibly tell from these
14     documents, in that last statement you were just
15     talking about, what account -- What of those are
16     account receivables at the time of filing, can I?
17     Well, here, let me say it once more: I want the
18     records showing the post-petition collection of the
19     accounts receivable that existed at the time of
20     filing and I want to be able to see where those are
21     coming from, all right?
22  A  I believe you have these, but I will ask my attorney
23     to work with you to make sure you're getting what
24     you're requesting. I think this is what you're
25     requesting. You're telling me it's not, but I'll be

30

1      happy to try and provide them.
2  Q   All right. So on the first page of this, this
3      $36,833.34, that's all pre-petition accounts
4      receivable, right?
5  A   It would be, yes.
6  Q   Okay. And you got that 17 days after your
7      bankruptcy filing, correct?
8  A   If that's the math, yes.
9  Q   Well, you filed on July 13th, right?
10  A  I believe that's correct.
11  Q  So when you got in this $36,833.34 that you knew was
12     estate property, why didn't you just turn that money
13     over to the Chapter 13 Trustee?
14  A  I'm not sure why I would have turned that money over
15     to the Chapter 13 Trustee.
16  Q  Well, you scheduled it as an asset of the estate,
17     didn't you?
18  A  Yes, but my understanding of using assets in the
19     course of bankruptcy is that if you are operating a
20     business, for example, in the ordinary course, which
21     I was, the money would have gone to pay employees,
22     pay rent, pay basic office overhead.
23  Q  So to come back to my question, so why didn't you
24     turn it over to the Chapter 13 Trustee?
25  A  The accounts receivable were processed just as any

31

1      other business, to pay off -- To pay business
2      expenses and continue operating the business.
3  Q   It just never occurred to you that perhaps you
4      should turn it over to the Chapter 13 Trustee?
5  A   Again, I used the accounts receivable money to
6      operate my business in the ordinary course.
7  Q   It just never -- Just answer my question, though, if
8      you would: Did it ever occur to you that you should
9      turn that money over to the Chapter 13 Trustee?
10  A  I guess my answer continues to be it occurred to me
11     to continue operating my business in the ordinary
12     course. And my understanding is that that was -- It
13     was fine to operate my business in the ordinary
14     course.
15  Q  Is your understanding that you were free to use
16     those pre-petition assets in any way you deemed
17     appropriate?
18  A  Nope.
19  Q  Here, let me put in front of you an affidavit that
20     you signed, sir. And this is an affidavit, Paul
21     Hansmeier. And if you go to the very last page,
22     it's dated February 16, 2016. Do you see that?
23  A  I do.
24  Q  And that's your signature, right?
25  A  It is.

32

1  Q   And the second sentence or the third -- Or the
2      second sentence up from the bottom says, the
3      accounts receivables were used to run my law
4      practice and to fund my Chapter 13 plan, correct?
5  A   That's what the sentence says, yes.
6  Q   So those receivables that existed at the time of
7      filing that you collected after the bankruptcy
8      filing were used to fund your Chapter 13 plan?
9  A   The receivables would have been used to --
10  Q  Just answer my question, if you would, sir. Well,
11     let me ask you a different one: Is this affidavit
12     true?
13  A  Yes.
14  Q  Okay. So it is true that the pre-petition accounts
15     receivable were used to fund your Chapter 13 plan;
16     is that true?
17  A  If I may answer the question.
18  Q  Is that true? Is it true? It's a yes-or-no
19     question. Is this affidavit, what I read, is it
20     true or false?
21  A  The affidavit is true.
22  Q  Okay. So why, when we asked Ms. May to turn over
23     those funds that she's holding from the Chapter 13
24     Trustee, was that request refused?
25  A  It's my position that those are not assets of the

33

1    Chapter 7 estate.

2  Q  Regardless of the fact that you have represented to

3     the Bankruptcy Appellate Panel that the pre-petition

4     receivables were used to fund the plan, you're

5     saying here, under oath, that they're not property

6     of the Chapter 7 estate?

7  A  My legal position is those funds --

8  Q  Is that what you're saying?

9  A  My legal position is that those funds are not

10     property of the converted Chapter 7 estate.

11  Q  And why is that, sir, if they were accounts

12     receivable that existed at the time the case was

13     filed?

14  A  I believe the Supreme Court's decision in -- I can't

15     remember the name of the case --

16        MS. MAY:  Harris.

17        THE WITNESS:  Harris -- states that

18     post-petition wages are not properly part of the

19     converted Chapter 7 estate.

20  BY MR. SEAVER:

21  Q  So you're saying when you took those accounts

22     receivable that existed at the time of filing and

23     ran them through your law firm, you somehow

24     transformed them into assets that are no longer

25     property of the bankruptcy estate; is that it?

34

1  A  That's my legal position, that these funds are not

2     property of the converted Chapter 7 estate.

3  Q  For the reason I just said; is that true?

4  A  Well, I don't think it's very fair to go through a

5     fully developed legal argument.  I believe this is

6     something we can brief and present to the Court and

7     receive a decision.

8  Q  Yeah, but I want your factual position here, sir.

9     Because you've made a representation to the

10     Bankruptcy Appellate Panel that the pre-petition

11     funds were used to fund your Chapter 13 plan, but

12     yet you won't turn the money over to me and I'm

13     entitled to know why that is.

14  A  It's a legal position.  And we can certainly brief

15     it before the Court and have the Court make a

16     determination whether my legal position is sound or

17     whether your legal position is sound.

18  Q  Well, let me just tell you that it's going to come

19     on very quickly.  The issue is going to be brought

20     to the Court very quickly.

21        So is it your view, sir, that you don't

22     have to pay the Chapter 7 -- You don't have to pay

23     any of the $72,000 in accounts receivable that

24     existed at the time of filing; there's no reason for

25     you to ever pay any of that money to the Chapter 7

35

1     estate?

2  A  I believe the accounts receivable --

3  Q  Is that your position, sir?

4  A  If you may allow me to talk through my position so I

5     can provide an answer to your question, is that

6     okay?

7  Q  Go ahead.

8  A  It's my understanding that the accounts receivable

9     were used in the ordinary course of operating a

10     business, just as they had been used prior to filing

11     and post-filing.  And due to their use in the

12     ordinary course of business, I don't believe they

13     are part of the converted Chapter 7 estate.

14  Q  Okay.  So when your Chapter 13 was filed, there was

15     $72,000 sitting right there that would have been

16     available to creditors, right?

17  A  There was $72,000 in accounts receivables.  The

18     creditors, I don't think, could have done much with

19     them.

20  Q  Well, you collected them all by August, right?

21  A  Yes.  The accounts receivables were -- Well, not by

22     August.  Whatever the last date of the -- September

23     I guess --

24  Q  Okay.

25  A  -- end of September.

36

1  Q  Right.  So by the end of September, that whole

2     $72,000 had come in.  And if you'd been in a

3     Chapter 7, it would have been paid to creditors.

4  A  If it was in a Chapter 7 at the time of the filing,

5     then, yes, I believe the creditors would have -- I

6     assume the Trustee would have taken an action to

7     liquidate those accounts receivables and pay them

8     off to the estate.

9  Q  And now they're just gone, in your view?

10  A  In the ordinary course of operating the law firm,

11     the accounts receivables were collected and they

12     were used to pay off ordinary business expenses.

13  Q  And in your view, the Chapter 7 Trustee just has no

14     ability to get that $72,000 back?

