## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

---

In re:                                                        Chapter 7

PAUL HANSMEIER,                                               No. 15-42460

      Debtor.

---

### OBJECTION TO MOTION OF CHAPTER 7 TRUSTEE FOR AN ORDER ANNULLING THE AUTOMATIC STAY TO RATIFY ENTRY OF JUDGMENT BY THE FIRST CIRCUIT COURT OF APPEALS AND AN ORDER BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

---

### RELEVANT FACTUAL & PROCEDURAL BACKGROUND

1.  On November 13, 2012, the Debtor, Paul Hansmeier ("Debtor"), filed suit against Chowdhury in the District Court of Massachusetts. *AF Holdings, LLC v. Chowdhury*, No. 12-cv-12105 (D. Mass. 2012) (hereinafter "*AF Holdings*").

2.  On May 6, 2013, the Debtor, John Steele and Paul Duffy (collectively, "Principals") were found to be the real parties in interest for claims brought by AF Holdings and Ingenuity 13. The Principals were held to be jointly and severally liable for the acts of one another, Prenda Law, AF Holdings, and Ingenuity 13. *Ingenuity 13 LLC v. John Doe*, 2013 U.S. Dist. LEXIS 64564 (C.D. Cal. May 6, 2013); aff'd *Ingenuity 13 v. Doe*, 651 Fed. App'x. 716 (9th Cir. 2016). RED

3.  The District Court of Massachusetts entered a default judgment on Chowdhury's counterclaims jointly and severally against AF Holdings, LLC, Prenda Law, the Debtor, John Steele and Paul Duffy on October 22, 2013. *AF Holdings*, ECF No. 33.

4.  The Debtor noticed his appeal from the judgment against him on December 16, 2013. *AF Holdings*, ECF No. 45.

5.  The District Court of Massachusetts certified the judgment, and on October 17, 2014, the *AF Holdings* judgment was registered as a lien on the Debtor's homestead in Minnesota.

6.  On July 13, 2015, the Debtor filed a voluntary Chapter 13 Petition. *In re Hansmeier*, No. 15-bk-42460, Doc. 1 (Bankr. D. Minn. 2015) (hereinafter "*Hansmeier*"). The Debtor's original schedules listed his interest in the Real Property and identified the *AF Holdings* judgment as a disputed debt under appeal. *Id.*, pg. 17.

7.  On September 16, 2015, the Debtor listed for sale his homestead, a property of the bankruptcy estate, without notifying the Chapter 13 Trustee, the U.S. Trustee, or the bankruptcy court. *Hansmeier*, Doc. 126, ¶ 24.

8.  The Debtor entered into a purchase agreement to sell his homestead on November 9, 2015, again without notifying the Chapter 13 Trustee, the U.S. Trustee, or the bankruptcy court. *Hansmeier*, Doc. 31. Only after the Court was made aware of the sale did the Debtor move for approval on November 25, 2015. *Id.*, Doc. 49. On November 12, 2015, the United States Trustee moved to convert the bankruptcy case to Chapter 7 citing Debtor's concealment of the listing agreement and contract to sell the homestead. *Id.*, Doc. 32.

9. On December 3, 2015, the Court, being properly apprised of the appeal and disputed debt entered an order approving the sale, providing that proceeds "shall be used at closing only to satisfy the underlying first mortgage on the property, judgment lien, realtor fees, and all other usual and customary closing costs such as deed recording fees paid to the county." *Hansmeier*, Doc. 59, ¶ 3.

10. The same day, a second order was entered converting the case to Chapter 7. Once appointed, the Chapter 7 trustee was authorized to close on the sale of the property. *Hansmeier,* Doc. 59,¶ 4; Doc. 60. The Court's decision to convert was based on its findings that the bankruptcy had been designed only to thwart the collection efforts of creditors, and that Debtor, post-petition, "filed misleading or false documents in this case and provided potentially false testimony at his Rule 2004 examination." *Id.*, Doc. 110, pg. 9.

11. The Trustee was appointed on December 4, 2015. *Hansmeier*, Doc. 62.

12. December 9, 2015, Defendants reached out to the Chapter 7 Trustee and informed him they were in possession of extensive financial documents detailing Debtor's control and financial involvement with various entities. Defendants provided the Trustee with previously filed pleadings and no fewer than 89 documents illustrating the alter-ego nature of these entities with the Debtor. *See e.g.,* Ex. A.

13. On December 15, 2015, the sale of the condominium was finalized with the Court's authorization. *Hansmeier*, Doc. 59, ¶ 3. The judgment in favor of Chowdhury, plus applicable interest, was included among the closing costs of the sale. *Id.,* Doc. 113, pgs. 4 & 12; *id.*, Doc. 166, pg. 1.

14. On December 17, 2015, Defendants received an email wherein they were informed that the Trustee was interested in settling the appeal in *AF Holdings, LLC v. Chowdhury*, No. 13-2535 (1st Cir. 2013) (hereinafter "*AF Holdings II*") for a nominal amount, as the Trustee did not greatly value the appeal.

15. The *AF Holdings* judgment lien was never challenged. The Debtor had moved to avoid the lien on September 22, 2015 [*Hansmeier*, Doc. 23] but later withdrew the challenge on November 23, 2015 [*id.*, Doc. 46]. The Trustee approved the terms of the sale, including the judgment payoff—without condition. See *Id.*, Doc. 120, pg. 4 ("Judgment payoff to Best & Flanagan LLP Trust Account ref. Chowdhury"); *id.*, pg. 6 ("Randall Seaver Bankruptcy Trustee-READ and Approved"). The Trustee moved for, and was granted on April 13, 2016, approval of a settlement and payment. *Id.*, Docs. 120 & 132.

16. The Trustee did not record the settlement with the First Circuit, nor did the Trustee dismiss the *AF Holdings* appeal after settling the debt. *Seaver v. Chowdhury et al*, No. 16-ap-04124, Doc. 1, ¶ 25 (Bankr. D. Minn. 2016) (hereinafter "*Seaver*") ("Despite satisfaction of the Chowdhury Judgment, the appeal of the Chowdhury Judgment continued[.]").

17. On August 4, 2016, the First Circuit vacated the judgment as to the Debtor, John Steele and Paul Duffy, and remanded the matter on a procedural issue. *AF Holdings*, ECF No. 76. The judgment against AF Holdings and Prenda Law still stands. *Id*.

18. On September 29, 2016, in accord with mandate filed by the District Court of Massachusetts, the Defendants filed a motion to substitute the Debtor. *See*, Ex. B. The motion was not served upon the Debtor because Defendants were going to seek relief from the stay before serving the motion. However, relief from the stay was rendered moot, when the District Court of Massachusetts denied the motion without prejudice with the instructions to first serve the motion then file.

19. Shortly thereafter, the Trustee made its first demands for restitution and commenced an adversary proceeding against Defendants on November 18, 2016. *Seaver*, Doc. 1. The complaint was premised upon the First Circuit judgment vacating the district court in *AF Holdings,* and sought to avoid and recover the settlement paid from the proceeds of the sale of Debtor's homestead. *Id.*, ¶¶ 33, 39.

## STANDARD OF REVIEW

Actions taken in violation of the automatic stay are *void ab initio. LaBarge v. Vierkant* (*In re Vierkant*), 240 B.R. 317 (B.A.P. 8th Cir. 1999). The Court can grant retroactive relief from the stay, but this should be granted "only sparingly and in compelling circumstances." *Id.* at 325 (quoting *Soares v. Brockton Credit Union* (*In re Soares*), 107 F.3d 969, 978 (1st Cir. 1997)).

> "[I]f congressional intent is to be honored and the integrity of the automatic stay preserved, retroactive relief should be the long-odds exception, not the general rule. In our view, only a strict standard will ensure the accomplishment of these objectives. … We conclude, therefore, that although courts possess a limited discretion to grant retroactive relief from the automatic stay, instances in which the exercise of that discretion is justified are likely to be few and far between."

*Suggs v. Regency Fin. Corp.* (*In re Suggs*), 377 B.R. 198, 206 (B.A.P. 8th Cir. 2007) (quoting *Soares*, 107 F.3d at 978).

Cases that have granted retroactive relief from the automatic stay are uncommon. "Retroactive relief is not an automatic remedy or routinely granted in the ordinary course. On the contrary, retroactive relief is an extraordinary remedy and should generally be granted in only unique or compelling circumstances since the violator is essentially asking the court to exercise its power to balance the equities between the parties." *Kemper Ins. Co. v. Profile Sys.* (*In re Profile Sys.*), 193 B.R. 507, 512 (Bankr. D. Minn. March 27, 1996) (citations omitted). As this Court has previously said, "Because the automatic stay is at the very heart of the Bankruptcy Code, courts are generally very unwilling to turn a blind eye to violations of the automatic stay." *In re Harris*, 268 B.R. 199, 202 (Bankr. W.D. Mo. Aug. 17, 2001) (quoting *In re Major*, 218 B.R. 501, 503 (Bankr. W.D. Mo. 1998)).

While the reasons for this unusual relief vary, in determining whether retroactive relief from the automatic stay is warranted, courts of the Eighth Circuit must always evaluate the movant's conduct. *See e.g., In re Webb*, 294 B.R. 850, 854 (Bankr. E.D. Ark. July 3, 2003); *In re Donovan*, 266 B.R. 862, 870-71 (Bankr. S.D. Iowa 2001); *Wilson v. Carter* (*In re Carter*), 240 B.R. 767, 769-70 (Bankr. W.D. Mo. 1999).

## ARGUMENT

On July 13, 2015, upon the filing of the Debtor's Chapter 13 Petition, the automatic stay provisions of 11 U.S.C. § 362(a) were immediately triggered. *Hansmeier*, Doc. 1. "Once triggered by a debtor's bankruptcy petition, the automatic stay suspends any non-bankruptcy court's authority to continue judicial proceedings then pending against the debtor." *In re Vierkant*, 240 B.R. 317, 321 (B.A.P. 8th Cir. 1999) (citation omitted).

At the time the petition was filed, the Debtor had an appeal from a judgment against him pending in the First Circuit. *AF Holdings*, ECF No. 45. That appeal was subject to the automatic stay. 11 U.S.C. § 362(d); *Farley v. Henson*, 2 F.3d 273 (8th Cir. 1993) (automatic stay applied to appeal brought by debtors from judgment obtained against them as defendants); *Am. Prairie Constr. Co. v. Hoich*, 560 F.3d 780, 789 (8th Cir. 2009); *In re Hoffinger Indus.*, 329 F.3d 948, 953 (8th Cir. 2003); *Marquis Yachts v. Allied Marine Group, Inc.*, 2010 U.S. Dist. LEXIS 31878, *14 (D. Minn. March 31, 2010). See also, *Parker v. Bain*, 68 F.3d 1131, 1137 (9th Cir. 1995) (stay applies); *Koolik v. Markowitz*, 40 F.3d 567, 26 (2d Cir. 1994) (stay applies with respect to judgment on counterclaim against the debtor); *Alpern v. Lieb*, 11 F.3d 689 (7th Cir. 1993) (appeal brought by debtor from judgment obtained against it is subject to the automatic stay); *Ellison v. Northwest Eng'g Co.*, 707 F. 2d 1310, 1311 (11th Cir. 1983) (automatic stay prevented federal appeals court from deciding case that had been briefed and argued pre-petition). At no point did the Debtor seek or receive relief from the automatic stay to allow the appeal to continue.

On December 3, 2015, the Debtor's petition was converted to Chapter 7 and the Trustee was appointed the next day. After appointment of the Trustee, the Debtor no longer had standing to pursue or settle the First Circuit appeal that existed at the time the order for relief was entered. Only the Trustee had the authority and discretion to prosecute, defend and settle, as appropriate in its judgment, such a cause of action. 11 U.S.C.S. § 323; *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 535 (4th Cir. 1997) ("once appointed, the trustee becomes the estate's proper party in interest"); *Bluemark v. Geeks On Call Holdings, Inc.*, 2009 U.S. Dist. LEXIS 121984 (E.D. Va. Nov. 18,2009) (once chapter 7 petition filed, debtor no longer has standing to pursue its prepetition cause of action); *In re Innovative Communication Corp.*, 2010 U.S. Dist. LEXIS 73408, *6-7 (D.V.I. July 20, 2010) (prosecution of an appeal); *Saellam v. Norfolk S. Corp.*, 2007 U.S. Dist. LEXIS 41150, *10 (W.D. Pa June 6, 2007); *Martin v. O'Connor* (*In re Martin*), 201 B.R. 338, 343 (Bankr. N.D.N.Y 1996).

On December 9, 2015, the Defendants reached out to the Trustee and informed him they were in possession of extensive financial documents detailing Debtor's control over various entities. Defendants provided the Trustee with no fewer than 89 documents illustrating the alter-ego nature of these entities with the Debtor. *See e.g.*, Ex. A. These same documents were cited to by the Trustee to argue Monyet LLC and the Mill Trust were "the alter egos of Paul Hansmeier." *Seaver v. Browne*, No. 16-04031, Doc. 18, pgs. 26, 30-31. In particular, the Trustee argued the entities were "sham[s] … formed for the sole purpose of placing the Debtor's funds outside of the reach of his creditors" [*id.*, pg. 27] and "through whose accounts Hansmeier funneled hundreds of thousands of dollars" [*id.*, pg. 7]. *See e.g.,* Ex. C. AF Holdings and Prenda Law were two of the entities whose assets the Debtor funneled through Monyet and the Mill Trust. Defendants also provided an order wherein the Debtor was found to be the real party in interest for claims brought by AF Holdings and Ingenuity 13. The Principals were held to be jointly and severally liable for the acts of one another, Prenda Law, AF Holdings, and Ingenuity 13. *Ingenuity 13 LLC v. John Doe*, 2013 U.S. Dist. LEXIS 64564 (C.D. Cal. May 6, 2013); aff'd *Ingenuity 13 v. Doe*, 651 Fed. App'x. 716 (9th Cir. 2016).[1]

On December 17, 2015, the Trustee, through an intermediary, approached the Defendants offering to settle the First Circuit appeal for a nominal amount, as it did not greatly value the appeal. *See e.g.,* Ex. D. Like the Debtor before him, the Trustee never sought relief from the automatic stay for the appeal in the First Circuit to continue. In fact, the Trustee thought so little of the judgment on appeal, it was never challenged. Rather, the Trustee approved the judgment payoff—without condition. See *Hansmeier*, Doc. 120, pg. 4 ("Judgment payoff to Best & Flanagan LLP Trust Account ref. Chowdhury"); *id.*, pg. 6 ("Randall Seaver Bankruptcy Trustee-READ and Approved"). See also, *Id.*, Docs. 120 & 132 (motion for approval and order granting Trustee's settlement and payment of the *AF Holdings I* judgment). Where a party has authorized, consented to, participated in, or ratified a transfer of assets, nor invoked his right to revocation, he "can hardly claim to have been defrauded by [the transfer], or otherwise to be victim[] of it." *In re Lyondell Chem. Co.*, 503 B.R. 348, 383-84 (Bankr. S.D.N.Y. 2014). Indeed, as only the Trustee had standing to pursue the pre-petition cause of

---

[1] The Trustee cites the Court's July 27, 2017 order in Adversary No. 17-4076, to argue "[i]nherent in this Court's finding is that Chowdhury was not a creditor because Hansmeier was not individually liable in the AF Holdings Action" and "defendants … were sanctioned for their post-petition attempt to create an obligation of the Debtor." Doc. 248, pg. 10. Both statements are demonstrably false. This Court has never ruled on the liability of the Debtor for the acts of his alter egos, nor have any of the Defendants herein been sanctioned.

action, the Debtor's action should have been dismissed when the Trustee chose not to pursue the matter. *In re Ozark Restaurant Equip. Co., Inc.*, 816 F.2d 1222, 1225 (8th Cir. 1987). The Trustee cannot now be heard to disavow the consequences of his actions or the transfer of assets when they operate to his detriment; he cannot ask the Court to annul such consent to avoid the subsequent consequences. *Moon v. Anderson* (*In re Hixon*), 295 B.R. 866, 870-871 (8th Cir. 2003)

The Trustee knew of the appeal and the disputed nature of the debt. The Trustee was provided with all material facts. Yet he never challenged the debt; never noticed his appearance in *AF Holdings II*; never notified the First Circuit of the settlement; nor dismissed the appeal after settling the Estate's claims.

On August 4, 2016, the First Circuit vacated the District Court of Massachusetts' judgment against the Debtor—in violation of the automatic stay. *AF Holdings*, ECF No. 76. "Courts within the Eighth Circuit consider any action [or judgment] taken in violation of the automatic stay to be void *ab initio*." *In re M & M Mktg., L.L.C.*, 2013 Bankr. LEXIS 2451, *5 (Bankr. D. Neb. June 18, 2013); *In re Eugene L. Pieper, P.C.*, 202 B.R. 294, 298 (Bankr. D. Neb. Aug. 22, 1996) (post-petition judgment rendered in violation of stay void); *In re Vierkant*, 240 B.R. at 325 (citing *Soares v. Brockton Credit Union*, 107 F.3d 969 (1st Cir. 1997). The Trustee was not only aware of the pending appeal, but knew any judgment entered by the First Circuit in violation of the stay would be void *ab initio* and subject to collateral attack. The Trustee further knew that any and all subsequent actions predicated upon the void judgment would also be void. *Pan American Petroleum Corp. v. Kansas-Nebraska Natural Gas Co.*, 297 F.2d 561, 568 (8th Cir. 1962); *Olson v. United States* 133 B.R. 1016, 1019 (Bankr. D. Neb. Nov. 1, 1991); *Seaver v. New Buffalo Auto Sales* (*In re Hecker I*), 459 B.R. 6, 9 n.2 (B.A.P. 8th Cir. 2011).

## RETROACTIVE RELIEF OF THE STAY IS UNWARRANTED

It is cannot be disputed that the continuation of the First Circuit action by the Trustee in this case violated the Bankruptcy Code's automatic stay provision. The issue then becomes whether the circumstances of this case warrant retroactive relief. They do not.

**I. Retroactive relief cannot be premised on the benefit of hindsight.**

The Trustee's main argument is one of hindsight, that a favorable judgment warrants annulment. He argues that because the First Circuit ruled the Debtor was not properly made a party to the proceedings, there was never a stay in place to be violated by the Trustee. However, what the

Trustee fails to recognize is that he proceeded in violation of what was, *at the time he acted*, a valid stay. *In re Webb*, 294 B.R. 850, 854 (Bankr. E.D. Ark. July 3, 2003). "[A]ctions that are taken in violation of the stay are void. … If creditors believe that there is a legitimate possibility that their intentional actions post petition in violation of Section 362 may be ratified later by a court weighing the equities, creditors will be encouraged to take the action and hope for the best result later." *Overland Nat'l Bank v. Olson,* 101 B.R. 134, 145-46 (Bankr. D. Neb. 1989) aff'd, *Olson*, 133 B.R. 1016. An action that is void cannot be asserted against a party as a matter of law or be revived by an otherwise permissible action. *In re Heating Oil Partners*, 2009 U.S. Dist. LEXIS 117871, *33-35 (D. Conn. Dec. 17, 2009). If the Court annuls the stay as the Trustee requests, it will only encourage parties to proceed in violation of the stay, betting on an annulment and substituting their judgment for the dictates of the Bankruptcy Code.

> To afford relief under any other circumstances, would provide creditors with the impetus to *sua sponte* determine whether the circumstances merit relief. Under such a system, a creditor would simply examine its position, determine for itself if "cause" exists, essentially grant itself relief and, at some later point, come into court and seek ratification or validation of acts taken in violation of the stay. Such a course of conduct is clearly improper and undermines both the letter and spirit of § 362(a).

*In re Profile Sys*., 193 B.R. at 512.

> While the Trustee would ordinarily be expected to seek redress for violations of the automatic stay, the Trustee chose not to do so here. That is no doubt because the Trustee is seeking to recover the benefit the Judgment Creditors received by registering their judgment liens. If the Judgment Creditors' action in registering their liens without obtaining stay relief were to be held void, then the Trustee would not be able to attempt to piggyback onto those liens to recover any equity captured by those liens when GMAC failed to protect its second lien position.

*Seaver v. New Buffalo Auto Sales* (*In re Hecker II*), 496 B.R. 541, 549-550 (B.A.P. 8th Cir. 2013).

The Trustee knew of the potential problem, and waited to see if he obtained a favorable result in the First Circuit action. One can't help but wonder, had the First Circuit's decision not been favorable, would the Trustee have then invoked the automatic stay to render that decision void?

**II.   The Trustee's motives in seeking annulment are disingenuous.**

The Trustee claims he "is not seeking relief to rehabilitate his own actions, or the actions of the debtor, but seeks retroactive relief to ratify actions taken by the First Circuit Court of Appeals and the United States District Court for the District of Massachusetts." Doc. 248, pg. 14. But that is exactly what he is doing.

Even though it may have been the First Circuit who entered the judgment, it was the Trustee who violated the stay as this was the Trustee's claim against the Defendants it seeks to enforce. See e.g. *Myers v. Blumenthal* (*In re M & M Mktg., L.L.C.*), 2013 Bankr. LEXIS 2451, *6 (Bankr. D. Neb. June 18, 2013). The good faith or knowledge of the First Circuit is not at issue, the Trustee's is.

As an initial matter, the Trustee is the officer responsible for administering the Estate. The Debtor's original schedules identified the *AF Holdings* judgment as a disputed debt under appeal. *Hansmeier*, Doc. 1, pg. 17. Unquestionably, the Trustee knew of the bankruptcy filing, the appeal and the stay. "A willful violation of the automatic stay occurs when the creditor acts deliberately with knowledge of the bankruptcy petition. … [I]f the creditor is aware of the bankruptcy filing, any intentional act that results in a violation of the stay is willful." *In re Gray*, 519 B.R. 767, 774-75 (B.A.P. 8th Cir. 2014).

Secondly, the Trustee has also proposed a settlement to the Court wherein control of this litigation would be transferred to the Debtor in exchange for the Trustee's security interest in any recoverable proceeds; the dismissal of Debtor's claims against the Trustee; and the Debtor's assent to a denial of discharge. *Hansmeier*, Doc. 247. However, the Trustee does not represent the Debtor nor owe the Debtor any fiduciary duty. *In re Bashour*, 124 B.R. 52, 54 (Bankr. N.D. Ohio 1991). Nor is the underlying property at issue necessary for an effective reorganization since this is a Chapter 7 liquidation. *Martens v. Countrywide Home Loans* (*In re Martens*), 331 B.R. 395, 396 (B.A.P. 8th Cir. Oct. 3, 2005). What it is necessary for, is the Trustee's settlement with the Debtor.

### III. Equity weighs in favor of denying annulment.

The Trustee also laments that should the annulment be denied, he "would be forced to bring a motion for stay relief for the sole purpose of requesting that the First Circuit Court of Appeals be permitted to enter the same order, based on the same unchangeable facts present at the time the bankruptcy case was filed. Such a requirement appears to be the type of prejudice Congress considered when granting the Bankruptcy Court authorization to annul the automatic stay. The request for relief is not only equitably warranted, but is also in the best interest of judicial resources." *Hansmeier*, Doc. 248, pg. 14. However, what the Defendants have repeatedly argued and what the Trustee fails to consider is;

> Judgments may be amended to add additional judgment debtors on the ground that a person or entity is the alter ego of the original judgment debtor. Amendment of a judgment to add an alter ego is an equitable procedure based on the theory that the court is not amending the judgment to add a new defendant *but is merely inserting the*

> *correct name of the real defendant.* Such a procedure is an appropriate and complete
> method by which to bind new defendants where it can be demonstrated that in their
> capacity as alter ego of the corporation they in fact had control of the previous
> litigation, and thus were virtually represented in the lawsuit. The decision to grant an
> amendment in such circumstances lies in the sound discretion of the trial court. The
> greatest liberality is to be encouraged in the allowance of such amendments in order
> to see that justice is done.

*Danko v. O'Reily*, 232 Cal. App. 4th 732 (Cal. App. Nov. 25, 2014). Substitution is appropriate even "after judgment has been rendered." *Negrón-Almeda*, 579 F.3d at 53 (*citing Explosives Corp.*, 817 F. 2d at 905). Parties may be added or substituted under Rule 25(c) even after a default judgment. *United States v. Aiken*, 867 F.2d 965, 967 (6th Cir. 1989) (affirming substitution); *Minn. Mining & Mfg. Co. v. Eco Chem, Inc.*, 757 F.2d 1256, 1258-59 (Fed. Cir. 1985))(affirming addition of "successors in interest and alter egos" of company subject to default judgment).

On May 6, 2013, the Debtor, John Steele and Paul Duffy (collectively, "Principals") were found to be the *real parties in interest* for claims brought by AF Holdings and Ingenuity 13. The Principals were held to be jointly and severally liable for the acts of one another, Prenda Law, AF Holdings, and Ingenuity 13. *Ingenuity 13 LLC v. John Doe*, 2013 U.S. Dist. LEXIS 64564 (C.D. Cal. May 6, 2013); aff'd *Ingenuity 13 v. Doe*, 651 Fed. App'x. 716 (9th Cir. 2016). *See*, Ex. E. Hansmeier specifically argued the issue of his liability in his appeal. *See*, Ex. F.

The Trustee wants to annul on the grounds of equity and judicial economy. The Trustee's claim is, at its heart, a non-core issue—alter ego liability of the Debtor. Judicial economy then would best be served by granting relief from the stay for final adjudication in the District Court of Massachusetts, or deferring the issue to the District Court of Minnesota. *See e.g.,* Ex. G (settlement letter proposing such a resolution).

And what of equity for Mr. Chowdhury? He was accused by the Debtor of something he didn't do and forced to defend himself in meritless litigation in Massachusetts. And when he did defend himself, Hansmeier placed Chowdhury's name on Prenda's website, defaming him as "proven guilty"; a "criminal"; etc. At the time of the bankruptcy, Chowdhury held a valid judgment, certified by the District Court of Massachusetts, then properly domesticated in Minnesota and placed as a lien on Hansmeier's property. The disputed nature of the debt and the appeal were facts known to all, nonetheless the Defendants were paid in full and without condition. Then almost a year later, and Defendants are asked to return the judgment—at which time no longer existed—and forced over the next year to needlessly litigate, what is in essence a non-core issue, in a foreign bankruptcy court.

And what happens once the substitution is granted? In a phone conversation with Matt Swanson on or around October 27, 2015, the answer was simple: Defendants would then have to sue the Trustee in Minnesota to get the judgment back.

## CONCLUSION

Pursuant to the foregoing, the circumstances in this case are not so compelling that annulment of the stay is warranted. Debtor is not attempting to reorganize and this is apparently a no-asset case. The Trustee was aware of the disputed nature of the debt and the appeal, but chose to settle.

There are indications that Debtor has acted in bad faith, considering his multiple filings and continued attempts to thwart the United State's attempts to finalize district court proceedings against him. On the other hand, the Defendants have incurred undue expenses in litigating void matters; have been denied attempts to finalize the district court proceedings in Massachusetts; and detrimentally relied on the Trustee's settlement.

Dated: November 25, 2017

Respectfully,

Jason E. Sweet
_____
Jason E. Sweet
Counsel for Defendants
*Pro Hac Vice Appearance*
BOOTH SWEET LLP
Jason E. Sweet (BBO# 668596)
32R Essex Street
Cambridge, MA 02139
Tel.: (617) 250-8619
Fax: (617) 250-8883
Email: jsweet@boothsweet.com

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

_____

In re:                                                          Chapter 7

PAUL HANSMEIER,                                                  No. 15-42460

      Debtor.

_____

**DECLARATION OF JASON E. SWEET**

_____

I, Jason E. Sweet, declare under penalty of perjury, that:

1.  I am one of the attorneys representing the Defendants Sandipan Chowdhury and Booth Sweet LLP, in the above captioned case and submit this declaration in opposition of the Trustee's motion for relief from the automatic stay.

2.  Attached hereto as Exhibit A is a true and correct copy of email correspondence between myself and Matthew Swanson, wherein I provided the Trustee with no fewer than 89 documents detailing the Debtor's control over and financial interests in various entities.

3.  Attached hereto as Exhibit B is a true and correct copy of the "Memorandum in Support of Motion for Substitution of Parties and Entry of an Amended Judgment" filed by defendant Sandipan Chowdhury in Civil Action No. 12-cv-12105, in the United States District Court for the District of Massachusetts.

4.  Attached hereto as Exhibit C is a true and correct copy of the "Amended Motion for Prejudgment Attachment" filed by the Trustee in Adversary No. 16-ap-4031, in the United States Bankruptcy Court for the District of Minnesota.

5.  Attached hereto as Exhibit D is a true and correct copy of the an email I received on December 17, 2015 from Ted Sheu, wherein the Trustee expressed interest in settling.

6.  Attached hereto as Exhibit E is a true and correct copy of the judgment entered by the United States Court of Appeals for the Ninth Circuit, Case No. 13-55859, on appeal from Civil Action No. 12-cv-00833 in the United States District Court for the Central District of California.

7.  Attached hereto as Exhibit F is a true and correct copy of the Debtor's appellate brief filed in the United States Court of Appeals for the Ninth Circuit, Case No. 13-55859, on appeal from Civil Action No. 12-cv-00833 in the United States District Court for the Central District of California.

8.  Attached hereto as Exhibit G is a true and correct copy of an October 27, 2016 settlement letter to the Trustee.

Dated: November 25, 2017

                                          Respectfully,

                                          Jason E. Sweet _____
                                          Jason E. Sweet
                                          Counsel for Defendants

*Pro Hac Vice Appearance*
BOOTH SWEET LLP
Jason E. Sweet (BBO# 668596)
32R Essex Street
Cambridge, MA 02139
Tel.: (617) 250-8619
Fax: (617) 250-8883
Email: jsweet@boothsweet.com



**From:** **Matthew Swanson** mswanson@fssklaw.com
**Subject:** RE: In re Hansmeier, 15-42460 /// 1 of 2
**Date:** December 17, 2015 at 4:21 PM
**To:** jsweet@boothsweet.com

I am missing #2 of 3.

**From:** jsweet@boothsweet.com [mailto:jsweet@boothsweet.com]
**Sent:** Thursday, December 17, 2015 3:20 PM
**To:** Matthew Swanson
**Subject:** Re: In re Hansmeier, 15-42460 /// 1 of 2

Which one are you missing?

On Dec 17, 2015, at 4:15 PM, Matthew Swanson <mswanson@fssklaw.com> wrote:

Thank you, I received 4 emails.

Matt S.

**From:** jsweet@boothsweet.com [mailto:jsweet@boothsweet.com]
**Sent:** Thursday, December 17, 2015 2:49 PM
**To:** Matthew Swanson
**Subject:** Fwd: In re Hansmeier, 15-42460 /// 1 of 2

Begin forwarded message:

**From:** "jsweet@boothsweet.com" <jsweet@boothsweet.com>
**Subject: In re Hansmeier, 15-42460 /// 1 of 2**
**Date:** December 9, 2015 at 11:44:20 AM EST
**To:** rseaver@fssklaw.com

Looks like the second Lightspeed pleading was too large for your server. I've had to break this pleading into two emails.