15  A  Yes.  I think that's one of the consequences of

16     converting an estate.  I think the law is pretty

17     clear that if you convert an estate and there was

18     assets that were used between the time of the

19     original filing and the time of conversion, that the

20     estate gets everything that was there at the time of

21     filing with the exception of assets that were used

22     in the ordinary course.

23        MR. SEAVER:  Mr. Kreuziger, I'm just

24     about done here.  Do you have anything?

25        MR. KREUZIGER:  I do have just a few

37

1    questions.

2

3                EXAMINATION

4    BY MR. KREUZIGER:

5    Q    Mr. Hansmeier, my name is Colin Kreuziger. I'm with

6         the United States Department of Justice and I

7         represent the U.S. Trustee.

8              Following up on Mr. Seaver's questions

9         about the accounts receivable, do you have any

10        records that would substantiate your claim that you

11        used those accounts receivable that you collected to

12        pay business expenses?

13   A    Yes. I believe the operating accounts of the law

14        firm, which I believe are in Mr. Seaver's

15        possession, would show how the funds were used.

16   Q    Do you have any other records that your law firm

17        keeps that would show the use of those funds to pay

18        the business expenses?

19   A    For example, ADP, the payroll processor, would show

20        funds being used, paying employees, for example.

21   Q    Does your law firm keep any kind of ledger?

22   A    I don't believe we do, but that's something I could

23        double check on.

24   Q    Can you provide any ledger or similar document to

25        me?

38

1    A    Yeah. If I -- I'll go back and see if we have a

2         ledger. And if I have a ledger, I'll -- Do you have

3         access to the drop box?

4    Q    I don't, but I'm sure that Mr. Seaver could provide

5         it.

6              MR. SEAVER: Sure.

7              MR. KREUZIGER: Mr. Seaver, do you have

8         the operating accounts for the law firm, as Mr.

9         Hansmeier has indicated?

10             MR. KREUZIGER: You know, I don't remember

11        right offhand, Mr. Kreuziger, if they're in the drop

12        box or not. There are some bank statements there

13        for sure, but I don't know if -- Are there operating

14        accounts, sir, I mean, as opposed to just bank

15        account statements?

16             THE WITNESS: When I say operating, I'm

17        just distinguishing between like the IOLTA Trust

18        account and the operating account, so it would be

19        the bank account.

20   BY MR. KREUZIGER:

21   Q    So you also testified that some of the funds that

22        were collected that are attributed to these accounts

23        receivable were used to make Chapter 13 plan

24        payments, correct?

25   A    They were -- They were paid as post-petition wages

39

1         to me and then I used my post-petition wages to make

2         Chapter 13 payments.

3    Q    Okay. And do you have documentation of -- Well,

4         strike that question.

5              When the funds were delivered to you as

6         post-petition wages, how did they come to you?

7    A    They would have gone from my business account to my

8         joint checking account.

9    Q    Okay. And have you provided bank statements to

10        Mr. Seaver that would evidence that?

11   A    I believe we have.

12             MR. SEAVER: There aren't any payroll

13        checks, are there, sir? There are just checks in

14        even amounts written by you to you drawn on the

15        Class Justice account?

16             THE WITNESS: I would have withdrawn them

17        by checks, yes.

18             MR. SEAVER: So there's no withholding on

19        any of those. They're just checks that you wrote on

20        the Class Justice account, Paul Hansmeier, and then

21        you deposited into your account, right?

22             THE WITNESS: I don't believe there's

23        withholding on those. They were checks that I wrote

24        from my business account to myself and then

25        deposited them into the joint checking account with

40

1         my wife.

2

3    BY MR. KREUZIGER:

4    Q    Which checking account is that; what bank is that

5         held on?

6    A    It's Associated Bank.

7    Q    Now, you had testified about various bonds in the

8         Lightspeed case earlier and I just wanted to clarify

9         a few matters there. With respect to the $60,000

10        that was paid to Mr. Steele --

11   A    Uh-huh.

12   Q    -- your testimony is that Ms. Brown gave those funds

13        in cash to Mr. Steele, correct?

14   A    That's correct.

15   Q    And you believe that would have been approximately

16        April of 2014?

17   A    Yes.

18   Q    And is it your testimony that those funds belonged

19        to Ms. Brown at the time of that transfer?

20   A    My testimony is that they belonged to the Mill Trust

21        at the time.

22   Q    And all the funds that went into the Mill Trust were

23        your funds originally, correct?

24   A    I believe that's correct, yes.

25             MR. SEAVER: The funds had been paid out

41

```
1    of the Mill Trust to Ms. Brown's personal account,
2    though, you know that, right?
3              THE WITNESS:  The custody of the funds
4    was held in Ms. Brown's personal account, yes.
5              MR. SEAVER:  Right.  The funds were
6    transferred into her personal account, she took it
7    out in cash?
8              THE WITNESS:  Yes.  She had custody of
9    the funds, that's correct, as the Trustee for the
10   Mill Trust.
11             MR. SEAVER:  The account that you had
12   those funds transferred into, sir, does it say that
13   it's an account held as trustee for the Mill Trust?
14             THE WITNESS:  Does Ms. Brown's personal
15   account say?
16             MR. SEAVER:  The personal account of
17   Ms. Brown that you had those funds transferred into,
18   does it say it's an account held in her capacity as
19   trustee of the Mill's Trust?
20             THE WITNESS:  I don't know.  I've never
21   reviewed the account document she has.
22             MR. SEAVER:  You don't know; is that your
23   testimony?
24             THE WITNESS:  My testimony is I've never
25   reviewed the account documents associated with my
```

42

```
1    wife's account at TCF Bank.
2              MR. SEAVER:  Go ahead, Mr. Kreuziger.
3              MR. KREUZIGER:  Thank you, Mr. Seaver.
4    BY MR. KREUZIGER:
5    Q   With respect to -- I believe it's a $65,000 bond
6        that was posted in August of 2015?
7    A   Yes.
8    Q   Okay.  So with respect to that bond, it's your
9        testimony that none of the funds that were used to
10       post that bond were your funds, correct?
11   A   Mr. Steele posted the bond, yes.
12   Q   Well, that's not my question.  My question is, is
13       were any of the funds that were used to post the
14       bond your funds?
15   A   I don't claim ownership to any of those funds.
16   Q   Okay.  Did any of the funds that Mr. Steele used to
17       post that bond originate with the Mill Trust?
18   A   This is the point I was trying to make to Mr. Seaver
19       before:  I obviously transferred cash to him in the
20       amount of about 50 to $60,000 sometime in 2014.  I
21       don't know if any of that is traceable to the money
22       that he deposited with the Court for the bond, for
23       the $65,000 August 2015 bond.
24   Q   The way I understood your earlier testimony was that
25       the roughly $60,000 that Ms. Brown gave to
```

43

```
1    Mr. Steele in cash was then used by Mr. Steele to
2    post an earlier bond in the same case; is that
3    right?
4    A   That's my understanding of how he used those funds.
5        When we gave him the funds, he was going to
6        contribute it towards the approximately $260,000
7        bond that was posted with the Court.  I can't --
8        Obviously I can't tell you what Mr. Steele
9        physically did with it after he took possession of
10       the cash and whether any of those funds that he
11       received would in some manner be traceable to the
12       amount he posted with the Court.  That's my only
13       point I'm trying to make.
14   Q   So what you're saying, then, is that it's possible
15       that the $60,000 in cash perhaps wasn't used for the
16       earlier bond because you don't know --
17             MS. MAY:  Only Mr. Steele would know
18       that.
19             THE WITNESS:  That's my testimony.  Only
20       Mr. Steele would know how he used the money.
21   BY MR. KREUZIGER:
22   Q   Okay.  So you can't really say, sitting here today,
23       whether or not any of the funds that Mr. Steele
24       posted in August of 2015 for that bond are
25       attributable to you, to the Mill Trust, to your wife
```