Jason Sweet
Booth Sweet LLP
32R Essex Street
Cambridge, MA 02139
T: (617) 250-8619
F: (617) 250-8883
www.boothsweet.com
www.facebook.com/BoothSweet

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| AF HOLDINGS, LLC, | ) | |
| | ) | |
| Plaintiff/Counterdefendant, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:12-cv-12105-IT |
| | ) | |
| SANDIPAN CHOWDHURY, | ) | |
| | ) | |
| Defendant/Counterplaintiff. | ) | |
| | ) | |

## SANDIPAN CHOWDHURY'S MEMORANDUM IN SUPPORT OF MOTION FOR SUBSTITUTION OF PARTIES AND ENTRY OF AN AMENDED JUDGMENT

The Court entered an uncontested $64,180.80 default judgment against Counterdefendant AF Holdings, LLC ("AF") that still stands. Doc. 31. The Court re-entered the judgment against attorneys John Steele ("Steele") and Paul Hansmeier ("Hansmeier") jointly and severally with AF among others, and denied their motions to set that judgment aside. Doc. 34, 43. Other courts find that "AF is an empty shell created by Steele and Hansmeier," who used AF as an alter ego. Doc. 30-1 pp. 17, 19. Yet the First Circuit vacated the re-entered judgment because the attorneys were not personally served or named as parties; even an indisputable alter ego relationship with AF "that would permit both serving them and holding them liable on the judgment does not obviate the need to call them before the court before entering judgment." Doc. 76 p. 2. To satisfy that need, and the Court's Order on Remand to "file a proposed Amended Judgment," Doc. 78, Counterplaintiff Sandipan Chowdhury ("Chowdhury") moves the Court to add or substitute Steele and Hansmeier as counterdefendants pursuant to Rule 25(c) so they may be held liable for damages they caused him through their alter ego. In support, Chowdhury states as follows.

## RELEVANT FACTUAL BACKGROUND

AF filed this suit alleging copyright infringement against Chowdhury on November 13, 2012. Doc. 1. In his January 4, 2013 counterclaims, Chowdhury described hundreds of virtually identical lawsuits AF brought against thousands of defendants through Prenda Law, Inc. ("Prenda"). Doc. 7 p. 12 ¶¶ 6-7. AF moved to strike in part and dismiss the counterclaims. Doc. 8, 9. On January 30, 2013, Chowdhury moved to require AF to post a $60,000 bond for costs. Doc. 11.

On May 6, 2013, attorneys Steele, Hansmeier, and Paul Duffy ("Duffy") (collectively "the Principals"), AF, and others were sanctioned in a related case, *Ingenuity 13 LLC v. John Doe*, No. 12-

cv-8333-ODW, 2013 U.S. Dist. LEXIS 64564 (C.D. Cal. May 6, 2013). Doc. 15-1. The court found
the Principals had formed AF "among other fungible entities … for the sole purpose of litigating
copyright-infringement lawsuits. They created these entities to shield the Principals from potential
liability and to give an appearance of legitimacy." *Id.* p. 5. AF had "no assets other than several
copyrights to pornographic movies" and "no official owners of officers … but the Principals are the
de facto owners and officers." *Id.* The Principals also owned and controlled Prenda. *Id.* Their
litigation strategy of filing boilerplate complaints to subpoena the identities of internet subscribers
whom they could then shake down for settlements, without ever proceeding to trial, "was highly
successful because of statutory-copyright damages, the pornographic subject matter, and the high
cost of litigation." *Id.* All settlement proceeds "resided in the Principals' accounts and not in accounts
belonging to AF Holdings[.]" *Id.*

> The Principals maintained full control over the entire copyright-litigation operation.
> The Principals dictated the strategy to employ in each case, ordered their hired
> lawyers and witnesses to provide disinformation about the cases and the nature of
> their operation, and possessed all financial interests in the outcome of each case.

*Id.* p. 6. The *Ingenuity 13* court sanctioned the Principals for fraudulently using AF and other shell
company plaintiffs to conceal "that they had the sole financial interest in the suit." *Id.* p. 9.

On May 8, 2013, Chowdhury requested that the Court take judicial notice of the *Ingenuity 13*
sanctions order. Doc. 15.

AF failed to appear at a June 17, 2013 motion hearing. Doc. 16, 17. Instead that day, AF's
local counsel Dan Ruggiero ("Ruggiero") emailed the clerk of Court, "I have no objection to the
motion for bond. I will be filing a motion to dismiss plaintiffs claims against defendant shortly as
well as a motion to withdraw." Doc. 18. On June 19, 2013, the Court denied AF's motions to dismiss
and to strike the counterclaims, allowed Chowdhury's motion to require AF to post a $60,000 bond
for costs, and construed Ruggiero's June 17, 2013 email as a motion to dismiss AF's claims, which
the Court allowed. Doc. 20. On July 10, 2013, Chowdhury requested an entry of default when AF
failed to answer the counterclaims. Doc. 21. AF did not oppose.

Prenda was dissolved in July 2013. *See* Doc. 42-10 p. 9. Prenda was "a mere continuation of
Steele Hansmeier [PLLC]," also dissolved, in which Hansmeier and Steele had been partners. Doc.
30-1 p. 6; *see* Doc. 7 p. 12 ¶¶ 6-7; Doc. 12 p. 13, Doc. 42-16 p. 6.

Ruggiero moved to withdraw his appearance on August 14, 2013, citing the *Ingenuity 13*
order among other grounds. Doc. 22 p. 1. He called AF and those involved with it an "enterprise"

under RICO and explained that, to comply with Rule 11, he could no longer file pleadings on AF's behalf "when there is no reasonable basis to conclude that anything Plaintiff tells counsel is truthful." *Id.* p. 4. On August 20, 2013, the Court allowed his motion to withdraw. Doc. 24.

AF proceeded without counsel and was defaulted on August 29, 2013. Doc. 25, 26. Chowdhury moved for default judgment against AF on September 13, 2013. Doc. 28. He sought as damages $21,393.60 incurred in attorney's fees, trebled to $64,180.80 pursuant to Mass. Gen. L. c. 93A. Doc. 29 pp. 6-7. *See* Doc. 7 pp. 18-20 (Chapter 93A counterclaim); Doc. 29-2.

On September 23, 2013, Chowdhury requested that the Court take judicial notice of an order issued in another AF lawsuit, *AF Holdings LLC v. Navasca*, No. 12-cv-02396-EMC (NJV), 2013 U.S. Dist. LEXIS 149156 (N.D. Cal. Sept. 16, 2013). Doc. 30, 30-1. The *Navasca* magistrate judge adopted as preclusive the *Ingenuity 13* findings about the relationship between AF and the Principals, and recommended that Steele and Hansmeier be ordered to show cause why they should not be sanctioned. "Issue preclusion bars AF, Steele and Hansmeier from re-litigating the findings of fact … made in *Ingenuity 13* regarding their alter ego relationship, their conduct, and their business model." Doc. 30-1 p. 11. Further, those

> findings (which AF, Steele and Hansmeier are precluded from re-litigating) establish that Steele and Hansmeier are the alter egos of AF … They share a unity of interest and ownership; they acted as attorneys for AF behind the scenes and dictated all litigation decisions; AF was undercapitalized (indeed, it had no assets as the settlement proceeds never left Steele and Hansmeier's accounts); they kept all litigation proceeds AF "earned"; and AF was a mere shell created to shield Hansmeier and Steele from liability.

*Id.* p. 18. Having found that "AF is an empty shell created by Steele and Hansmeier," the *Navasca* magistrate recommended adding them as debtors to the judgment against AF. *Id.* p. 19.

On September 30, 2013, the Court endorsed Chowdhury's motion for default judgment against AF as "allowed without opposition." Doc. 31. AF did not contest or appeal from the judgment. On October 17, 2013, Chowdhury moved for entry of final judgment jointly and severally against AF "and its aliases," including the Principals. Doc. 32, 32-1. The Court allowed the motion and re-entered judgment in that form on October 22, 2013. Doc. 33, 34. The Principals moved to vacate the judgment, arguing that they had not been separately named as parties and served. Doc. 36, 38, 41. On December 3, 2013, the Court denied their motions to vacate. Doc. 43. The Principals filed a notice of appeal on December 16, 2013. Doc. 45.

Duffy died on August 10, 2015. *See Lightspeed Media Corp. v. Smith*, Nos. 15-2440 &
15-2682, 2016 U.S. App. LEXIS 13195, *8 (7th Cir. July 19, 2016). The Ninth Circuit affirmed the
*Ingenuity 13* sanctions order on June 10, 2016. Memorandum, *Ingenuity 13 LLC v. Doe*, Nos.
13-55859 et al. (9th Cir. June 10, 2016), attached as Exhibit A hereto.

The First Circuit vacated and remanded this Court's judgment against the Principals on
August 4, 2016. Doc. 76. "Contrary to [Chowdhury], the fact that non-parties do not, or cannot,
dispute alter ego allegations that would permit both serving them and holding them liable on the
judgment does not obviate the need to call them before the court before entering judgment." *Id.* p. 2.
The mandate entered on August 29, 2016. Doc. 77. On September 8, 2016, the Court vacated the
order denying the Principals' motions to vacate, granted those motions, and set aside the judgment
against them, ordering Chowdhury to file a proposed amended judgment. Doc. 79.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 25 governs substitution of parties. Rule 25(c) provides:

> If an interest is transferred, the action may be continued by or against the original
> party unless the court, on motion, orders the transferee to be substituted in the action
> or joined with the original party. The motion must be served as provided in Rule
> 25(a)(3).

Fed. R. Civ. P. 25(c) ("Transfer of Interest"). Rule 25(c) "is a discretionary 'procedural
vehicle' in which 'the transferee is brought into court solely because it has come to own the property
in issue.'" *Negrón-Almeda v. Santiago*, 579 F.3d 45, 53 (1st Cir. 2009) (*quoting Maysonet-Robles v.
Cabrero*, 323 F.3d 43, 49 (1st Cir. 2003)). "The merits of the case and the disposition of the property
are still determined vis-a-vis the originally named parties.'" *Maysonet-Robles*, 323 F.3d at 49
(*quoting Minn. Mining & Mfg. Co. v. Eco Chem, Inc.*, 757 F.2d 1256, 1263 (Fed. Cir. 1985)).

A "substitution decision is within the discretion of the district court." *Explosives Corp. of Am.
v. Garlam Enters. Corp.*, 817 F.2d 894, 904 (1st Cir. 1987). Only "a factual dispute that the court is
compelled to view as genuine" requires a trial or evidentiary hearing before substitution under Rule
25(c). *Arnold Graphics Indus., Inc. v. Indep. Agent Ctr., Inc.*, 775 F.2d 38, 43 (2d Cir. 1985); *Beane v.
Beane*, No. 08-236-JL, 2011 U.S. Dist. LEXIS 8872, *8 (D.N.H. Jan. 24, 2011) ("In the absence of a
genuine factual dispute … [t]he court can therefore rule on [a] motion to substitute by looking to
materials beyond the pleadings, and without conducting an evidentiary hearing.") (*citing Luxliner P.
L. Exp., Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69, 72 (3d Cir. 1993)); "If … there is no genuine factual

4

issue, the formality of a hearing serves no purpose." 6 James Wm. Moore et al., *Moore's Federal Practice* § 25.35[3], at 25-56 (3d ed. 2007).

ARGUMENT

Steele and Hansmeier should be added as counterdefendants or substituted for AF under Rule 25(c) and held fully liable on Chowdhury's counterclaims. "[I]t is not only the transfer of assets in litigation that calls for a Rule 25(c) joinder, but also the possibility that the party to be joined could be held accountable for the actions of the original party." *Maldonado v. Valsyn S.A.*, 434 F. Supp. 2d 90, 92 (D.P.R. 2006). Steele and Hansmeier can be held accountable for AF's actions, and the judgment against AF, because they employed it as an alter ego, received substantially all of its assets, and secretly controlled all of its litigation. Issues adjudicated in *Ingenuity 13* preclude them from denying those grounds for their liability.

**I.      This motion is timely.**

This motion is timely. "There is no time limit for a Rule 25(c) motion and the determination is solely within the discretion of the court." *USI Props. Corp. v. M.D. Constr. Co.*, 186 F.R.D. 255, 260 (D.P.R. 1999) (*citing* 7C C.A. Wright, A.R. Miller & M.K. Kane, *Federal Practice and Procedure* 2d § 1959, at 561 (1986)), *vacated on other grounds*, 230 F.3d 489 (1st Cir. 2000). Substitution is appropriate even "after judgment has been rendered." *Negrón-Almeda*, 579 F.3d at 53 (*citing Explosives Corp.*, 817 F.2d at 905). Parties may be added or substituted under Rule 25(c) even after a default judgment. *United States v. Aiken*, 867 F.2d 965, 967 (6th Cir. 1989) (affirming substitution); *Minn. Mining & Mfg. Co.*, 757 F.2d at 1258-59 (affirming addition of "successors in interest and alter egos" of company subject to default judgment).

**II.     Steele and Hansmeier should be substituted for AF or added as parties because they used AF as a mere alter ego and received substantially all of its assets.**

The First Circuit has "sanctioned the use of Rule 25(c) to join parties as alter egos and hold them liable for the full judgment." *Rodríguez-Miranda v. Benin*, 829 F.3d 29, 2016 U.S. App. LEXIS 12872, *30 (1st Cir. July 13, 2016). AF is a sham entity that the Principals created to perpetrate fraudulent copyright lawsuits. Doc. 15-1 pp. 4-5. Its corporate form should be disregarded and Steele and Hansmeier, who used AF as an alter ego, should be held fully liable. *See Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry.*, 210 F.3d 18, 25 (1st Cir. 2000).

The Court's jurisdiction over AF on the counterclaims establishes jurisdiction over Steele and Hansmeier, once properly served. "[A] court which has jurisdiction over a corporation has jurisdiction over its alter egos." *Minn. Mining & Mfg. Co.*, 757 F.2d at 1265 (citations omitted).

**A.      Under federal common law, AF's corporate form should be disregarded.**

In this case the parties raised federal questions of copyright law, so federal choice-of-law principles apply, which dictate that federal common law governs the alter-ego inquiry. "If the federal statute in question demands national uniformity, federal common law provides the determinative rules of decision." *Bhd. of Locomotive Eng'rs*, 210 F.3d at 26 (*citing United States v. Kimbrell Foods, Inc.*, 440 U.S. 715, 728 (1979)). "In federal question cases, courts are wary of allowing the corporate form to stymie legislative policies." *United Elec., Radio and Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1091 (1st Cir. 1992). Federal copyright law seeks to foster a "national uniformity." *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 231 n. 7 (1964) (citing 28 U.S.C. § 1338(a)); *see Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1994) (choosing to fashion federal common law of agency rather than applying the applicable state law when interpreting the work-for-hire provisions of the Copyright Act, "given the Act's express objective of creating national, uniform copyright law"). Applying state alter-ego law would undermine that uniformity.

Under federal common law, Chowdhury need only show that it would be unfair under the circumstances not to disregard AF's corporate form. "[T]he rule in federal cases is founded only on the broad principle that 'a corporate entity may be disregarded "in the interests of public convenience, fairness and equity.'"" *Bhd. of Locomotive Eng'rs*, 210 F.3d at 27 (*quoting Town of Brookline v. Gorsuch*, 667 F. 2d 215, 221 (1st Cir 1981)). Where no statute or statutory precedent dictates "a test for alter ego liability," the First Circuit has applied an "inquiry focusing on (1) whether the entities in question have ignored the independence of their separate operations, (2) whether the defendant employed the multiplicity of entities as part of an artifice or scheme to defraud, and (3) whether holding the corporate form inviolate would lead to substantial injustice or inequity." *Intergen N.V. v. Grina*, 344 F.3d 134, 148-49 (1st Cir. 2003) ("borrow[ing] from the standards developed in other statutory contexts that manifest a need for national uniformity"). Those factors support disregarding AF's corporate form and finding Steele and Hansmeier liable.

The First Circuit cited multiple subfactors for the first, "independent operations" prong:

(1) whether a corporation is operated as a separate entity; (2) commingling of funds and other assets; (3) failure to maintain adequate records or minutes; (4) the nature of

> the corporation's ownership and control; (5) absence of corporate assets and
> undercapitalization; (6) use of a corporation as a mere shell, instrumentality or
> conduit of an individual or another corporation; (7) disregard of legal formalities and
> the failure to maintain an arms-length relationship among related entities; and (8)
> diversion of the corporation's funds or assets to noncorporate uses.

*Id.* at 149 (*quoting United States v. Diviner*, 822 F.3d 960, 965 (10th Cir. 1987)). Steele and

Hansmeier barely maintained the pretext of separately operating their shell company. AF had "no

official owners or officers" except the Principals. Doc. 15-1 p. 5. "No one else appears to work for

AF" other than Mark Lutz, "variously described as the corporate representative and CEO of AF."

Doc. 30-1 p. 10; *see also* Doc. 42-16 p. 10 (identifying AF's nominal leader Lutz as "Prenda's former

paralegal"). AF's pre-suit demand letter instructed Chowdhury to send payment to Prenda at Steele's

Miami Beach address. Doc. 12-1 p. 3; *see* Doc. 45 p. 2. Hansmeier appeared as AF's Rule 30(b)(6)

deponent in *Navasca*. Doc. 30-1 p. 15. "Hansmeier was unable to testify about 'the exact

mechanisms by which the money goes []' to AF Holdings from the law firms that represent it." *AF*

*Holdings LLC v. Navasca*, No. 12-cv-2396-EMC (NJV), 2013 U.S. Dist. LEXIS 118110, *3-4 (N.D.

Cal. Aug. 20, 2013). The *Navasca* magistrate judge found it established that Steele and Hansmeier

"were the only ones to work with the 'client,'" and that

> Steele and Hansmeier are the alter egos of AF .... They share a unity of interest and
> ownership; they acted as attorneys for AF behind the scenes and dictated all litigation
> decisions; AF was undercapitalized (indeed, it had no assets as the settlement
> proceeds never left Steele and Hansmeier's accounts); they kept all litigation
> proceeds AF "earned"; and AF was a mere shell created to shield Hansmeier and
> Steele from liability.

Doc. 30-1 p. 18. Affirming, the *Navasca* court noted that the *Ingenuity 13* court was also aware of

Hansmeier's Rule 30(b)(6) testimony that AF had no officers with titles like CEO, president,

treasurer or secretary. Doc. 42-12 p. 9.

Further supporting the *Ingenuity 13* findings, Brett Gibbs ("Gibbs"), Prenda's former counsel

in California, presented evidence that "Steele and Hansmeier are the beneficial owners of the sham

companies that served as Plaintiffs, and of Prenda Law itself." Doc. 42-16 p. 5. That evidence

included Prenda's profit and loss statement and balance sheet for 2012, showing that Prenda paid

Hansmeier and Steele nearly 70% of its total revenue, all of which came from settlement payments,

while paying none to AF or Prenda's other plaintiffs. Doc. 42-13, 42-14. As Gibbs put it, "This

supports the conclusion that these companies were not independent entities, but rather alter egos of

Steele and Hansmeier." Doc. 42-16 p. 13 n. 9.

All of AF's corporate funds were diverted, primarily to Steele and Hansmeier. The diversion was so extensive that the profit and loss statement showed Prenda operating at a net loss of $450,721.64 for 2012 despite taking in $1,931,977.09 in settlement proceeds, due to $2,382,698.73 in "expenses," including more than $1,343,806.78 distributed to the Principals. Doc. 42-13. When the *Navasca* magistrate judge "ordered AF to be prepared to explain at the [evidentiary] hearing the money trail and provide an accounting of the funds it received from copyright infringement actions or settlements, AF failed to present a witness who could do so or documents that might shed light on these issues." Doc. 30-1 p. 18. AF presented "no evidence … that any settlement or litigation proceeds ever reached AF." *Id*. *See also* Doc. 42-12 p. 11. "Steele and Hansmeier were the primary beneficiaries of settlement payments to Prenda Law, giving them a compelling, if secret, financial interest in all aspects of Prenda's operations and litigation. They had a direct financial incentive to ignore any court order—or ignore Gibbs when he relayed such an order—if complying would slow the flow of settlement proceeds to Prenda." *Id*. p. 14.

The other *Intergen* factors—"(2) whether the defendant employed the multiplicity of entities as part of an artifice or scheme to defraud, and (3) whether holding the corporate form inviolate would lead to substantial injustice or inequity," 344 F.3d at 148-49—also fully support disregarding AF's corporate form. The Principals created their multiple entities, including Prenda and AF, for the specific purpose of pursuing fraudulent settlements and fraud on the courts. Doc. 15-1. AF was "a limited liability company formed in the Caribbean islands of Saint Kitts and Nevis." *AF Holdings LLC v. Does 1-1,058*, 752 F.3d 990, 992 (D.D.C. 2014). See Doc. 1 ¶ 2. AF had "no assets other than several copyrights to pornographic movies." Doc. 15-1 p. 5. Steele and Hansmeier depleted AF of all proceeds from its lawsuits and settlements. Doc. 30-1 p. 18. In *Navasca*, AF offered no evidence to rebut evidence establishing "that Steele and/or Hansmeier … uploaded the copyrighted works that form the basis of AF's lawsuits to BitTorrent swarms in order to induce infringement." *Id*. p. 9; *see also* Declaration of Delvan Neville ¶¶ 16-18, 20, & 24-26, *First Time Videos, LLC v. Oppold*, No. 12-cv-01493-CEH-KRS (M.D. Fla. filed June 3, 2013); *Navasca*, 2013 U.S. Dist. LEXIS 102249, *7-9 (N.D. Cal. July 22, 2013) ("persons affiliated with AF … [uploaded] copyrighted works *in order to induce users to download the works so that they could then be sued for copyright infringement*.") (emphasis in original); Doc. 29 p. 3 & Doc. 42-16 pp. 14-15 (Steele and Steele Hansmeier PLLC used uploader's IP address).

It would be inequitable to allow Steele and Hansmeier to maintain the corporate fiction of AF. Unless they are substituted or added as parties, the judgment will not be satisfied. It is effectively uncollectible from AF, their dissolved firm Prenda, or their fellow Principal Duffy, who died last year. AF did not oppose the Court's order requiring it to post a $60,000 bond for costs, but never complied, though Ruggiero notified Steele of the order. Doc. 20, 28, 42-2 ¶ 11. AF never substituted counsel despite notice of Ruggiero's withdrawal. Doc. 22 p. 2. Ever since judgment entered against it, Court orders mailed to AF are returned as undeliverable. Doc. 31, 35, 40, 44, 49, 56, 57, 66, 68, 73, 74. If liability rests only with AF, "it is certain that Plaintiffs will transfer out their settlement proceeds and plead paucity." Doc. 15-1 p. 10. Steele and Hansmeier have proven that *Ingenuity 13* prediction elsewhere by falsely claiming inability to pay sanctions. *See Lightspeed*, 2016 U.S. App. LEXIS 13195, *4-7 & 15 ("Steele and Hansmeier were emptying accounts they controlled of sums vastly in excess of the sanctions they owed"); *id.*, 761 F.3d 699, 710-12 (7th Cir. 2014). "AF was a mere shell created to shield Hansmeier and Steele from liability." Doc. 30-1 p. 18. To avoid inequity, their shield must be set aside.

## B.     Under Massachusetts law, AF's corporate form should be disregarded.

An alter-ego analysis under Massachusetts law instead of federal common law would also lead to disregarding corporate form. *See Zimmerman v. Puccio*, 613 F.3d 60, 74 n. 16 (1st Cir. 2010) (choosing to apply Massachusetts law); *id.* p. 75 (controlling owners treated "companies as mere shells, ignoring financial, legal and practical formalities in furtherance of their own money-making enterprise"). In Massachusetts, liability may be imposed on an alter ego theory

> (a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting.

*My Bread Baking Co. v. Cumberland Farms, Inc.*, 355 Mass. 614, 618-19, 233 N.E.2d 748, 752 (Mass. 1968) (discussing liability of "one corporation, or a person controlling it" for acts or torts of another corporation under common control). Both prongs of the *My Bread* analysis support imposing liability on Steele and Hansmeier. They pervasively controlled AF, as the *Ingenuity 13* court found, and AF's fraud injured Chowdhury, as the entry of default judgment determined. *See* Doc. 29, 31.

There is a confused commingling of funds between AF, Prenda and other shell companies in a common enterprise, and a deep, purposeful ambiguity about Steele and Hansmeier's actions on behalf of Af: "[T]he Principals' enterprise relies on deception. … The Principals also obfuscate other facts, especially those concerning their operations, relationships, and financial interests. The Principals' web of disinformation is so vast that the Principals cannot keep track—their explanations of their operations, relationships, and financial interests constantly vary." Doc. 15-1 p. 9; *see also id.* p. 6 ¶ 11.

Since *My Bread*, the Massachusetts Supreme Court has identified factors relevant to the analysis, including: common ownership, pervasive control, confused intermingling of business assets, thin capitalization, nonobservance of corporate formalities, absence of corporate records, siphoning away of corporate funds, nonfunctioning of officers and directors, and use of the corporation in promoting fraud. *Att'y Gen. v. M.C.K., Inc.*, 432 Mass. 546, 555 n. 19, 736 N.E. 2d 373, 381 n. 19 (Mass. 2000) (*citing Pepsi-Cola Metro. Bottling Co., Inc. v. Checkers, Inc.*, 754 F.2d 10, 14-16 (1st Cir. 1985)); *see also Zimmerman*, 613 F.3d at 74 (applying certain *M.C.K.* factors, guided by "seminal Massachusetts case" *My Bread*). Those factors also call for holding Steele and Hansmeier liable. They personally and totally controlled AF, using it chiefly if not exclusively as an instrument of fraud. Doc. 15-1 pp. 6-9. AF could not have been more thinly capitalized: its only putative assets were its putative copyrights. *Id.* pp. 5-6. Prenda's financial statements reflect that almost 70% of the firm's settlement proceeds were siphoned to Steele and Hansmeier, while none went to AF. Doc. 42-16, Doc. 42 pp. 12-13. AF maintains no corporate records, observes no corporate formalities and has only *de facto* officers or directors. *See* Doc. 42-12 pp. 9-11 (noting AF's lack of corporate officers and inability to show knowledge or documents related to trust that Hansmeier testified was AF's owner).

Steele and Hansmeier are effectively indistinguishable from AF. Its corporate form should be disregarded so they may bear its liability.

## III.    Steele and Hansmeier controlled AF's litigation so they should be made parties.

Substitution is also proper against non-parties who control the litigation. "It has long been the rule that a nonparty who controls the litigation is bound by the judgment." *Explosives Corp.*, 817 F. 2d at 906. Such control means "the power - whether exercised or not - to call the shots." *Gonzalez v. Banco Central Corp.*, 27 F.3d 751, 758 (1st Cir. 1994). ""[One] who prosecutes or defends a suit in

the name of another to establish and protect his own right, or who assists in the prosecution or defense of an action in aid of some interest of his own … is as much bound … as he would be if he had been a party to the record." *Montana v. United States*, 440 U.S. 147, 154 (1979) (*quoting Souffront v. Compagnie des Sucries*, 217 U.S. 475, 486-87 (1910)). Non-parties who "assume control over litigation in which they have a direct financial or proprietary interest" are bound by the judgment. *Alman v. Danin*, 810 F.2d 1, 4 (1st Cir. 1986) (*quoting Montana*, 440 U.S. at 154). When assessing whether to substitute and hold liable a non-party to a judgment, the First Circuit instructs that the analysis turns on the relationship between the non-party and the adjudged party, and the role the non-party played in the litigation. *Id.* at 905.

By that standard, substitution is wholly warranted. The Principals controlled not just AF's litigation but AF in its entirety, as its "de facto owners and officers." Doc. 15-1 p. 5. Until the *Ingenuity 13* order pulled down the curtain on their scheme, Ruggiero litigated this case in AF's name but on behalf of the Principals, to further and protect their financial interests. "The Principals maintained full control over the entire copyright-litigation operation. The Principals dictated the strategy to employ in each case … and possessed all financial interests in the outcome of each case. … The Principals instructed Gibbs to prosecute these lawsuits only if they remained profitable; and to dismiss them otherwise." *Id.* p. 6. In *Navasca*, AF introduced declarations that failed to "rebut Gibbs' testimony that Steele and Hansmeier alone communicated with their purported client, and that they directed Gibbs' litigation strategy. The declarations actually corroborate Gibbs' testimony: he communicated with local counsel for AF, essentially acting as a go-between for Steele and Hansmeier." Doc. 30-1 pp. 7-8.

Ruggiero considered AF one of Prenda's "subsidiaries," and Gibbs asked him to keep Prenda abreast of this case and his other AF cases by adding Prenda email addresses to the ECF notification list. Doc. 42-2 p. 1. When the Court ordered AF to post a bond, Ruggiero "contacted Steele regarding the Order." *Id.* p. 2. Gibbs left Prenda in the fallout from *Ingenuity 13*, and Steele and Lutz both instructed Ruggiero to "dismiss all active AF cases," including this case. *Id*. Ruggiero informed Steele that he could not simply dismiss this case as counterclaims were pending. *Id*.; Doc. 22 p. 2.

Steele and Hansmeier totally controlled AF, including the conduct of this litigation, and had direct financial stakes in its outcome. They should be made to answer for that outcome.

## IV.     Steele and Hansmeier are precluded from denying the grounds for substitution.

The grounds for substituting or adding Steele and Hansmeier as parties—their alter ego relationship with AF, and their control of its litigation—need not be relitigated because the same issues were preclusively resolved in *Ingenuity 13*. "Issue preclusion requires that (1) both proceedings involved the same issue of law or fact, (2) the parties actually litigated that issue, (3) the prior court decided that issue in a final judgment, and (4) resolution of that issue was essential to judgment on the merits." *Global Naps, Inc. v. Verizon New England, Inc.*, 603 F.3d 71, 95 (1st Cir. 2010). Issue preclusion may bind a substitute party to issues previously decided against the party it replaces. *See Levitt v. Univ. of Texas*, 847 F.2d 221, 222-23 & n.1 (5th Cir. 1988); *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1441-42 & n.1 (9th Cir. 1990).

Steele and Hansmeier's alter ego relationship with AF and control over its litigation were squarely at issue in *Ingenuity 13*, contested in both the district court and on appeal, and resolving those issues was essential to the sanctions judgment on the merits against them. The *Ingenuity 13* court thoroughly explored the deceptive enterprise in which Steele, Hansmeier, and Duffy—the Principals—used AF as a shell company plaintiff in litigation they ran behind the scenes. The court found that "the Principals are the de facto owners and officers" of AF, which they formed "for the sole purpose of litigating copyright-infringement lawsuits" over which they maintained full control: "The Principals dictated the strategy to employ in each case … and possessed all financial interests in the outcome of each case." Doc. 15-1 pp. 4-5.

As required for preclusion to apply, the pertinent issues were actually litigated and determined in detailed findings of fact, "[b]ased on the evidence presented on the papers and through sworn testimony." *Id.* p. 3. The Principals were made parties to the *Ingenuity 13* sanctions proceedings, ordered to appear and show cause why they should not be sanctioned. *Id.* pp. 2-3. They argued that they were not subject to personal jurisdiction, but the court found "at least specific jurisdiction over [the Principals] because of their pecuniary interest and active, albeit clandestine participation in these cases." Order, *Ingenuity 13 LLC v. John Doe*, No. 12-cv-8333-ODW (C.D. Cal. Mar. 14, 2013). The Principals did not attend the first show-cause hearing as ordered; at the second, all three invoked the Fifth Amendment, and the court drew adverse inferences from their refusal to testify. Doc. 15-1 p. 4 n. 3 (*citing Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)).