44

```
1    or to Monyet, LLC; is that right?
2    A   I think that's a fair statement because I don't know
3        how he used the funds that he received and whether
4        any of those funds are traceable to the amount
5        that's on deposit with the Court right now.
6    Q   Okay.  But to your knowledge, after -- This is a
7        question about your knowledge:  After the $60,000
8        was given by Ms. Brown to Mr. Steele in cash, to
9        your knowledge neither you nor Ms. Brown gave
10       Mr. Steele any other money; is that right?
11   A   No.  I believe what my testimony was before was that
12       there may have been modest expenditures that came up
13       in connection with, for example, appellate costs or
14       something along those lines.  So I may have paid
15       half of something to him at a certain point in time,
16       but nothing -- Not a major transfer like a $60,000
17       transfer.
18   Q   So any of those transfers would be directly
19       attributable to reimbursing him for the costs of
20       pursuing the appeal; is that right?
21   A   Or something similar to that, yes.
22   Q   Well, what else would be similar to that?
23   A   Well, I believe we paid some money to -- I guess I
24       can't think of anything in specific.  I know
25       appellate costs are one thing that comes up, but I
```

45

1   can't think of any other specifically.

2   Q   Okay.  With respect to the Groupon case that you

3       testified about at the beginning of the meeting

4       today, my understanding is that the request for

5       attorney's fees is a request for approximately

6       $200,000?

7   A   That's correct.

8   Q   Who does Ms. Brown owe the $200,000 to?

9   A   It's my understanding that first she'll get the

10      money and the money is taxable, so she owes some to

11      the federal government to pay off taxes on it.  And

12      then a significant portion, if not the remaining

13      portion, would go to an attorney Nathan Worzel, who

14      prosecuted the appeal on her behalf before the Ninth

15      Circuit.

16  Q   Okay.  Who is Nathan Worzel?

17  A   He's an attorney.

18  Q   Do you know him personally?

19  A   I do.

20  Q   And has he ever been an attorney in any firm that

21      you've operated?

22  A   He's been employed by me in the past.

23  Q   Now, you said that she would owe the federal

24      government money, but aren't you asking for, on her

25      behalf, aren't you asking for $200,000 in attorney's

46

1       fees?

2   A   Yes.

3   Q   So is it your testimony that she owes Mr. Worzel

4       $200,000 in attorney's fees?

5   A   I don't believe -- Whether she owes him that amount

6       or not, I'm not sure of the exact number, but I do

7       know that the theory behind the 10 percent -- I'm

8       sorry -- Behind the request for $200,000 is on a

9       common fund basis, which means that it's not

10      necessarily directly tied to the amount of fees

11      she's incurred, although it has to bear some logical

12      relationship.  It's more about the benefit she

13      provided to the class and taking a percentage of it

14      than anything else.

15  Q   So she doesn't actually owe somebody $200,000 in

16      attorney's fees?

17  A   I guess you'd have to ask Ms. Brown.  Just

18      speculating at this point.

19  Q   Well, have you reviewed any invoices or billings

20      that she's received from any attorneys in order to

21      draft whatever you filed with the Court on her

22      behalf?

23  A   No, I did not review billings or invoices.

24  Q   So the number is purely based off of this percentage

25      recovery that you've described?

47

1   A   It's based off the common fund.  Oftentimes the

2       Court will perform a cross-check to see if this is

3       reasonable, given the amount of time expended to do

4       a particular action.  In here the cross-check is the

5       reference to the plaintiff's attorneys' billings,

6       which, for their appeal, I believe it exceeded over

7       a million dollars to do not just the appeal, but all

8       of the post-original settlement filing work.

9   Q   So would it be accurate to say, then, that you don't

10      really know how much she owes in attorney's fees?

11  A   Do I personally know?  No.

12  Q   Okay.  And you haven't seen any records that would

13      tell you that?

14  A   That's correct.

15  Q   Okay.

16          MR. KREUZIGER:  I have nothing further,

17      Mr. Seaver.

18          MR. SEAVER:  And I don't think that I do.

19      But, once again, on these accounts receivable, what

20      I have been asking for and I thought I was clear on,

21      I want to be able to track those accounts

22      receivable.  I want to see when they were paid, when

23      they came in, I want to see the existence of them at

24      the time of filing.  And all I've gotten are those

25      first thing, the four line items, and then these

48

1       documents that we looked at today.  So that's what I

2       want.

3           MS. MAY:  You were also talking about the

4       bank account statements, personal and business.  Can

5       you give me better times and dates you want those

6       for and then I can check the drop box and make sure

7       you've got them?

8           MR. SEAVER:  Today I was talking about

9       that, Ms. May?

10          MS. MAY:  Well, it was --

11          MR. SEAVER:  It was when Mr. Kreuziger

12      and Mr. Hansmeier were talking?

13          MR. KREUZIGER:  Yeah.  I mean, if there's

14      anything you think I need, just let me know.

15          MS. MAY:  Yeah, let me know.  Because the

16      question was did the AR go into his account and can

17      we track it from the business account to the

18      personal account.  You asked if he had gotten the

19      bank statements and he said he put it in your drop

20      box.

21          MR. SEAVER:  Okay.

22          MR. KREUZIGER:  I can get you a specific

23      request.

24          MS. MAY:  If you would, thanks, Colin,

25      because I can come up with those.

49

```
1              MR. SEAVER:  All right.  So I'm going to
2      conclude the 341 meeting.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

50