12

The issues were actually litigated despite the refusal to testify. "The mere invoking of the Fifth Amendment privilege does *not* disallow issue preclusion in subsequent cases." *Birdsall v. Tulloch (In re Tulloch)*, 373 B.R. 370, 387 (Bankr. D.N.J. 2007) (emphasis in original) (concluding that the Massachusetts Supreme Judicial Court would so rule); *cf. Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 981 (1st Cir. 2001) (where issue was "squarely raised," giving a "'full and fair opportunity for judicial resolution of the issue,' … silence alone satisfied the [actual litigation] criterion under the collateral estoppel analysis") (*quoting Blonder-Tongue Lab., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 328 (1971)). The Ninth Circuit found the Principals were given due process in *Ingenuity 13*: notice and "an opportunity to be heard at both the first and second hearings … [they] were allowed to submit responsive briefs." Ex. A p. 9; *see also* Doc. 30-1 p. 12 ("AF, Steele and Hansmeier all had a full and fair opportunity to litigate these very issues in *Ingenuity 13*. … Any prejudice they might have suffered … was caused by their own gamesmanship and failure to appear at the hearing in violation of Judge Wright's order."); Doc. 42-12 p. 10.

The *Ingenuity 13* sanctions order was sufficiently final to apply issue preclusion. Issues decided in such a post-judgment order may be preclusive: "it is well established that the finality requirement for collateral estoppel does not require a final judgment." *Pina v. Rodriguez*, 278 F. Supp. 2d 195, 203 (D.P.R. 2003); *accord O'Reilly v. Malon*, 747 F.2d 820, 822-23 (1st Cir. 1984). It was uncontested that the *Ingenuity 13* order "was a final judgment on the merits" when the *Navasca* court found issue preclusion applied. Doc. 30-1 p. 13. Its finality was necessary to the Ninth Circuit's jurisdiction under Rule 54(a) and 28 U.S.C. § 1291, and to its affirmance. Ex. A p. 4. Factual findings affirmed on appeal have a binding, preclusive effect. *See Lawton v. Nyman*, 357 F. Supp. 2d 428, 433-34 (D.R.I. 2005).

The *Ingenuity 13* court's alter-ego and litigation-control findings were both necessary grounds for its order sanctioning Steele and Hansmeier. "A determination ranks as necessary or essential only when the final outcome hinges on it." *Bobby v. Bies*, 556 U.S. 825, 835 (2009) (*citing* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4421, at 543 (2d ed. 2002)). The *Ingenuity 13* court's findings that AF and Ingenuity 13 LLC ("Ingenuity") were shell companies, formed and *de facto* owned and operated by the Principals, resulted from the court ordering them to "show cause why they should not be sanctioned for their behind-the-scenes role in the conduct facially perpetrated by Gibbs." Doc. 15-1 pp. 4-5; *see id.* p. 3 ("It was when the Court realized Plaintiffs engaged their cloak of shell companies and fraud that the Court went to battlestations.").

That behind-the-scenes role was central to the determination in *Ingenuity 13* that sanctions were appropriate. The court sought to redress not only specific instances of fraud but a systematic reliance on deception whereby the Principals had not "assigned the copyright to themselves, brought suit in their own names, and disclosed that they had the sole financial interest in the suit," but instead, hired other lawyers to file suits in the names of shell companies such as AF. *Id.* p. 9. Findings that the Principals set up the shell companies, "maintained full control over the entire copyright-litigation operation," and "conspired to operate this enterprise," justified imposing those sanctions on Steele and Hansmeier, and not just on the shell companies and Gibbs. *Id.* pp. 3-6.

"If … 'the appellate court' affirms both grounds of the holding, each receives preclusive effect." *Ruthann v. Baylis (In re Baylis)*, 217 F.3d 66, 70-71 (1st Cir. 2000) (*quoting* 1 Restatement (Second) of Judgments § 27 cmt. o)). The Ninth Circuit affirmed *Ingenuity 13* on both alter ego and litigation control grounds. It found that AF was a shell company set up by the Principals for litigation through Prenda, Ex. A p. 5, and specifically affirmed the findings that they controlled and bore responsibility for the cases litigated in AF's name:

> Based on the myriad of information before it—including depositions and court documents from other cases around the country where the Prenda Principals were found contradicting themselves, evading questioning, and possibly committing identity theft and fraud on the courts—it was not an abuse of discretion for Judge Wright to find that Steele, Hansmeier, and Duffy were principals and the parties actually responsible for the abusive litigation.   Similarly, it was not an abuse of discretion for Judge Wright to find that the Prenda Principals were indeed the leaders and decision-makers behind Prenda Law's national trolling scheme.

Ex. A p. 8 (footnote omitted). As the *Navasca* magistrate judge ruled, Judge "Wright's sanctions order was based on his finding that Hansmeier and Steele were culpable, and thus the nature of their control over Gibbs' action was necessary to his award of sanctions." Doc. 30-1 pp. 12-13.

The Supreme Court has instructed that non-mutual offensive issue preclusion generally should not be allowed "where a plaintiff could easily have joined in the earlier action or where … [it] would be unfair to a defendant." *Parklane Hosiery Co. v. Shore*, 439 U.S. 329, 331 (1979). Neither restriction applies. Chowdhury could not have easily joined the post-merits sanctions proceeding in *Ingenuity 13* while he was busy defending AF's claims and litigating his own in this Court. If all parties opposing AF had to join *Ingenuity 13* before obtaining any preclusive effect from its ruling, the District Court of California would have been deluged with third-party intervenors. And it is fully fair to preclude AF's alter egos, who systemically controlled its litigation nationwide, from denying

here matters proven in that court, where they had ample incentive and opportunity to litigate but invoked their Fifth Amendment privilege. *See* Doc. 30-1 pp. 11-12.

Therefore, Steele and Hansmeier cannot dispute their alter ego relationship with AF, and their control of its litigation. On those grounds, any paper distinction between them and AF must be disregarded. To hold them liable for the damages AF caused Chowdhury on their behalf, the Court must substitute or add them as parties subject to the judgment on his counterclaims.

## CONCLUSION

Wherefore Sandipan Chowdhury requests that the Court substitute or add AF Holdings LLC's alter egos John Steele and Paul Hansmeier as parties under Rule 25(c) and, upon service hereof, enter judgment against them as proposed in the attached amended judgment.

Dated: September 29, 2016                    Respectfully submitted,

                                             /s/ Jason Sweet
                                             Jason E. Sweet (BBO# 668596)
                                             jsweet@boothsweet.com

                                             /s/ Dan Booth (with consent)
                                             Dan Booth (BBO# 672090)
                                             dbooth@boothsweet.com

                                             BOOTH SWEET LLP
                                             32R Essex Street
                                             Cambridge, MA 02139
                                             Tel.: (617) 250-8602
                                             Fax: (617) 250-8883

                                             *Counsel for Sandipan Chowdhury*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above motion and the attached memorandum in support, notice of hearing on the motion, and proposed amended judgment, were filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on September 29, 2016, and, further, that John Steele and Paul Hansmeier will be served copies of said documents pursuant to Rules 4 and 25 of the Federal Rules of Civil Procedure.

/s/  Jason Sweet

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1(a)(2)

I, Jason E. Sweet, hereby certify that counsel for Sandipan Chowdhury sought to confer with opposing counsel in a good faith effort to resolve or narrow the issues in the foregoing motion but was unable to do so. AF Holdings' counsel withdrew in 2013 without replacement, and mail sent to its last known address has been returned as undeliverable since 2013. I emailed attorneys Steele and Hansmeier but did not obtain consent to the motion.

/s/  Jason Sweet

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

_____

BKY No.  15-42460

In re:

Paul Hansmeier,

        Debtor.

_____

ADV No. 16-4031

Randall L. Seaver, Trustee,

        Plaintiff,

vs.

Padraigin Browne,

        Defendant.

_____

### NOTICE OF HEARING AND AMENDED MOTION
### FOR PREJUDGMENT ATTACHMENT
_____

To:    Padraigin Browne and her attorney David Burns; 301 4th Ave. S., Suite 270,
Minneapolis, MN 55415.

       1.    Plaintiff, Randall L. Seaver, Trustee ("Trustee") for the Bankruptcy Estate of

Paul Hansmeier ("Estate"), by his attorneys, moves the Court for a prejudgment attachment

and gives notice of hearing.

       2.    A hearing on this amended motion will be held at <u>9:30 a.m.</u> on <u>May 25, 2016</u>

in Courtroom 8W, U.S. Bankruptcy Court, 300 South Fourth Street, Minneapolis, MN

55415, to determine whether or not the Plaintiff is entitled to prejudgment attachment.

1

3.     Pursuant to Minnesota Statute § 570.026 Subd. 2, the movant is required to notify Defendant that the hearing is "to determine whether the sheriff shall seize nonexempt property belonging to you [Defendant] to secure a judgment that may be entered against you[Defendant].   The Plaintiff is currently in possession of the nonexempt funds and therefore the statutory language is partially moot.

4.     You may attend the court hearing alone or with an attorney.  After you have presented your side of the matter, the court will decide what should be done with your property until the lawsuit which has been commenced against you is finally decided.

5.     Any response to this motion must be filed and served by delivery not later than May 20, 2016 which is five days before the time set for the hearing (including Saturdays, Sundays and holidays).  UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.

6.     Minnesota Statute § 570.026 also requires Plaintiff to provide the following notices to Defendant:

>   If the court directs the sheriff to seize and secure the property while the lawsuit is pending, you may still keep the property until the lawsuit is decided if you file a bond in an amount set by the court.

>   IF YOU DO NOT ATTEND THIS HEARING, THE COURT MAY ORDER YOUR NONEXEMPT PROPERTY TO BE SEIZED.

7.     The petition commencing the Chapter 13 case was filed on July 13, 2015.  The case was converted to one under Chapter 7 on December 3, 2015.  The case is now pending in this court.

8. This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§157 and 1334, Bankruptcy Rule 5005, 7065, 7005 and Local Rule 7005-3. This motion arises under Minn. Stat. § 570.02, applicable in accordance with F. Bank. R. 7064 and F.R.Civ.P. 64.

9. Plaintiff files this amended motion seeking an order of prejudgment attachment in the Defendant's property to secure the satisfaction of a judgment sought by Plaintiff in his Amended Complaint.

10. On March 17, 2016, the Plaintiff commenced adversary proceeding no. 16-4031 by the filing of a complaint, seeking judgment in the amount of at least $245,000 against the Defendant Padraigin Browne. The Plaintiff filed an amended complaint on May 11, 2016("Amended Complaint").

11. As set forth in the Amended Complaint, and Plaintiff's affidavit filed with the April 13, 2016 motion for prejudgment attachment, served on Defendant, the Plaintiff believes that:

   a. Defendant has secreted and disposed of non-exempt assets with the intent to hinder, delay and defraud creditors.

   b. Defendant withdrew funds from her financial institution and converted them to cash in order to prevent creditors from learning of or gaining access to the assets.

   c. Defendant has provided false testimony to this court in her October 2015 Rule 2004 Examination in order to avoid disclosing the truth regarding her and the debtor's finances and transfers.

   d. The Defendant conspired with the debtor to mislead this court and to mislead and defraud the bankruptcy estate and trustees by falsely representing the amount of cash in possession of the debtor and the Defendant as of the date of filing.

3

12.     Pursuant to this Court's order of December 3, 2015, the Plaintiff is currently holding funds from the sale of real property owned by Paul Hansmeier and Padraigin Browne ("Sale Proceeds").  Padraigin Browne has an interest in some of the Sale Proceeds.

13.     Plaintiff requests that the court grant Plaintiff an order of attachment in the non-exempt portion of the Defendant's interest in the Sales Proceeds, as set forth in the Amended Complaint.  The Plaintiff believes the Defendant's non-exempt portion of the Sales Proceeds totals in excess of $65,000, but no more than the judgment amount sought in Adversary Proceeding No. 16-4031.

14.     As set forth herein, as well as the previously served and filed affidavit of Randall L. Seaver, and the Amended Complaint filed in Adv. No. 16-4031, grounds exist under Minn. Stat. 570.02 for entry of an order of attachment in the funds currently in the possession of the Plaintiff.


Wherefore, the Plaintiff requests that the Court issue its order as follows:

1.      Granting the Plaintiff's amended motion for prejudgment attachment.

2.      Holding that the Defendant's non-exempt interest in the proceeds from the sale of real property, currently in the possession of the Plaintiff, are hereby attached as security for the satisfaction of the judgment sought by Plaintiff in Adversary No. 16-4031.

3.      For such other and further relief as the court deems just and equitable.

**FULLER, SEAVER
SWANSON & KELSCH, P.A.**

Dated: May <u>11</u>, 2016                              By:  /e/ Matthew D. Swanson _____

Matthew D. Swanson          390271
Randall L. Seaver              152882
12400 Portland Avenue South, Suite 132
Burnsville, MN 55337
(952) 890-0888; (952) 890-0244 (fax)
mswanson@fssklaw.com

Attorneys for Plaintiff


<u>**VERIFICATION**</u>

I, Randall L. Seaver, the Plaintiff in Adv. No. 16-4031, and Chapter 7 Trustee in the underlying bankruptcy case, states under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on May <u>11</u>, 2016                          /e/ Randall L. Seaver _____

Randall L. Seaver, Trustee

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

Bky No. 15-42460

In re:                                                          Chapter 7 Case

Paul Hansmeier,

        Debtor.

ADV No. 16-4031

Randall L. Seaver, Trustee,

        Plaintiff,

vs.

Padraigin Browne,

        Defendant.

---

### Memorandum in Support of Plaintiff's Amended Motion for Prejudgment Attachment

---

### INTRODUCTION

The Plaintiff's amended motion seeks entry of an order for prejudgment attachment, securing the Plaintiff's claim with funds currently in the possession of the Plaintiff. Pursuant to this court's December 3, 2015 Order, the Plaintiff is in possession of the net sale proceeds from the sale of the Defendant's homestead. Plaintiff commenced adversary case no. 16-4031 to determine the appropriate allocation of the net sales proceeds. A portion of the net sales proceeds are non-exempt property of the Defendant and are subject to attachment.

### FACTUAL BACKGROUND

In December 2010, Paul Hansmeier ("Debtor" or "Hansmeier") caused the limited liability company Monyet, LLC to be organized in the state of Deleware (hereinafter "Monyet"). According to Article 8 of the operating agreement for Monyet, the Debtor is the sole manager of

Monyet.   According to the purported operating agreement of Monyet, the sole member of Monyet is The Mill Trust.  However, communication from the Internal Revenue Service appears to state that the sole member is Lee S. McCullough, III.  Seaver Aff. Ex. 16.

Also in December 2010, Hansmeier caused the creation of the The Mill Trust. The trust agreement for The Mill Trust provides the following:

   a. The named beneficiaries of The Mill Trust are Hansmeier's parents, siblings, future spouse and any future descendants;

   b. The Mill Trust is an irrevocable trust;

   c. the trustee, Browne, had the sole discretion, subject to Hansmeier's right to veto, to distribute the assets of The Mill Trust for the benefit of the beneficiaries; and

   d. the Trust Agreement is executed by Hansmeier as "grantor" and Browne as "trustee" on December 28, 2010.

See Swanson Aff. Ex. 4 at 1[1].  A copy of the trust agreement for The Mill Trust is attached to the Swanson Affidavit as Ex. 4.

Despite Hansmeier's representations to this Court at Schedule B, Monyet is not a "self settled trust".  Seaver Aff. Ex. 1 at 1.  Monyet is simply a limited liability company through whose accounts Hansmeier funneled hundreds of thousands of dollars.  See Seaver Ex. 15 and Ex. 11.

Information regarding the identity of the member of Monyet, LLC is contradictory. Communication from the Internal Revenue Service indicates that the sole member is Lee S. McCullough, III.  Seaver Aff. Ex. 16.  The purported operating agreement of Monyet, LLC states that it is The Mill Trust.  That purported operating agreement appears to have been altered by deletions in many places.  Swanson Aff. Ex. 6.  And the Debtor claims to be the owner on his Schedule B.  Seaver Aff. Ex. 1 at 1.

---

[1] "Swanson Aff." refers to the Affidavit of Matthew D. Swanson filed with the Plaintiff's April 13, 2016 motion for prejudgment attachment and served on Defendant.

Hansmeier Transfers Money to Monyet, LLC

As will be seen, Hansmeier did not transfer money to The Mill Trust. Rather, he transferred hundreds of thousands of dollars into an account held in the name of Monyet, LLC.

In December of 2010 the Debtor completed an application to open a checking account at TCF Bank in the name of Monyet, LLC. The Debtor is the only authorized signer listed on the application, which allowed the Debtor to maintain compete control over the funds in that account. Seaver Aff. Ex. 14 at 1[2]. The Debtor began transferring his personal funds into the Monyet TCF bank account through 2012.

Also in December of 2010, the Debtor completed a brokerage account application to open a new brokerage account at Scottrade in the name of Monyet, LLC("Monyet Scottrade Account"). Once again, the Debtor was the sole signatory on the Monyet Scottrade Account, and he signed a personal guarantee for the account. Swanson Aff. Ex. 1 at 1, 3-4. In June 2012, the Debtor transferred over $500,000 from the Monyet account at TCF, emptying the account, to the Monyet Scottrade Account by way of check issued and endorsed by Hansmeier. Seaver Aff. Ex. 15.

In total, Hansmeier transferred over $600,000 into the Monyet Scottrade Account. The funds were never transferred to The Mill Trust. Rather, they were in accounts in the name of Monyet, LLC, and the funds were always under the sole control of Hansmeier.

During 2012, almost all of the activity in the Monyet Scottrade Account, consisted of Hansmeier engaging in stock trades. At the same time that he was actively trading stocks in the Monyet Scottrade Account, over which he had sole and unfettered control, Hansmeier was running into substantial financial difficulties as a result of his law practice. A timeline setting

---

[2] "Seaver Aff." refers to the Affidavit of Randall L. Seaver filed with the Plaintiff's April 13, 2016 motion for prejudgment attachment and served on Defendant.

3

forth sanctions and judgments sought and ordered against Hansmeier during that time period is

attached to the Swanson Aff. as Ex. 2.

In May of 2013, Hansmeier began the liquidation of the Monyet Scottrade Account with

all payments being made for his personal benefit.  His personal use of those funds included the

following:

- A May 15, 2013, transfer of $51,333.50 to account held by SureTec Insurance Company for the purpose of posting an appellate bond in 12-cv-8333 (*Ingenuity 13, LLC v. John Doe*) ("Ingenuity Bond").
- A June 27, 2013, transfer of $10,000 to an account held by Livewire Holdings, LLC, to repay funds;
- A June 28, 2013, transfer of $10,000 to an account held by Livewire Holdings, LLC, to repay funds.
- A July 15, 2013, transfer of $69,000 to an account held by SureTec Insurance Company for the Ingenuity Bond.
- A July 19, 2013, transfer of $10,000 to an account held by SureTec Insurance Company for the Ingenuity Bond.
- A July 26, 2013, transfer of $25,000 to an account held by Class Justice, PLLC, a law firm in which Hansmeier is the sole shareholder.  He had to start a new law firm because of sanctions against Alpha.  Debtor stated the reason for request was "Capitalize Law Firm".
- A July 30, 2013, transfer of $5,000 to Padraigin Browne.
- An August 7, 2013, transfer of $2,575 to Deutsche Bank to cover ADP payroll expenses.
- An August 27, 2013, transfer of $30,000 to Padraigin Browne.
- A September 25, 2013, transfer of $10,000 to Voelker Litigation Group for personal legal services (Voelker Litigation Group represented Hansmeier, Steele, and Duffy in the appeal to the Ninth Circuit Court of Appeals in *Ingenuity 13, LLC v. John Doe.*).
- An October 1, 2013, transfer of $25,000 to Class Justice, PLLC, Hansmeier's solely owned law firm.
- A November 19, 2013, transfer of $10,000 to Voelker Litigation Group, for personal legal services.
- A November 19, 2013, transfer of $20,000 to Class Justice, PLLC, Hansmeier's solely owned law firm.
- A November 22, 2013, transfer of $175,000 to Padraigin Browne.
- A December 9, 2013, transfer of $21,250 to Robert P. Balzebre.  Although Hansmeier's testimony is contradictory, those payments appear to be a payment on debt owed by Hansmeier's colleague, John Steele, to Robert P. Balzebre.
- A January 17, 2014, transfer of $20,000 to Class Justice, PLLC, Hansmeier's solely owned law firm.
- A February 7, 2014, transfer of $70,000 to Padraigin Browne.
- A March 19, 2014, transfer of $25,000 to Class Justice, PLLC, Hansmeier's solely owned law firm.

4

- A March 19, 2014, transfer of $3,750 to Voelker Litigation Group for personal attorney fees.
- A May 5, 2014, transfer of $39,231.25 to Chisholm Properties South Beach. Although Hansmeier's testimony is contradictory, those payments appear to be a payment on debt owed not by Hansmeier, but by Hansmeier's colleague, John Steele, to Robert P. Balzebre. Seaver Aff. Ex. 12 at 45-47.

See Seaver Aff. Ex. 11. The two transfers which are the focus of the Trustee's complaint are

transfers Hansmeier made to a TCF bank account held solely in the name of his spouse,

Padraigin Browne as follows:

a.    On November 22, 2013, Hansmeier transferred $175,000 to an account at TCF Bank held solely in Browne's name.

b.    On February 7, 2014, Hansmeier transferred $70,000 to an account at TCF Bank held solely in Browne's name.

Id.

As a part of the trustee's investigation, he obtained Rule 2004 authorization for both

Associated Bank and TCF Bank, and served subpoenas and supplemental subpoenas upon those

entities. After obtaining information from those banks and others, he conducted the February 18,

2016 Rule 2004 examination of Padraigin Browne. A copy of Browne's February 18, 2016 Rule

2004 examination, together with redacted copies of Exhibits 6 – 13 thereto are attached to Seaver

Aff., Ex. 6. As a result of his investigation, the trustee learned the following:

a.    With respect to the $175,000 transfer to her TCF account, Padraigin Browne had withdrawn $150,000 in cash, consisting of 1,500 $100 bills on December 13, 2013. That cash was then hidden in a box in a closet in the condominium shared by the debtor and the defendant.

b.    With respect to the $70,000 transfer to her TCF account, Browne engaged in a series of $2,000 cash withdrawals of the $70,000 transfer, resulting in an additional approximate amount of $30,000 in cash being withdrawn. That cash was also placed with the $150,000 previously withdrawn, resulting in approximately $180,000 in cash being held in a box concealed in the condominium shared by the debtor and the defendant, in early 2014.

As a part of the trustee's investigation, he also analyzed the cash deposits made into

Browne's Associated Bank account after the $180,000 in cash was concealed in the residence of the debtor and Browne. According to Schedule B and the debtor's January 21, 2016 §341 testimony, it appeared that there remained $8,554 of that cash on the day of filing. Seaver Aff. Ex. 1 at 1, and Ex. 12 at 6-7. However, his analysis of cash deposited back into Browne's account indicated a discrepancy between cash withdrawn and cash deposited, in an amount in excess of $60,000. Seaver Aff. at ¶ 8.

Confronted with this evidence, the Defendant at her Rule 2004 examination testified that she and the debtor had paid a large amount of cash to John Steele. She estimated that she believed it was $60,000. Seaver Aff. at ¶ 9, Ex. 6 at 60-62. The trustee has been told that there is no written receipt for this supposed $60,000 cash payment to John Steele.

As a part of the trustee's investigation, including the reconciliation of cash deposits, it became clear to him that Browne had deposited cash, derived from the cash withdrawals, into her account after commencement of the bankruptcy case that exceeded the stated remaining cash of $8,554. When confronted with this evidence, Browne admitted as follows:

> Q: So you had to have at least 20,900 in cash in your possession on July 13 of 2015?
>
> A: Yes, and I'm saying when we filed, I had spent that money, the 15,000 already, approximately, on various things and was paying – so I said that not there because I need to pay off my credit card, we just haven't paid it off yet, so we're going to say that that's not there, and then the 5,000 is part of the 8,000 that we were still saying was part of the trust.
>
> Q: So you and Mr. Hansmeier sat down and counted out how much was left in there, correct?
>
> A: Yes.
>
> Q: Okay.
>
> A: Pretty close, I mean, there was probably some ones and stuff lying around.
>
> Q: And what did you come up with for a total?

6

A:  I don't remember exactly how much it was.

Q:  Okay.  And then you and he talked and decided rather than stating how much cash was actually there, you would deduct for cash that was – for things that you were going to pay in the future?

A:  For things that had already been purchased on my credit cards that needed to be paid off.  They had already – I had already, bought them, we had the things.

Seaver Aff. Ex. 6 at 66 to 67.

As a result of the trustee's investigation, he also discovered that, after commencement of this bankruptcy case, the defendant had deposited into an account held solely in her name, proceeds from the sale of Minnesota Viking's tickets held in the name of the debtor's deceased grandfather and, according to the debtor in his statement of financial affairs, paid for by the debtor's law firm.  The deposits were in the following amounts:

| | |
|---|---|
| September 15, 2015 | $350.20 |
| September 23, 2015 | $168.30 |
| September 29, 2015 | $360.40 |
| October 9, 2015 | $314.50 |
| October 16, 2015 | $299.20 |
| November 11, 2015 | $336.60 |

Seaver Aff. at ¶ 11.

As a part of the trustee's investigation, he also discovered that although not listed in the debtor's Schedule B, the debtor and the defendant received a 2014 property tax refund of $2,120 in August, 2015.  That was also deposited into an account held solely in the name of the defendant.  Seaver Aff. at ¶ 12.

As a part of the trustee's investigation, he also discovered that on July 9, 2015, $20,000 of the cash still concealed in the home was deposited by the defendant into her Associated Bank account ending in #1853.   Immediately after that $20,000 cash was deposited into the account, Browne wrote a check to Barbara May in the amount $15,305 as payment to Barbara May for the debtor's Chapter 13 bankruptcy.  A copy of the check is attached to Seaver Aff., Ex. 7.  The

7

debtor's statement of financial affairs and the statement of compensation filed by Barbara May and verified by the debtor, both indicate that the payment to Ms. May was from the debtor. Copies of the relevant page of the statement of financial affairs and the statement of attorney are attached to Seaver Aff. Ex. 8. After the $20,000 cash deposit and the payment to Ms. May, there was a remaining balance in the Associated Bank account held in Browne's name of $7,709.64. A redacted copy of that statement is attached to Seaver Aff. Ex. 9.

At item 19d of the statement of financial affairs, the debtor indicated that no financial statement had been issued by the debtor in the two years immediately preceding the commencement of the case. During the course of his investigation, the trustee learned that the U.S. District Court in the *Lightspeed*[3] case, docket entry 123, on February 13, 2014, had ordered the debtor to produce an asset statement to the Court. The trustee then demanded that the debtor provide a copy of the financial statement. A copy of that statement of financial condition is attached to Seaver Affidavit as Exhibit 10. The financial statement evidences two relevant facts 1) Hansmeier was pleading insolvency to a Federal Court in December of 2013; and 2) Hansmeier admits that the portion of the bond that he posted in the Ingenuity 13, LLC case is his personal property. The statement provided by Hansmeier to the U.S. District Court as a representation of his financial situation on December 1, 2013, indicates that his liabilities exceed his assets by over $338,000.[4]

Hansmeier, himself, has admitted to this Court, and at least one other Court, that certain supposed Monyet, LLC assets are his personal property. Hansmeier has represented to this Bankruptcy Court in his schedules, the following:

1. He owns a ½ interest in the supercedeas bond posted with appellate court in the *Ingenuity 13, LLC v. John Doe* case, which one half interest has a value of $118,791. This bond was posted by Hansmeier using funds he transferred from the Monyet

---

[3] *Lightspeed Media Corp. v. Anthony Smith, et al.,* Case 12:-cv-00889, U.S. District Court for Southern District of Illinois.

[4] It appears that Hansmeier intentionally concealed from the U.S. District Court, his ownership interest in Class Justice, LLC. He had capitalized, or loaned money to that entity in the amount of at least $70,000.00, by December 1, 2013, all of which he had transferred to that entity from the Monyet, LLC Scottrade account.

Scottrade Account and he has thereby admitted that those funds are bankruptcy estate property.  Schedule B, item 2.

2. "Self settled trust monyet" $8,554.  He has admitted to joint ownership of this asset.  In truth, this asset consists of a supposed total of $8,554 in cash hidden in the debtor's condominium on the day of filing.  In truth, the amount of cash hidden in the debtor's condominium on the day of filing, exceeded $20,000.

3. Barbara May Email regarding $60,000 bond. Hansmeier admitted at the second phase of his §341 meeting that an email from his attorney, Barbara May, was true.  The essence of that email was that $60,000 in cash apparently given to John Steele, which had been part of the cash hidden in Hansmeier's home, was property of Hansmeier.  Swanson Affidavit, Exhibit 3.  Hansmeier also admitted through his testimony, at least twice at the continued §341, that he made a $60,000 payment to Steele.  See pages 18 to 19, and 42 to 43 of his testimony.  Seaver Affidavit, Exhibit 13.

4. At item 9 of his Statement of Financial Affairs, Hansmeier confirmed that the payment of $15,000 in attorneys' fees to Barbara May was made with the debtor's funds.  He made the same admission at the Disclosure of Compensation of Attorney for Debtor.  The payment to Barbara May came from cash hidden in Hansmeier's home and deposited into an account held in the name of Browne on July 9, 2015.  See Seaver Aff. Ex. 6 at 50.

5. Admission to U.S. District Court.  Hansmeier was ordered to produce a financial statement to the U.S. District Court in the *Lightspeed* matter.  He produced a document reporting to set forth his financial condition as of December 1, 2013.  In that statement, provided to the U.S. District Court, he indicated an asset of his was a $125,000 security bond.[5] Seaver Aff. Ex. 10 at 2.

## ARGUMENT

Federal Rule of Civil Procedure 64, made applicable through Federal Rule of Bankruptcy Procedure 7064, governs "seizure of person or property" in federal court. This rule specifically provides that:

> At the commencement of and during the course of an action, all remedies providing for seizure of person or property for the purpose of securing satisfaction of a judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the law of the state in which the district court is held, existing at the time the remedy is sought . . . .

---

[5] In that financial statement, Hansmeier concealed from the U.S. District Court his ownership of Class Justice, LLC, which by December 1, 2013, had already received financing by wire transfers made by Hansmeier from the Monyet Scottrade Account, in an amount of $65,000.

Minnesota Statute § 570.01 is the prejudgment attachment statute which gives the bankruptcy court court authority to attach assets as security for satisfaction of a final judgment. *See* Minn. Stat. § 570.01.

Minnesota Statute § 570.026 provides for an attachment order following a hearing, where movant files a motion, filed with an affidavit, setting forth in detail:

1. the basis and amount of the claim in the civil action; and
2. the facts which constitute one or more of the grounds for attachment as specified in section 570.02.

The Affidavit of Randall L. Seaver, filed herewith, sets forth the basis and amount of the claim in the civil action. In conjunction with the facts set forth in the Plaintiff's affidavit, and this memorandum, grounds exist warranting an attachment order pursuant to Minn. Stat. § 570.02.

## I.       Attachment is Justified and Appropriate

According to the facts set forth in the Plaintiff's affidavit, and as described herein, grounds exist in this matter and support entry of order for attachment as a result of the following grounds being met:

1. when the respondent has assigned, secreted, or disposed of, or is about to assign, secrete, or dispose of, any of the respondent's nonexempt property, with intent to delay or defraud the respondent's creditors; Minn. Stat. § 570.02 Subd. 1(1)

2. when the respondent has converted or is about to convert any of the respondent's nonexempt property into money or credits, for the purpose of placing the property beyond the reach of the respondent's creditors; Minn. Stat. § 570.02 Subd. 1(2)

3. when the respondent has committed an intentional fraud giving rise to the claim upon which the civil action is brought; Minn. Stat. § 570.02 Subd. 1(4)

Minn. Stat. § 570.02 Subd. 1.