```
1      STATE OF MINNESOTA)
                        )  ss.
2      COUNTY OF HENNEPIN)
3
4
5                  REPORTER'S CERTIFICATE
6
7
8              I, Julie Rixe, do hereby
9      certify that the above and foregoing transcript of the
10     digitally-recorded proceeding, consisting of the
11     preceding 48 pages, is a full, true and complete
12     transcript of the digitally-recorded proceedings to the
13     best of my ability.
14              Dated February 29, 2016.
15
16
17
18          _____
               JULIE RIXE
19             Court Reporter
20
21
22
23
24
25
```

Page: 43

1  Q.   It looks like the same day another $20,000

2  business loan from Monyet to Class Justice?

3  A.   Correct.

4  Q.   So what's Class Justice doing with all the money

5  that it's getting from Monyet?

6  A.   It spent it on business expenses.

7  Q.   The next one is the big whopper, November 22,

8  2013, $175,000 transfer from Monyet to your wife.   Why

9  the big transfer?

10  A.   She testified that --

11  Q.   I want your testimony, I don't want her

12  testimony.

13  A.   May I please answer?

14  Q.   Yes.

15  A.   She testified that the money was transferred for

16  household expenses and I agree with her testimony.

17  Q.   What household expenses?

18  A.   The same household expenses as we discussed

19  which include mortgage, or home expenses generally

20  speaking, food.

21         MS. MAY:   What was the year of that

22  transfer?

23         MR. SHEU:   November 22, 2013.

24  Q.   Why $175,000 transfer, why in one lump sum, what

25  expense was $175,000?

800-545-9668
612-339-0545
Paradigm Reporting & Captioning
www.paradigmreporting.com
EXHIBIT 4
Exhibit 4 Page 43
#90984

Case 15-42460    Doc 128    Filed 03/30/16    Entered 03/30/16 14:09:39    Desc Main
Document      Page 50 of 66
Case 15-42460    Doc 32-4    Filed 11/12/15    Entered 11/12/15 16:37:15    Desc
Exhibit(s) Paul Duesmeier 70
10/28/2015

Page: 44

1    A.  I don't believe there was an expense that was

2  $175,000, but at this point in time I think the idea was

3  my income was very low and we could make several

4  independent wire transfers and pay a wire transfer fee

5  every time or we could do one, recognizing that my

6  income would likely be low for 2014 at that point.

7    Q.  This is a couple months after the Guava v Merkel

8  judgment, right?

9    A.  I don't recall when the Guava v Merkel judgment

10  was entered.

11    Q.  This is September of 2013?

12    A.  It was entered against Alpha Law Firm, that's

13  correct, and Michael Dugas and Guava, and I was

14  specifically excluded from that judgment, yes.

15    Q.  Moving forward, there's a $21,250 transfer to

16  Robert Balzebre that we talked about earlier on

17  December 9, 2013, it says your relationship to

18  recipient, business, the reason for the request is a

19  loan.  Why is Monyet giving a loan to Robert Balzebre?

20    A.  I don't believe that Monyet was giving a loan to

21  Robert Balzebre.  I believe what this was was that

22  Robert Balzebre had provided a loan to John Steele to

23  pay for attorneys fees and expenses and this was just

24  paying back my half of that loan to pay for the

25  attorneys fees and expenses.

1        Q.   What were they for?

2        A.   I had several legal matters going at that time.

3   Most likely some of it would have been the Voelker

4   Litigation Group and then other attorneys fees and

5   expenses related to the Ingenuity 13 matter.

6        Q.   Why wasn't the transfer just made to John

7   Steele?

8        A.   Because Robert Balzebre had loaned the money to

9   John Steele and so John Steele was paying back his half

10  to Robert and I was paying back my half to Robert and

11  Robert had paid the full amount to the attorneys.

12       Q.   And was Robert, was he an attorney?

13       A.   I believe he is an attorney.

14       Q.   What, what did he do again for you and John

15  Steele, I'm sorry, I missed it?

16       A.   He provided a loan, he had money to pay the

17  attorney, other attorneys, third-party attorneys.

18       Q.   He provided a loan to you and John Steele and

19  you're paying him back?

20       A.   He provided a loan to John Steele to pay these

21  attorneys and then John said why don't you pay for half

22  of this, and I said that sounds reasonable since we both

23  benefitted from the legal help, and so I paid back half

24  and John paid back half.

25       Q.   If you flip to the next one, January 17, 2014.

Case 15-42460   Doc 128   Filed 03/30/16   Entered 03/30/16 14:09:39   Desc Main
Document   Page 52 of 66
Case 15-42460   Doc 32-4   Filed 11/12/15   Entered 11/12/15 16:37:15   Desc
Exhibit(s) Paul Hansmeier 70
10/28/2015

Page: 46

1   Monyet is now issuing a $20,000 transfer to Class

2   Justice, PLLC, a loan installment, a relationship now as

3   lender.  Is there some loan agreement between Monyet and

4   Class Justice?

5       A.   There's no formal paper agreement, no.

6       Q.   Is there any informal paper agreement?

7       A.   There's no agreement on paper.

8       Q.   This is just you deciding to loan money from

9   Monyet to Class Justice?

10      A.   No.

11      Q.   Does Class Justice have to pay it back to

12  Monyet?

13      A.   I think the idea is that Class Justice will

14  attempt to pay it back to Monyet, yes.

15      Q.   The next document is a February 7, 2014, $70,000

16  wire transfer from Monyet to your wife.  What was that

17  for?

18      A.   Same idea as before with the other transfers to

19  my wife, which was to provide for the family's living

20  expenses.

21      Q.   And you guys burned through the 175 that had

22  been transferred a few months earlier?

23      A.   I doubt we had burned through $175,000 during

24  that time.

25      Q.   It was just in your wife's account?

```
 1        A.   The document you provided me doesn't show where

 2   the money went to.   It looks like it went to a TCF

 3   National Bank account, I assume that's my wife's

 4   account, but the bank account number where it goes is

 5   blocked out on the document you gave me.

 6        Q.   The next document is a March 19, 2014 transfer

 7   of $25,000 from Monyet to Class Justice.   Again, it says

 8   the reason for the request, it's an installment loan, it

 9   says Monyet's relationship to the recipient is payee.

10   Do you know what you meant by that?

11        A.   Yes, the person that's paying money to the other

12   person is the payee.

13        Q.   Why are you saying it here?

14        A.   I'm saying it here because when you make a wire

15   transfer from Scottrade they require you to put

16   something in there and I did not go back and review all

17   my prior wire transfer statements to ensure consistent

18   statements of relationships of recipients.   This is

19   certainly not legally binding in any sense and it's just

20   a description.   So after the fact you can look back and

21   see and get some context for the wire transfer.