The Defendant's actions, in concert with her husband, unequivocally establish that the Defendant has exhibited a pattern of deception and fraud in an attempt to evade the debtor's creditors and bankruptcy estate.

10

a. <u>Conversion and Concealment of Monies.</u>
   <u>Minn. Stat. § 570.02 Subd. 1(1) & (2)</u>

The Defendant and her spouse worked in concert to conceal and transfer funds out of the reach of creditors, including the conversions of funds in financial accounts to cash.  The Debtor transferred in excess of $245,000 to the Defendant in the midst of judgments and sanctions being entered against him.  Seaver Aff. Ex. 11.  Following those transfers to the Defendant's account, the Defendant converted over $180,000 of those funds to cash and hid those monies in a box in the debtor and Defendant's condominium.  When questioned at her February 18, 2016 Rule 2004 examination the Defendant admitted that in an attempt to keep the assets she converted the subject funds to cash in order to avoid creditors, or the court, from freezing the accounts. Seaver Aff. Ex. 6 at 22.

The Debtor and Defendant were both questioned, under oath, regarding the use of the funds transferred to Defendant, and both testified that the funds were used for ordinary living expenses.  Seaver Ex. 2 at pp. 43 and 46, and Ex. 3 at pp. 40 and 42.  Once the Plaintiff was able to obtain financial records for the Defendant's bank accounts the Plaintiff was able to discern that over $60,000 of the withdrawn cash was unaccounted for.  Once confronted with this truth the Defendant admitted, despite her prior testimony, that approximately $60,000 had been transferred to the Debtor's former law partner, John Steele.  Seaver Aff. Ex. 6 at 60.

The Defendant has also conspired with the Debtor to conceal from this court, the estate, trustees and creditors the true amount of funds held in cash on the filing date.  According to the Debtor's schedule B, he had an interest in $8,554 of cash relating to the Monyet, LLC as of the filing of his petition.  Seaver Aff. Ex. 1 at 1.  The truth is that the actual amount of cash relating to the Monyet, LLC exceeded $20,000, and the Debtor and Defendant sat down together, counted the money, and decided Debtor would only report a fraction of the funds to the Bankruptcy Court. Seaver Aff. Ex. 6 at 66-67.

11

The cash for which the Plaintiff seeks an attachment order is from the sale of the Debtor and Defendant's homestead. That property was listed for sale after the filing of the Debtor's bankruptcy petition. Debtor and Defendant did not notify the Chapter 13 trustee of their intention to sell the real property, and absent discovery efforts by a creditor, the Debtor and Defendant may have sold the real property and concealed the sales proceeds, which exceed their statutory exemption amount.

    b.   <u>Plaintiff's Claim is Based on Defendant's Intentional Fraud.
         Minn. Stat. § 570.02 Subdiv. 1(4)</u>

The Plaintiff's claim against Defendant arises under 11 U.S.C. § 548(a), seeking to avoid an intentionally fraudulent transfer. The Plaintiff seeks recovery of $245,000, which constitutes funds that the Debtor transferred to the Defendant in an effort to hinder, delay, and defraud creditors(the "Pre-Petition Transfers").

Defendant has admitted, under oath, that the funds which are at issue in Adv. No. 16-4031 relate to a transfer made with the intent to remove and conceal the property from the reach of creditors. Seaver Aff. Ex. 6 at 22. The Defendant then testified under oath, that the funds had been spent on ordinary living expenses, which she knew was a lie. Seaver Aff. Ex. 6 at 22. She also testified that the Debtor lied about the amount of cash remaining at the time of his bankruptcy filing. Seaver Aff. Ex. 6 at 66-68.

## II.    <u>The Plaintiff will Prevail on the Merits of his Claims Against Defendant</u>

Pursuant to Minn. Stat. § 570.026 Subd. 3, in addition to showing that grounds exist under § 570.02 for an attachment order, the Plaintiff must also demonstrate the probability of success on the merits. The two claims in front of the Court in Adv. No. 16-4031 are: 1) that the funds held in the Monyet Scottrade Account were at all times relevant hereto the property of the Debtor; and 2) that the debtor's transfers of those funds to Defendant are avoidable as fraudulent transfers pursuant to 11 U.S.C. § 548.

The Amended Complaint, as filed by the trustee on May 11, 2016, contains three alternative counts for the Court to find that the funds held in the Monyet Scottrade Account were funds of the Debtor. The facts asserted in the Amended Complaint strongly support a finding of substance over form, and holding that the funds in the Monyet Scottrade Account always were property of the Debtor.

Once it is established that the funds in the Monyet Scottrade Account were property of the Debtor, the remaining claim in the Amended Complaint seeks to avoid the transfer of $245,000 of the Debtor's property to his spouse, Browne. Once again, the Plaintiff has pled substantial facts supporting the actual fraud engaged by the Debtor and Defendant in and around the transfer of the subject funds, warranting the avoidance of the transfers to Defendant.

A. **Funds Held in Monyet Scottrade Account were Property of Paul Hansmeier**

1. **Applicable Law as to Monyet, LLC Claims**

The Plaintiff's claim for a reverse pierce of Monyet, LLC is a claim sounding under state law. Traditionally, the local law of the state of incorporation is applied except in the rare situations where a contrary result is required by the overriding interest of another state in having its rule applied. Rupp v. Thompson, No. C5-03-347, 2004 WL 3563775, at *3-4 (Minn. Dist. Ct. Mar. 17, 2004), *at comment (g).* The "extremely rare" situations are where the corporation has little contact with the state of incorporation, and the relevant local law rules of the other state embody an important policy of that state, and the matter involved does not affect the corporation's organic structure or internal administration. *Id.*, discussing *Restatement 2d of Conflict of Laws § 301.* This case presents one of the "extremely rare" situations. Monyet, LLC was organized under the laws of Deleware; however; the only nexus between Deleware and Monyet, LLC is the fact that it was organized in that state. All other nexuses relating to Monyet,

13

LLC relate to Minnesota. All parties relating to Monyet live in Minnesota, and all of the acts at issue in this matter occurred in Minnesota.

As described in the Amended Complaint, there has been no internal administration of Monyet as it is a sham entity formed for the sole purpose of placing the Debtor's funds outside of the reach of his creditors. The reality of Monyet is that it was formed to be the Debtor's piggybank, and it was used as such. The Court is not being asked to address an issue between members of a limited liability company in this action, which would require an analysis of Delaware law. However, the Court is being asked to evaluate and make findings regarding the actions of one of its citizens, which took place within the borders of Minnesota. The state laws of Minnesota should be employed to govern the activities of Minnesota residents within its borders.

## 2. The Monies in the Monyet Scottrade Account were always property of the Debtor.

The Plaintiff's first claim seeks a finding of fact from the Court that the funds held in the Monyet Scottrade Account were always property of the Debtor. This claim is akin to an claim under Minnesota law for a finding that the Monyet is the alter ego of the Debtor. As a result of the similarities of the requested relief, the Plaintiff utilizes a similar analysis in support of his claim. In a typical situation a creditor may seek to use an alter ego claim to assess liability against a related entity, similar to a piercing claim, however, as courts have noted, an alter ego claim is also appropriate to find that the Debtor and Monyet, LLC are in essence the same entity. *IUUA Local 600 v. Aguirre,* 410 F.3d 297, 302 (6th Cir.2005). This finding would not only establish direct liability, but it would also establish that the assets of Monyet, LLC belonged to the Debtor. *Fisher,* 296 Fed.Appx. at 506, 2008 WL 4569946, at *27–28. *See also United States v. Toler,* 666 F.Supp.2d 872, 886 (S.D.Ohio 2009).

The Plaintiff's claim does not seek to impose liability through an alter ego claim, but

14

under a similar analysis seeks a holding that the assets of Monyet are property of the debtor's bankruptcy estate pursuant to 11 U.S.C. § 541(a). The facts surrounding the Debtor's use of Monyet, and The Mill Trust, support the Court's use of its equitable powers to cut through the sham which is Monyet, and find that we are simply dealing with the Debtor's property. The Supreme Court has long held that the Bankruptcy Court has a duty to use its equitable powers to prevent the kind of scheme that we are presented with in this case:

> They have been invoked to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done.
>
> …
>
> But when there is added the existence of a 'planned and fraudulent scheme', as found by the District Court, the necessity of equitable relief against that fraud becomes insistent. No matter how technically legal each step in that scheme may have been, once its basic nature was uncovered it was the duty of the bankruptcy court in the exercise of its equity jurisdiction to undo it.

Pepper v. Litton, 308 U.S. 295, 304-05, 312 60 S. Ct. 238, 244, 84 L. Ed. 281 (1939).

In a related context, Minnesota courts have utilized the *Victoria Test*[6] to determine whether or not a legal form should be disregarded in favor of substance to impose liability. Similar considerations are helpful in establishing that Monyet is simply the Debtor, and the Court should disregard any distinction.

### a. There is little to no distinction between Hansmeier and Monyet

Under the first prong of the *Victoria Test* the Court should examine the relationship between Hansmeier and Monyet, LLC, observing the reality of how the entity operated, regardless of the form. The relevant factors to this determination include:

> [I]nsufficient capitalization for purposes of corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation at time of transaction in question, siphoning of funds by dominant shareholder, nonfunctioning of other officers and directors, absence of

---

[6] "*Victoria Test*" refers to the analysis set forth in *Victoria Elevator Co. v. Meriden Grain Co.,* 283 N.W.2d 509, 512 (Minn.1979)) when analyzing whether or not to pierce the corporate veil.

corporate records, and existence of corporation as merely facade for individual dealings.

*Victoria Elevator Co. v. Meriden Grain Co.,* 283 N.W.2d 509, 512 (Minn.1979)).  The facts set forth in the attached affidavit establish a number of the factors required by the *Victoria test*:

> i.     <u>Hansmeier observed no formalities in his dealings with The Mill Trust and Monyet, LLC</u>

The Mill Trust documents state that the trust was created for the benefit of Hansmeier's future spouse(Defendant), siblings, and parents.  Swanson Aff. Ex. 4, at 1.  Pursuant to the trust agreement for The Mill Trust, the Defendant is the sole trustee of The Mill Trust and has sole authority over the distribution of the trust's assets.  Id.  Hansmeier's only supposed right as to the distribution of trust assets is a right to veto proposed transfers.  Id. at 1-2.  Monyet, LLC is a limited liability company, with no apparent business function.  According to the operating agreement of Monyet, The Mill Trust is the sole member of Monyet.  It appears that the Defendant and Hansmeier consider the funds held in the Monyet Scottrade Account to be property of The Mill Trust.

In spite of the legal formalities put into place by Hansmeier, Hansmeier was the individual that caused the transfer of the "trust" monies at his own discretion and without limitation.  Seaver Aff. Ex. 11.  Hansmeier is not a named beneficiary of The Mill Trust.  However, except for the funds transferred to the Defendant, to conceal in their home, essentially all of the transfers of the "assets" of The Mill Trust are being directed by Hansmeier for the benefit of Hansmeier.

Hansmeier also transferred at least $90,000.00 from the Scottrade Monyet Account to his law firm Class Justice, PLLC.  Seaver Ex. 11.  These transfers were made without any written agreements or any evidence of authorization from the trustee of The Mill Trust.  At his January 21, 2016, section 341 meeting of creditors, the Debtor admitted that the transfers to his law firm were undocumented.

The Debtor ignored the supposed legal structures of The Mill Trust and Monyet, LLC. Monyet was used as just another bank account for Hansmeier's use while remaining out of his creditor's reach. Hansmeier never relinquished control of the funds supposedly transferred to the purported "trust", and the funds were never actually deposited into an account in the name of The Mill Trust. The funds were only deposited into accounts where Hansmeier had unfettered access, and could use them for his personal benefit, as he did.

ii. Defendant as the trustee of The Mill Trust legally had control over the use of the trust assets; however she was essentially a non-functioning figurehead to create the illusion of ownership and control

Defendant had no access to the monies while they were in the Monyet, LLC Scottrade account. The Debtor was the sole signatory on the Monyet Scottrade Account. Despite her position as the trustee of The Mill Trust, the entities were created in a way that provided Defendant no access to the trust assets. The Defendant and The Mill Trust were used to provide yet another layer of the façade to conceal assets from the Debtor's creditors. Once the Debtor's creditors had discovered the existence of Monyet, LLC, and purported trust, the Debtor lied to the attorney for the creditors, under oath, in an attempt to conceal the monies transferred by the Debtor from the Monyet Scottrade Account, including the transfers at issue in this adversary proceeding. Seaver Aff. Ex. 4 at 3 and Ex. 5 at 4-5. (Debtor testified he didn't know where the Monyet funds were and didn't think he had access to them).

iii. there is a complete absence of records as it relates to the purported loans and transfers made from Monyet, LLC

As described herein and evidenced in the attached Affidavit, Hansmeier made over a dozen transfers out of the Monyet Scottrade Account, including transfers to his law firm, to attorneys for personal legal expenses, posting appellate bonds, and making purported loans. There are no loan documents relating to these transfers, or written evidence that any of these transfers were authorized by the Defendant as the supposed trustee of The Mill Trust.

17

The two entities' records consist solely of their formation documents.   No operational documents or accounting records outside of bank statements appear to exist; nor does it appear any yearly accounting records are maintained.  When questioned, at her October 28, 2015 examination, regarding the maximum amount contained in the trust the Defendant testified as follows:

> Q:    What was the most the trust ever had?
>
> A:    I don't know.
>
> Q:    Who would know?
>
> A:    I don't know
>
> Q:    You don't know who would know about –
>
> A:    I don't know if anyone would know how much it had, what the maximum amount that was ever in it.
>
> Q:    Well, there would be some bank record of some sort, wouldn't there?
>
> A:    I don't know.
>
> Q:    You don't know?
>
> A:    That's correct.
>
> Q:    You're the trustee of this trust, right?
>
> A:    That is correct.

Seaver Aff. Ex. 3 at 40-41.  As trustee of The Mill Trust, the Defendant apparently did not keep a record of the assets in the trust.

      iv.    <u>Hansmeier used Monyet, LLC as a mere façade for his individual
dealings</u>

Finally, the evidence of the self-dealing transfers is consistent with Hansmeier's prior

conduct with his law firm's entity, Alpha Law Firm.  The Minnesota Appellate Court, agreeing

with the district court, recognized this behavior:

> The district court also found that Hansmeier was using Alpha as a façade to perpetrate
> fraud on the court, citing the fact that Hansmeier and Dugas misrepresented which of
> them was employed by Alpha and Hansmeier later attempted to convince the court that
> Prenda Law, not Alpha, was the law firm of record for Guava.

See *Guava, LLC v. Merkel*, 2015 WL 4877851, at 7 (Minn. App. Aug. 17, 2015)(citing district

court holding); See Swanson Aff. Ex. 7 at 17.  The Debtor maintains that the funds in the

Monyet Scottrade Account are held in trust, and not property of the Debtor or his bankruptcy

estate.  Seaver Aff. Ex. 13 at 23-24.  However, the Debtor on his own accord has used those

funds for his personal expenses, including loans to his new law firm, payments on account of a

former business partner's debt and posting appellate bonds to appeal personal sanctions awards.

See Seaver Aff. Ex. 11.  The Debtor never treated the purported "trust assets" as if they were

part of a trust, or as if he had relinquished control of the assets.

      The Debtor's clear disregard of an established "trust" is evidenced by his scheduling of 1)

an interest in the "Self Settled Trust Monyet"; and 2) an interest in an appellate bond in his

Schedule B. Seaver Aff. Ex. 1 at 1-2.  The Debtor's disclosure of the "Self Settled Trust

Monyet" is false, Monyet is clearly not a trust, and the Debtor was aware of this fact when filing

his bankruptcy petition and schedules.  The Debtor testified under oath, clarifying prior

testimony, that Monyet, LLC was not a trust, yet he failed to make that distinction when

competing his Bankruptcy Schedules.  Seaver Aff. Ex. 5 at 3.

      Hansmeier's verified Schedule B, filed with his Chapter 13 petition on July 13, 2015,

19

disclosed his one-half interest in a supercedeas bond which he valued at $118,791. Seaver Ex. 1 at 1. That supercedeas bond was posted in the *Ingenuity 13* case, and was funded by monies Hansmeier wired directly from the Monyet Scottrade Account. Seaver Aff. Ex. 11. The appellate bond is just one example of the multiple instances where Hansmeier was the clear beneficiary of self-directed transfers from the purported "trust", regardless of what the actual trust documents state.

Despite the Debtor's acknowledgment to this Court, through his Schedule B, of his interest in the Monyet funds, and the funds he transferred to secure a supercedeas bond, the Debtor has lied under oath in order to conceal these interests from his creditors. After Hansmeier had posted the appellate bond, using over $100,000 from the Monyet Scottrade Account, and before any decision had been returned from the appellate court, Hansmeier testified under oath on July 2, 2014, that he didn't know where the monies in Monyet, LLC were located, and that he didn't think he could "get any of it". Seaver Aff. Ex. 5 at 4-5. This testimony was clearly false, and intended to mislead his creditor.

On July 26, 2013, Paul Hansmeier authorized the transfer of $25,000 from the Monyet Scottrade Account to an account in the name of Class Justice, PLLC. Hansmeier described the reason for the transfer on the authorization form as "Capitalize Law Firm". Seaver Aff. Ex. 11. Monyet, LLC is not an owner of Class Justice, PLLC, nor is the Defendant. The transfer of $25,000 to "capitalize law firm" was a transfer by Paul Hansmeier, of his personal funds to capitalize his law firm. A limited liability company cannot capitalize a law firm. On August 7, 2013, Paul Hansmeier transferred $2,575 from the Monyet Scottrade Account to apparently cover payroll expenses for his law firm, Class Justice, PLLC. Seaver Aff. Ex. 11. The transfers made to Class Justice, LLC or on account of Class Justice, LLC evidence the Debtor's use of

20

Monyet, LLC for his personal dealings.

>    b.    It would be fundamentally unfair to allow the Debtor's use of the legal
>    form as a façade to hinder, delay and defraud creditors.

The second and final prong of the *Victoria Test* requires "the veil-piercer to show that
there was 'an element of injustice or fundamental unfairness' that would result from not piercing
the corporate veil." *Victoria Elevator,* 283 N.W.2d at 512. Injustice or unfairness is present if
the individual has used the legal entity's form to gain "an advantage he does not deserve." *Id.*
"Proof of strict common law fraud is not required, but ... evidence that the corporate entity has
been operated as a constructive fraud or in an unjust manner must be presented." *Equity Trust
Co. v. Cole,* 766 N.W.2d 334 at 340 (Minn. Ct. App. 2009)(quoting *Groves v. Dakota Printing
Servs., Inc.,* 371 N.W.2d 59, 62–63 (Minn.App.1985)).

The purpose of The Mill Trust and Monyet, LLC was to shield monies from creditors
while maintaining complete control over the funds.  This is evidenced by Hansmeier's unfettered
use of the monies.  The truth is that the trust was a paper fallacy created so Hansmeier could use
the funds at his sole discretion without interference from his creditors.

Hansmeier continued this fraud when questioned under oath by a creditor, wherein
Hansmeier testified that he didn't know where the money in Monyet, LLC was located, and
didn't think he could get any of it.  Seaver Aff. Ex. 5 at 4-5.  This testimony was provided amidst
Hansmeier's active use of the funds held in the Monyet, LLC Scottrade account.  Seaver Aff. Ex.
11.  The numerous undocumented transfers from the Monyet Scottrade Account are evidence
that the account was merely an instrument of the Debtor, used to frustrate efforts of his creditors
and the bankruptcy trustee.  The Debtor has used the legal entities of The Mill Trust and Monyet,
LLC in an improper and unjust manner.  The facts in this matter justify a finding that The Mill
Trust and Monyet, LLC are the alter egos of Paul Hansmeier, and satisfy the Trustee's burden on
this motion.

The *Victoria Test* sets forth similar grounds to what the Plaintiff seeks from the Court, the

21

Debtor should not be allowed to frustrate the Trustee's recovery through the formation of sham entities devised to keep creditors at bay. The facts in this matter clearly show that the Debtor were treating these funds as his own, and the Plaintiff asks the Court to align the law with the facts in order to prevent an injustice in allowing the Debtor to further harm his creditors.

<strong>2.    <u>The Mill Trust is not an Irrevocable Spendthrift Trust under Minnesota Law and therefore the Trust and its corpus are Property of the Bankruptcy Estate</u></strong>

To the extent the Mill Trust was a valid irrevocable trust and even if the monies in the Monyet Scottrade Account could somehow be argued to be the corpus of the trust, the Debtor's unfettered use of and control of the supposed "trust" assets requires that The Mill Trust be deemed a revocable self-settled trust, and property of the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 541(a).

a.   <u>The Mill Trust was not an Irrevocable Trust in Practice</u>

The Court must look at the substance of a transaction instead of the label placed on it. The Debtor has attempted to conceal funds in an "irrevocable trust". However, merely putting the work "irrevocable" on a piece of paper does not mean that a Court cannot look at the reality of the situation to determine whether or not an irrevocable trust was intended, or effectuated through practice. The facts in this case establish, without doubt, that Hansmeier did not intend the money that he alone controlled in the Monyet Scottrade Account to be out of his control and irrevocably contributed to a trust. Rather, he desired that creditors would not have access to it, all the while retaining all indicia of ownership and control over the monies. That is not an irrevocable trust. That is simply fraud.

One of the primary features of a true irrevocable trust is that it is "irrevocable." That is, property transferred to the trust by the settlor never again becomes property of the settlor, and the settlor no longer controls the property. A revocable trust, on the other hand, is a trust in which the grantor maintains control over the assets even after they are transferred to the trust. The

22

grantor can revoke a revocable trust at any time and regain complete ownership and control of those assets.

For a trust to be irrevocable, it is not enough that the title "irrevocable" is merely stamped on the trust. Rather, the Court must look to see if it was, in fact, operated as an irrevocable trust. Hansmeier never treated the monies in the Monyet accounts as being in an irrevocable trust. It was Hansmeier alone who exercised full and complete control over those funds. The purported trustee of the purported "irrevocable" trust was not a signatory to the account and had no ability to control the funds in that account. Indeed, as evidenced by her testimony, Browne didn't know what supposed assets were in this supposed trust, and did not know to what use they had been put. Hansmeier never treated the trust as an "irrevocable" trust. Rather, at best, he used it as a revocable trust, ultimately using the money that he had put into the Monyet Scottrade Account for his personal use, including capitalizing his new law firm.

### b. The Mill Trust is not a Spendthrift Trust under Minnesota Law

Bankruptcy courts have utilized a three-prong test based on the Minnesota Supreme Court's language in *Moulton* to determine whether a trust qualifies as a spendthrift trust under Minnesota law, and excluded from property of the estate pursuant to § 541(c)(2). A spendthrift trust is one in which: (1) the trust implicitly or explicitly prohibits the voluntary and involuntary alienation of the beneficiary's interest; (2) the beneficiary is not also the settlor of the trust; and (3) the beneficiary has no present dominion or control over the trust corpus. *In re Simmonds*, 240 B.R. 897, 899 (B.A.P. 8th Cir. 1999); citing *In re Taylor,* 119 B.R. 170, 177 (Bankr.N.D.Iowa 1990); *In re Fritsvold,* 115 B.R. 192, 195 (Bankr.D.Minn.1990); *In re Hansen,* 84 B.R. 598, 601 (Bankr.D.Minn.1987); *In re Loe,* 83 B.R. 641, 645 (Bankr.D.Minn.1988).

On paper, The Mill Trust appears to satisfy the requirements of a spendthrift trust under Minnesota law. However, as is the case with Monyet, LLC, the legal foundation for The Mill Trust has no bearing on how the Debtor interacted and treated the trust. As set forth in the facts pled in the Plaintiff's Amended Complaint, the Debtor was the settlor of the Mill Trust, as stated

in the trust documents. In addition to being the settlor, he was effectively the beneficiary of The Mill Trust through his use of the trust funds. After review of the transfers from the Monyet Scottrade Account, United States District Court Judge Herndon held that the bulk of the transfers were used on Hansmeier related expenditures:

> ... However, documents from Scottrade, Inc. reveal that Monyet, LLC was not solely associated with estate planning, as the bulk of its assets went towards expenses such as payment of appellate bonds and attorney's fees, investments in Livewire Holdings, LLC, and loans to his Class Justice LLC law firm (Doc. 190-3). Said expenditures occurred throughout the 2013 year and up to May 2014, demonstrating that Hansmeier had access to the Monyet funds both before and after he pled insolvency to the court.

See Judge Herndon's June 5, 2015 order, p. 17, U.S. District Court, Southern Dist. Illinois, case 3:12-cv-00889. As held by Judge Herndon, the Debtor was in essence the beneficiary of the The Mill Trust.

Hansmeier's verified Schedule B, filed with his Chapter 13 petition on July 13, 2015, disclosed his one-half interest in a supercedeas bond which he valued at $118,791. Seaver Ex. 1 at 1. That supercedeas bond was posted in the *Ingenuity 13* case, and was funded by monies Hansmeier wired directly from the Monyet Scottrade Account. Seaver Aff. Ex. 11. The appellate bond is just one example of the multiple instances where Hansmeier was the clear beneficiary of self-directed transfers from the purported "trust", regardless of what the actual trust documents state.

As the actual beneficiary of the The Mill Trust the Debtor is precluded from exercising dominion or control over the trust. *Simmonds*, 240 B.R. at 899. The Debtor was the only party with the ability to exercise control over the assets in the Monyet Scottrade Account as he was the sole signatory on that account. Not only did the Debtor have the ability to exercise control and dominion over the funds in the Monyet Scottrade Account, he did in fact exercise control, and used them as deemed appropriate.

The facts set forth in the Plaintiff's Amended Complaint establish that the Debtor cannot

satisfy 2 of the 3 factors to establish a spendthrift trust under Minnesota law, therefore, the alleged trust and its corpus are not excluded from the bankruptcy estate under 11 U.S.C.§ 541(c)(2).

### 3.     The Plaintiff is Entitled to a Reverse Pierce of Monyet, LLC

Under Minnesota law a Court through the reverse piercing of an entity can hold that the assets of an entity are property of a bankruptcy estate.  Reverse Piercing is somewhat unique to Minnesota, but has been used to allow Debtors to reverse pierce a corporation in order to allow them to claim an exemption in real property. *See* Gregory S. Crespi, *The Reverse Pierce Doctrine: Applying Appropriate Standards,* 16 J. Corp. L. 33 (1990); *Cargill, Inc. v. Hedge,* 375 N.W.2d 477 (Minn.1985).  Minnesota courts have examined the following factors to determine if a reverse pierce is appropriate: (1) the degree of identity between the individual and his or her corporation; (2) the extent to which the corporation is an alter ego; and (3) whether others, such as a creditor or other shareholder, would be harmed by piercing the corporate veil. *Cargill*, 375 N.W.2d at 479.

There is a substantial identity between Monyet, LLC and the Debtor and Monyet, LLC is in essence the alter ego of the Debtor.  Many of the facts supporting the first two factors analyzed for a reverse pierce are similar to the argument set forth in support of Plaintiff's claim requesting Declaratory Relief, described above.  Monyet has effectively served as the Debtor's bank account, and has no independent identity from the Debtor.  The Debtor was the manager of Monyet and had sole control over the assets of Monyet.  The Debtor created Monyet and funded Monyet with his personal monies.  Monyet, LLC conducted no legitimate business.  As argued above, the Debtor was in essence the primary beneficiary and thereby interest holder in Monyet, LLC and The Mill Trust.

In assessing whether or not Monyet was the alter ego of the Debtor, many of the arguments and facts set forth in support of the Plaintiff claim for declaratory judgment, discussing *Victoria Elevator*, are directly applicable to this claim.  Disregarding the corporate

25

entity theory is equitable in nature, and generally is not available, absent fraud." *In re Hecker*, 414 B.R. 499, 503 (Bankr. D. Minn. 2009); citing *G.G.C. Co. v. First Nat'l Bank of St. Paul,* 287 N.W.2d 378, 384 (Minn.1979). <mark>"Alter ego means 'other self'—where one person or entity acts like, or, for another to the extent that they may be considered identical."</mark> *United States v. Scherping*, 187 F.3d 796, 801 (8th Cir. 1999); quoting *Loving Saviour Church v. United States,* 556 F.Supp. 688, 691 (D.S.D.1983), *aff'd,* 728 F.2d 1085 (8th Cir.1984). <mark>When an entity is without economic substance, it may be deemed to be the "alter ego" of the taxpayer. *Id.* at 801.</mark>

As set forth above, in detail, analyzing the factors of the *Victoria Test*, the Plaintiff has established through citations to the record that: 1) Hansmeier observed no formalities in his dealings with The Mill Trust and Monyet, LLC; 2) Defendant as the trustee of The Mill Trust legally had control over the use of the trust assets; however she was essentially a non-functioning figurehead to create the illusion of ownership and control; 3) there is a complete absence of records as it relates to the purported loans and transfers made from Monyet, LLC; and 4) Hansmeier used Monyet, LLC as a mere façade for his individual dealings.

Monyet appears to have had no purpose outside of housing funds of the Debtor. Furthermore, the Debtor, through verified schedules, has confirmed that assets derived from the Monyet Scottrade Account are his personal property. The Debtor used funds from the Monyet Scottrade Account to post an appellate bond, an undocumented transfer, and now the funds are claimed as property of the estate, with no corresponding obligation to Monyet.

<mark>The Plaintiff asks the Court to recognize the substance of these transactions in light of the form created by the Debtor to conceal his assets, and to find that Monyet is in fact the Debtor.</mark>

The final factor analyzed to determine the necessity of reverse piercing is "whether others, such as a creditor or other shareholder, would be harmed by piercing the corporate veil." *Cargill*, 375 N.W.2d at 479. The Plaintiff is unaware of any legitimate creditor or shareholder that would be harmed by the reverse pierce of Monyet, LLC. The Plaintiff is unaware of any

direct creditors of Monyet, LLC.

As in *Cargill*, courts have held that special circumstances demand the use of reverse piercing, such as the strong policy reasons in furtherance of the homestead exemption. *Id.* The Court in this matter is faced with the integrity of the bankruptcy code. Denying the reverse piercing of the veil as to Monyet would in effect allow the Debtor to out-scheme his creditors, the Trustee, and the bankruptcy court. The Plaintiff is entitled to a reverse pierce of Monyet, LLC to establish the assets of Monyet are property of the bankruptcy estate and always have been.

**B.      The Transfers to Defendant are Avoidable as Actually Fraudulent Transfers**

The Plaintiff's second claim is an action to avoid two pre-petition transfers totaling $245,000(the "Pre-Petition Transfers"). The Pre-Petition Transfers are transfers from the Monyet Scottrade Account to the Defendant's personal TCF Account, and then liquidated to cash by the Defendant. Section 548 of the Bankruptcy Code provides, in relevant part:

> (a)(1) The trustee may avoid any transfer ... of an interest of the debtor in property, or any obligation … incurred by the debtor, that was made or incurred on or within two years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted;

*See* 11 U.S.C. § 548(a)(1)(A). There is no factual dispute that Hansmeier transferred $245,000 from the Monyet Scottrade Account to the Defendant's personal TCF Bank account, and that the Defendant then liquidated those monies to cash. Hansmeier exhibited all indicia of ownership when the funds were transferred. The remaining question under 11 U.S.C. § 548(a)(1)(A) is whether or not the transfers were made with actual intent to "hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted."