22        Q.   The next one is a, looks like another attorney

23   fee payment to Voelker Litigation.   The one after that

24   is an attorneys fee escrow in an undetermined amount to

25   Chisholm Properties South Beach, Inc. on May 5, 2014.
```

10/28/2015                                                                      Page: 10

## Page 37

1  A. I've heard of it before.
2  Q. You've heard of it?
3  A. Yes.
4  Q. Is that your husband's law firm?
5  A. I think so.
6  Q. You think so, you don't know that for a fact?
7  A. That's correct.
8  Q. I'll have you flip ahead to the next one which
9  hopefully you'll know something about, the recipient is
10 yourself, it's $5,000 on July 30, 2013, the reason for
11 the request is personal transfer. Do you know what that
12 was for?
13        MS. MAY: What was the date on that?
14        MR. SHEU: July 30, 2013.
15 A. I don't remember what the money was for.
16 Q. Do you know where you put the money?
17 A. It went to my Associated Bank account.
18 Q. Do you remember where it went?
19 A. Yes.
20 Q. Do you know what you did with it?
21 A. I can't be positive, it was in 2013.
22 Q. Did you provide in the documents today any
23 statements for Associated Bank?
24 A. I did.
25 Q. For 2013?

## Page 38

1  A. Yes, I provided six years of Associated Bank
2  account statements.
3  Q. Did you include copies of checks?
4  A. I did not have those.
5  Q. I'll have you turn to the next page. This is a
6  $30,000 transfer from Monyet, Scottrade account, to
7  yourself on August 27, 2013. Do you know what this was
8  for?
9  A. I don't know the exact specifics of why the
10 money was transferred, no, I don't remember.
11 Q. Under reason for request it says, "Trust
12 agreement," does that ring any bells for you?
13 A. No.
14 Q. You have no idea why your husband was
15 transferring $30,000 to you?
16 A. Probably because we talked about it.
17 Q. Do you know what you would have done with it?
18 A. I can't say for sure, but I'm assuming it went
19 to pay everyday living expenses.
20 Q. It looks like the receiving institution was TCF
21 Financial. Did you have an account at TCF Financial?
22 A. I did.
23 Q. Did you provide bank statements with your, that
24 box?
25 A. Yes.

## Page 39

1  Q. Did you provide statements for 2013?
2  A. I provided statements for the entire time that
3  that account was open.
4  Q. Did you also have an Associated Bank account at
5  the same time during 2013?
6  A. Yes.
7  Q. So what was the purpose of having another bank
8  account, that TCF Financial Bank account?
9  A. TCF Bank asked me to open up a personal bank
10 account when we had the, got the mortgage, so I did.
11 Q. And you don't know where this $30,000 went?
12 A. Not specifically, no.
13 Q. Is there any way we'll be able to find that out?
14 A. I would look at the statements that I provided.
15 Q. I'll have you turn to the next page. Actually,
16 you can skip that. And the next page after that is a
17 $25,000 loan from Monyet to Class Justice, PLLC. Are
18 you familiar with your husband having loaned any money
19 to anybody including any entities?
20 A. We would have talked about this, but I don't
21 remember because it was in 2013.
22 Q. Are there any loan agreements that you know of?
23 A. I don't know.
24 Q. Do you know if there's any money that's owed to
25 you or your husband by anybody or any entity?

## Page 40

1  A. I personally am not owed any money that I know
2  of.
3  Q. What about your husband?
4  A. I don't know.
5  Q. I'll have you turn to the next page which you
6  can skip and the next page which you can also skip. And
7  then stop where it says the November 22, 2013 transfer
8  of $175,000 to you from Monyet, Scottrade account. What
9  was this for?
10 A. For personal and everyday living expenses.
11 Q. $175,000?
12 A. That's correct.
13 Q. This is transferred to your TCF Bank account?
14 A. Yes.
15 Q. And so the, this $175,000, your sworn testimony
16 is it's all been spent, is that correct?
17 A. Well, the trust currently has approximately
18 $8,000 in it.
19 Q. What was the most the trust ever had?
20 A. I don't know.
21 Q. Who would know?
22 A. I don't know.
23 Q. You don't know who would know about --
24 A. I don't know if anyone would know how much it
25 had, what the maximum amount that was ever in it.

Case 15-42460   Doc 128   Filed 03/30/16   Entered 03/30/16 14:09:39   Desc Main
Document   Page 55 of 66
Case 15-42460   Doc 32-2   Filed 11/12/15   Entered 11/12/15 16:37:15   Desc
Exhibit(s) Page 11 of 18
Padraigin Browne
10/28/2015                                                              Page: 11

Page 41

```
 1    Q.  Well, there would be some bank record of some
 2  sort, wouldn't there?
 3    A.  I don't know.
 4    Q.  You don't know?
 5    A.  That's correct.
 6    Q.  You're the trustee of this trust, right?
 7    A.  That is correct.
 8    Q.  It's kind of your job to know what's in it,
 9  isn't that part of the job of a trustee?
10    A.  If that's how you want to define it, sure.
11    Q.  I'll have you turn to the next page.  You'll see
12  a $21,250 transfer to Robert P. Balzebre,
13  B-A-L-Z-E-B-R-E.  Do you know who that is?
14    A.  I've heard the name before.
15    Q.  Where have you heard the name?
16    A.  In discussing this.
17    Q.  Discussing what?
18    A.  Making a loan or whatever this was, this
19  transfer.
20    Q.  What was this loan or transfer for?
21    A.  I believe, I'm going to say I don't know because
22  I don't remember.  It was a while ago.
23    Q.  It was December of 2013?
24    A.  That's correct.
25    Q.  You don't remember two years ago --
```

Page 42

```
 1    A.  That's correct.
 2    Q.  -- a $21,000 loan?  I'll have you turn, skip the
 3  next page and then stop at the next one where there's
 4  the $70,000 transfer to you from Monyet, Scottrade
 5  account, on February 7, 2014.  Do you know what that was
 6  for?
 7    A.  That money was used for everyday living
 8  expenses.
 9    Q.  What expenses are those?
10    A.  Our mortgage, daycare, my personal car payment,
11  food, utilities.  I don't know, what everybody spends
12  money on.
13    Q.  Is that money all gone?
14    A.  There's approximately $8,000 left in the trust
15  account.
16    Q.  At some point did you ever hear how your husband
17  had a judgment against him?
18    A.  Yes, I am aware that there is a judgment against
19  my husband.
20    Q.  There's a few judgments, is that correct, is
21  that your understanding?
22    A.  I don't know the specifics.  I know we're here
23  today.
24    Q.  When did you first learn about any judgments or
25  liabilities that your husband had?
```

Page 43

```
 1    A.  I don't know.
 2    Q.  I'll have you flip ahead a couple of pages to
 3  the authorization to wire money to Chisholm Properties
 4  South Beach, Inc., do you see that?
 5    A.  I do.
 6    Q.  What is Chisholm Properties South Beach?
 7    A.  I don't know.
 8    Q.  You've never heard of it?
 9    A.  I don't remember hearing about it, I don't
10  remember that specific name.
11    Q.  Do you guys have any property in Florida?
12    A.  No.
13    Q.  Do you know anybody with property in Florida?
14    A.  I don't, yes, I do know some people that have
15  property in Florida.
16    Q.  Who's that?
17    A.  Paul's aunt, for one.
18    Q.  Anybody else?
19    A.  I know, that's the only person I feel
20  comfortable for sure saying has property in Florida.
21    Q.  Have you ever invested any money --
22    A.  No.
23    Q.  -- in Florida property?
24    A.  No.
25    Q.  Have you ever invested any money in Florida
```

Page 44