The Eighth Circuit has recognized that since direct evidence of such intent is rarely

27

forthcoming, court may make inferences on the issue "from the circumstances surrounding the transfer." *See In re Northgate Computer Systems, Inc.,* 240 B.R. 328, 360 (Bankr.D.Minn.1999), citing *In re Sherman,* 67 F.3d 1348, 1353 (8th Cir.1995). "The courts recognize that certain sorts of events, conditions, or characteristics frequently accompany the execution of a scheme to defraud third-party creditors." *Northgate,* 240 B.R. at 360. "The presence of several or more of these 'badges of fraud' gives rise to a presumption of fraudulent intent." *Northgate,* 240 B.R. at 360, citing *Kelly v. Armstrong,* 141 F.3d 799, 802 (8th Cir.1998); *In re Bateman,* 646 F.2d 1220, 1223 (8th Cir.1981); *In re Sherman,* 67 F.3d at 1353–1354.  In determining intent the court examines the non-exclusive badges of fraud set forth in Minn. Stat. § 513.44(b):

1. the transfer or obligation was to an insider;
2. the debtor retained possession or control of the property transferred after the transfer;
3. the transfer or obligation was disclosed or concealed;
4. before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
5. the transfer was of substantially all the debtor's assets;
6. the debtor absconded;
7. the debtor removed or concealed assets;
8. the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
9. the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
10. the transfer occurred shortly before or shortly after a substantial debt was incurred; and
11. the debtor transferred the essential assets of the business to a lienor was transferred the assets to an insider of the debtor.

*See* Minn. Stat. § 513.44(b); *Northgate,* 240 B.R. at 361, n. 45, citing *In re Sherman,* 67 F.3d at 1353; *Kelly,* 141 F.3d at 802.

The Defendant has admitted the fraudulent intent behind the transfers from the Monyet Scottrade Account, to her account, and the subsequent liquidation to cash.  In response to the Plaintiff's questioning as to why she converted $150,000 of the funds transferred to her from her husband to cash, Defendant testified :

Because we were – I wanted to make sure that we were still able to make our payments on our everyday living expenses. We had recently had a judgment entered against Paul without him being served at all or being aware of it and I was concerned that, because the attorneys that were representing people against him were getting things without letting us know, that they would freeze my account without ever letting us know and we wouldn't be able to pay for things.

Seaver Aff. Ex. 6 at 22. This is direct evidence of the fraudulent intent required by § 548(a)(1)(A).

In addition to the direct evidence of intent provided by Defendant's testimony, the facts in this case also satisfy a majority of the badges of fraud. The presence of several badges of fraud gives rise to a presumption of fraudulent intent. *Kelly,* 141 F.3d at 802. Here the Debtor's actions satisfy 9 of the 11 badges. Based on the facts presented in the attached affidavit, and discussed herein, the following badges have been satisfied evidencing the Debtor's fraudulent intent:

   i.  <u>The transfer or obligation was to an insider</u>

The transfers at issue were transfers to the Debtor's spouse, who is a statutory insider pursuant to 11 U.S.C. § 101(31)(A)(i).

   ii.  <u>The Debtor retained possession or control of the property transferred after the transfer</u>

The transferred funds were initially placed in Browne's personal bank account, but were then reduced to cash and placed in a closet in the Debtor's home. Seaver Aff. Ex. 6 at 23-24. Defendant has testified that the Debtor had access to those funds. Id. at 24. The Debtor also testified at his 2nd 341 Meeting of Creditors that he transferred $60,000 of the concealed cash to a former business partner; "I obviously transferred cash to him in the amount of about 50 to $60,000 sometime in 2014." Seaver Aff. Ex. 13 at 22. The Debtor also had $20,000 of the cash deposited into Browne's Associated Bank account in order to pay his bankruptcy attorney's legal

fee, a payment the Debtor and his attorney verified as being from the Debtor.   Seaver Aff. Ex. 7 and Ex. 8.

### iii.   The transfer or obligation was disclosed or concealed

The Debtor did not disclose any of the transfers at issue in his statement of financial affairs.  When questioned regarding The Mill Trust and Monyet, the Debtor feigned ignorance in an effort to avoid disclosing the truth.  Seaver Aff. Ex. 5 at 4-5.  The Debtor also failed to disclose his position as the manager of Monyet, LLC in his statement of financial affairs.  The filing of the Debtor's bankruptcy petition was intended, at least in part, to avoid disclosing financial information in State court.

### iv.   Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit

At the time of the Pre-Petition Transfers to Defendant the Debtor had already been found liable for substantial attorney's fee awards.  See Swanson Aff. Ex. 2.  Nine days prior to the $175,000 transfer to Defendant, the Debtor was party to a motion in the United States District Court of the Southern District of Illinois where the court held a hearing on a motion to hold the Debtor personally liable for attorneys' fees and expenses totaling over $250,000.  Id.  At the time of the February 7, 2014 transfer to Browne, a motion had been filed to hold Hansmeier liable for yet another award of attorney's fees in the Fourth Judicial District of the State of Minnesota.  Id.

### v.   The transfer was of substantially all the debtor's assets

The Pre-Petition Transfers were part of over $250,000 in transfers from the Debtor to the Defendant, which constituted a substantial portion of the Debtor's non-exempt assets at that time.  This is evidenced by the financial statement the Debtor provided to the U.S. District Court for the Southern District of Illinois in early 2014.  According to the financial statement the Debtor was insolvent as of December 1, 2013.  Seaver Aff. Ex. 10 at 2.

### vi.   The debtor removed or concealed assets

30

The Pre-Petition Transfers to Browne removed the funds from the Debtor's creditors, and Hansmeier testified in a misleading or false manner about the funds in order to conceal those funds.

### vii.   The value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred

There is no evidence of the Debtor receiving any value in exchange for the transfer of $245,000 to the Defendant.  As testified by the Defendant, the transfer served the purpose of removing the funds from the reach of the Debtor's creditors.  Seaver Aff. Ex. 6 at 22.

### viii.   The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred

As discussed above, the Debtor provided a financial statement to the U.S. District Court for the Southern District of Illinois in early 2014.  That financial statement covered the same time period when the Pre-Petition Transfers were made, and evidences the Debtor's insolvency pursuant 11 U.S.C. § 101(32)(A), as his debts exceeded his non-exempt assets by over $300,000. Seaver Aff. Ex. 10 at 2.

### ix.   The transfer occurred shortly before or shortly after a substantial debt was incurred

Five days after the transfer of $175,000 to Defendant, judgment was entered against Hansmeier in the amount of $261,025.31.  See Swanson Aff. Ex. 2.  As evidenced herein, and in Ex. 2 attached to the Affidavit of Matthew Swanson, the Pre-Petition Transfers to Browne were made at a time when creditors were obtaining judgments and sanctions orders against the Debtor. The Defendant has testified that she converted funds to cash because she was concerned with the funds being frozen by courts.  Seaver Aff. Ex. 6 at 22.  That concern had arisen out of debts being incurred by her husband, and the threat of additional sanctions orders resulting from similar litigation tactics.

The list of badges provided by Minn. Stat. § 513.44(b) is not an exhaustive list.  The

31

Plaintiff believes that another badge of fraud is applicable in this case, and asks the court to

consider it as an additional badge of fraud:

>   x.    The recipient of the transfer actively participated in the fraudulent
>         behavior.

The Defendant is a licensed attorney.  She is charged with understanding the importance

of being candid while testifying under oath.  Nevertheless, the Defendant has actively engaged in

her husband's attempt to conceal assets from creditors and from the court.

On October 28, 2015 the Defendant was questioned under oath in a Rule 2004

examination.  At that examination the testified as follows:

> Q(Sheu):  … And then stop where it says the November 22, 2013
>           transfer of $175,000 to you from Monyet, Scottrade account.
>           What was this for?
>
> A(Defendant):  For personal and everyday living expenses.
>
> Q:     $175,000?
>
> A:     That's correct
>
>                          …
> Q:     … I'll have you turn, skip the next page and then stop at the next
>        one where there's the $70,000 transfer to you from Monyet,
>        Scottrade account on February 7, 2014.  Do you know what that
>        was used for?
>
> A:     That money was used for everyday living expenses.
>
> Q:     What expenses are those?
>
> A:     Our mortgage, daycare, my personal car payment, food, utilities.  I
>        don't know, what everybody spends money on.

Seaver Aff. Ex. 3 at 40, 42.   The Defendant knew this testimony was a lie, or at best misleading.

Defendant testified under oath again on February 18, 2016, and after being confronted with the

fact that she could not account for a large sum of the concealed cash, the Defendant finally

admitted that the money was not used solely for "everyday living expenses".

32

> Q(Trustee): Even if that is cash. So 79 and 35 gets you to 114,000. That leaves $66,000 of cash that we don't see coming into any of these accounts?
>
> A(Defendant): Yeah.
>
> Q: Where is the money?
>
> A: It went to John Steele to pay for one of the bonds for the appeal.
>
> Q: How much went to Mr. Steele?
>
> A: I think 60.

Seaver Aff. Ex. 6 at 60.

Defendant's cooperation in this scheme to defraud creditors is further evidenced by her participation in concealing the true value of cash relating to Monyet, LLC. The Debtor's Scheduled B states that he possessed $8,554 in the "Self Settled Trust Monyet"; which was actually cash located in a box in his condominium. The Trustee discovered that the scheduled $8,554 was actually cash, and after tracing the cash withdrawals questioned Defendant as to a discrepancy in the remaining balance, Defendant testified as follows:

> Q: So you had to have at least 20,900 in cash in your possession on July 13 of 2015?
>
> A: Yes, and I'm saying when we filed, I had spent that money, the $15,000 already, approximately, on various things and was paying – so I said that's not there because I need to pay off my credit card, and then I deposited it afterwards. Just because he hadn't – just because he listed 8,500, we said, well, we've already spent that money on a credit card, we just haven't paid it off yet, so we're going to say that that's not there, and then the 5,000 is part of the 8,000 that we were still saying was part of the trust.
>
> Q: So you and Mr. Hansmeier sat down and counted out how much money was left there, correct?
>
> A: Yes.
>
> Q: Okay.

A:     Pretty close.  I mean there was probably some ones and stuff lying
       around.

Q:     And what did you come up with for a total?

A:     I don't remember exactly how much it was.

Q:     Okay.  And then you and he talked and decided rather than stating
       how much cash was actually there, you would deduct for cash that
       was – for things that you were going to pay in the future.

A:     For things that had already been purchased on my credit cards that
       needed to be paid off.  They had already – I had already,
       essentially, bought them, we had the things.

Q:     You charged them on your cards?

A:     Yes, and it needed to be paid off.

Q:     All right.  But we know there's at least an additional $500 or so
       that you testified earlier today that still exists, right?

A:     Yes.

Q:     So we know that there was over $21,000 in cash on the day you
       filed bankruptcy, correct?

A:     Yes.

Seaver Aff. Ex. 6 at 66-67.   The Defendant admitted that she decided, with the Debtor, to

conceal the true amount of cash in their possession.  These are two licensed attorneys, gathering

information to be included in the Debtor's bankruptcy schedules, and deciding to falsify the

information.  The Debtor then proceeded to verify the bankruptcy schedules containing the false

value.

       In addition to the sworn testimony of the Defendant, establishing the required intent

under § 548(a)(1)(A), the facts in this case, as set forth above and in the attached affidavit,

establish numerous badges of fraud.  The evidence overwhelmingly establishes the Plaintiff's

likelihood of success as to count II of the Complaint.

34

## CONCLUSION

Based on the actions of the Defendant in conjunction with the actions of the Debtor, the Plaintiff believes that if the Defendant receives the non-exempt monies being held by the Plaintiff, pursuant to this Court's order regarding the condominium sale, Browne will immediately dispose of or conceal those funds, and those funds will no longer be available for recovery by the bankruptcy estate in this litigation against Browne. When sanctioning the Debtor in the *Ingenuity 13, LLC* case, Judge Otis Wright in his May 6, 2013 decision recognized the tendencies of the Debtor, stating "[e]ven if the Court enters such a sanction, it is certain that Plaintiffs will transfer out their settlement proceeds and plead paucity." Swanson Aff. Ex. 5 at 9. The Debtor has a history of shifting and concealing assets in order to avoid paying his creditors, and as described above the Defendant has been a willing participant in those actions. Approval of the Plaintiff's amended motion is necessary to prevent further concealment of any non-exempt assets.

The Plaintiff has satisfied the requirements of Minn. Stat. § 570.02 and 570.026. Grounds exist for the Court to enter an order of attachment to any non-exempt funds of the Defendant which are currently in the possession of the Plaintiff, as security for the judgment the Plaintiff seeks in Adversary No. 16-4031.

FULLER, SEAVER, SWANSON & KELSCH, P.A.

Dated: May 11, 2016                     By: _/e/ Matthew D. Swanson_____
                                        Matthew D. Swanson          390271
                                        Randall L. Seaver           152882
                                        12400 Portland Avenue South, Suite 132
                                        Burnsville, MN 55337
                                        mswanson@fssklaw.com
                                        Telephone: 952-890-0888

35

**From:** **Edward P. Sheu** esheu@best aw.com
**Subject:** Hansme er
**Date:** December 17, 2015 at 10:29 AM
**To:** jsweet@boothsweet.com

# EXHIBIT A



Jason. I got a call today from the Ch. 7 trustee. He asked about "settling" the Chowdhury matter, namely, the appeal in the 1st Circuit. Since the Ch. 7 trustee now owns Hansmeier's right to pursue litigation, including the appeals (this would include the 7th circuit appeal too), he wonders whether there is any interest in settling the appeal with him. I presume that, since you've been paid the judgment, there is the possibility that a reversal in the 1st circuit could result in the judgment being vacated and the money coming back to the trustee. Even though it's just in the world of possibility, and not probability, the trustee is making the request to settle (i.e., give him some money, presumably, nominal) to induce the trustee to dismiss the appeal, thus ending Hansmeier's appeal. Even though I'm sure you don't want to give up any of the money, there would be value in pissing off Hansmeier. Plus, the trustee (as you might imagine) does not greatly value the appeal, so one possibility is that the trustee would reject the appeal as an asset and give it back to Hansmeier to continue pursuing. (This is what the Ch. 13 trustee was doing essentially.) You might want to give it some thought (same thing with the 7th circuit), however, at the same time, unless co-appellant Steele is also willing to dismiss the appeal, it is probably not worth it. The Ch. 7 trustee's guy is Matt Swanson, who is an associate of Randy Seaver.

Edward "Ted" Sheu
Attorney
DIRECT 612.349.5656 V-CARD

**BEST & FLANAGAN LLP**
60 South Sixth Street, Suite 2700, Minneapolis, Minnesota 55402
TEL 612.339.7121 FAX 612.339.5897 BESTLAW COM

CONFIDENTIAL: This email may contain confidential and privileged information and is for the intended recipient only. If you are not the intended recipient, please refrain from reading and delete all copies of this email. IRS NOTICE: Any tax advice contained in this email and any attachment was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties that may be imposed under the tax laws, or (2) promoting or recommending any transaction.

 Caution
As of: November 25, 2017 10:03 PM Z

# *Ingenuity13 LLC v. Doe*

United States Court of Appeals for the Ninth Circuit

May 4, 2015, Argued and Submitted, Pasadena, California; June 10, 2016, Filed

No. 13-55859, No. 13-55880, No. 13-55881, No. 13-55882, No. 13-55883, No. 13-55884, No. 13-56028

**Reporter**
651 Fed. Appx. 716 *; 2016 U.S. App. LEXIS 10557 **; 2016 Copy. L. Rep. (CCH) P30,944; 2016 WL 3212176

INGENUITY13 LLC, Plaintiff, And PAUL HANSMEIER, Esquire, Movant - Appellant, v. JOHN DOE, Defendant - Appellee.INGENUITY13 LLC, Plaintiff - Appellant, v. JOHN DOE, Defendant - Appellee.INGENUITY13 LLC, Plaintiff, And PRENDA LAW, INC., Movant - Appellant, v. JOHN DOE, Defendant - Appellee.INGENUITY13 LLC, Plaintiff, And AF HOLDINGS, LLC, Movant - Appellant, v. JOHN DOE, Defendant - Appellee.INGENUITY13 LLC, Plaintiff, And PAUL DUFFY, Movant - Appellant, v. JOHN DOE, Defendant - Appellee.INGENUITY13 LLC, Plaintiff, And JOHN STEELE, Movant - Appellant, v. JOHN DOE, Defendant - Appellee.INGENUITY13 LLC, Plaintiff, And PRENDA LAW, INC., Movant - Appellant, v. JOHN DOE, Defendant - Appellee, And PAUL DUFFY, Movant - Appellee.

**Notice:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History:** [**1] Appeal from the United States District Court for the Central District of California. D.C. No. 2:12-cv-08333-ODW-JC. Otis D. Wright II, District Judge, Presiding.

*Ingenuity 13 LLC v. Doe, 2013 U.S. Dist. LEXIS 64564 (C.D. Cal., May 6, 2013)*

**Disposition:** AFFIRMED.

## Core Terms

Principals, sanctions, attorney's fees, district court, bad faith, infringement, compensate, attorneys, courts

## Case Summary

### Overview
HOLDINGS: [1]-The district court did not abuse its discretion in finding bad faith and sanctioning appellants under its inherent power because it was not an abuse of discretion to find that appellants were principals and the parties actually responsible for the abusive litigation; [2]-The district court did not abuse its discretion in awarding $40,659.86 in attorneys fees and costs to appellee to compensate attorneys for expenses incurred in the vexatious lawsuit because appellants received the due process protections to which they were entitled, which were notice, the opportunity to be heard, and a finding of bad faith; [3]-The doubling of the attorney's fees award was appropriate because the sanction was remedial and for the benefit of appellee; [4]-It was not an abuse of discretion to order appellants to post additional bond to cover appellee's attorney's fees on appeal.

### Outcome
Judgment affirmed.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Governments > Courts > Authority to Adjudicate

Civil Procedure > Sanctions

651 Fed. Appx. 716, *716; 2016 U.S. App. LEXIS 10557, **1

Civil Procedure > Judicial Officers > Judges > Discretionary Powers

*HN1*[⬇] **Standards of Review, Abuse of Discretion**

An appellate court reviews for abuse of discretion the district court's imposition of sanctions pursuant to its inherent power. With respect to sanctions, a district court's factual findings are given great deference. The district court's broad discretion will not be found to be an abuse unless the appellate court has been left with a definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached.

Civil Procedure > Sanctions

Governments > Courts > Authority to Adjudicate

*HN2*[⬇] **Civil Procedure, Sanctions**

Federal courts have inherent power to impose sanctions against both attorneys and parties for bad faith conduct in litigation or for willful disobedience of a court order. A federal court's inherent power allows the court to punish conduct both within their confines and beyond, regardless of whether that conduct interfered with trial.

Civil Procedure > Sanctions

*HN3*[⬇] **Civil Procedure, Sanctions**

When a sanction is intended to compensate a party, and not the court, it is civil in nature. Monetary sanctions imposed are compensatory where they are, in part, designed to compensate the plaintiff. If the sanction is remedial and for the benefit of the complainant, it is considered civil.

Civil Procedure > Sanctions

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

*HN4*[⬇] **Civil Procedure, Sanctions**

Due process for civil sanctions requires notice, an opportunity to be heard, and a finding of bad faith.

Civil Procedure > Sanctions

*HN5*[⬇] **Civil Procedure, Sanctions**

The U.S. Supreme Court has tended to classify fines payable to another party as remedial.

Civil Procedure > Remedies > Bonds

Governments > Courts > Authority to Adjudicate

Civil Procedure > Sanctions

Civil Procedure > Remedies > Costs & Attorney Fees > Costs

*HN6*[⬇] **Remedies, Bonds**

A district court has the inherent authority to sanction litigants in the form of a bond for projected appellate attorney's fees and costs for bad-faith conduct.

**Counsel:** For INGENUITY13 LLC, Plaintiff (13-55859): Daniel J. Voelker, Voelker Litigation Group, Chicago, IL.

For JOHN DOE, Defendant - Appellee (13-55859): Morgan E. Pietz, Esquire, The Pietz Law Firm, Manhattan Beach, CA; Nicholas Richard Ranallo, Law Offices of Nicholas Ranallo, Boulder Creek, CA.

For PAUL HANSMEIER, Esquire, Movant - Appellant (13-55859): Daniel J. Voelker, Voelker Litigation Group, Chicago, IL.

PAUL HANSMEIER, Esquire, Movant - Appellant (13-55859), Pro se, Minneapolis, MN.

For INGENUITY13 LLC, Plaintiff - Appellant (13-55880): Steven Goodhue, Esquire, Attorney, Law Offices of Steven Jame Goodhue, Scottsdale, AZ.

For JOHN DOE, Defendant - Appellee (13-55880): Morgan E. Pietz, Esquire, The Pietz Law Firm, Manhattan Beach, CA; Nicholas Richard Ranallo, Law Offices of Nicholas Ranallo, Boulder Creek, CA.

For INGENUITY13 LLC, Plaintiff (13-55881): Daniel

J. Voelker, Voelker Litigation Group, Chicago, IL.

For JOHN DOE, Defendant - Appellee (13-55881): Morgan E. Pietz, Esquire, The Pietz Law Firm, Manhattan Beach, CA; [**2] Nicholas Richard Ranallo, Law Offices of Nicholas Ranallo, Boulder Creek, CA.

For PRENDA LAW, INC., Movant - Appellant (13-55881): Daniel J. Voelker, Voelker Litigation Group, Chicago, IL.

For INGENUITY13 LLC, Plaintiff (13-55882): Daniel J. Voelker, Voelker Litigation Group, Chicago, IL.

For JOHN DOE, Defendant - Appellee (13-55882): Morgan E. Pietz, Esquire, The Pietz Law Firm, Manhattan Beach, CA; Nicholas Richard Ranallo, Law Offices of Nicholas Ranallo, Boulder Creek, CA.

For AF HOLDINGS, LLC, Movant - Appellant (13-55882): Daniel J. Voelker, Voelker Litigation Group, Chicago, IL; Steven Goodhue, Esquire, Attorney, Law Offices of Steven Jame Goodhue, Scottsdale, AZ.

For INGENUITY13 LLC, Plaintiff (13-55883): Daniel J. Voelker, Voelker Litigation Group, Chicago, IL.

For JOHN DOE, Defendant - Appellee (13-55883): Morgan E. Pietz, Esquire, The Pietz Law Firm, Manhattan Beach, CA; Nicholas Richard Ranallo, Law Offices of Nicholas Ranallo, Boulder Creek, CA.

For PAUL DUFFY, Movant - Appellant (13-55883): Daniel J. Voelker, Voelker Litigation Group, Chicago, IL.

PAUL DUFFY, Movant - Appellant (13-55883), Pro se, Chicago, IL.

For INGENUITY13 LLC, Plaintiff (13-55884): Daniel J. Voelker, Voelker [**3] Litigation Group, Chicago, IL.

For JOHN DOE, Defendant - Appellee (13-55884): Morgan E. Pietz, Esquire, The Pietz Law Firm, Manhattan Beach, CA; Nicholas Richard Ranallo, Law Offices of Nicholas Ranallo, Boulder Creek, CA.

JOHN STEELE, Movant - Appellant (13-55884), Pro se, Miami Beach, FL.

For INGENUITY13 LLC, Plaintiff (13-56028): Daniel J. Voelker, Voelker Litigation Group, Chicago, IL.

For JOHN DOE, Defendant - Appellee (13-56028): Morgan E. Pietz, Esquire, The Pietz Law Firm, Manhattan Beach, CA; Nicholas Richard Ranallo, Law

Offices of Nicholas Ranallo, Boulder Creek, CA.

PAUL DUFFY, Movant - Appellee (13-56028), Pro se, Chicago, IL.

For PRENDA LAW, INC., Movant - Appellant (13-56028): Daniel J. Voelker, Voelker Litigation Group, Chicago, IL.

**Judges:** Before: PREGERSON, TALLMAN, and NGUYEN, Circuit Judges.

# Opinion

[*718] MEMORANDUM*

Paul Duffy, Paul Hansmeier, and John Steele (collectively, "the Prenda Principals") appeal the district court's award of attorney's fees, including a punitive multiplier, and a second supersedeas bond order. We have jurisdiction pursuant to *28 U.S.C. § 1291*, and we affirm.

These consolidated cases began [**4] as minor copyright infringement suits, until courts nationwide started catching on to the plaintiffs' real business of copyright trolling. The scheme went essentially like this: The Prenda Principals, through their law firm, Prenda Law, Inc. ("Prenda Law"), set up a number of shell companies, including Ingenuity 13, LLC ("Ingenuity 13") and AF Holdings, LLC ("AF Holdings"), that purchased copyrights to pornographic movies. When one of those movies was illegally downloaded, the shell company (via Prenda Law or a local attorney hired by Prenda Law) filed a complaint against "John Doe" in federal or state court for copyright infringement and used early discovery mechanisms to determine the identities of the persons it alleged illegally downloaded the film.

The shell company would then mail the purported "John Doe" a letter threatening to sue unless the individual paid roughly $4,000 to "settle" the case. Out of embarrassment and for economic reasons, many "John Does" settled, regardless of whether they, or another family member, friend, or guest, infringed the copyright.

---

* This disposition is not appropriate for publication and is not precedent except as provided by *9th Cir. R. 36-3*.

When the "John Does" settled, Prenda Law would voluntarily dismiss the case; Prenda Law never litigated a single copyright [**5] infringement case through to a merits judgment. By misusing the subpoena power of the court, the Prenda Principals made millions of dollars from suing hundreds to thousands of "John Does" across the country.

Concerned that Ingenuity 13 was engaging in a "legal shakedown" and "fishing-expedition discovery," the district court ordered it to show cause ("OSC") why early discovery was warranted and to demonstrate "how it would proceed to uncover the identity of the actual infringer once it has obtained subscriber information."

Ingenuity 13 then moved to disqualify Judge Wright for "pervasive bias." The **[*719]** motion was assigned to district court Judge Michael W. Fitzgerald, who denied it. Ingenuity 13 then voluntarily dismissed the case against Doe.

By the time of the dismissal, however, the Prenda Principals' nationwide scheme had started to unravel, and Judge Wright ordered the Prenda Principals, who until then were not part of the lawsuit, to appear before the court. Judge Wright determined that Ingenuity 13 was a dummy LLC set up by Prenda Law, and that Duffy, Hansmeier, and Steele, were the controlling attorneys at Prenda Law. After a hearing, the district court judge sanctioned the Prenda [**6] Principals, Brett Gibbs (the Prenda Law attorney for Ingenuity 13 and AF Holdings), Prenda Law, Ingenuity 13, and AF Holdings, and awarded Doe attorney's fees, including a "punitive multiplier." After the Prenda Principals posted a supersedeas bond of 125% of the value of the monetary sanction, the district court judge ordered them to post a second supersedeas bond of $135,333.06 (equaling the amount of Doe's projected costs and attorney's fees to defend the sanctions on appeal). The Prenda Principals appealed the sanctions.

**HN1**[⬆] We review for abuse of discretion the district court's imposition of sanctions pursuant to its inherent power. *F.J. Hanshaw Enters, Inc. v. Emerald River Dev., Inc., 244 F.3d 1128, 1135 (9th Cir. 2001)*. "With respect to sanctions, a district court's factual findings are given great deference." *Id.* The district court's broad discretion will not be found to be an abuse unless we have been left with "a definite and firm conviction that the [district] court committed a clear error of judgment

in the conclusion it reached." *United States v. Sumitomo Marine & Fire Ins. Co. Ltd., 617 F.2d 1365, 1369 (9th Cir. 1980)* (quoting *In re Josephson, 218 F.2d 174, 182 (1st Cir. 1954))*.

The district court did not abuse its discretion in finding bad faith and sanctioning the Prenda Principals under its inherent power. *See Chambers v. NASCO, Inc., 501 U.S. 32, 44-45, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991)* (*HN2*[⬆] federal courts have inherent power to impose sanctions against both attorneys and parties [**7] for "bad faith" conduct in litigation or for "willful disobedience" of a court order); *Hanshaw, 244 F.3d at 1136* (a federal court's inherent power allows the court to "punish conduct both within their confines and beyond, regardless of whether that conduct interfered with trial").

Based on the myriad of information before it—including depositions and court documents from other cases around the country where the Prenda Principals were found contradicting themselves, evading questioning, and possibly committing identity theft and fraud on the courts—it was not an abuse of discretion for Judge Wright to find that Steele, Hansmeier, and Duffy were principals and the parties actually responsible for the abusive litigation.[1] Similarly, it was not an abuse of discretion for Judge Wright to find that the Prenda Principals were indeed the leaders and decision-makers behind Prenda Law's national trolling scheme.

The district court did not abuse its discretion in awarding $40,659.86 in attorneys fees and costs to Doe to "compensate [attorneys] . . . [**8] for expenses incurred in this vexatious lawsuit, especially for their efforts in countering and revealing the fraud perpetrated by Plaintiffs." *HN3*[⬆] As this sanction was intended to compensate Doe, **[*720]** and not the court, it is civil in nature. *Lasar v. Ford Motor Co., 399 F.3d 1101, 1110-11 (9th Cir. 2005)* (monetary sanctions imposed were compensatory where they were, in part, "designed to compensate" the plaintiff); *Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 827-28, 114 S. Ct. 2552, 129 L. Ed. 2d 642 (1994)* (If the sanction is

---

[1] *See also Lightspeed Media Corp. v. Smith, 761 F.3d 699, 710 (7th Cir. 2014)* (Seventh Circuit affirming district court's finding that Steele, Hansmeier, and Duffy were "in cahoots" to "use the judicial system for a legally meritless claim").

"remedial[] and for the benefit of the complainant," it is considered civil.) (quoting *Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 441, 31 S. Ct. 492, 55 L. Ed. 797 (1911))*.

*HN4*[↑] Due process for civil sanctions requires notice, an opportunity to be heard, and a finding of bad faith. *See Hanshaw, 244 F.3d at 1143*. The Prenda Principals received sufficient notice from Judge Wright's March 6, 2013 OSC ordering the Prenda Principals and others to appear at the already-scheduled March 11, 2013 sanctions hearing. Before the March 6 OSC, Judge Wright issued an OSC on February 7, ordering Gibbs, Prenda Law's Of Counsel, to show cause why he should not be sanctioned for several violations, including fraud on the court. And on February 27, Judge Wright ordered Gibbs to provide the names of the senior members of Prenda Law, the names of the persons making strategic decisions for Prenda Law, the names of the owners of the copyrights, and the names **[**9]** of the principals of AF Holdings and Ingenuity 13.

Appellants were also afforded an opportunity to be heard at both the first and second hearings and were allowed to submit responsive briefs. Finally, the district court made a finding of bad faith. Judge Wright found, *inter alia*, that the Prenda Principals "demonstrated their willingness to deceive not just this [c]ourt, but other courts where they have appeared," and "borrow[ed] the authority of the [c]ourt to pressure settlement."

Because the Prenda Principals received the due process protections to which they were entitled—notice, the opportunity to be heard, and a finding of bad faith—the district court did not abuse its discretion in awarding $40,659.86 in compensatory attorney's fees and costs.