```
 1  property?
 2    A.  No.
 3    Q.  Do you know if Paul has?
 4    A.  I do not.
 5    Q.  So he could have since you don't know?
 6    A.  I don't know.
 7    Q.  Okay.  We can set aside Exhibit 5.  And by the
 8  way, let me know if you ever need to take a break to go
 9  to the bathroom, get a drink of water.
10        MS. MAY:  Can you make sure that I get
11  copies of the exhibits?
12        MR. SHEU:  Yes.
13        MS. MAY:  Ms. Court Reporter, make sure
14  that you catch that I asked for copies of the exhibits.
15        MR. SHEU:  My intention is to leave the
16  exhibits that have been marked with the court reporter
17  and have the transcript include all of the exhibits.
18        MS. MAY:  But I won't necessarily be asking
19  for a copy of the transcript, which is why I'm asking
20  for a copy of the exhibits.
21        MR. SHEU:  Okay.  Can we mark another one.
22        (Browne Deposition Exhibit Number 6
23        marked for identification.)
24        (Attorney Paul Godfread entered the
25        deposition room.)
```

**Page 41**

1 A.  Yes.
2 Q.  And to start with, there was a $170,000 transfer,
3 I'll find it in just a second here, that goes to
4 your wife, $175,000.  It was November 22 of 2013.
5 Here, let me just show you my copy and save a little
6 bit of time.  Here's the one I'm referring to.  This
7 is an authorization signed by you on 11/22 of 2013
8 to transfer $175,000 from Monyet to TCF Bank account
9 held in your wife's name, correct?
10 A.  Yes.
11 Q.  And then here's a page of a TCF statement -- or two
12 pages of a statement for the same time period that's
13 showing that $175,000 deposit into your wife's
14 account, correct?  It's down in the lower left.
15 MS. MAY: What is that time period?
16 THE WITNESS: This is November 22, 2013.
17 I guess that's what it shows, yes.
18 BY MR. SEAVER:
19 Q.  Okay.  And then if you look over in the withdrawal
20 section, which is on the right side, you'll see on
21 December 13 there's a $150,000 withdrawal.  Do you
22 see that?
23 A.  I do.
24 Q.  What happened to that $150,000?
25 A.  I think it was used to pay for household expenses.

**Page 42**

1 Around this time my wife either was pregnant or she
2 had just lost her job, so she was using that to pay
3 for the mortgage and...
4 Q.  How was the $150,000 withdrawn?  Here's what I mean
5 by that:  Was it in a series of money orders,
6 cashier's checks, was it one $150,000?
7 A.  I don't know the answer to that question.
8 Q.  Okay.  And other than what you've testified to, you
9 don't know what happened to that $150,000?
10 A.  Yeah.  I believe it was used for household expenses.
11 Q.  Would it have been deposited into accounts after
12 this, after it was withdrawn from this account?
13 A.  I'm not sure what -- I mean, I just don't know what
14 -- What her method of withdrawing it was.
15 Q.  You weren't involved at all in that 150,000
16 withdrawal from TCF?
17 A.  Well, I was certainly aware that she was withdrawing
18 the money.  I just don't know, like, the particular
19 mechanics of it.  I'm sure she won't.
20 Q.  All right.  Back to the Scottrade account, that
21 stack of statements that I have there.  So the first
22 page is the brokerage account application.  And
23 those are your signatures down there, right, about
24 7/8ths of the way down the page?
25 A.  Other people signed different parts, but, yes, I

**Page 43**

1 signed.
2 Q.  Okay.  And then the next page, the margin
3 application, the only signature on that page --
4 Well, on the signature line, that's your signature,
5 correct?
6 A.  That's correct.
7 Q.  All right.  And then on the limited -- Next page,
8 limited liability company certification, that's your
9 signature there on the signature line as the manager
10 or designated member signature?
11 A.  It is.
12 Q.  All right.  And then the next page is a guarantee
13 agreement.  And the first page of the guarantee
14 agreement has your name on it as manager of Monyet,
15 LLC, and then the next page has your signature on
16 the guarantee, correct?
17 A.  Yes.
18 Q.  All right.  And then the next page after that there
19 is a transfer to Frost National Bank to SureTec,
20 appellate bond, at Frost National Bank.  Is this
21 partial payment on the bond that we talked about
22 earlier, the 181,000, roughly?
23 A.  Yeah, in connection with the Star Trek order.
24 Q.  Okay.  And then the next page of this stack of
25 Scottrade authorizations is a $20,000 payment to

**Page 44**

1 Class Justice, PLLC, correct?
2 A.  That's correct.
3 Q.  And it says, loan installment, the reason for the
4 request.  What does that mean?
5 A.  Well, I think the idea was to loan money to the law
6 firm in order to provide it with operating.
7 Q.  Okay.  So it would be money being loaned to the law
8 firm?
9 A.  In theory.  We never formalized it with the actual
10 loan agreement.
11 Q.  Did the money ever get paid back?
12 A.  I believe money was returned.
13 Q.  Returned to who?
14 A.  Either to my wife or to -- I don't think I deposited
15 back with money to LLC.
16 Q.  Okay.  It went to either your wife or you?
17 A.  Well, not to me, but it would have been to my wife,
18 I'd assume, but I don't -- I mean, some money was
19 paid back, not a lot.
20 Q.  How much was paid back?
21 A.  I believe -- I want to say somewhere between ten and
22 $15,000.
23 Q.  Okay.  And then the next page is the one we talked
24 about, the 175,000 to your wife.  The one after that
25 says, business loan to Class Justice, PLLC, $20,000.



**Page 49**

1 gift?
2 A. I guess I don't know how I characterize it because,
3 on the one hand, I understand that the word loan
4 appears in the documents, but --
5 Q. Well --
6 A. -- We also did not formally document the loan
7 transactions, so I'm not sure how the law would
8 treat that.
9 Q. Okay. And when you say the word loan appears,
10 you're the one who had the word loan put in there,
11 right?
12 A. Sure.
13 Q. Okay. And then there's a $30,000 payment to
14 Padraigin Browne on 8/27/13, correct? Do you have
15 that in front of you?
16 A. I do.
17 Q. Yeah. And what's that for?
18 A. I believe that would have just been to cover
19 business expenses. I believe she was either
20 pregnant around that time or lost her job around
21 that time.
22 Q. Okay. And then there's the Voelker Litigation Group
23 one after that that we talked about briefly. Then
24 there's a $70,000 transfer to your spouse on 2 --
25 February 7 of 2014. What was that for?

**Page 50**

1 A. That would have been, again, to pay for the costs of
2 living. She was either pregnant at that time, so
3 she was out of work, or maybe she was on maternity
4 leave at that time. Anyway, so it would have been
5 to cover expenses and costs.
6 Q. Okay. And then the one after, the next page after
7 that, is a transfer to SureTec Insurance Company,
8 Frost National Bank. Is this the same 181,000,
9 roughly, bond we talked about earlier?
10 A. I believe it's 118,000, but, yeah, that's
11 (inaudible).
12 Q. 118,000, right, not 181. Okay. It's on that --
13 It's called the Star Wars bond?
14 A. Yeah.
15 Q. Is that what it is?
16 A. Yeah.
17 Q. Okay. And then the next page here it says, payroll
18 tax lawyer, on it. What company's benefit is that
19 being transferred for?
20 A. That's a good question. Looking at it, I don't
21 recall. It was in August of 2013, $2,575.
22 Q. Would it be Live Lawyer?
23 A. I don't believe so, but I just simply don't recall.
24 Q. Okay. But that's your signature on here, right, on
25 the authorization?

**Page 51**

1 A. Yeah, it looks like it.
2 Q. And the next page, it's a $5,000 transfer to your
3 wife on July 30th of 2013, correct?
4 A. Correct.
5 Q. And then the next page says, investment loan to
6 LiveWire. That's investment, slash, loan to
7 LiveWire, $10,000. What was that for?
8 A. This, I believe, we were just returning cash to
9 LiveWire. I think I had been paid $10,000 or
10 $15,000 from LiveWire. And the owner of LiveWire
11 said, hey, we're in some trouble here, business is
12 not going good in large part due to the California
13 stuff. So he said, could you -- would you be
14 willing to return the money, and I said fine.
15 Q. Okay. Then the next page is a transfer to Class
16 Justice, PLLC, $25,000. And what it says up at the
17 top is, capitalize law firm, correct?
18 A. Correct.
19 Q. Is that what the money was for?