The doubling of the attorney's fees award was also appropriate. Though labeled a "punitive multiplier," this sanction was "remedial[] and for the benefit of the complainant." *Bagwell, 512 U.S. at 827-28* (quoting *Gompers, 221 U.S. at 441*). The doubling of the attorney's fees award did not vindicate the authority of the court but instead "compensate[d] [Doe and Pietz] for losses sustained." *Bagwell, 512 U.S. at 829* (quoting *Gompers, 221 U.S. at 441*). Rather than being paid to the court, this additional sanction was paid to Doe, and *HN5*[↑] "the Supreme Court has tended to classify **[**10]** . . . fines payable to another party [as] remedial." *Lasar, 399 F.3d at 1111* (noting that, while

not determinative, "the party who receives the fine is an important indicator" of whether it is remedial). Given that the doubling of the attorney's fees was compensatory, it does not trigger heightened due process protections. The Prenda Principals received notice, an opportunity to be heard, and a finding of bad faith, which collectively satisfy the due process standards for civil sanctions.

The district court did not abuse its discretion in ordering the Prenda Principals to post additional bond to cover Doe's attorney's fees on appeal. The district court had ample reason to do so. The Prenda Principals have engaged in abusive litigation, fraud on courts across the country, and willful violation of court orders. They have lied to other courts about their ability to pay sanctions. *See Lightspeed Media, 761 F.3d at 711*. They also failed to **[*721]** pay their own attorney's fees in this case. Considering the Prenda Principals' tactics throughout this case, it was not an abuse of discretion to increase the bond amount to cover the projected cost of attorney's fees on appeal.

The bankruptcy case relied on by the Prenda Principals, *In re Southern California Sunbelt Developers, Inc., 608 F.3d 456, 467 n.6 (9th Cir. 2010)*, does not address litigants **[**11]** who engaged in bad-faith conduct from the start of the litigation and throughout the sanctions' proceedings. *HN6*[↑] The district court had the inherent authority to sanction litigants in the form of a bond for projected appellate attorney's fees and costs for bad-faith conduct. *See Chambers, 501 U.S. at 50*. Considering the magnitude of the Prenda Principals' misdeeds, and the covert nature of their businesses, the district court did not abuse its discretion by increasing the bond amount. Without hope of receiving attorney's fees for defending sanctions on appeal, Doe and other victims of abusive litigation would be left with no remedy. Doe would likely not defend the sanctions in appellate court, and thus would lose the only compensation—attorney's fees at the district court level—that he was awarded.

Because we do not remand for further proceedings, we need not reach the Prenda Principals' request to transfer the case to a different district court judge.

**AFFIRMED**.

651 Fed. Appx. 716, *721; 2016 U.S. App. LEXIS 10557, **11

**End of Document**

**Nos. 13-55859, 13-55871, 13-55880, 13-55881, 13-55882, 13-55883, 13-55884 & 13-56028**

_____

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

INGENUITY 13, LLC,

Plaintiff-Appellant,

v.

John Doe,

Defendant-Appellee,

v.

AF HOLDINGS, LLC; PRENDA LAW, INC.; PAUL DUFFY, ESQ.; PAUL HANSMEIER, ESQ.; JOHN STEELE, ESQ.; and BRETT GIBBS, ESQ.,

Additional Appellants.

_____

**OPENING BRIEF FOR APPELLANTS**
**INGENUITY 13, LLC; AF HOLDINGS, LLC; PRENDA LAW, INC.;**
**PAUL DUFFY, ESQ.; PAUL HANSMEIER, ESQ.; and JOHN STEELE, ESQ.**

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
U.S.D.C. No. 2:12-cv-08333-ODW-JC
THE HONORABLE OTIS D. WRIGHT II

_____

DANIEL J. VOELKER, ESQ.
Voelker Litigation Group
311 West Superior Street
Suite 500
Chicago, Illinois 60654
312-870-5430
*Attorney for Plaintiff-Appellant and*
*Certain Additional Appellants.*

## <u>RULE 26.1 CORPORATE DISCLOSURE STATEMENT</u>

Appellant, Ingenuity 13, LLC, is a limited liability company organized and existing under the laws of the Federation of St. Kitts and Nevis, and is owned by the I13 Trust.  No publicly held corporation owns 10% or more of its stock.

Appellant, AF Holdings, LLC, is a limited liability company organized and existing under the laws of the Federation of St. Kitts and Nevis, and is owned by the Salt March Trust.  No publicly held corporation owns 10% or more of its stock.

Appellant, Prenda Law, Inc., was an Illinois corporation, which was dissolved on July 26, 2013.  Prenda Law had no parent corporation; and, no publicly held corporation owned, or owns, 10% or more of its stock.

Dated:  November 18, 2013      Respectfully submitted,

VOELKER LITIGATION GROUP
Daniel J. Voelker, Esq.


By:  /s/Daniel J. Voelker_____
Daniel J. Voelker
Attorney for Appellants:  Ingenuity 13,
LLC;  AF Holdings, LLC; Prenda Law, Inc.;
Paul Duffy, Esq.; Paul Hansmeier, Esq.; and
John Steele, Esq.

i

# **TABLE OF CONTENTS**

**SECTION**                                                    **PAGE NO.**

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ..................................... i

TABLE OF CONTENTS ........................................................................... ii

TABLE OF CASES AND AUTHORITIES .............................................. v

STATEMENT OF JURISDICTION ........................................................ 1

ISSUES PRESENTED AND STANDARD OF REVIEW .................................. 2

PERTINENT STATUTORY PROVISIONS ............................................ 5

STATEMENT OF CASE ......................................................................... 6

STATEMENT OF FACTS ...................................................................... 10

    The Underlying Litigation ........................................................... 10

    The Order to Show Cause Proceeding Against Brett Gibbs ............................. 13

    The March 11 Show-Cause Hearing ............................................. 16

    The Amended Show-Cause Order ................................................ 19

    The April 2 Show-Cause Hearing ............................................... 20

    The May 6 Sanctions Order ......................................................... 22

    The Court's Requirement of a Second Supersedeas Bond ............................... 23

SUMMARY OF ARGUMENT ................................................................ 25

ARGUMENT ......................................................................................... 29

    I.    The District Court's Inherent Sanctioning Authority Did Not Extend to
        the Individual Appellants ............................................... 29

II.    Under this Court's Prior Precedent, a District Court's Inherent
       Sanctioning Authority Does Not Permit the Imposition of Punitive
       Sanctions .......................................................................................... 35

III.   The Procedure Used by the District Court to Impose Sanctions
       Violated Procedural Due Process Requirements................................ 37

       A.    The Sanctions Imposed by the District Court Required a
             Proceeding for Indirect, Criminal Contempt............................ 38

             1.    The sanctions imposed by the District Court
                   required criminal contempt proceedings.......................... 39

             2.    The type of criminal contempt proceedings required
                   in this case was a proceeding for an indirect criminal
                   contempt........................................................................... 42

       B.    The Procedures Implemented by the District Court
             Violated Procedural Due Process Requirements...................... 42

             1.    The District Court's procedures violated procedural
                   due process by drawing adverse inferences from the
                   invocation of Fifth Amendment rights by the
                   individual Appellants....................................................... 44

             2.    The District Court's procedures violated procedural
                   due process requirements by appointing a prosecutor
                   who was not impartial....................................................... 46

             3.    The District Court's procedures violated procedural
                   due process requirements by denying Appellants the
                   ability to cross-examine witnesses................................... 49

             4.    The District Court's procedures violated procedural
                   due process requirements by denying Appellants the
                   ability to present a defense and call witnesses................. 52

IV.    The District Court Committed Clear Error in Allowing Defendant to Recover Attorneys' Fees Incurred in Pursuing Post-Dismissal Sanctions and in Requiring Appellants to Post Supersedeas Bonds that, among other Things, Insured Defendant's Ability to Recover Attorneys' Fees Incurred in Defending these Sanctions on Appeal .. 53

V.    If this Court Decides that It Is Appropriate to Remand  this Case for further Proceedings, Appellants Respectfully Ask that the Case Be Transferred to a Different District Court Judge ................................. 58

CONCLUSIONS ................................................................................ 62

STATEMENT OF RELATED CASES ................................................. 64

CERTIFICATE OF COMPLIANCE ...................................................... 65

## TABLE OF AUTHORITIES

**Federal Cases**                                                    **Page No.**

*AF Holdings, LLC v. Doe*,
    No. 2:12-cv-6636-DW(JCx) (C.D. Cal. filed Aug. 1, 2012) ................... 13 & 14

*AF Holdings, LLC v. Doe*,
    No. 2:12-cv-6669-DW(JCx) (C.D. Cal. filed Aug. 2, 2012) ........................... 13

*Am. Civil Liberties Union v. Holder,* 673 F.3d 245 (4th Cir. 2011) ...................... 30

*Anz Advanced Techs., LLC v. Bush Hog*, LLC,
    2012 U.S. Dist. LEXIS 29534 (S.D. Ala.) ........................................ 31

*Azizian v. Federated Dep't Stores, Inc.*, 499 F.3d 950 (9th Cir. 2007).......... 56 & 57

*Bartos v. Pennsylvania*, 2010 U.S. Dist. LEXIS 43937 (M.D. Pa.) ...................... 31

*Baxter v. Palmigiano*, 425 U.S. 308 (1976) ........................................... 45

*Books Are Fun, Ltd. v. Rosenbrough*,
    239 F.R.D. 532 (S.D. Iowa 2007) .............................................. 31

*Caldwell v. United Capital Corporation, 77 F.3d 278 (9th Cir. 1996)* ................. 32

*Cetacean Research v. Sea Shepherd Conservation Soc'y*,
    725 F.3d 940 (9th Cir. 2013) ................................................. 59

*Chambers v. Nasco, Inc.*, 501 U.S. 32 (1991) ................................. 29-30 & 35-36

*Cooke v. United States*, 267 U.S. 517 (1925) ................................... 43 & 53

*Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990)........................ 57

*Davis v. Alaska*, 415 U.S. 308 (1974)......................................... 43 & 49

*Douglas v. Alabama*, 380 U.S. 415 (1985).................................... 49 & 51

*F.J. Hanshaw Enters. v. Emerald River Dev., Inc.*,
    244 F.3d 1128 (9th Cir. 2001) ...................................38, 40-41, 43, 49, 51 & 53

*Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418 (1911) ................................ 43

*Griffin v. California*, 380 U.S. 609 (1965) ............................................................ 45

*Helmac Products Corp. v. Roth Plastics, Corp.*,
    150 F.R.D. 563 (E.D. Mich. 1993) ............................................................ 29-32

*Hicks v. Feiock*, 485 U.S. 624 (1988).......................................................... 40 & 42

*In re:  DeVille*, 280 B.R. 483 (9th Cir. B.A.P. 2002) ...............................35-37 & 41

*In re Dyer*, 322 F.3d 1178 (9th Cir. 2003)........................................36-37 & 39-40

*In re Rumaker,* 646 F.2d 870 (5th Cir. 1980) ....................................................... 39

*Ingenuity 13, LLC v. Doe*,
    No. 2:12-cv-6668-ODW(JCx) (C.D. Cal. filed Aug. 2, 2012) ................ 13 & 14

*Ingenuity 13, LLC v. Doe*,
    Dkt. No. 2:12-cv-8333-ODW(JC) (C.D. Calif. filed Sept. 27, 2012) ........ *passim*

*Ingenuity 13 LLC v. Doe*,
    Dkt. No. 2:12-cv-6662-ODW(JCx) (C.D. Cal. filed Aug. 2, 2012) ......... 13 & 14

*Int'l Union, United Mine Workers of America v. Bagwell*,
    512 U.S. 821 (1994)........................................................................ 38, 40 & 42

*Koninklijke Philips Elecs., N.V. v. KXD Tech., Inc.*,
    539 F.3d 1039 (9th Cir. 2008) .......................................................................... 39

*Lockary v. Kayfetz*, 974 F.2d 1166 (9th Cir. 1992) .................................54-55 & 57

*Mathews v. Chevron Corp.*, 362 F.3d 1172 (9th Cir. 2004) ..................................... 3

*Margolis v. Ryan*, 140 F.3d 850 (9th Cir. 1998).................................................... 54

*Morales-Garcia v. Holder*, 567 F.3d 1058 (9th Cir. 2009) .................................. 3–5

*Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*,
   2 F.3d 1397 (5th Cir. 1993) ............................................... 30

*Orange Blossom Limited Partnership v. Southern California Sunbelt Developers,
Inc.*, 608 F.3d 456 (9th Cir. 2010) ..................................................... 53-58

*Pointer v. Texas*, 380 U.S. 400 (1965) .................................................. 51

*Roadway Express, Inc. v. Piper,* 447 U.S. 752 (1980) ........................................... 30

*Slochower v. Board of Higher Education*, 350 U.S. 551 (1956) ............................ 45

*Ullmann v. United States*, 350 U.S. 422 (1956) ..................................... 45

*Union Tool Co. v. Wilson*, 259 U.S. 107 (1922) ....................................... 39

*United States v. Armstrong*, 781 F.2d 700 (9th Cir. 1986) ..................................... 39

*United States v. Henry*, 2013 U.S. Dist. LEXIS 133148 (E.D. Va.) ..................... 31

*United States v. Wolf Child*, 699 F.3d 1082 (9th Cir. 2012)................................. 58

*Young v. United States ex rel. Vuitton Et Fils S.A.*,
   481 U.S. 787 (1987).......................................................43 & 46-48

## Statutes

28 U.S.C. § 1291.......................................................................... 2

28 U.S.C. § 1331.......................................................................... 1

28 U.S.C. § 1338(a) ....................................................................... 1

28 U.S.C. § 1367(a) ....................................................................... 1

Bankruptcy Act, 11 U.S.C. § 303(i) ................................................. 5 & 55

Copyright Act, 17 U.S.C. § 505.....................................................4-5, 25 & 56-57

Fed. Rule Civ. Proc.  11 .......................................................................... 13, 54 & 58

Fed. R. Civ. Proc. 41(a)(1) ...................................................................... 13

# STATEMENT OF JURISDICTION

Ingenuity 13[1] commenced this action on September 27, 2012, alleging that Defendant had downloaded an adult film in which Ingenuity 13 had a copyright. The Complaint alleged copyright infringement, contributory infringement and negligence. The District Court had jurisdiction over the copyright infringement claim pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a). The District Court had supplemental jurisdiction over Plaintiff's contributory infringement and negligence claims pursuant to 28 U.S.C. § 1367(a).

On May 6, 2013, the District Court entered an Order imposing monetary and other sanctions against, among others: AF Holdings, Ingenuity 13, Prenda Law, and the three individual Appellants (the "Sanctions Order", ER19-ER29). Hansmeier filed a timely Notice of Appeal from the Sanctions Order on May 15, 2013. (ER377-ER404.) Ingenuity 13, AF Holding, Prenda Law, Steele and Duffy, each filed a timely Notice of Appeal from the Sanctions Order on May 17, 2013.

---

[1] For brevity, Plaintiff, Ingenuity 13, LLC will be referred to as "Ingenuity 13". AF Holdings, LLC, will be referred to as "AF Holdings". Prenda Law, Inc. will be referred to as "Prenda Law". The three individual Appellants submitting this brief (John Steele, Paul Hansmeier and Paul Duffy), will be referred to individually by last name only and collectively as the "individual Appellants". Ingenuity 13, AF Holdings, Prenda Law and the individual Appellants will sometimes be referred to as "Appellants".

[2] Appellants' citation to pages in the Excerpts of the Record will be in the

(ER467-ER496; ER405-ER435; ER506-ER536; ER537-ER566 & ER436-ER466.)

On June 11, 2013, the District Court entered an Order requiring the sanctioned parties to post supersedeas bonds totaling $237,583.66, to cover the monetary sanctions plus Defendant's estimated costs and attorneys' fees for this Appeal (the "Bond Order").  (ER32-ER34.)  The District Court also imposed additional requirements with respect to the bond.  (*Id.*)  Prenda Law filed a timely Notice of Appeal from the Bond Order on June 12, 2013. (ER601-ER603.)

Both the Sanctions and Bond Orders are final Orders.  This Court has jurisdiction to hear the appeals from the Sanctions and Bond Orders pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED AND STANDARD OF REVIEW

1.    Whether the District Court exceeded its inherent sanctioning authority by imposing sanctions on individuals who had not appeared as parties or counsel in the consolidated cases, were not subject to any existing order of the District Court and were not real parties in interest.

Appellants objected to the District Court's purported exercise of its inherent authority over the individual Appellants in Hansmeier's Response to

2

Show Cause Order, (ER349[2]).  This issue involves a mixed question of law

and fact.  Mixed questions of law and fact are reviewed *de novo*; however,

the underlying factual findings are reviewed for clear error.  *Mathews v.

Chevron Corp.*, 362 F.3d 1172, 1180 (9th Cir. 2004).

2.     Whether the District Court committed error by imposing

criminal sanctions solely on the basis of its inherent authority to sanction

improper conduct.

Appellants objected to the District Court's imposition of criminal

sanctions pursuant to its inherent sanctioning authority in Steele's Response

to Show Cause Order (ER368 & ER369).  This issue involves a question of

law, which is reviewed *de novo*.  *Morales-Garcia v. Holder*, 567 F.3d 1058,

1061 (9th Cir. 2009).

3.     Whether the District Court committed error by imposing

criminal sanctions in a proceeding in which the Court:  (a) drew negative

inferences from the individual Appellants' invocation of their Fifth

Amendment rights; (b) appointed Defendant's counsel as the *de facto*

prosecutor; (c) denied Appellants the right to cross-examine witnesses; and,

(d) denied Appellants the right to call witnesses and put on a defense.

---

[2] Appellants' citation to pages in the Excerpts of the Record will be in the
format "ER__".

Appellants objected to the District Court's denial of their criminal procedural rights in Steele's Response to Show Cause Order (ER368-ER370). This issue involves a question of law, which is reviewed *de novo*. *Morales-Garcia v. Holder*, 567 F.3d 1058, 1061 (9th Cir. 2009).

4.    Whether the District Court committed error by including in its sanctions the amount of attorneys' fees incurred by Defendant in pursuing sanctions imposed under the District Court's inherent sanctioning authority.

Appellants had no reasonable opportunity to object to the District Court's award of attorneys' fees incurred by Defendant in pursuing sanctions because the District Court awarded such attorneys' fees in its Sanctions Order without any prior indication that it would allow such fees to be included in its award and was based upon a declaration of Defendant's counsel as to the costs and fees expended on the instant litigation, rather than on a formal petition for an award of fees. The issue of whether sanctions awarded under a District Court's inherent sanctioning authority may include attorneys' fees incurred in pursuing sanctions involves a question of law, which is reviewed *de novo*. *Morales-Garcia v. Holder*, 567 F.3d 1058, 1061 (9th Cir. 2009).

5.    Whether the District Court committed error by finding that, under the fee-shifting provision of the Copyright Act, 17 U.S.C. § 505,

4

Appellants were liable for attorneys' fees incurred by Defendant in defending the sanctions award on appeal.

Appellants objected to the District Court's inclusion of attorneys' fees incurred in defending these sanctions on appeal in Hansmeier's Emergency Motion to Reconsider (ER593 & ER594). This issue involves a question of law, which is reviewed *de novo*. *Morales-Garcia v. Holder*, 567 F.3d 1058, 1061 (9th Cir. 2009).

## PERTINENT STATUTORY PROVISIONS

### 17 U.S.C. § 505: Remedies for Infringement: Costs & Attorney's Fees

In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award reasonable attorney's fees to the prevailing party as part of the costs.

### Bankruptcy Act, 11 U.S.C. § 303(i)

**(i)** If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment—

**(1)**    against the petitioners and in favor of the debtor for—

**(A)** costs; or

5

**(B)** a reasonable attorney's fee; or

**(2)**      against any petitioner that filed the petition in bad faith, for—

**(A)** any damages proximately caused by such filing; or

**(B)** punitive damages.

## STATEMENT OF THE CASE

In this Appeal, Appellants ask this Court to vacate Orders entered by the District Court on May 6, 2013, and on June 11, 2013, that: impose punitive monetary and non-monetary sanctions on Appellants (ER19-ER29) and allow Defendant to recover attorneys' fees incurred in defending the sanctions award on appeal (ER32-ER34).

Both Orders arose in the context of a lawsuit filed on September 27, 2012 (Dkt. No. 12-08333 (C.D. Cal.)) (ER113), in which Ingenuity 13 claimed that an unknown Defendant had used the internet to download an adult film in which Ingenuity 13 owned a copyright. (ER113-ER129.) In its three-count Complaint, Ingenuity 13 alleged copyright infringement, contributory infringement and negligence by Defendant in allowing an IP address to be used in a manner that infringed Plaintiff's copyright. (*Id.*)

Following a discovery order that rendered it impossible for Ingenuity 13 to discover the true identity of the copyright infringer and, therefore, to

proceed with this litigation (ER146-ER148), Plaintiff voluntarily dismissed the case on January 28, 2013. (ER158-ER160.)

On February 7, 2013, the District Court, acting *sua sponte*, issued an Order directed at Ingenuity 13's counsel of record, Brett Gibbs ("Gibbs"), requiring him to show cause why he should not be sanctioned for allegedly: violating the District Court's discovery orders, failing to perform an adequate investigation as to the identify of two copyright infringers and presenting to the Court a copyright assignment that had allegedly been forged (ER1-ER11). In the sanctions proceedings, the District Court consolidated Case No. 8333 with four other copyright infringement cases in which Gibbs had represented Ingenuity 13 or AF Holdings (another holder of copyrights in adult videos). (ER12.)

After reviewing an affidavit and testimony by Gibbs stating that his actions were directed by others, the District Court expanded the target of its Show-Cause Order to include Ingenuity 13, AF Holdings, Prenda Law and the three individual Appellants, who had never appeared as counsel or parties in any of the consolidated cases. (ER16-ER18.)

On May 6, 2013, the District Court issued an Order that jointly and severally imposed what the Order characterized as "punitive" monetary sanctions on Gibbs and Appellants. (ER28.) In addition, the Sanctions

Order imposed a series of non-monetary sanctions imposed on Gibbs and the individual Appellants.  (ER28 & ER29.)

Hansmeier filed a timely Notice of Appeal on May 15, 2013. (ER377-ER404.)  The remaining Appellants (who are filing this brief) each filed a timely notice of appeal on May 17, 2013.  (ER467-ER496; ER405-ER435; ER506-ER536; ER537-ER566 & ER436-ER466.)

On May 23, 2013, Duffy filed an undertaking for a supersedeas bond equal to 125% of the value of the monetary sanctions (ER583-ER586) and an application with the District Court requesting, among other things, approval of the bond (ER574-ER582).

On June 6, 2013, the District Court entered an Order (ER587-ER595) that conditionally approved the initial supersedeas bond, but required, among other things, Appellants to post a second supersedeas bond of $135,333.66 (equal to Defendant's projected costs and attorneys' fees incurred in pursuing these sanctions on appeal).  (ER589.)

In addition, the June 6 Order required Appellants to, among other things:  permit Defendant's counsel to execute on the bond if any one of the parties sanctioned failed to successfully appeal the District Court's Sanctions Order; agree that the bond not be subject to a Bankruptcy Court's jurisdiction; and agree to the District Court's conditions.  (ER588 & ER589.)

On June 11, 2013, the District Court issue a slightly amended version of the June 6 Order (the "Bond Order").  (ER32-ER34.)

On June 12, 2013, Prenda Law filed a timely Notice of Appeal from the Bond Order.  (ER601-ER603.)  Appellants posted the second supersedeas bond on July 23, 2013.  (ER604-ER607.)

On October 17, 2013, Gibbs filed a motion with the District Court for an indicative ruling asking that the Sanctions Motion be vacated with respect to Gibbs.  (E613.)  On October 30, 2013, the District Court granted Gibbs' motion.  (*Id.*)  On November 13, 2013, this Court issued a limited remand of the case to the District Court in Appeal No. 13-55871 to allow the District Court to to consider Gibbs' motion to vacate the Sanctions Order.

On November 14, 2013, the District Court vacated the portion of the Sanctions Order imposing monetary sanctions on Gibbs, based on Gibbs' alleged disassociation from Prenda Law.  However, the Order, by its terms, did not vacate the non-monetary sanctions imposed by the District Court on Gibbs or the sanctions imposed on the other Appellants.  Gibbs has now asked this Court to dismiss Appeal No. 13-55871.  As of the time that Appellants filed the instant brief, Gibbs' motion is pending.

## STATEMENT OF FACTS

### The Underlying Litigation

This is an Appeal from the Sanctions Order entered by the District Court after the voluntary dismissal of the underlying litigation, which imposed both monetary and non-monetary sanctions against Appellants (E19-E29), and, the subsequent Bond Order, which required Appellants to post a supersedeas bond sufficient to cover Defendant's estimated costs and attorneys' fees incurred through this Appeal (in addition to a supersedeas bond valued at 125% of the value of the monetary sanctions imposed) (E32-E34.).

Both Orders arose in the context of a lawsuit brought by Plaintiff, Ingenuity 13, alleging, among other things, that an unknown internet user ("John Doe") had infringed Ingenuity 13's rights in an adult film by improperly downloading the film.  (ER113-ER129.)

Ingenuity 13 holds rights to a number of copyrighted works, including an adult video entitled "A Peek Behind the Scenes at a Show" (the "Film"). (ER114 & ER126.)  In the course of monitoring internet-based infringement of its copyrighted content (*i.e.*, unauthorized downloading of copyrighted works), Plaintiff's agents observed that the Film had been unlawfully

downloaded by an unknown internet user who was accessing the internet through Internet Protocol ("IP") address 108.13.119.253.  (ER114.)

On September 27, 2012, Ingenuity 13 filed a lawsuit in the District Court against the John Doe user of this IP address, alleging copyright infringement, contributory infringement and negligence.  (ER113-ER129.) Ingenuity 13 was represented solely by Gibbs.  (ER113.)  Gibbs had listed himself as Of Counsel to Prenda Law (ER113 & ER167); and, in affidavits and argument before the District Court, Gibbs was characterized as an independent contractor to Prenda Law.  (ER169 & ER204).

On October 8, 2012, Ingenuity 13 sought leave to conduct early discovery by issuing a subpoena to John Doe's Internet Service Provider in order to discover John Doe's identity.  (ER130-ER142.)  Leave was granted the following day (the "Early Discovery Order").  (ER143 & ER 144.)

However, on December 19, 2012, the instant case was reassigned to Judge Wright (ER145), who wasted no time in rescinding the Early Discovery Order.    The day after the reassignment, Judge Wright vacated the Early Discovery Order and ordered Ingenuity 13 to show cause why it should be allowed to proceed in discovering John Doe's identity.  (ER146-ER148.)  In his December 20 Order, Judge Wright required that Ingenuity

13 "cease its discovery efforts relating to or based on information obtained

through any abovementioned Rule 45 subpoenas". (ER146.)

In issuing this Order, the District Court stated that, while a subpoena

issued to the Internet Provider for IP Address 108.13.119.253 may yield the

identity of the subscriber for that IP Address, the Court required further

proof that it was the subscriber who had performed the illegal download,

rather than another individual who may have been using the subscriber's IP

address. (ER147.)

As a result of Judge Wright's Order, Ingenuity 13 had no way of

identifying the unknown infringer and, therefore, no way of proceeding with

the litigation.  Apparently aware that this Order placed Ingenuity 13 in an

impossible position in the litigation, Judge Wright proclaimed that it was his

"duty to protect the innocent citizens of this district from this sort of legal

shakedown, even though a copyright holder's rights may be infringed by a

few deviants." (ER147.)

Two days later, Ingenuity 13 filed a motion to disqualify Judge

Wright, arguing that his actions and comments called into question the

District Court's ability to act impartially.  This motion was denied. (ER149-

ER152.)  Having no way to proceed without knowing the identity of the

copyright infringer, on January 28, 2013, Ingenuity 13 voluntarily dismissed

the action in its entirety without prejudice pursuant to Fed. R. Civ. Proc. 41(a)(1).  (ER158-ER160.)

**The Order to Show Cause Proceeding against Brett Gibbs**

Ten days after the case was dismissed, on February 7, 2013, Judge Wright issued an Order to Show Cause, requiring Gibbs to appear before the District Court on March 11, 2013, to "justify his violations of Federal Rule of Civil Procedure 11 and Local Rule 83-3 . . . ."  (ER1-ER11.)  Although nominally issued in Case No. 8333, the body of the Order described conduct by Gibbs in the instant case and in four other copyright-infringement cases that had been consolidated for purposes of Judge Wright's Show-Cause Order (the "consolidated cases"[3]), in which Gibbs had represented Ingenuity 13 or AF Holdings, a company that also held rights in various adult videos. (ER12.)

Specifically, Judge Wright identified three categories of conduct that he considered sanctionable:

---

[3] The four cases that were consolidated with the instant case for purpose of the Show-Cause Order were:  *AF Holdings, LLC v. Doe*, No. 2:12-cv-6636-DW(JCx) (C.D. Cal. filed Aug. 1, 2012); *AF Holdings, LLC v. Doe*, No. 2:12-cv-6669-DW(JCx) (C.D. Cal. filed Aug. 2, 2012); *Ingenuity 13, LLC v. Doe*, No. 2:12-cv-6662-ODW(JCx) (C.D. Cal. filed Aug. 2, 2012); and *Ingenuity 13, LLC v. Doe*, No. 2:12-cv-6668-ODW(JCx) (C.D. Cal. filed Aug. 2, 2012).  (ER12.)  Where it is necessary to refer to individual cases, the cases will be referred to by the last four digits of the case number; *e.g.*, Case No. 2:12-cv-6636-DW(JCx) will be cited as Case No. 6636.

1. In Case Nos. 6636 and 6639, violating Judge Wright's Orders terminating early discovery by continuing to conduct discovery based upon subpoenas that had been issued prior to the termination;

2. In Case Nos. 6662 and 6668, identifying infringers of copyrighted adult videos "based on a snapshot of Internet activity, without conducting a reasonable inquiry"; and

3. In Case No. 8333, perpetrating a fraud on the District Court by filing a forged acceptance of a copyright assignment.

(ER9 & ER10.)

Morgan Pietz, attorney for the Defendant in the Case No. 8333, was appointed by Judge Wright to present evidence concerning Gibbs' alleged misconduct. (ER10.)

The Show-Cause Order concluded by listing the potential sanctions that the District Court might impose, including: "a monetary fine, incarceration, or other sanctions sufficient to deter future misconduct." (ER10 & ER11.)

In the weeks that ensued, Gibbs filed a brief and a supporting declaration (ER167–ER180) in response to the Show-Cause Order in which he defended his conduct by claiming, among other things, that he had received guidance and direction from "senior members" of the law firms that had employed him as Of Counsel. (ER168–ER171.)

Subsequently, the District Court ordered Gibbs to identify the "senior members" referenced in his brief and declaration. (ER12 & ER13.) Gibbs

responded by filing a second declaration in which he identified Appellants Steele and Hansmeier as the "senior members", while simultaneously admitting that neither had an ownership interest in the law firm in which Gibbs was then Of Counsel. (ER181–ER185.)

In response to Gibbs' filings, on March 5, 2013, the District Court ordered, among others, Minnesota citizen and resident, Hansmeier, Florida citizen and resident, Steele, and Illinois citizen and resident, Duffy, "to appear on March 11, 2013, at 1:30 p.m.". (ER14 & ER15.) None of the individual Appellants had been a party, filed an appearance as counsel nor had otherwise appeared before the District Court in any of the consolidated cases. (*See* ER35-ER129.)