20 A. Yeah. It was used to provide money to the firm so
21 it could operate and pay employees and...
22 Q. And has that money ever been paid back?
23 A. No. This money was not repaid back.
24 Q. All right. The next one is Voelker Litigation Group
25 again. And this one says escrow, and it's just

**Page 52**

1 $3,750. Is that something different than attorney's
2 fees?
3 A. I think it's the same thing.
4 Q. Okay. The next one is a $10,000 transfer. It says,
5 business transfer to LiveWire. Is that another
6 return of money to LiveWire?
7 A. Yeah. Like I said, I'd been paid 15, $20,000 and I
8 was just returning them. And I don't know if these
9 two --
10 Q. It might be the same, huh?
11 A. It might be the same transfer.
12 Q. Yep. Well, one looks like it says 6/23 and the
13 other looks like it says 6/28 and 6/27.
14 A. I don't know specifically, but if I recall, the
15 first time I did it, the account number may have
16 been of or there was some problem with the transfer
17 and I just redid it.
18 Q. Okay, okay. All right. The next to last page here
19 is another payment to Frost National Bank SureTec
20 Insurance Company. Is this on the Star Wars bond
21 again?
22 A. I believe so, yes.
23 Q. Okay. And the very last page here is $25,000. It
24 says, installment loan, going to Class Justice,
25 PLLC. Is this another loan for operations of the

**Randall Seaver**

| | |
|---|---|
| **From:** | Matthew Swanson |
| **Sent:** | Monday, February 22, 2016 10:17 AM |
| **To:** | Randall Seaver |
| **Subject:** | FW: Hansmeier |

**From:** Barbara May [mailto:barbara@barbaramaylawoffice.com]
**Sent:** Monday, February 22, 2016 9:34 AM
**To:** Matthew Swanson
**Subject:** Hansmeier

Oral arguments were held last week in one of Mr. Hansmeier's appeals involving Anthony Smith and a $65000 sanction. It was one of those oral arguments that was cringeworthy in that it was obvious how the court is going to rule. They are going to toss Mr. Smith's claim on the grounds of lack of due process, much like the other reversals.

This case has a $65000 supercedeas bond. It is in the estate's interest to have this appeal come down in Mr. Hansmeier's favor, so that the bond can be paid over to the estate.

The Appellee's attorneys are using the conversion to Chapter 7 and subsequent appeal as a basis for a collateral attack on the appeal. As I understand it, Randy currently owns this appeal. Do you think he would agree to abandon the right of defense to allow Hansmeier to simply get the appeal kicked? I would like to get this before the appellate court promptly. It benefits the estate to the tune of $65000.00.



EXHIBIT 7

1

**Page 9**

**Page 9**

1  Q  Well, you know what that is, though, sir. And it's
2     a matter of public record, so I don't think there's
3     any attorney-client privilege here. So what was her
4     original Groupon purchase?
5  A  I don't recall the specifics there. It's set forth
6     very specifically in her original objection.
7  Q  And you just don't have any independent recollection
8     of that?
9  A  I -- I recall that she purchased Groupons and that
10    was her basis for standing.
11 Q  So how do you come up with this over $200,000 you're
12    telling the Court she should be paid as attorney's
13    fees, you say?
14 A  Well, as explained in her motion for attorney's
15    fees, it's based on the common fund principle, which
16    allows an objector who brings benefits to the class
17    to receive some of the benefits of that amount in
18    return.
19 Q  Yeah, but it's attorney's fees. I mean, has she
20    paid somebody 200,000 in attorney's fees?
21 A  I don't think she's come out of pocket for $200,000
22    in attorney's fees, no.
23 Q  So how do you justify asking for 200,000 in
24    attorney's fees if she hasn't paid any attorney's
25    fees?

**Page 10**

1  A  Well, just as in any case where attorney's fees
2     don't come out of pocket, for example, a contingency
3     fee arrangement or an action where someone may
4     represent somebody in a civil rights case and
5     there's statutory attorney's fees, at the end of the
6     case the attorney, even if the client does not come
7     out of pocket, is entitled to recover fees -- Or the
8     client, actually, is entitled to recover the fees.
9  Q  Have you ever seen any written agreement between
10    Padraigin Brown and any law firm regarding the
11    representation of her in this Groupon case?
12 A  I have not.
13 Q  Let me just give you a copy of an email that Ms. May
14    sent over to Matthew Swanson of my firm earlier this
15    week. In this email Ms. May is talking about one of
16    Mr. Hansmeier's appeals involving Anthony Smith and
17    the $65,000 sanction. And she says, this case has a
18    supersedeas bond.
19         Have you seen a copy of this email
20    before?
21 A  I have.
22 Q  Okay. Is everything in here accurate?
23 A  Yeah, I believe so.
24 Q  Okay. And just so we know what email it is, because
25    we don't have exhibits here at a 341 meeting, this

**Page 11**

1     is one that Ms. May sent over to Matthew Swanson at
2     my office on February 22, 2016 at 9:34 a.m.,
3     correct?
4  A  That's correct.
5  Q  Okay. Here, let me just show you the docket. I've
6     printed the docket for the Lightspeed matter. And
7     the bond is in the Lightspeed case, right?
8  A  That's correct.
9  Q  Okay.
10 A  Well, I should be clear. It's money on deposit with
11    the Court, not a bond.
12 Q  Right, okay. And if you turn to the next to last
13    page of this docket sheet, there's a long carry-over
14    court entry there talking about posting -- I don't
15    know if you use the word bonds -- I guess deposit
16    with the Court. Is this the bond or the money
17    posted with the Court that we're talking about here?
18 A  Yes, it is --
19 Q  Okay.
20 A  -- referring to Entry Number 216.
21 Q  Yeah, thank you. Yeah, it is 216. So is it
22    accurate to say that it was on or about August 10 of
23    2015 that the $65,000 got paid into the Court?
24 A  Yes.
25 Q  Okay. And you weren't present at this hearing that

**Page 12**

1     Ms. May is referring to, correct?
2  A  I was not present at the hearing.
3  Q  Okay. As far as you know, the Court hasn't yet
4     ruled on that?
5  A  The Court has not ruled. The appeal has now been
6     taken under advisement.
7  Q  Okay. Have you reviewed the deposition transcript
8     of the 2004 examination of Padraigin Brown that was
9     taken last week?
10 A  No.
11 Q  Have you looked any part of it?
12 A  I have looked at some of it, yes.
13 Q  All right. What parts did you look at, generally
14    what areas?
15 A  I read through the first maybe half of it.
16 Q  Okay. Let me just give you a few pages that I'd
17    like you to read through. I just want to confirm
18    some things with you. What I've given you, it's a
19    condensed transcript. And I'd just like you to read
20    through pages 60 to the top of page 68 to yourself.
21    You don't need to read it out loud. Let me know
22    when you're done.
23 A  Okay. I've read through it.
24 Q  All right. Thanks. Do you see any of her testimony
25    there that you believe is not accurate?

**41**

1    of the Mill Trust to Ms. Brown's personal account,
2    though, you know that, right?
3            THE WITNESS:  The custody of the funds
4    was held in Ms. Brown's personal account, yes.
5            MR. SEAVER:  Right.  The funds were
6    transferred into her personal account, she took it
7    out in cash?
8            THE WITNESS:  Yes.  She had custody of
9    the funds, that's correct, as the Trustee for the
10   Mill Trust.
11           MR. SEAVER:  The account that you had
12   those funds transferred into, sir, does it say that
13   it's an account held as trustee for the Mill Trust?
14           THE WITNESS:  Does Ms. Brown's personal
15   account say?
16           MR. SEAVER:  The personal account of
17   Ms. Brown that you had those funds transferred into,
18   does it say it's an account held in her capacity as
19   trustee of the Mill's Trust?
20           THE WITNESS:  I don't know.  I've never
21   reviewed the account document she has.
22           MR. SEAVER:  You don't know; is that your
23   testimony?
24           THE WITNESS:  My testimony is I've never
25   reviewed the account documents associated with my

**42**

1    wife's account at TCF Bank.