The District Court required Gibbs to serve the March 5 Order on the individual Appellants by March 7, 2013, the Thursday before the Monday March 11 Hearing. (ER15.) However, the March 5 Order failed to specify the purpose for which these three individuals were ordered to appear. (ER14 & ER15.) Indeed, at the time that the District Court initially ordered the three individual Appellants to appear, the existing Show-Cause Order had not accused them of any sanctionable conduct. (ER1–ER11.)

After being made aware of the March 5 Order on March 7, 2013, the individual Appellants managed to retain counsel and, within 24 hours, filed

an *ex parte* motion asking the District Court to withdraw its March 5 Order requiring their appearance. (ER186 & ER187.) Specifically, the three objected, among other things, to the District Court's assertion of nationwide personal jurisdiction and to the lack of sufficient notice of the hearing. (*See id.*) The District Court did not rule on this motion prior to the March 11 Hearing.

**The March 11 Show Cause Hearing**

With only four calendar days (and only one business day's) notice of the hearing, and no notice of the charges that they faced, Steele, Hansmeier and Duffy, nonetheless, appeared through counsel at the March 11 Hearing and made themselves available by telephone. (ER189 & ER192–ER194.)

Pietz, acting in the role of *de facto* prosecutor appointed by the District Court, and Gibbs' counsel, presented testimony and/or documents regarding a broad range of topics, some of which addressed the three categories of sanctionable conduct identified in the Show-Cause Order. (ER213–ER258 & ER292–ER301.)

However, the District Court rebuffed the attempt by counsel for the individual Appellants to participate in the hearings. (ER192–ER194.) Upon learning that the individual Appellants were not physically present in the

16

courtroom, the District Court instructed individual Appellants' counsel to "have a seat" and would not permit counsel to complete her argument. (*Id.*)

Regarding two of the three categories of sanctionable conduct described in the Show-Cause Order, Pietz and/or Gibbs' counsel presented testimony or documents relating to: discovery conducted on behalf of AF Holdings after the District Court had terminated early discovery in two of the consolidated cases filed by Gibbs and deficiencies in the investigation performed by Gibbs before identifying the alleged copyright infringer in two of the consolidated cases that Gibbs had filed on behalf of Ingenuity 13. (*See* ER213–ER258 & ER292–ER301.)

However, there was a disconnect between the District Court's forgery allegations in the Show-Cause Order and the testimony presented at the March 11 Hearing. The Show-Cause Order contended that Gibbs and Appellants had fraudulently presented to the District Court a forged copyright acceptance in Case No. 8333. (ER10.) The allegation could not possibly have been accurate because Ingenuity 13 was the original holder of the copyright, and, consequently, had not acquired it through assignment. (ER126.) In fact, the person whose signature had allegedly been forged testified as to whether his signature had been forged with respect to other

copyright assignments in other cases, but was never asked about any alleged forgery in Case No. 8333.  (ER208–ER221.)[4]

In addition to the conduct that the Show-Cause Order had actually alleged to be sanctionable, testimony and/or documents were presented regarding:  Gibbs' failure to inform the District Court of related cases that he had filed (ER267–ER271); and his failure to inform the District Court of Prenda Law's alleged financial interest in either Ingenuity13 or AF Holdings (ER262 & ER264–ER267).

During his testimony, Gibbs attempted to deflect primary blame to Steele and Hansmeier.  Despite the fact that he had testified through affidavit that he was an independent contractor (ER169) and the fact that he alone had filed the five consolidated cases (ER35, ER56, ER74, ER92 & ER113), Gibbs testified that his conduct was directed by Steele and Hansmeier. (ER261 – ER267.)

Later in the hearing, upon questioning by the District Court, counsel informed Judge Wright that, while Steele, Hansmeier and Duffy were not physically present in the courtroom, they were available by telephone to

---

[4] In addition, the District Court did not indicate what possible motive Appellants would have to intentionally present a forged copyright assignment to the Court.  As the District Court itself stated in its Sanctions Order, "a recipient of a copyright assignment need not sign the document . . ."  (ER26.)  Thus, Appellants had absolutely nothing to gain by intentionally presenting a forged copyright assignment.

participate.  (ER207 & ER208.)  While Judge Wright stated that he might take them up on their offer to participate by telephone (ER208), he did not include them in the hearing.

### The Amended Show-Cause Order

On March 14, 2013, three days after the Show-Cause Hearing, Judge Wright issued an Order, amending the original Show-Cause Order (the "Amendment").  (ER16–ER18.)  In the Amendment, Judge Wright belatedly denied the individual Appellants' prior motion to withdraw the District Court's earlier March 5 Order requiring their appearance at the March 11th Hearing.  (ER16.)  In doing to, Judge Wright held that he had specific jurisdiction over these persons because of their alleged pecuniary interest and supposedly "clandestine" participation in the five consolidated cases. (*Id.*)  In addition, despite the fact that the individual Appellants had filed their Motion within 24 hours after first receiving notice of the March 5 Order to appear at the March 11 Hearing, Judge Wright made a point of observing that movants' "eleventh-hour filing exemplifi[ed] gamesmanship . . ." (*id.*)

Judge Wright's also amended the original Show-Cause Order to include possible sanctions against Steele, Hansmeier and Duffy, and ten

other persons or entities, ordering each to appear at a Show-Cause Hearing

on March 29, 2013, to explain why they should not be sanctioned for:

1. Their alleged participation, direction, and execution of the acts described in the Court's February 7, 2013 Order to Show Cause;

2. Failing to notify the Court of all parties that have a financial interest in the outcome of the litigation;

3. Defrauding  the  Court  by misrepresenting  the  nature and relationship of  the  individuals and entities involved in the five cases consolidated for purposes of the Show-Cause Order;

4. Steele's and Hansmeier's failure to file a *pro hac vice* appearance before  the  Court,  given  their  alleged  involvement  as  "senior attorneys" in the cases; and

5. Not appearing at the March 11 Show Cause Hearing.

(ER17 & ER18.)  Judge Wright again invited John Doe's attorney, Morgan

Pietz,  and  his  co-counsel,  Nicholas  Ranallo,  to  appear  at  the  hearing.

(ER18.)

### The April 2, 2013 Show-Cause Hearing

Each of the individual Appellants appeared before the District Court

at  the  Show-Cause  Hearing,  rescheduled  to  April  2,  2013.  (ER307  &

ER308.)  However, because the Show-Cause Order, as amended, provided

for criminal sanctions, including incarceration (ER10 & ER11), and because

the District Court had indicated an intent to require testimony that might

invade the attorney-client privilege, all three invoked their Fifth Amendment

privilege against compelled testimony.  (ER312–ER314.)

20

In response to their decision to exercise their Fifth Amendment privilege, Judge Wright denied counsel for the individual Appellants leave to present argument or otherwise to participate, and abruptly terminated the hearing.  (ER313-ER318.)   No testimony, evidence, or argument was allowed or presented at the hearing, which lasted approximately 12 minutes. (ER317–ER318.)

Gibbs had previously identified Mark Lutz ("Lutz") as the chief executive officer of both AF Holdings and Ingenuity 13.  (ER184 & ER265.) Lutz was present in the courtroom, had specifically been identified to the District Court as "present", (ER310) and was in a position to testify as to the persons or entities that owned AF Holdings and Ingenuity 13.  However, due to Judge Wright's abrupt termination of the hearing, counsel for the individual Appellants had no opportunity to examine Lutz.

Following the hearing, the three individual Appellants, and the other targets of the Amended Show-Cause Order, submitted substantial briefing, objecting to the procedures imposed by the District Court and the evidence presented by Pietz.  (*See* ER628-ER630.)

**The May 6, 2013 Sanctions Order**

On May 6, 2013, Judge Wright issued an Order sanctioning Gibbs, AF Holdings, Ingenuity 13, Prenda Law and the three individual Appellants. (ER19–ER29.)  Despite threatening incarceration in the Show-Cause Order (ER10 & ER11) and imposing punitive monetary sanctions (ER28), the District Court stated that the proceedings and sanctions were civil in nature, thereby allowing the Court to draw negative inferences against those who invoked their Fifth Amendment rights.  (ER21.)  In addition, the Sanctions Order ignored all of the evidentiary objections to the testimony and documents introduced at the March 11 Hearing and afterward.

As monetary sanctions, the District Court held the three entities and four individuals jointly and severally liable for:  (1) an award of attorneys' fees and costs totaling $40,659.86; and (2) "[a]s a punitive measure, the Court double[ed] this award, yielding $81,319.72."  (ER28.)

The District Court left no doubt that it had set monetary damages to discourage any appeal from the Order.  In explaining why he had calculated the punitive award in this manner, Judge Wright asserted that the monetary sanctions were "calculated to be just below the cost of an effective appeal." (*Id.*)

22

In addition, with respect to the three individuals, the District Court imposed further sanctions, including: referrals to state and federal bar organizations and disciplinary committees; referral to the United States Attorney for the Central District of California; referral to the Criminal Investigative Division of the Internal Revenue Service; and notification of "all judges before whom these attorneys have pending cases." (ER28 & ER29.)

In the Sanctions Order, the District Court noted its disappointment in its inability to identify justification for imposing further sanctions, stating: "Unfortunately, other than these specific instances of fraud, the Court cannot make more detailed findings of fraud." (ER26.)

Appellants Gibbs, Ingenuity 13, AF Holdings, Prenda Law, Steele, Hansmeier and Duffy filed timely Notices of Appeal during the period May 15, 2013, through May 18, 2013. (ER567-ER573, ER467-ER496, ER405-ER435, ER506-ER536, ER537-ER566, ER377-ER404 & ER436-ER466.)

**The Court's Requirement of a Second Supersedeas Bond**

On May 20, 2013, Prenda Law filed an application with the District Court requesting that the Sanctions Order be stayed pending resolution of the appeal (ER497-ER505). The District Court denied the application on May 21, 2013, and, thereafter, imposed a $1,000 per day, per respondent,

penalty for each day after May 20, 2013, that the respondents failed either to pay the sanction award or submit for approval a supersedeas bond in the amount of the court-ordered sanctions. (ER30 & ER31.)

On May 23, 2013, Duffy filed an undertaking for a supersedeas bond in the amount of $101,650, equal to 125% of the value of the monetary sanctions. (ER583-ER586.) In addition, Duffy filed an application with the District Court requesting approval of the bond and further requesting that the Sanctions Order be stayed pending resolution of the appeal. (ER574-ER582.)

Pietz opposed Duffy's motion (ER623), arguing that, under Fed. Rule App. Proc. 7, he was entitled to a bond that covered not only $5,000 in prospective appellate costs, but also $135,993.66 in prospective attorneys' fees for the appeal. Pietz also asked that several other conditions be imposed prior to approval of the original bond, including: permitting him to execute on the bond if any one respondent failed to successfully appeal the District Court's Sanctions Order; specifying that the bond not be subject to a Bankruptcy Court's jurisdiction; and requiring each Appellant to sign off on the bond and the extra conditions imposed by the District Court. (*Id.*)

The District Court signed Pietz's proposed order without permitting Duffy or Prenda Law an opportunity to respond to Pietz's legal arguments either by way of reply brief or oral argument. (ER32-ER34.) Further, the District Court ordered Prenda Law and the other bonded respondents to file acknowledgements of the validity of the conditions imposed by the court on each bond and to post a second bond in the amount of $135,993.66, finding that, under the fee-shifting provision of the Copyright Act, 17 U.S.C. § 505, the prevailing party in the copyright action is also entitled to receive attorneys' fees incurred in pursuing sanctions and defending those sanctions on appeal . (ER33.) The District Court also promised to impose further sanctions if the parties did not comply with the Order. (*Id.*) The undertaking for the second supersedeas bond in the amount of $135,933.66 was filed with the District Court on July 23, 2013. (ER604-ER607.)

Prenda Law filed a timely Notice of Appeal from the Bond Order on June 12, 2013. (ER601-ER603.)

## SUMMARY OF ARGUMENT

The District Court's sanctions were supposedly issued pursuant to the District Court's inherent sanctioning authority. However, under prevailing case law, the sanctions chosen by the District Court were improper for at least three reasons:

1.    The District Court's inherent sanctioning authority did not extend to persons, such as the individual Appellants, who had not appeared as parties or counsel in the consolidated cases, who were not (at the time of the Show-Cause Order) subject to any order by the District Court and who were not real parties in interest;

2.    The sanctions chosen by the District Court were criminal in nature and were imposed without the procedural safeguards required by federal law; and,

3.    The District Court, in its sanction award, improperly included punitive sanctions and attorneys' fees incurred by Defendant in pursuing the sanctions and defending the sanctions on appeal.

The District Court's inherent sanctioning authority does not extend to the three individual Appellants.  Under prevailing case law, the District Court's inherent sanctioning authority is limited to:  parties and their counsel, persons and entities that are subject to an existing court order and real parties in interest.  The individual Appellants did not fall into any of these categories.  None of the three appeared as parties or counsel in any of the five consolidated cases.  Further, the record on appeal is devoid of any information from which the District Court could reasonably infer that the individual Appellants were real parties in interest.  None of the three held an ownership interest in either of the two Plaintiffs in the five consolidated cases (*i.e.*, Ingenuity 13 or AF Holdings).

In addition, the District Court erred in its conclusion that its sanctions were civil in nature.  Under the case law of the Supreme Court and of this

Court, civil sanctions must be either compensatory or intended to coerce compliance with a court's directive.  Sanctions that are intended to punish are considered criminal sanctions.

There is no possibility that the sanctions entered by the District Court were intended to coerce compliance with a court directive.   The District Court's sanctions were issued after each of the five consolidated cases had been voluntarily dismissed.  Moreover, by setting the sanctions at 200% of Defendant's stated costs and attorneys' fees, the sanctions were not merely compensatory.  Indeed, the District Court itself characterized the sanctions as "punitive".

This Court has previously held that monetary sanctions set at 200% of a party's costs and attorneys' fees are criminal in nature, and can only be imposed through criminal contempt proceedings, which require the full panoply of procedural due process rights required in criminal cases, including: a prohibition against drawing negative inferences from the exercise of Fifth Amendment Rights; the right to an unbiased, disinterested prosecutor; the right of cross-examination; and, the right to call witnesses.

The procedures used by the District Court did not comply with these Constitutional requirements.  The District Court's factual findings were based, in large part, or in whole, on the individual Appellants' invocation of

their Fifth Amendment privileges.  The District Court appointed Defendant's counsel as the *de facto* prosecutor, who could not qualify as a disinterested prosecutor under federal case law.  Appellants were denied any right to cross-examine witnesses; and, Appellants were denied the right to call witnesses and put on a defense.  In short, while the District Court's punitive sanctions could only be imposed through criminal contempt proceedings, the procedures employed by the Court violated procedural due process requirements in criminal contempt proceedings.

Moreover, under its inherent sanctioning authority, the District Court lacked the authority to impose either punitive sanctions or sanctions that included Defendant's costs and attorneys' fees incurred in pursuing those sanctions or defending such sanctions on appeal.  The case law is crystal clear that a District Court, acting under its inherent sanctioning authority, cannot impose punitive monetary sanctions.  Moreover, the case law is equally clear that sanctions imposed under a District Court's inherent sanctioning authority cannot include the attorneys' fees incurred by the party in seeking sanctions, either at the District Court level or on appeal.  Thus, by requiring Appellants to post supersedeas bonds that guarantee Defendant's ability to recover attorneys' fees incurred in this appeal, the District Court's Bond Order constitutes error.

# ARGUMENT

## I. THE DISTRICT COURT'S INHERENT SANCTIONING AUTHORITY DID NOT EXTEND TO THE INDIVIDUAL APPELLANTS.

Under prevailing case law, the District Court's inherent sanctioning authority did not extend to the three individual Appellants.  The sole authority cited by the District Court for imposing sanctions on these individual Appellants was the Court's inherent sanctioning authority.  (ER24 & ER25.)  Under modern case law, a District Court's inherent sanctioning authority is limited to three classes of persons or entities:  parties and their counsel, persons who violate an existing court order and real parties in interest.  *Helmac Products Corp. v. Roth Plastics Corp.*, 150 F.R.D. 563, 565-66 (E.D. Mich. 1993).  The three individual Appellants do not fall within any of these categories.

To be sure, a District Court's inherent authority to sanction improper conduct extends beyond the parties and their counsel who have appeared before the Court.  Indeed, in the watershed case describing the scope of a District Court's inherent authority, *Chambers v. Nasco, Inc.*, 501 U.S. 32, 36-37 (1991), a portion of the sanctioned conduct occurred prior to the time that Chambers became a party or was subject to any order by the District Court.

However, a District Court's inherent authority to impose sanctions is not unlimited. *Am. Civil Liberties Union v. Holder,* 673 F.3d 245, 256 (4th Cir. 2011); *Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.,* 2 F.3d 1397, 1406-07 (5th Cir. 1993). In *Chambers* itself, the Supreme Court cautioned that the Court's inherent power "is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function" (501 U.S. at 42) and "must be exercised with restraint and discretion." (*Id.* at 45). *See also Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764 (1980).

In the seminal case of *Helmac Products Corp. v. Roth Plastics, Corp.*, *supra*, the court pioneered a two-part test to gauge whether a District Court's inherent sanctioning authority extends to an individual who is neither a litigant nor an attorney who has appeared in the case. In that case, the owner of the defendant corporation had ordered the destruction of relevant documents, thereby rendering it impossible to conduct a trial on his corporation's liability. However, the owner was not a party to the case and was not subject to any court order at the time that he directed the document destruction.

In finding that the court's inherent sanctioning authority extended to the owner of the defendant corporation, the court held that its "inherent

power to sanction [is limited] to those individuals [who] were either (1) parties, (2) subject to a court order, or (3) real parties in interest." 150 F.R.D. at 568. Finding that the owner of the defendant corporation was, for all practical purposes, the ==real party in interest,== the court imposed sanctions.

Since its development, the *Helmac* standard has been widely applied by federal courts in determining whether, and to what extent, a District Court's inherent sanctioning authority extends to a non-party and non-attorney (*i.e.*, an individual who has neither filed an appearance nor otherwise appeared before the court in the case as counsel).

Within the past two months, the test and principles underlying *Helmac* were echoed in *United States v. Henry*, 2013 U.S. Dist. LEXIS 133148 (E.D. Va.) at *108-09, in which, partially quoting *Helmac*, the court stated:

> Although the federal courts may certainly sanction disruptive or disobedient bad faith conduct, "the Court's power to sanction cannot possibly extend to everyone who interferes with litigation before the court. Otherwise the power to sanction would be so wide that it would be unenforceable."

*See also Anz Advanced Techs., LLC v. Bush Hog*, LLC, 2012 U.S. Dist. LEXIS 29534 (S.D. Ala.) at *34; *Bartos v. Pennsylvania*, 2010 U.S. Dist. LEXIS 43937 (M.D. Pa.) at *18; *Books Are Fun, Ltd. v. Rosenbrough*, 239 F.R.D. 532, 555 (S.D. Iowa 2007).

31

The prior decisions of this Court are in accord with the *Helmac* standard. In *Caldwell v. United Capital Corporation*, 77 F.3d 278 (9th Cir. 1996), this Court held that a District Court's inherent sanctioning authority extended to a person who had a controlling interest in the debtor and who, through the debtor, had implemented a fraud on the District Court. Such a result is consistent with *Helmac*'s extension of the District Court's inherent power to real parties in interest. However, diligent research has not shown a single case in which the District Court's inherent authority to sanction has been extended to persons who are neither parties, attorneys of record, persons subject to an existing court order or real parties in interest.

It is undisputed that none of the three individual Appellants appeared as parties or counsel in any of the five consolidated cases. (ER35, ER56, ER74, ER92 & ER113.) Further, none of the three were subject to any order of the District Court in any of the consolidated cases when the Sanctions Order was issued.

Under the *Helmac* standard, the District Court's inherent sanctioning authority can extend to these three individuals if and only if they were real parties in interest in at least one of the consolidated cases. Under the case law cited above, to be real parties in interest, an individual Appellant must

32

have a controlling ownership interest in either AF Holdings or Ingenuity 13, who were Plaintiffs in the consolidated cases.

There was no evidence from which the District Court could reasonably infer that any of the three individual Appellants had an ownership interest in either AF Holding or Ingenuity 13, much less a controlling interest. The District Court simply states, without any factual support or citation, that "the principles are the de facto owners and officers [of AF Holdings and Ingenuity 13]". (ER22.) With total respect for the District Court, there was not a shred of evidence supporting that conclusion, nor did the District Court cited any supporting evidence. (*Id.*)

The only witness who claimed to have any knowledge of Ingenuity 13 or AF Holdings was Gibbs. Nothing in Gibbs' testimony or affidavits could possibly be construed as suggesting that any of the three individual Appellants had an ownership interest of any kind in either Ingenuity 13 or in AF Holdings.[5] Further, there were no documents of any kind that lent

---

[5] Five months after the Notice of Appeal had been filed, Gibbs filed a motion with the District Court seeking an indicative ruling vacating the Sanction Order as to Gibbs. (ER613.) In his Motion and supporting Declaration, Gibbs for the first time alleges that the individual Appellants have a financial interest in Ingenuity 13 and AF Holdings. The other Appellants, each of which strongly denying the accuracy of that allegation, have had no opportunity to counter Gibbs' assertion. Moreover, the District Court could not have relied upon Gibbs' eleventh-hour "revelation", which

support to the District Court's conclusion that the individual Appellants are owners of either company.

Under the procedures employed in this case, it would be particularly unfair to infer, without any supporting evidence, that any of the individual Appellants had an ownership interest in AF Holdings or Ingenuity 13. The one person who was in a position to explain the ownership of both entities, Mark Lutz ("Lutz"), was physically present at the April 2 Hearing. (ER310.) Had the individual Appellants been permitted to examine Lutz, any question regarding the ownership of AF Holdings or Ingenuity 13 could have been established.

However, the Circuit Court terminated the hearing abruptly upon learning that the individual Appellants were invoking their Fifth Amendment rights. (ER317 & ER318.) In effect, the District Court impermissibly prevented the individual Appellants from introducing exculpatory testimony as a punishment for invoking their Fifth Amendment rights.

---

came long after this Appeal was noticed by each of Appellants (including Gibbs himself).

## II.  UNDER THIS COURT'S PRIOR PRECEDENT, A DISTRICT COURT'S INHERENT SANCTIONING AUTHORITY DOES NOT PERMIT THE IMPOSITION OF PUNITIVE SANCTIONS.

In its own words, the District Court's imposition of monetary sanctions that doubled Defendant's actual costs and attorneys' fees was intended "[a]s a punitive measure".  (ER 28.)  This Court's prior precedents hold that a District Court's inherent sanctioning authority is limited to sanctions necessary to compensate an opposing party for harm caused by improper conduct or to coerce compliance with an existing order.  However, the imposition of punitive sanctions can only be done pursuant to criminal contempt proceedings.

In a series of cases dating back to 2002, the Bankruptcy Panel of this Court has interpreted the Supreme Court's decision in *Chambers v. Nasco, Inc.*, *supra*, as limiting sanctions that may be imposed under a Court's inherent sanctioning authority to compensatory or coercive sanctions.  The Bankruptcy Panel of this Court first addressed this issue in *In re: DeVille*, 280 B.R. 483 (9th Cir. B.A.P. 2002).  In that case, the plaintiff had filed a lawsuit against a number of defendants in a state court action.  In order to delay the state court trial, defendants' counsel orchestrated a series of bankruptcy filings and notices of removal of the state court action to the bankruptcy court that halted the state court action on several occasions.  The

District Court found that the sole purpose of the bankruptcy filings was to delay prosecution of the state court claims; and, imposed sanctions on the defendant, citing, among other things, its inherent sanctioning authority. After finding that reasonable costs and attorneys' fees totaled $5,548.50, the court doubled the costs and attorneys' fees as a deterrent to future misconduct (as the District Court in the instant case did). 280 B.R. at 490-91.

In holding that the court's inherent sanctioning authority would not permit such an award, this Court stated:

> It is apparent from *Chambers* that "inherent authority" will not suffice to support such a "penalty" in this instance. The award in *Chambers* was purely compensatory. *The context of the Chambers rationale is that "inherent power" is not a manifestation of contempt power and may be determined without resort to contempt proceedings so long as the sanctions are compensatory. Id.,* 501 U.S. at 42-51. By implication, a penalty is not authorized as part of "inherent power" sanctioning authority and, if imposed as part of the court's "inherent power," must be done by way of contempt proceedings.

280 B.R. at 497-98 (emphasis added). *Accord In re Dyer*, 322 F.3d 1178, 1197 (9th Cir. 2003).

The holding in *DeVille* could not possibly be more on point. In the instant case, the District Court awarded attorneys' fees and costs of $40,659.86. In the District Court's own words, "[a]s a punitive measure, the

Court doubles this award, yielding $81,319.72." (ER28.)  This is precisely the same conduct that was expressly prohibited in *DeVille*.

Under the holdings in *DeVille* and *Dyer*, the District Court clearly exceeded its inherent sanctioning authority by doubling the award of compensatory costs and attorneys' fees.  Before doubling the award, it was incumbent upon the District Court to conduct criminal contempt proceedings, under which Appellants would have been entitled to all of the constitutional protections inherent in a criminal proceeding.

## III.   THE PROCEDURE USED BY THE DISTRICT COURT TO IMPOSE SANCTIONS VIOLATED PROCEDURAL DUE PROCESS REQUIREMENTS.

The portion of this Court's decision in *DeVille* quoted above specifically holds that a District Court may impose punitive sanctions only by conducting contempt proceedings.  280 B.R. at 497-98.  While the District Court did not characterize its two hearings (March 11, 2013 and April 2, 2013) as contempt proceedings, the type of sanctions imposed by the District Court could only be imposed through a criminal contempt proceeding.

Therefore, the key question is whether the District Court's procedures complied with requirements of procedural due process mandated in a criminal contempt proceeding.  As discussed below, the particular type of

criminal contempt proceeding required in order to impose the punitive sanctions contained in the Sanctions Order was an indirect criminal contempt proceeding. The case law is crystal clear that the District Court's procedures systematically violated no fewer than four safeguards mandated by procedural due process: the right to invoke the Fifth Amendment without incurring negative inferences; the right to an independent, impartial prosecutor; the right to cross-examine witnesses; and, the right to call witnesses and put on a defense.

### A. The Sanctions Imposed by the District Court Required a Proceeding for an Indirect Criminal Contempt.

Federal case law distinguishes between civil and criminal contempt proceedings. *Int'l Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 826–30 (1994). Within the category of criminal contempt proceedings, the case law recognizes a distinction between contemptuous conduct that occurs in the court's presence (direct contempt) and contemptuous conduct that occurs outside of the court's presence (indirect contempt). *Id.*, 512 U.S. at 826, n.2. Both Supreme Court case law and the prior precedents of this Court require that a party accused of an indirect criminal conduct be accorded the procedural due process rights required in criminal actions. *See, e.g.*, *F.J. Hanshaw Enters. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1139 (9th Cir. 2001).

## 1.   The sanctions imposed by the District Court required criminal contempt proceedings.

The prior decisions of this Court have provided a bright-line test to be used in determining whether the sanctions imposed by a court are civil or criminal.  A District Court's characterization of a contempt proceeding as civil or criminal is not dispositive.  *In re Rumaker*, 646 F.2d 870, 871 (5th Cir. 1980).   The distinction between a civil contempt and a criminal contempt lies in the purpose underlying the sanction.  *Koninklijke Philips Elecs., N.V. v. KXD Tech., Inc.*, 539 F.3d 1039, 1041-42 (9th Cir. 2008).

The purpose of civil contempt is to coerce the contemnor into compliance with an existing court order, or to compensate a party for the contemnor's improper conduct.  *United States v. Armstrong*, 781 F.2d 700, 703 (9th Cir. 1986).  The purpose of a criminal contempt is to punish.  *Id.* Where the sanctions imposed are quasi-remedial and quasi-criminal, the sanction is treated as a criminal sanction.  *Union Tool Co. v. Wilson*, 259 U.S. 107, 110 (1922); *In re Rumaker*, 646 F.2d at 872.

In the case of monetary sanctions, this Court has held that the sanction is civil if the amount of the sanction is calculated to be compensatory or it is intended to coerce compliance with a directive of the court.  In general, civil coercive sanctions can be avoided by complying with the court's directive. As this Court stated in *In re Dyer*:

> We recently explained the difference between civil sanctions
> and criminal sanctions: Civil penalties must either be
> compensatory or designed to coerce compliance. . . . In
> contrast, "a flat unconditional fine totaling even as little as $50"
> could be criminal "if the contemnor has no subsequent
> opportunity to reduce or avoid the fine through compliance,"
> and the fine is not compensatory. *Id. at 1138* (citation omitted).

322 F.3d at 1192. *Accord F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.*, 244 F.3d at 1137-38; *Int'l Union, United Mine Workers of America v. Bagwell*, 512 U.S. at 829.

Similarly, in the case of incarceration, the sanction is civil only if the contemnor can secure release by compliance with a required behavior. *Hicks v. Feiock*, 485 U.S. 624, 646 (1988). Where, however, the punishment is for a definite period of time, the contempt is regarded as criminal. *Id.*

In its Sanctions Order, the District Court characterized the proceedings under which it imposed sanctions as a civil proceeding. (ER21, n.3.) However, that characterization squarely, and unambiguously, contradicts the principles quoted above from *Dyer*, *Hanshaw*, *Hicks* and *United Mine Workers*.

At the time that the District Court issued its Sanctions Order on May 6, 2013 (ER19-ER29), each of the five consolidated cases had been voluntarily dismissed. (ER153-ER166.) There was no possibility that the

sanctions either threatened or imposed by the District Court were intended to coerce compliance with any court directive. Thus, when the District Court threatened incarceration in its Show-Cause Order (ER10 & ER11), there was nothing that any of the individual Appellants could do to secure their release through compliance with a court directive. Similarly, there was nothing that any of the Appellants could do to avoid a monetary sanction threatened in the Show-Cause Order. (*Id.*)

Further, the Sanctions Order clearly states that it was set at 200% of the amount needed to compensate the Plaintiff. (ER28.) In effect, the sanction was "a flat unconditional fine", which has been held to constitute a criminal sanction. *F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.*, 244 F.3d at 1137-38; *In re: DeVille*, 280 B.R. at 497-98.

It is clear from both the context in which these sanctions were imposed and from the very characterization of these sanctions in the Sanctions Order that the purpose of these sanctions was to punish, rather than to compensate or coerce compliance with a court directive. Under both Supreme Court case law and the prior decisions of the Ninth Circuit, these sanctions were criminal and could only be imposed after conducting criminal contempt proceedings.

## 2. The type of criminal contempt proceedings required in this case was a proceeding for an indirect criminal contempt.

As discussed above, the case law distinguishes between a direct criminal contempt, in which the conduct takes place in the presence of the court, and an indirect contempt, in which the conduct takes place outside of the presence of the court. *Int'l Union, United Mine Workers of America v. Bagwell*, 512 U.S. at 827. While direct criminal contempts can be penalized summarily in light of the court's substantial interest in maintaining order, greater procedural protections are afforded regarding sanctions for indirect contempts. *Id.* at 833.

The contempt alleged in the instant case is, of necessity, an indirect criminal contempt. The Appellants were not parties, and had never appeared before the District Court in any of the consolidated cases. (ER35, ER56, ER74, ER92 & ER113.) Thus, it is impossible that the alleged offending conduct could have occurred in the presence of the District Court.