2            MR. SEAVER:  Go ahead, Mr. Kreuziger.
3            MR. KREUZIGER:  Thank you, Mr. Seaver.
4    BY MR. KREUZIGER:
5    Q   With respect to -- I believe it's a $65,000 bond
6        that was posted in August of 2015?
7    A   Yes.
8    Q   Okay.  So with respect to that bond, it's your
9        testimony that none of the funds that were used to
10       post that bond were your funds, correct?
11   A   Mr. Steele posted the bond, yes.
12   Q   Well, that's not my question.  My question is, is
13       were any of the funds that were used to post the
14       bond your funds?
15   A   I don't claim ownership to any of those funds.
16   Q   Okay.  Did any of the funds that Mr. Steele used to
17       post that bond originate with the Mill Trust?
18   A   This is the point I was trying to make to Mr. Seaver
19       before:  I obviously transferred cash to him in the
20       amount of about 50 to $60,000 sometime in 2014.  I
21       don't know if any of that is traceable to the money
22       that he deposited with the Court for the bond, for
23       the $65,000 August 2015 bond.
24   Q   The way I understood your earlier testimony was that
25       the roughly $60,000 that Ms. Brown gave to

**43**

1    Mr. Steele in cash was then used by Mr. Steele to
2    post an earlier bond in the same case; is that
3    right?
4    A   That's my understanding of how he used those funds.
5        When we gave him the funds, he was going to
6        contribute it towards the approximately $260,000
7        bond that was posted with the Court.  I can't --
8        Obviously I can't tell you what Mr. Steele
9        physically did with it after he took possession of
10       the cash and whether any of those funds that he
11       received would in some manner be traceable to the
12       amount he posted with the Court.  That's my only
13       point I'm trying to make.
14   Q   So what you're saying, then, is that it's possible
15       that the $60,000 in cash perhaps wasn't used for the
16       earlier bond because you don't know --
17           MS. MAY:  Only Mr. Steele would know
18       that.
19           THE WITNESS:  That's my testimony.  Only
20       Mr. Steele would know how he used the money.
21   BY MR. KREUZIGER:
22   Q   Okay.  So you can't really say, sitting here today,
23       whether or not any of the funds that Mr. Steele
24       posted in August of 2015 for that bond are
25       attributable to you, to the Mill Trust, to your wife

**44**

1    or to Monyet, LLC; is that right?
2    A   I think that's a fair statement because I don't know
3        how he used the funds that he received and whether
4        any of those funds are traceable to the amount
5        that's on deposit with the Court right now.
6    Q   Okay.  But to your knowledge, after -- This is a
7        question about your knowledge:  After the $60,000
8        was given by Ms. Brown to Mr. Steele in cash, to
9        your knowledge neither you nor Ms. Brown gave
10       Mr. Steele any other money; is that right?
11   A   No.  I believe what my testimony was before was that
12       there may have been modest expenditures that came up
13       in connection with, for example, appellate costs or
14       something along those lines.  So I may have paid
15       half of something to him at a certain point in time,
16       but nothing -- Not a major transfer like a $60,000
17       transfer.
18   Q   So any of those transfers would be directly
19       attributable to reimbursing him for the costs of
20       pursuing the appeal; is that right?
21   A   Or something similar to that, yes.
22   Q   Well, what else would be similar to that?
23   A   Well, I believe we paid some money to -- I guess I
24       can't think of anything in specific.  I know
25       appellate costs are one thing that comes up, but I

EXHIBIT 9



Tracer: 1000003054 - Amt: $2,500.00 - 02/21/2014

Tracer: 1000003054 - Amt: $2,500.00 - 02/21/2014

EXHIBIT 10



Tracer: 1000009534 - Amt: $2,500.00 - 03/03/2014

Tracer: 1000009534 - Amt: $2,500.00 - 03/03/2014

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

BKY No. 15-42460

In re:

      Paul Hansmeier,

           Debtor.

### UNSWORN CERTIFICATE OF SERVICE

I hereby certify that on <u>March 30, 2016</u>, I caused the following documents:

1.     Notice of Hearing and Motion for Turnover of Property;
2.     Unsworn Certificate of Service; and
3.     Order Regarding Turnover of Property (proposed).

to be filed electronically with the Clerk of Court through ECF, and that the above documents will be delivered by automatic e-mail notification pursuant to ECF and this constitutes service or notice pursuant to Local Rule 9006-1(a).

I further certify that I caused a copy of the foregoing documents to be mailed by first-class mail, postage pre-paid to the following:

John L. Steele
500 Michigan Ave.
Suite 600
Chicago, IL 60611

**FULLER, SEAVER, SWANSON & KELSCH, P.A.**

Dated: <u>March 30</u>, 2016

By: <u>/e/ Matthew D. Swanson</u>
    Matthew D. Swanson
    12400 Portland Avenue South, Suite 132
    Burnsville, MN 55337
    (952) 890-0888

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

---

BKY No. 15-42460

In re:                                                                  Chapter 7 Case

Paul Hansmeier,

        Debtor.

---

## ORDER

---

This case before the court on the motion of Randall L. Seaver, Chapter 7 trustee, for turnover of property of the estate.  Appearances, if any, were noted upon the record.

Upon the motion and the files,

IT IS ORDERED:

1.      All communications between John L. Steele and any of the following from January 1, 2013 to date:

        a.  Paul Hansmeier;
        b.  Monyet, LLC;
        c.  Padraigin Browne;
        d.  Class Justice, PLLC;
        e.  Class Action Justice Institute; and
        f.  Alpha Law Firm.

2.      Copies of any and all documents relating to or evidencing the purpose for the $2,500 monthly transfers to Paul Hansmeier as evidenced by check nos. 1903 and 1904 attached to the motion as Exhibit 10.

3.      Copies of any and all documents evidencing or relating to all transfers and the reason for all transfers, of any monies to John L. Steele by any of the following from January 1, 2013 to date:

    a.  Paul Hansmeier;
    b.  Monyet, LLC;
    c.  Padraigin Browne;
    d.  Class Justice, PLLC;
    e.  Class Action Justice Institute; and
    f.  Alpha Law Firm.

4.     Copies of any and all bank statements, money orders, wire transfers and any and all other documents evidencing or relating to the receipt, deposit and use of any monies transferred to John L. Steele by any of the following from January 1, 2013 to date:

    a.  Paul Hansmeier;
    b.  Monyet, LLC;
    c.  Padraigin Browne;
    d.  Class Justice, PLLC;
    e.  Class Action Justice Institute; and
    f.  Alpha Law Firm.

5.     Copies of any and all other documents evidencing the transfer of any monies from John L. Steele to, on account of or on behalf of any of the following from January 1, 2013 to date:

    a.  Paul Hansmeier;
    b.  Monyet, LLC;
    c.  Padraigin Browne;
    d.  Class Justice, PLLC;
    e.  Class Action Justice Institute; and
    f.  Alpha Law Firm.

6.     Copies of any and all bank statements, money orders, wire transfers and any all other documents relating to or evidencing the receipt, deposit and use of approximately $60,000 in cash allegedly given to John L. Steele by the debtor and/or Padraigin Browne.

7.     Copies of any and all documents including, without limitation, bank account statements from which funds were drawn, money orders, checks and wire authorizations, relating to or evidencing the source of funds used to pay all of the following:

a.  Wire transfer in the amount of $65,000 filed with the court on or about August 10, 2015 in the case of Light Speed Media Corporation v. Smith, et al., civil docket no. 3:12-CV-00889;

b.  Wire transfer in the amount of $47,171.75 filed with the court on or about August 10, 2015 in the case of Light Speed Media Corporation v. Smith, et al., civil docket no. 3:12-CV-00889; and

c.  Supersedeas bond in the amount of $287,300 filed with the court on or about April 8, 2014 in the case of Light Speed Media Corporation v. Smith, et al., civil docket no. 3:12-CV-00889.

Dated:

_____
Kathleen H. Sanberg
United States Bankruptcy Judge