## B. The Procedures Implemented by the District Court Violated Procedural Due Process Requirements.

Criminal contempt is a crime in the ordinary sense. *Bloom v. Illinois*, 391 U.S. 194, 201 (1968); and, criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings. *Hicks v. Feiock*, 485 U.S. at 632.

42

In *F.J. Hanshaw Enters. v. Emerald River Dev., Inc.*, 244 F.3d at 1139, this Court delineated the specific procedural rights inuring to a person or entity accused of an indirect criminal contempt, stating:

> .  .  .  .  .    An individual charged with an indirect criminal contempt is entitled to the right to be advised of the charges, *Young*, 481 U.S. at 794; the right to a disinterested prosecutor, *id*. at 808; the right to assistance of counsel, *Cooke v. United States*, 267 U.S. 517, 537, 69 L. Ed. 767, 45 S. Ct. 390 (1925); a presumption of innocence, *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 444, 55 L. Ed. 797, 31 S. Ct. 492 (1911); proof beyond a reasonable doubt, *id.*; the privilege against self-incrimination, *id.*; the right to cross-examine witnesses, *Davis v. Alaska*, 415 U.S. 308, 315-16, 39 L. Ed. 2d 347, 94 S. Ct. 1105 (1974); the opportunity to present a defense and call witnesses, *Cooke*, 267 U.S. at 537; and the right to a jury trial if the fine or sentence imposed will be serious, *Bagwell*, 512 U.S. at 837 n.5.

> We hold that when a court uses its inherent powers to impose sanctions that are criminal in nature, it must provide the same due process protections that would be available in a criminal contempt proceeding.

A review of the record on appeal demonstrates that the District Court erroneously concluded that its sanctions and proceedings were civil in nature, and, therefore, made no attempt to provide Appellants with any of the required criminal procedural safeguards described in *Hanshaw*.

1.      **The District Court's procedures violated procedural due process by drawing adverse inferences from the invocation of Fifth Amendment rights by the individual Appellants.**

The District Court made clear, both at the April 2 Hearing and in its Sanctions Order, that its findings were based in part on adverse inferences that it drew from the invocation of Fifth Amendment rights by the individual Appellants.

At the April 2, 2013 hearing, the District Court stated,

> I want to know if some of my conjecture is accurate. The only way I can find out is to have the principles [*sic*] here and answer those questions.
>
> Now, if you say he will not answer those questions, then I will draw whatever inferences I think are reasonable from the facts as I know them.

(ER313 & ER314.)

Further, the Sanctions Order makes clear that the District Court made good on its threat, stating:

> Based on the evidence presented on the papers and through sworn testimony, the Court *finds the following facts, including those based on adverse inferences drawn from Steele, Hansmeier, Duffy, and Van Den Hemel's blanket refusal to testify*.

(ER21, emphasis added.)   As justification for its inferences, the District Court further explained:

44

> Even if their refusal was based on the Fifth Amendment
> privilege against self-incrimination, the Court still may draw
> adverse inferences against them in this civil proceeding. *Baxter
> v. Palmigiano*, 425 U.S. 308, 318 (1976).

(ER21, n.3.)

The Supreme Court has made abundantly clear, on numerous occasions, that, in a criminal proceeding, a trier of fact is prohibited from drawing an inference of guilt from a defendant's invocation of his Fifth Amendment rights. *Griffin v. California*, 380 U.S. 609, 615 (1965). As the Court stated in *Ullmann v. United States*, 350 U.S. 422, 426 (1956):

> Too many, even those who should be better advised, view this
> privilege as a shelter for wrongdoers. They too readily assume
> that those who invoke it are either guilty of crime or commit
> perjury in claiming the privilege.

Rather, "[t]he privilege serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances." *Slochower v. Board of Higher Education*, 350 U.S. 551, 557-58 (1956); *accord Griffin*, 380 U.S. at 613.

The District Court attempted to justify its right to draw adverse inferences from the individual Appellants' invocation of Fifth Amendment rights by characterizing the sanctions proceedings as a civil proceeding. (ER21, n.3.) Indeed, the case upon which the District Court relied, *Baxter v. Palmigiano*, 425 U.S. 308 (1976), was a civil proceeding. However, as discussed in detail above, the sanctions imposed by the District Court could

only be imposed through a criminal contempt proceeding, in which the District Court is precluded from drawing adverse inferences based on the invocation of Fifth Amendment rights.

>     **2.      The District Court's procedures violated procedural due process requirements by appointing a prosecutor who was not impartial.**

A second major constitutional flaw in the procedures implemented by the District Court was its failure to appoint a disinterested prosecutor. In *Young v. United States ex rel. Vuitton Et Fils S.A.*, 481 U.S. 787, 812 (1987), the Court characterize this particular deficiency as "an error whose effects are pervasive. Such an appointment calls into question, and therefore requires scrutiny of, the conduct of an entire prosecution, rather than simply a discrete prosecutorial decision." Indeed, this breach of constitutional rights is so major that the Court went on to hold that it cannot constitute harmless error. *Id.* at 813-14.

There is absolutely no question that the District Court violated this requirement by appointing Defendant's counsel, Pietz, as the *de facto* prosecutor. In its February 7, 2013 Show-Cause Order, the District Court "invite[d]" Pietz "to present evidence concerning the conduct outlined in this order." (ER10.) With the sole exception of Gibbs, whom Pietz cross-examined, Pietz played the role of prosecutor, deciding on the witnesses who

testified, selecting the documents to be presented to the District Court and presenting oral argument in favor of sanctions. (ER213-ER260 & ER292-ER300.)

Pietz was also invited by the District Court to appear at the April 2 Hearing against Appellants. (ER18.) There, Pietz took his place with his co-counsel at the prosecutor's table, with several boxes of documents ready to levy against the Appellant. (ER307 & ER309.)

After the March 11 and April 2 Hearings, the District Court granted Pietz leave to file post-hearing submissions against Appellants. (*E.g.*, ER629 & ER630.) Ultimately, the vast majority of the District Court's award of attorneys' fees to Pietz was attributable to the extensive prosecutorial work he performed after the underlying copyright infringement action had been dismissed. (*See* ER331-ER336.)

The standard for determining whether a prosecutor is disinterested was established in *Young v. United States, supra*, in which the Supreme Court held that "counsel for a party that is the beneficiary of a court order may not be appointed to undertake contempt prosecutions for alleged violations of that order." 481 U.S. at 790, 809. "[S]uch an attorney is required by the very standards of the profession to serve two masters." *Id.* at 814.

Under this standard, Pietz is the antithesis of a disinterested prosecutor. Pietz's John Doe client was a direct beneficiary of the District Court's orders vacating early discovery in the consolidated cases. The termination of early discovery rendered it impossible to ascertain the identity of Pietz's client, necessitating dismissal of Case No. 8333 and the other consolidated cases. Further, the alleged violation of the early discovery orders in the consolidated cases was one of the District Court's bases for finding sanctionable conduct. (ER26.) Under the Supreme Court's standard in *Young v. United States*, Pietz was, by definition, "counsel for a party that is a beneficiary of a [allegedly violated] court order."

Further, a simple review of Pietz's website, "pietzlawfirm.com" reveals many statements and links that are inconsistent with any contention that he was a disinterested prosecutor. As an example, regarding the litigation involving Ingenuity 13, Pietz provided the following solicitation on his website:

> This summer, Prenda Law, Inc. and its attorneys John Steele and Brett Gibbs have been busy filing lawsuits in California on behalf of Ingenuity 13, LLC. Ingenuity 13 is the latest plaintiff that Prenda is using to orchestrate its national campaign to coerce copyright "settlements" from ISP subscribers who may or may not have actually downloaded any of plaintiff's movies…. If you have received a letter from your ISP regarding an Ingenuity 13 subpoenas, or if you have been contacted by an Ingenuity 13 representative directly, please contact The Pietz Law Firm.

(ER376A & ER376B.)

The District Court's appointment of Pietz as the prosecutor in what, of necessity, was (or should have been) a criminal contempt proceeding was a direct violation of procedural due process.

> **3.     The District Court's procedures violated procedural due process requirements by denying Appellants the ability to cross-examine witnesses.**

In *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974), the United States Supreme Court held that the Sixth Amendment requires that defendants in a criminal action be allowed to cross-examine opposing witnesses.    In explaining the importance of this right, the Court, quoting *Douglas v. Alabama*, 380 U.S. 415, 418 (1965), stated:   "Our cases construing the [confrontation] clause hold that a primary interest secured by it is the right of cross-examination."   In *F.J. Hanshaw Enters. v. Emerald River Dev., Inc.*, 244 F.3d at 1139, this Court confirmed that the right of cross-examination extends to indirect criminal contempt proceedings.

As discussed above, the District Court in this matter conducted two hearings, the March 11 and April 2 Hearings.   (*Supra* at 16-19 & 20-21.) The District Court only allowed testimony at the earlier hearing.   (*Id.*) While Appellants were represented by counsel at the March 11 Hearing, an examination of the transcript of that hearing demonstrates that the District

Court did not permit Appellants' counsel to participate, much less conduct cross-examination of the witnesses hand-picked by Pietz or of Appellants' principal accuser, Gibbs. (ER192–ER194.)

The effect of denying Appellants the right to cross-examine witnesses is particularly pernicious in this case. None of the individual Appellants appeared as counsel or parties in any of the consolidated cases. Every one of the three categories of sanctionable conduct identified by the District Court (ER24-ER26) was performed directly by Plaintiffs' attorney of record, Gibbs. The only nexus between Appellants and the sanctioned conduct was Gibbs' exculpatory (and inaccurate) testimony that his conduct was directed by Steele and Hansmeier. (ER183; ER261 – ER267.)

The weakness and implausibility of Gibbs' attempt to extricate himself from his own conduct is demonstrated by the fact that, while filing the consolidated cases as Of-Counsel to Prenda Law, he affirmatively represented that the two persons whom he accuses of directing his conduct had no any ownership interest in the law firm. (ER183.) Gibbs fails to explain how, as Of Counsel for Prenda Law and the attorney of record in each of the consolidated cases, he was answerable to two individuals who have no ownership interest in the law firm. Perhaps even more to the point, Gibbs made no claim whatsoever that the third individual Appellant, Duffy,

performed any supervision at all over Gibbs in the consolidated cases, or at any other time.  (ER264.)

Certainly, if Appellants were to be, in effect, convicted of criminal contempt on the basis of Gibbs' testimony, they had a right to challenge that testimony by cross-examining Gibbs.  Failure to accord Appellants that right was clear error.  *Douglas v. Alabama*, *supra*.

Moreover, it was also critical that Appellants' counsel be given the right to cross-examine Alan Cooper (ER208-ER223), whose testimony was the sole basis for the District Court's conclusion that Appellants and others had perpetrated a fraud on the Court by submitting acceptances of copyright assignments containing Cooper's forged signature.  (*Id.*)  Appellants should have been given the opportunity to examine Cooper with respect to his involvement with Ingenuity 13 and AF Holdings and whether the individual Appellants had any involvement whatsoever with respect to the allegedly forged assignment-acceptances.

In this case, the District Court's imposition of punitive (and thereby criminal) sanctions against Appellants without allowing the right of cross-examination is precisely what both the United States Supreme Court and the prior decisions of this Court have forbidden.  *Pointer v. Texas*, 380 U.S. 400, 404 (1965); *F.J. Hanshaw Enters. v. Emerald River Dev., Inc.*, *supra*.

4.    **The District Court's procedures violated procedural due process requirements by denying Appellants the ability to present a defense and call witnesses.**

In addition to preventing Appellants from cross-examining witnesses, the District Court's procedures also prevented Appellants' counsel from calling witnesses and putting on a defense. The three individual Appellants were present at the April 2 Hearing. (ER309 & ER310.) As emphasized above, upon learning that each of these individuals were invoking their rights under the Fifth Amendment, the District Court abruptly terminated the hearing and refused to hear further argument from Appellants' counsel. (ER311-ER318.)

The termination of the hearing effectively cut-off Appellants' ability to present testimony from other witnesses. This was particularly important because Mark Lutz, whom Gibbs had identified as the chief executive officer of both Ingenuity 13 and AF Holdings (ER184), was present at the April 2 Hearing pursuant to the District Court's amended Show-Cause Order. (ER17.) Indeed, Lutz was identified to the District Court as being present at that hearing. (ER310.)

Lutz was in a position to explain the ownership of Ingenuity 13 and AF Holdings and (contrary to the District Court's findings (ER22)) to demonstrate that none of the individual Appellants had an ownership interest

in, or control of, either entity. That definitive proof would have conclusively established that the District Court's inherent sanctioning authority did not extend to the individual Appellants.

The opportunity to present a defense and call witnesses has long been held to be a fundamental requirement of procedural due process in connection with indirect criminal contempt proceedings (*Cooke v. United States*, 267 U.S. 517, 537 (1925)) and has been explicitly endorsed by this Court. *F.J. Hanshaw Enters. v. Emerald River Dev., Inc.*, 244 F.3d at 1139. As with the denial of cross-examination, the District Court's denial of Appellants' right to present a defense by its sudden termination of the April 2 Hearing constitutes error.

## IV. THE DISTRICT COURT COMMITTED CLEAR ERROR IN ALLOWING DEFENDANT TO RECOVER ATTORNEYS' FEES INCURRED IN PURSUING POST-DISMISSAL SANCTIONS AND IN REQUIRING APPELLANTS TO POST SUPERSEDEAS BONDS THAT, AMONG OTHER THINGS, INSURED DEFENDANT'S ABILITY TO RECOVER ATTORNEYS' FEES INCURRED IN DEFENDING THESE SANCTIONS ON APPEAL.

Of the $40,659.86 in costs and attorneys' fees awarded by the District Court, $21,090 was expended in connection with the post-dismissal sanctions hearings mandated by the District Court. (ER331-ER336.) Under this Court's decision in *Orange Blossom Limited Partnership v. Southern California Sunbelt Developers, Inc.*, 608 F.3d 456, 466-67 (9th Cir. 2010), a

monetary sanction issued pursuant to a District Court's inherent sanctioning authority cannot include attorneys' fees incurred in pursuing those sanctions. Thus, the District Court's inclusion of such attorneys' fees in its sanctions award was clearly erroneous.

In *Lockary v. Kayfetz*, 974 F.2d 1166, 1177-78 (9th Cir. 1992), this Court held the attorneys' fees generated by counsel in pursuing sanctions issued pursuant to both Fed. Rule Civ. Pro. 11 and the District Court's inherent sanctioning authority are not properly included in the sanctions award. While Rule 11 was subsequently amended to allow such attorneys' fees[6], in *Orange Blossom Limited Partnership v. Southern California Sunbelt Developers, Inc.*, 608 F.3d at 466-67 (9th Cir. 2010), this Court reiterated that sanctions issued pursuant to a court's inherent sanctioning authority cannot include attorneys' fees incurred in pursuing such sanctions.

The decision in *Orange Blossom Limited Partnership* is directly on point. In that case, 13 entities filed involuntary bankruptcy petitions against two alleged debtors. After the petitions were dismissed, the alleged debtors

---

[6] *See Margolis v. Ryan*, 140 F.3d 850, 854-55 (9th Cir. 1998), confirming that the portion of *Lockary* dealing with Rule 11 sanctions was overruled by the 1993 Amendments to Rule 11. However, in *Orange Blossom Limited Partnership*, this Court stated that *Margolis* did not overrule *Lockary* with respect to the prohibition against including such attorneys' fees in sanctions issued under the District Court's inherent authority. *Orange Blossom Limited Partnership v. Southern California Sunbelt Developers, Inc.*, 608 F.3d at 467, n.6.

filed motions against the petitioning creditors for costs, attorney's fees and punitive damages under § 303(i) of the Bankruptcy Act, 11 U.S.C. § 303(i). The Court found that 11 U.S.C. § 303(i) (like the copyright law involved in each of the consolidated cases) is a fee shifting provision that allows recovery of attorneys' fees by the prevailing party.   608 F.3d at 461-63. The Court even found that the debtors were entitled to attorneys' fees incurred in pursuing their claims for attorney's fees and damages under § 303. *Id.* at 463-65.

However, the Court drew the line at allowing attorneys' fees incurred in pursuing sanctions issued under the court's inherent authority.  Citing to *Lockary*, this Court held that, while the fee shifting provision allowed recovery of attorneys' fees incurred in the substantive underlying litigation, it had no applicability to a post-dismissal motion for sanctions under the court's inherent authority.  608 F.3d at 466-67.

The holding in *Orange Blossom Limited Partnership* is dispositive of the issue in this case.  The fee shifting provision of the copyright law permits the prevailing party to recover attorneys' fees incurred in pursuing or defending the copyright claim.  However, under *Orange Blossom Limited Partnership*, that provision is wholly inapplicable to attorneys' fees incurred

in pursuing post-dismissal sanctions imposed under the court's inherent authority.

A moment's reflection reveals the practical rationale for the decision in *Orange Blossom Limited Partnership*. If a fee-shifting provision permitted the prevailing party in the substantive phase of the case to recover attorneys' fees in both the substantive litigation and in subsequent sanctions motions, the prevailing party would have every incentive to file a sanctions motion regardless of the merits. Under such an illogical procedure, a party that succeeded in defeating a sanctions motion would, nonetheless, be responsible for the attorneys' fees incurred by the party that filed the meritless motion. Such a rule would encourage sanctions motions in virtually every case involving a fee-shifting provision.

The District Court committed further error by holding that Defendant was entitled to recover attorneys' fees incurred in defending these sanctions on appeal and requiring Appellants to post a second supersedeas bond sufficient to cover those projected attorneys' fees. (ER33.) Citing to *Azizian v. Federated Dep't Stores, Inc.*, 499 F.3d 950 (9th Cir. 2007), the District Court reasoned that the fee-shifting provision of the Copyright Act, 17 U.S.C. § 505, extended to attorneys' fees incurred by a party seeking sanctions. (*Id.*)

Even ignoring the fact that *Azizian* was not a copyright case, it has nothing to do with Defendant's right to recover attorneys' fees on this appeal. The issue regarding this appeal is whether the fee-shifting provision in the Copyright Act, 17 U.S.C. § 505, applies to attorneys' fees incurred in pursuing sanctions or defending sanctions on appeal. That issue was not addressed in *Azizian*. It was, however, addressed in both *Lockary v. Kayfetz*, *supra*, and in *Orange Blossom Limited Partnership*.

As discussed above, *Orange Blossom Limited Partnership* definitively holds that a fee-shifting provision does not allow a prevailing party in the substantive phase of a case to also recover attorneys' fees incurred in pursuing sanctions. That holding would bar Defendant's recovery of attorneys' fees incurred in pursuing sanctions before both the District Court and before this Court.

However, in *Lockary*, this Court discussed an additional reason why Defendant cannot recover attorneys' fees incurred in this appeal. In that case, this Court held that attorney's fees incurred in defending a sanctions award on appeal are not directly caused by the conduct of the sanctioned party, but rather, by the District Court's sanction. Quoting the United States Supreme Court's decision in *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 407 (1990), this Court stated:

57

> If the district court imposes *Rule 11* sanctions on the plaintiff, and the plaintiff appeals, the expenses incurred in defending the award on appeal are directly caused by the district court's sanction and the appeal of that sanction, not by the plaintiff's initial filing in district court.

974 F.2d at 1178.  This holding was reaffirmed in *Orange Blossom Limited Partnership*, 608 F.3d at 466-67.  Thus, under no circumstances would Defendant be permitted to recover attorneys' fees incurred in this appeal.

Accordingly, the District Court's Bond Order was clearly erroneous.

## V.   IF THIS COURT DECIDES THAT IT IS APPROPRIATE TO REMAND THIS CASE FOR FURTHER PROCEEDINGS, APPELLANTS RESPECTFULLY ASK THAT THE CASE BE TRANSFERRED TO A DIFFERENT DISTRICT COURT JUDGE.

In the event that this Court remands this case to the District Court, Appellants very respectfully ask the Court to remand the case with instructions that it be transferred to a different District Court Judge.  In making this request, Appellants are aware that, under this Court's prior precedents, a case is remanded to a different judge "only in unusual circumstances or when required to preserve the interests of justice." *United States v. Wolf Child*, 699 F.3d 1082, 1102 (9th Cir. 2012).

However, with total respect for Judge Wright, and without any intent to question his motives or integrity, the outward appearances of bias in this case are very similar to those in this Court's very recent decision in *Inst. of*

*Cetacean Research v. Sea Shepherd Conservation Soc'y*, 725 F.3d 940, 947-48 (9th Cir. 2013), in which this Court remanded with instructions that the case be transferred to a different District Court Judge.

In *Cetacean Research*, after reversing the District Court's denial of a preliminary injunction, this Court remanded the case with instructions that it be reassigned to a different District Court Judge, stating:

> Panels have broad discretion to reassign cases on remand when they feel justice or its appearance requires it.  The district judge has expressed strong and erroneous views on the merits of this high profile case.  Without ourselves reaching any determination as to his ability to proceed impartially or impugning his integrity, to preserve the appearance of justice, we conclude reassignment is appropriate.  The appearance of justice would be served if the case were transferred to another district judge, drawn at random, and we so order in accordance with the standing orders of the Western District of Washington.

(725 F.3d 940, 947-48, citations omitted.)

There are strong parallels between the instant case and *Cetacean Research*.  The instant case, like *Cetacean Research*, has been well-publicized.  Moreover, the District Court Judge has expressed very strong, negative views about the Appellants, particularly the three individual Appellants.

One day after Case No. 8333 was assigned to him, Judge Wright expressed extreme negative views on the merits of litigation designed to enforce copyrights for adult films, characterizing Ingenuity 13's effort to

enforce its copyright as a "legal shakedown" and stating that it was his "duty to protect the innocent citizens of this district . . . even though a copyright holder's rights may be infringed by a few deviants." (ER147.)  It should be emphasized that this statement was made months before the District Court had even commenced its sanctions investigation.

In addition, the District Court has described the three as "attorneys with shattered law practices". (ER21.)  Without any investigation into the merits of the copyright infringement claims, the District Court has characterized the consolidated lawsuits as a use of the copyright law to compensate "starving attorneys in this electronic-media era to plunder the citizenry". (ER20.)  The Court's overt animosity toward the three attorneys, who have never appeared in any of the cases before Judge Wright, was graphically highlighted in the District Court's assertion that the individual Appellants "suffered from a form of moral turpitude unbecoming of an officer of the court" (ER28); and, has even speculated that Appellants will hide assets to avoid paying sanctions (ER27).

The District Court's apparent naked hostility toward Appellants is further demonstrated in the breadth of sanctions imposed.  In addition to imposing "punitive" monetary sanctions (ER28), the District Court has stated that it intends to notify the local and federal bars in which the

individual Appellants practice, refer the matter to the U.S. Attorney for the Central District of California, contact the Criminal Division of the Internal Revenue Service and notify all of the judges before whom these attorneys have pending cases.  (ER28 & ER29.)  Moreover, the District Court expressed disappointment in its inability to identify justification for imposing further sanctions, stating:  "Unfortunately, other than these specific instances of fraud, the Court cannot make more detailed findings of fraud."  (ER26.)  Indeed, the vast majority of the Sanctions Order is devoted to the District Court's open objections of using the copyright laws to protect Ingenuity 13 and AF Holdings' rights in adult films, which are wholly unrelated to the three categories of conduct that were identified as sanctionable.  (ER19-ER29.)

Finally, if the District Court's Sanctions Order is taken at its word, the monetary sanctions were set to discourage Appellants from appealing the Sanctions Order.  The District Court specifically stated that its monetary sanctions were "calculated to be just below the cost of an effective appeal."  (ER28, n.5.)

Thus, in the event that this Court deems a remand of this case for further proceedings to be necessary, the above-cited examples of hostility, coupled with procedural defects in the process used below, give at least the

appearance that Appellants will not receive an impartial hearing on remand and argue strongly for reassignment to a different District Court Judge.

## **CONCLUSION**

As discussed in detail above, the District Court committed reversible error by:  extending its inherent sanctioning authority to individuals who were not subject to that authority; imposing criminal sanctions without affording Appellants the protections required by procedural due process in criminal cases; improperly calculating the monetary sanctions imposed by including attorneys' fees incurred in pursuing such sanctions; and, committing further error by requiring Appellants to procure supersedeas bonds that, among other costs, were calculated to reimburse Defendant for attorneys' fees incurred in defending these sanctions on appeal.

For each of these reasons, Appellants respectfully ask this Court to vacate the District Court's Sanctions Order, entered on May 6, 2013, and its Bond Order, entered on June 11, 2013.

Alternatively, if this Court determines that any further proceedings are necessary, due to the appearance of bias suggested by the District Court's strong, and often gratuitous, statements in its various Orders and at the two hearings conducted, Appellants respectfully ask that this case be reassigned to a different District Court Judge.

Dated:  November 18, 2013          Respectfully submitted,

VOELKER LITIGATION GROUP
Daniel J. Voelker, Esq.


By:  /s/Daniel J. Voelker_____
Daniel J. Voelker
Attorney for Appellants:  Ingenuity 13, LLC;  AF Holdings, LLC; Prenda Law, Inc.; Paul Duffy, Esq.; Paul Hansmeier, Esq.; and John Steele, Esq.

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, there are no known pending cases in this Court which Appellants deem related to the cases that have been consolidated in this appeal.

Dated:  November 18, 2013          Respectfully submitted,

VOELKER LITIGATION GROUP
Daniel J. Voelker, Esq.


By:  /s/Daniel J. Voelker_____
Daniel J. Voelker
Attorney for Appellants:  Ingenuity 13,
LLC;  AF Holdings, LLC; Prenda Law, Inc.;
Paul Duffy, Esq.; Paul Hansmeier, Esq.; and
John Steele, Esq.

## CERTIFICATE OF COMPLIANCE

I certify that, in accordance with Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, Appellants' Opening Brief is proportionally spaced and has a typeface of 14 points.  According to the word-count feature in Microsoft Word software used to prepare this brief, it contains 13,166 words, including footnotes, and is double spaced.  This brief, therefore, complies with the 14,000 word type-volume limit established by Fed. R. App. P. 32(a)(7)(B).

Dated:  November 18, 2013          Respectfully submitted,

VOELKER LITIGATION GROUP
Daniel J. Voelker, Esq.


By:  /s/Daniel J. Voelker_____
Daniel J. Voelker
Attorney for Appellants:  Ingenuity 13, LLC;  AF Holdings, LLC; Prenda Law, Inc.; Paul Duffy, Esq.; Paul Hansmeier, Esq.; and John Steele, Esq.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 18, 2013.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: November 18, 2013          /s/Daniel J. Voelker_____
                                                        Daniel J. Voelker

## BOOTH SWEET LLP

32R Essex Street  Cambridge, MA 02139
T: 617.250.8602  |  F: 617.250.8883  |  www.boothsweet.com

## *RULE 408 SETTLEMENT CORRESPONDENCE*

October 27, 2016

Matthew Swanson
Fuller, Seaver, Swanson & Kelsch, P.A.
Portland Corporate Center
12400 Portland Avenue South, Suite 132
Burnsville, MN 55337

RE:    Paul Hansmeier/BKY 15-42460
       AF Holdings, LLC v. Chowdhury/12-cv-12105-IT

Matt:

I understand your argument, but you have to understand our client's.

There is no dispute that Hansmeier and AF Holdings are the same entity. The Ninth Circuit held as much in *Ingenuity 13*. More so, Hansmeier "unconditionally admits" that he, Steele, and Duffy instituted and brought AF's lawsuits nationwide. See Stipulation for Discipline ¶ 4, *In re Paul Robert Hansmeier*, File No. A5-1885 (Minn. July 1, 2016); Petition for Disciplinary Action ¶¶ 1-8, *id.* (Minn. Oct. 28, 2015). The Minnesota Supreme Court has entered a final order in the disciplinary action against Hansmeier based on the stipulation in which he admitted his controlling role in AF and Prenda Law. Order, *id.* (Minn. Sept. 12, 2016).

Here, Mr. Chowdhury was accused by Hansmeier/AF of something he didn't do and forced to defend himself in meritless litigation. And when he did defend himself, Hansmeier placed Chowdhury's name on Prenda's website, defaming him as "proven guilty"; a "criminal"; etc.

At the time of the bankruptcy, Chowdhury held a valid judgment, certified by the District Court of Massachusetts, then domesticated in Minnesota and placed as a lien on Hansmeier's property.

Hansmeier acknowledged he was a party to the proceedings in his Statement of Financial Affairs, also stating he was appealing the decision. Knowing of the appeal, the bankruptcy court and the trustee had an opportunity to evaluate the estate's interest, if any, in the litigation, found none and signed off on the satisfaction of the judgment.

That was almost a year ago, and now Chowdhury is being asked to return the judgment or face another lawsuit.

You say "it would be inequitable to the creditors … to allow your client to retain funds obtained through a vacated judgment", but isn't Chowdhury a creditor deserving of equity as well?

I haven't seen anything exactly on point that calls for restitution in a case such as this. The cases I have seen deal with a judgment that has been **reversed**. Here, the judgment has been **vacated** to comply with procedure. More importantly, the uncontested valid judgment against AF still stands. And herein lies the rub.

Chowdhury is moving to substitute Hansmeier as a counterdefendant pursuant to Rule 25(c). Under the applicable rule of civil procedure, if granted, Hansmeier's substitution relates back to the judgment against AF. Meaning if Chowdhury complies with the request for restitution, and is later successful in his motion for substitution, he would then have a claim against the estate.

Rather than continue to go in circles, here's what we propose.

1. If the trustee/estate assents to or joins our motion to lift the stay in this matter, we can resolve it in Massachusetts. If we're unable to attach liability to Hansmeier, then restitution is proper and you won't have wasted any of your time in litigation.

OR

2. The trustee/estate and Chowdhury file a joint motion to have the bankruptcy court decide whether or not Hansmeier is liable for any judgments against AF, Prenda, etc.

Let me know when you'd like to schedule a time to talk.

Regards,
Jason

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

---

In re:                                                    Chapter 7

PAUL HANSMEIER,                                           No. 15-42460

     Debtor.

---

**UNSWORN CERTIFICATE OF SERVICE**

---

I hereby certify that on November 25, 2017, I caused the following documents:

***-Memorandum of Law in Opposition of the Trustee's Motion for Stay Relief***
***-Declaration of Jason E. Sweet***
***-Order*** *(proposed)*

to be filed electronically with the Clerk of Court through ECF, and that the above document will be delivered by automatic e-mail notification pursuant to ECF and this constitutes service or notice pursuant to Local Rule 9006-1(a).


Dated: November 25, 2017

Respectfully submitted,

/e/ Jason E. Sweet
Jason E. Sweet

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

_____

In re:                                                    Chapter 7

PAUL HANSMEIER,                                           No. 15-42460

      Debtor.

_____

**ORDER**

_____

      This case is before the court on the Trustee's motion for an order annulling the automatic stay under 11 U.S.C. § 362(d)(1) in order to ratify post-petition judicial decisions entered by the United States Court of Appeals for the First Circuit and the United States District Court for the District of Massachusetts.

      Based on the record, the court finds that retroactive relief from the stay under 11 U.S.C. § 362(d) is not warranted.

**IT IS ORDERED:**

1.    The Trustee's motion for an order annulling the automatic stay under 11 U.S.C. § 362(d)(1) is DENIED.

2.    Notwithstanding Fed. R. Bankr. P. 4001(a)(3), this order is effective immediately.

Dated: _____

 

                                      _____

                                      Kathleen H. Sandberg
                                      United States Bankruptcy Judge